**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Joyce E. Schmelzer, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:18-cv-01253 |
| v. | ) | |
| | ) | |
| Animal Wellness Center of Monee, LLC, | ) | The Honorable Sharon Coleman |
| Lynlee Wessels-Marhanka and | ) | |
| Scott Marhanka | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS MEMORANDUM OF LAW**
**IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Defendant, Animal Wellness Center of Monee, LLC. ("AWC" or "Defendant"), through its undersigned attorneys, submits this Memorandum of Law in support of its Motion for Summary Judgment:

## I.    BACKGROUND

Plaintiff Joyce E. Schmelzer ("Schmelzer" or "Plaintiff") filed a two count, Third Amended Complaint seeking relief under §510 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1101 et seq. and under 26 U.S.C. §7434 (Tax Code).

The Animal Wellness Center of Monee ("AWC") is an animal hospital. The majority owner of AWC is Lynlee Wessels-Marhanka ("Lynlee"), where her husband, Scott Marhanka ("Scott") and her father, Edward Wessels, own less than 10%.  AWC established an IRA for its employees, which was active in 2016 and 2017. (Stmt. of Facts ¶¶4 and 7). AWC hired Schmelzer in September 2004, to perform duties as a receptionist and then later as an office manager. (Stmt. of Facts ¶ 3).

In July 2016, AWC started to go through some financial difficulties, where Edward Wessels, attempted to balance the lack of cash flow by holding paying contributions into the employees IRA.  (Stmt. of Facts ¶¶17, 20, 21, and 22).  The participants of the IRA plan included, Schmelzer, Lynlee, and Scott. (Stmt. of Fact ¶ 66).  This resulted in the employees' payroll checks deducting the IRA amount from their paychecks, but the contributions were not deposited into the participants IRA accounts. (Stmt. of Facts ¶19).  Lynlee and Scott did not learn of this until May of 2017, when Scott took over the books for the company. (Stmt. of Facts ¶¶19 and 23).

It was only when Scott took over the financial aspect of the business that they learned that the contributions were not being deposited.  (Stmt. of Facts ¶¶ 23 and 24).  As a result, Lynlee and Scott applied for a HELOC, in order to fund all of the IRA accounts. (Stmt. of Facts ¶25).  As the loan process moved forward, Scott received, but did not open his IRA statement. (Stmt. of Facts ¶¶25 and 26).  When he received his statement, Scott informed Lynlee that they needed to explain to the participants what occurred and how AWC has already started to apply for loans to repay the amounts, including the 3% match, and any lost interest. (Stmt. of Facts ¶¶27 and 29).  As a result, Scott informed the participants that AWC would have a meeting on July 8, 2019 to discuss the IRA accounts.  (Stmt. of Facts ¶29).  On July 8, 2017, AWC informed the participants who attended the meeting what occurred and how they were seeking loans to repay the money to the IRA accounts. (Stmt. of Facts ¶30).  Understandably, Schmelzer was agitated and angry, when she began to call the owners "liars" and "thieves." (Stmt. of Facts ¶31).

On July 27, 2017, the U.S. DOL sent an email to AWC and attached a letter regarding the complaint that was filed regarding the IRA accounts.  (Stmt. of Facts ¶¶14 and 35).  On that same day, Scott received a call from investigator Nicole Lenzy and explained that they were

already in the process of taking loans out to pay for the non-deposited IRA funds. (Stmt. of Facts ¶36). Shortly thereafter, all of the participants, except Lynlee and Scott, were paid the back contributions, 3% matching, and interest. (Stmt. of Facts ¶37). The Defendants did not know who filed a complaint with the U.S. DOL until, they received a text message from Schmelzer after she left AWC stating "FIY, Dept. of Labor has my name, but we all called and they didn't need multiple names." (Stmt. of Facts ¶¶38, 50, 51, and 52). Before that text message, Scott and Lynlee believed that a former employee, Jessica, file the complaint with the DOL, because another co-worker told them that it was Jessica. (Stmt. of Facts ¶51). The first time Scott and Lynlee learned who file the complaint with the U.S. DOL was when they received the above referenced text from Schmelzer on July 31, 2017. (Stmt. of Facts ¶52).

## II.     STANDARD OF REVIEW FOR FED. R. CIV. 56

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FRCP 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *see also Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 458 (7th Cir. 1999). A plaintiff opposing summary judgment must present admissible evidence showing a genuine issue of material fact; a scintilla of evidence, or evidence that is not significantly probative, is insufficient. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). A plaintiff "cannot rest on [her] own deposition, or self-serving affidavits, to meet [her] burden of proof," *Gilmour v. Abbott Labs.*, No. 03-C-9076, 2005 WL 947082, at *6 (N.D. Ill. Apr. 11, 2005).

## III.    SCHMELZER'S ERISA RETALIATION CLAIM

ERISA §510 provides the following:

It shall be unlawful for any person to *discharge*, fine, suspend, expel, discipline, or *discriminate* against a participate or beneficiary for *exercising any right* to which he is entitled under the provisions of an employee benefit plan

…

unlawful for any person to *discharge*, fine, suspend, expel, or discriminate against any person *because* she has given *information* or has testified or is about to testify in *any inquiry* or proceeding relating to

29 U.S.C. §1140 (2018).

The first portion relates to an individual exercising rights of a plan to which they are entitled; and the second portion relates retaliation. Further, Congress' focus on enacting §510 was to prevent "'unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights' or other benefits." *Lindermann v. Mobil Oil Corp.*, 141 F.3d 290 91998) quoting *Meredith v. Navistar Int'l Transp. Corp.*, 935 F.2d 124, 127 (7th Cir.1991) (quoting *Conkwright v. Westinghouse Elec. Corp.*, 933 F.2d 231, 237 (4th Cir.1991)).

The first portion of ERISA §510, provides that "[i]t shall be unlawful for any person to *discharge*, fine, suspend, expel, discipline, or discriminate against a participate or beneficiary for *exercising any right* to which he is entitled under the provisions of an employee benefit plan." 29 U.S.C. §1140 (2018). In order to prove this cause of action, Schmelzer must show that the Defendants had specific intent to deprive her of a right under the benefit plan, in this case the IRA. *Lindeman v. Mobil Oil Cop.*, 141 F.3d 290, 295 (7th Cir. 1998). Essentially, Schmelzer need to show AWC had "a desire to frustrate [her] attainment or enjoyment of benefits rights contributed toward the employer's decision and can avoid summary judgment only if the materials properly

before the district court, construed sympathetically, allowed for such conclusion." *Teumer v. General Motors Corp.*, 34 F.3d 542, 550 (7th Cir. 1994). Schmelzer cannot show any facts that the Defendants had a specific intent to prevent her from attaining or using her IRA account. The facts show the complete opposite, where the Defendants were seeking loans to allow Schmelzer to be able to use the full amount of her IRA account. (Stmt. of Facts ¶¶24, 27, and 33).

Schmelzer Third Amended Complaint fails to address any allegation that defendant had specific intent to deprive her of any right allowed under the IRA plan. Plaintiff testified that the only "right" that she believes was interfered with was relating to the fact that the contributions were not put into her account until July 27, 2017. (Stmt. of Facts ¶57). But, the facts show that the lack of funding the IRA account was in order to pay vendors—not to interfere with the participants use or enjoyment of their IRA account. (Stmt. of Fact ¶¶20-21). Furhter the facts show that Edwards Wessels was not forwarding the deducted contributions to any participant IRA account, which included Lynlee and Scott. Further, Edward Wessels kept the IRA accounts open to have it remain a liability for the company, compared to completely shutting the benefit down. (Stmt. of Fact ¶¶22).

Despite Schmelzer's Third Amended Complaint references the term "rights" and "interference," which are covered under ERISA §510, Schmelzer cannot show any facts that AWC denied her any right under the IRA plan or interfered with her benefits, since the facts provide that the reason the contribution were not deposited into the IRA accounts was because of cash flow issues. In addition, the Defendants paid the entire amount, plus interest back into Plaintiff's IRA account. (Stmt. of Facts ¶37). At no time, did Defendants keep Schmelzer or attempt to prevent her from using her IRA contributions. As Schmelzer acknowledges that she did not attempt to obtain any IRA funds during her employment for a loan or other purposes.

5

(Stmt. of Facts ¶57).  As such, Plaintiff cannot prove any facts to support a cause of action that the Defendants "interfered" with her attainment of her IRA benefits.

### A.  RETALIATION/DISCRIMINATION UNDER SECTION 510

§510 of ERISA also makes it "unlawful for any person to *discharge*, fine, suspend, expel, or discriminate against any person *because* she has given information or has testified or is about to testify in any inquiry or proceeding relating to "ERISA.  29 U.S.C. §1140.  Schmelzer will need to show that Defendants had a specific intent to violate ERISA.  *Schweitzer v. Teamsters Local 100*, 413 F.3d 533, 537 (6th Cir. 2005).  And since, Schmelzer does not allege any direct evidence, courts use the burden shifting approach under *Texas Dep't of Comm'y Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089 (1981). Also see, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817 (1973*); Libel v. Adventrue Lands of Am., Inc.*, 482 F.3d 1028, 1035 n. 7 (8th Cir. 2007).  Therefore, Schmelzer will need to meet the prima facia requirement, which provides that (1) she engaged in an activity protected under ERISA; (2) she suffered an adverse employment action; and (3) a causal link exists between her protected activity and the adverse action.  *Acosta v Brain*, 910 F.3d 502, 512, (2018), citing *Teutscher v. Woodson*, 835 F.3d 936, 945 (9th Cir. 2016). If Plaintiff meets those requirements, then it shifts back to AWC to show that it had a legitimate business reason. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817 (1973).  If AWC provide a legitimate business reason, then the burden shifts back to Schmeltzer to prove that AWC's legitimate reason is pretext. *Id*.

### IV.    PRIMA FACIA RETALIATION

Here, Schmelzer claims that she engaged in protected activity on two (2) occasions.  The first time was when AWC called a meeting and explained to the plan participants that the IRA

contributions were not deposited into their IRA accounts.  The second protected activity was

when the Plaintiff filed a complaint with the U.S. DOL. Since, Schmelzer must prove all three

(3) prima facia elements, Defendants will address the causal connection and adverse action.


### A.  ADVERSE ACTION

When analyze an adverse action, the action "need not be one that affects the terms and

conditions of employment, but it 'must be one that a reasonable employee would find to be

materially adverse such that the employee would be dissuaded from engaging in the protected

activity.'" *Poullard v. McDonald*, 829 F.3d 844, 856 (7th Cir. 2016) (quoting *Roney v. Ill. Dep't

of Transp*., 474 F.3d 455, 461 (7th Cir. 2007)).  On July 31, 2017, Schmelzer and Lynlee were at

the reception desk at the front of the office.  Schmelzer became irate when Lynlee gave a note

regarding an upcoming surgery to other receptionist sitting in the reception area. (Stmt. of Facts

¶63).  This resulted in Schmelzer going into Lynlee's office and stating "why the fuck are you

not talking to me." (Stmt. of Facts ¶64).  Stunned by Scmelzer's comment, Lynlee could only

stare at Schmelzer.  (Stmt. of Facts ¶40).  Schmelzer then looked at Scott and said "why [Lynlee]

wasn't talking to her" and Scott stated "maybe it's because you're yelling at her." (Stmt. of Facts

¶40).  Schmelzer then asked "do you want me to leave." (Stmt. of Facts ¶41).  With no response,

Schmelzer said it again "if you want me to leave, I will." (Stmt. of Facts ¶ 42).  Lynlee finally

responded with a "yes." (Stmt. of Facts ¶ 43).  Schmelzer then said "you heard – you just fired

me." (Stmt. of Facts ¶ 44).  To which, Lynlee responded "no." (Stmt. of Facts ¶45).  Schmelzer

then looked at Scott and stated "you heard her. Your wife just fired me" and Scott responded

"no."  (Stmt. of Facts ¶ 46).  In fact, Plaintiff admitted that Lynlee never told her that she was

fired. (Stmt. of Facts ¶48). It's unreasonable for Plaintiff to insist that she was terminated, when

the owners told her no you are not fired.  In addition, Schmelzer admits that the owners did not use the words "fired."  But the most telling is Schmelzer comments to the U.S. DOL, where she informs the U.S. DOL that it was her choice to leave AWC.

Schmelzer's comment to the U.S. DOL that she left AWC by "choice and was in no way related to her contacting USDOL" are facts that prove that she was not terminated. Schmelzer contacted the USDOL on three (3) occasions. (Stmt. of Facts ¶57).  On one of those occasions, Schmelzer informed the U.S. DOL of following:

> P called and states that funds have ·been deposited and she is no longer with the ·company.· ***P states this was by choice*** and was in no way related to her contacting USDOL. P states that she went to the ER and used the F-word because it has been so difficult working ·with her since she found out the money was owed. ·P states the owner did not respond. ·She asked the owner if she wanted her to leave.· The owner responded yes.· P thanked BA for assistance and states that the last person in the plan will be leaving the company soon as well.

(Stmt. of Fact 59).

## B.  CAUSAL CONNECTION

Schmelzer cannot show that her alleged protected activity is casually connected to the adverse action that she claims she suffered.  Further, §510 provides that its "unlawful for any person to discharge, fine, suspend, expel, or discriminate against any person ***because*** she has given information or has testified or is about to testify in any inquiry or proceeding relating to" ERISA.  29 U.S.C. §1140.  By using word *because* in the retaliation portion of the Act, Schmelzer protective activity "requires more than simply a complaint about some situation at work, no matter how valid the complaint might be; rather, the complaint must indicate the discrimination occurred ***because of***" the protected activity. *Skiba v. Illinois Central Railroad Company*, 884 F.3d 708 (7th Cir. 2018).  Here, Schmelzer would need show that her discharge occurred because she was verbally abusive to the owners by calling them "liars" and "thieves

during a July 8, 2017 IRA meeting, which Defendants called to inform the employees of the underfunding IRA accounts; or it was because she complained to the U.S. DOL. Schmelzer cannot meet this requirement.

As it relates to the complaint to the U.S. DOL, Schmelzer cannot show any facts that is her alleged discharge is causally connected to her filing a complaint with the U.S. DOL, because Scott and Lynlee did not know Schmelzer filed the complaint with the USDOL until after she was terminated. (Stmt. of Facts ¶ 38 and 62). Because the Defendants were unaware that Schmelzer complained to the U.S. DOL, Schmelzer' s retaliatory discharge claim cannot occur. *Shah v. Eclipsys Corp.,* 2010 WL 2710618, *12 (E.D.N.Y. July 7, 2010) citing *Brungart v. BellSouth Telecomms, Inc.* 231 F.3d 791, 800 (11th Cir. 2000).

Lastly, Schmelzer told the U.S. DOL that her leaving AWC was "by choice and was in no way related to her contacting the US DOL. (Stmt. of Facts ¶¶ 49, 56, 59). Schmelzer contacted the USDOL on three (3) occasions. (Stmt. of Facts ¶58). The last time Schmelzer's called the US DOL was after she left AWC and she informed the U.S. DOL that she was no longer working at AWC. (Stmt. of Facts ¶59). Specifically Schmelzer stated it was by ***"choice and was in no way related to her contacting USDOL."*** (Stmt. of Facts¶49, 56, 59). It doesn't get much clearer than that. The notes provide by the U.S. DOL provides the following:

> P called and states that funds have been deposited and she is no longer with the ·company.· *P states this was by choice and was in no way related to her contacting USDOL*. P states that she went to the ER and used the F-word because it has been so difficult working ·with her since she found out the money was owed. ·P states the owner did not respond. ·She asked the owner if she wanted her to leave.· The owner responded yes.· P thanked BA for assistance and states that the last person in the plan will be leaving the company soon as well.

(Stmt. of Fact ¶59.). Schmelzer's comments to the U.S. DOL confirms that she left AWC by choice. Before the lawsuit was filed, at a time when the memories were still fresh in her head.

In addition, the undisputed facts provide that when Schmelzer went into the owner's office, the topic was related to a note that Lynlee provided to another receptionist. (Stmt. of Fact ¶63). Schmelzer became irate when Lynlee gave a note regarding upcoming surgeries to other receptionist, which was not regarding any ERISA issue. (Stmt. of Fact 63). So after Lynlee walked away, Schmelzer followed her into her office where she stated "why the fuck are you not talking to me." (Stmt. of Facts 64). The undisputed facts show that Lynlee did not understand what Schmelzer was referring to when she made that comment. (Stmt. of Facts 65). Because the facts show that Lynlee did not know what Schmelzer was referring to when she made the comment, Schmelzer cannot show a causal connection between Schmelzer's protected activity and any alleged adverse action.

## V.    PERSONAL LIABILTY DOES NOT ATTACH TO §510 CLAIMS

ERISA §510 does not provide individual personal liability. The Seventh Circuit Court of Appeals held that §510 is "designed to protect the employment relationship" and the "fundamental prerequisite to a §510 action is an allegation that the employer-employee relationship … was changed in some discriminatory or wrongful way." De*eming v. American Standards, Inc.*, 905 F.2d 1124, 1127 (7th Cir. 1990). Judge Lenienweber further addressed this question in 2010, where he ruled that "[l]ikewise, ERISA §510 claims 'lie only against …[an] employer' and do not provide for individual liability." *Magnus v. St. Mark United Methodist Church*, 2010 WL 4177614 (N.D. Ill. 2010) citing *Byrd v. MacPapers, Inc*. 961 F.2d 157, 161

(11th Cir. 1992); also see Becker v. Mack Trucks, Inc. 281 F.3d 372, 382 (3rd Cir.2002)(§510 is "limited to actions affecting the employer-employee relationship").

Here, Plaintiff was hired by Animal Wellness Center of Monee. Plaintiff can show zero facts that she had an employee-employer relationship with Lynlee Wessel's or Scott Marhanka. Because no employee-employer relationship existed between Lynlee Wessel's, Scott Marhanka and Plaintiff, Plaintiffs claims under §510 of ERISA, against the individuals are not a valid cause of action. As a result, this Court should dismiss Plaintiff's claims against Lynlee Wessels and Scott Marhanka.

## VI.    <u>Count II</u>

Plaintiff's Count II attempts to allege that AWC violated 26 U.S.C. §7434, a tax statute that allows a person to recover civil damages through a private cause of action, where a person "willfully files a fraudulent information return with respect to payments purported to be made to any other person, such other person may bring a civil action for damages against the person so filing such return." 26 U.S.C. §7434(a). Furthermore, 26 U.S.C. §7434(d) states that any person bringing an action under this section shall provide a copy of the complaint to the IRS upon the filing of such complaint with the court. Section 7434(e) requires the court to include a finding as to the correct amount that should have been reported on the information return in its decision. The Act then defines that "[f]or purposes of this section the term 'information return' means any statement described in section §6724(d)(1)(A)." See §7434(f). "To state a claim under 26 U.S.C. §7434, Plaintiff must allege: (1) Defendant issued an information return; (2) the information return was fraudulent; and (3) Defendant willfully issued such a fraudulent

return." 26 U.S.C. §7434(a); *Carbonell v. Glaser,* No. 1:16-CV-21539-UU, 2016 WL 10933303, at *2 (S.D. Fla. Sept. 19, 2016).

The history makes clear that Section 7434 was intended to fill a gap in federal law by providing a "private cause of action to a taxpayer who is injured because a fraudulent information return has been filed with the IRS asserting that payments have been made to the taxpayer." Further, "prominent tax law commentators have traced § 7434's origin to a specific policy problem: `malcontents' who sometimes file fraudulent information returns reporting large amount of income for judges, law enforcement officials, and others who have incurred their wrath." This history "suggests the law is concerned with situations in which an individual filing a tax return on another's behalf misreports the amount paid in order to saddle the individual who is the subject of the tax return with additional tax liability." *Pacheco, Jorge v. Chickpea at 14th Street, Inc., et al,* 124 AFTR 2d 2019-5485 (DC NY, (8/8/2019); H.R. Rep. No. 104–506, at 35 (1996).

1. **PLAINTIFF HAS NOT MET THE REQUIREMENTS FOR 26 U.S. §7434(D) IN PROVIDING THE IRS A COPY OF EACH COMPLAINT AT THE TIME OF FILING.**

Plaintiff did not follow the statute by providing a copy of each complaint to the IRS upon the filing of such complaint with the court. In the three complaints filed by the Plaintiff, nowhere does she state that she followed §7434(d) in properly providing the IRS a copy of each complaint when it was filed with the court. With regard to this issue there is no genuine issue of a material fact and the Motion for Summary Judgment should be granted.

2. **PLAINTIFF HAS NOT MET THE REQUISITE HEIGHTENED PLEADING STANDARD REQUIRED BY FEDERAL RULE OF CIVIL PROCEDURE 9(B) WHEN PLEADING A FRAUD CLAIM.**

The heightened pleading standard requires that a party making fraud allegations "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). This means that

12

a party must plead "the who, what, when, where and how: the first paragraph of any newspaper story." U.S. *ex rel. Lusby v. Rolls-Royce Corp.,* 570 F.3d 849, 853 (7th Cir. 2009). All three of Plaintiff's complaints fail to allege her section 7434 fraud claim with the particularity required by Rule 9(b). Further, Plaintiff's complaints are wrought with mere alleged conclusions of law relating to the term "fraudulent" and Plaintiff fails to discuss any acts regarding AWC filing a fraudulent information return to state a claim under §7434. Plaintiff is simply regurgitating the Act and claiming that AWC violated the Act. "Willfully filing a fraudulent information return" requires a showing of deceitfulness or bad faith, not just a mistake, that Plaintiff absolutely has not plead or proved based on the three complaints filed.

Thus, according to the court in the Fourth Circuit, a person can't bring a civil action under Code Sec. 7434 (a) against the person filing an information return if that return correctly states the amount of payments made—even if the wrong form is used to report the payment. *Liverett, Grant v. Torres Advanced Enterprise Solutions, LLC,* (2016, DC VA) 117 AFTR 2d 2016-2274, 192 F Supp 3d 648. Moreover, the payee's claim that the employer knowingly filed a false Form 1099 was insufficient to show a willful intent to disobey Code Sec. 7434(a). *Tran, Thom V. v. Ngoc Tran,* (2017, DC FL) 119 AFTR.2d 2017-1636, later proceeding (2017, DC FL) 119 AFTR.2d 2017-1638, later proceeding (2017, DC FL) 119 AFTR 2d.2017-1640. In *Mould, Jeffrey B. v. NJG Food Service, Inc,* (2014, DC MD) 114 AFTR.2d 2014-5717, 2014 WL 3943693, it was held while the plaintiff may have been issued an erroneous W-2, the defendants neither acted with any "intentional wrongdoing" nor an "intent to deceive."

Furthermore, the Plaintiff must plead the specifics of the entirety in order to allow the court to award damages in the action. The court must have enough information from the Plaintiff to be able to include a finding of the correct amount which should have been reported

on the information return.  A motion for default judgment seeking the statutory $5,000 penalty was denied where the Plaintiff offered no proposed finding to the court about the amount which should have been reported on the information return.  26 U.S. §7434(e).

There are no such facts plead in any of the three complaints filed by the Plaintiff.  Based on the complaints and responsive pleadings filed in the record herein, no genuine issue of material facts exist.  Plaintiff states that all money has been correctly deposited into the IRA accounts and we concur.  The plaintiff offers no amount related to damages, because there are no damages.  The delay in the depositing of the monies into the IRA has been more than compensated for with the additional deposit of 10% above any amounts contributed by the Plaintiff and/or matched by AWC.

### 3. PLAINTIFF HAS NOT AND CANNOT MEET THE ESSENTIAL ELEMENTS OF PROOF REQUIRED BY 26 U.S.C. §7434 BECAUSE AWC DID NOT FILE A FRAUDULENT INFORMATION RETURN, AS ALL AMOUNTS AND INFORMATION REPORTED WERE CORRECT.

Plaintiff misses the point of §7434, which is for civil damages when a person "willfully files a fraudulent information form," not in a case like this where the amount reported was the correct amount, but was simply not transferred to the participants IRA account.  Any and all amounts that were listed, were the actual correct amounts that Plaintiff asked to be removed, but as Plaintiff's TAC alleges the amount was simply not placed into Plaintiff's and all other participants IRA account until July 2017.  That's not willfully filing a fraudulent information return, since the amounts reported were the correct amounts.

While most have held that willfulness "connotes a voluntary, intentional violation of a legal duty," others have required a "component of deceitfulness or bad faith" for purposes of Section 7434.  No bad faith or deceit exist.  AWC did not gain any tax advantage, Plaintiff did

not have any additional tax burden and there are is no evidence to show any type of harassment by AWC. This provision was enacted to provide a remedy for taxpayers who have been injured or inconvenienced by another person's filing of a fraudulent information return with the intent of defrauding IRS or harassing the taxpayer. *Gidding, John Robert v. Zurich American Insurance Co*, (2015, DC CA) 116 AFTR 2d 2015-6758, 2015-2 USTC ¶50580. It is clear from all of the pleadings filed herein that neither party has been injured or inconvenienced. The Plaintiff stated in her own deposition that she did not ever attempt to take monies out of her IRA for any reason, nor did she attempt to make a loan of said funds. (Stmt. of Fact ¶10 and 11).

In conclusion, Plaintiff has not and cannot produce any evidence of a material factual dispute such to preclude the granting of a Motion for Summary Judgement. Plaintiff has not and cannot prove that the Defendant willfully filed a fraudulent information return with respect to any person.

## VII. <u>CONCLUSION</u>

Accordingly, Defendants, respectfully requests that summary judgment be entered in its favor on all of Plaintiff's claims.

Respectfully submitted,

**ANIMAL WELLNESS CENTER OF MONEE, LLC**

By:    <u>s/ Sean F. Darke    </u>
            One of Its Attorneys

Sean F. Darke (ARDC No. 6285312)
Litchfield Cavo, LLP
303 W. Madison, Suite 300
Chicago, IL 60606
(312) 781-6554 (Direct)

15

(312) 781-6677 (Main)
Darke@LitchfieldCavo.com