| | | |
|---|---|---|
| Joyce E. Schmelzer, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:18-cv-01253 |
| v. | ) | |
| | ) | |
| Animal Wellness Center of Monee, LLC, | ) | The Honorable Sharon Coleman |
| Lynlee Wessels-Marhanka and | ) | |
| Scott Marhanka | ) | |
| | ) | |
| Defendants. | ) | |

## ANIMAL WELLNESS CENTER OF MONEE'S LR 56.1
## STATEMENT OF UNDISPUTED MATERIAL FACTS

Defendant, Animal Wellness Center of Monee, LLC ("AWC" or "Defendant"), in accordance with the Federal Rule of Civil Procedure 56 and Local Rule 56.1(a)(3), submits this Statement of Undisputed Material Facts In Support of Its Motion For Summary Judgment:

### A.      JURISDICTIONAL AND VENUE STATEMENT

1. AWC is a registered business under the laws of the State of Illinois and located within this District. **(Dkt. 88, Exhibit F at ¶¶ 1-4).**

2. Jurisdiction is proper in accordance with 28 U.S.C. §1331 and 28 U.S.C. §1367, and venue is proper pursuant to 28 U.S.C. §1391(b). **(Dkt. 88, Exhibit F at ¶¶ 5-6).**

3. Joyce E. Schmelzer was hired by AWC to perform desk and office manager employment in September 2004. **(Dkt. 88, Exhibit F at ¶ 7).**

4. During the years 2016 and 2017, AWC had an established Simple IRA Plan available for employees**. (Dkt. 88, Exhibit F at ¶ 9).**

5. Plaintiff was a participant and beneficiary of AWC's Simple IRA Plan. **(Dkt. 88, Exhibit F at ¶ 9).**

6. With each bi-weekly paycheck, Plaintiff contributed 3% of her gross pay into the AWC IRA from January 2016 to July 2017. **(Dkt. 88, Exhibit F at ¶ 11).**

7. As part of the AWC IRA, a fund was established for each participant at Franklin Templeton Investments. **(Dkt. 88, Exhibit F at ¶ 13).**

8. In mid-2017, Scott took over control of AWC's financial responsibilities. **(Dkt. 88, Exhibit F at ¶ 39).**

9. In early July 2017, Plaintiff directed AWC not to deduct any money from her wages to contribute to the plan. **(Dkt. 88, Exhibit F at ¶¶ 14 and 15; Exhibit A, 21:20-24).**

10. Plaintiff never tried to take a loan against her IRA account. **(Exhibit A, 20:20-24).**

11. Plaintiff did not ever try to take out money from her IRA plan for any reason. **(Exhibit A, 21:4-24 and 22:1-14).**

12. On or about July 8, 2017, AWC Managers held a meeting with the AWC Plan Participants. **(Exhibit A, 45:15-24).**

13. On or about July 21, 2016, AWC discontinued making AWC IRA Plan payments into the Franklin Templeton Investment account of Plaintiff. **(Dkt. 88, Exhibit F at ¶ 16).**

14. On or about July 26, 2017, the DOL contacted AWC to discuss its IRA account. **(Dkt. 88, Exhibit F at ¶ 20).**

15. On or about July 27, 2017, AWC funded all of the AWC IRA plan employee's accounts in full to reflect any contributions each employee made, plus the employer match (if any) and 10% for any interest or potential increase the employee may have earned. **(Dkt. 88, Exhibit F at ¶ 23).**

16. Plaintiff's last day of employment with AWC was July 31, 2017. **(Exhibit A, 22:15-18).**

17. In July 2016, the owner's father, Mr. Wessels, unilaterally decided not to forward the actual contributions removed from the employee's paycheck to the fund. **(Exhibit D, 55: 21, 56:1-6 and 69:5-7).**

18. This was done for all of the participants, which included Plaintiff, Lynlee Wessels, Scott Marhanka, Mandy Holt, Jessica McCaslin and Dominique Matthews. **(Exhibit D, 40:2-19; 52:8-22).**

19. This resulted in the employees payroll check listing the amounts withdrawn from their paychecks, but that money was not contributed to the IRA. Lynlee and Scott did not learn of this until May 2017. **(Exhibit B, 70:1-4).**

20. Mr. Wessels intended to pay the contribution with the next month's revenue. **(Exhibit D, 55:4-16).**

21. The reason Mr. Wessels decided not to pay the contributions was strictly cash flow. **(Exhibit D, 54:1-22).**

22. AWC kept the IRA account open, to make sure that it remained a liability. **(Exhibit D, 14:1-24)**

23. Scott Marhanka took over the financial aspect of the business in May 2017, which included the IRA payments. **(Exhibit B, 70:8-13).**

24. For the first time, Scott and Lynlee learned that the contributions were being removed, but not forwarded to the IRA plan. **(Exhibit B, 70:1-13 and 101:20-22).**

25. Lynlee and Scott applied for a HELOC, in order to fund all of the IRA accounts. **(Exhibit C, 91:13-22; 92: 1-22; 93:1-22 and 94:1).**

26. As the process of the HELOC was moving forward, Scott received, but did not open his IRA statement. **(Exhibit C, 119:12-14).**

27. When Scott received his statement, Scott informed Lynlee that they needed to explain to the participants what occurred and how AWC has already started to apply for loans to repay the IRA accounts, including interest. **(Exhibit B, 95:10-16; Exhibit C, 112:20-22 and 113:1-4).**

28. Lynlee never read her IRA statement received on or about July 5, 2017. **(Exhibit B, 94:14-18).**

29. Scott informed the participants that AWC would have a meeting on July 8, 2017 to discuss the IRA accounts. **(Exhibit B, 96:4-10; Exhibit C, 115:2-8).**

30. On July 8, 2017, AWC informed the participants who attended what occurred and how they were seeking loans to repay the money to everyone's IRA account. **(Exhibit B, 98:1-22; Exhibit C, 124:13-22 and 125:1-22).**

31. Plaintiff became very vocal during this meeting, which included calling Lynlee and Scott "thieves" and "liars." **(Exhibit B, 99:14-18 and 100:6-7; Exhibit C, 127:4-10 and 129:8-14).**

32. On July 18, 2017, AWC received a loan from a friend (Pat German) to cover the IRA accounts. **(Exhibit B, 76:17-22 and 77:2-16).**

33. On July 27, 2017, the U.S. DOL contacted AWC and attached a letter regarding the complaint that was filed against the company regarding the IRA accounts. **(Exhibit B, 66:14-22; 67:1-22 and 68:1-12).**

34. AWC was contacted for the first time on July 27, 2017. **(Exhibit B, 67:17-18 and Exhibit 17(a) of Exhibit B).**

35. The DOL emailed a letter to AWC on July 27, 2017. **(Exhibit B, 66:14-22 and Exhibit 17 of Exhibit B).**

36. On July 26, 2017, Scott discussed the situation with the U.S. DOL investigator, Nicole Lenzy, and explained that AWC was already in the process of taking loans out to pay for the IRA amounts. **(Exhibit B, 74:19-22; 75:1-4 and 103:1; Exhibit C, 150:15-22 and 151:1-13).**

37. On July 27, 2017, all participants, except Lynlee and Scott, were paid the back contributions, 3% matching, and interest. **(Exhibit A, 81:5-22).**

38. The Defendants did not know who filed a complaint with the U.S. DOL. **(Exhibit C, 153:13-16).**

39. On July 31, 2017, Plaintiff stormed into Lynlee's office and said "Why the fuck are you not talking to me." **(Stmt. of Facts 38 and Exhibit A, 62:15-19).**

40. Stunned by Plaintiff's comment, Lynlee could only stare at Plaintiff. Plaintiff then looked at Scott and said "why wasn't [she] talking to her" and Scott stated "maybe it's because you're yelling at her." **(Stmt. of Material Facts 38 and Exhibit C, 182:11-13).**

41. Plaintiff then asked Lynlee "do you want me to leave." **(Exhibit A, 62:23).**

42. With no response, Plaintiff said it again "if you want me to leave, I will." **(Exhibit C, 182:14-18).**

43. Lynlee finally responded with a "yes." **(Exhibit C, 182:19-22).**

44. Plaintiff then said "you heard – you just fired me." **(Exhibit C, 183:4).**

45. To which, Lynlee responded "no." **(Exhibit C, 183:4-5).**

46. Plaintiff then looked at Scott and stated "you heard her. Your wife just fired me". **(Exhibit B, 146:14-17; Exhibit C, 183:7-8).**

47. Scott responded "no." **(Exhibit C, 183:8; Exhibit B, 146:18).**

48. Plaintiff admitted that Lynlee never told her that she was fired. **(Exhibit A, 110:5-9).**

49. Plaintiff also told the U.S. DOL she was no longer with the company and it was by her choice and was in no way related to her contacting the DOL. **(Exhibit A, 78:7-24 and Exhibit 6 to Exhibit A).**

50. On July 31, 2017, Scott and Lynlee received a text message from the Plaintiff at 11:13 AM stating "FIY, Dept. of Labor has my name, but we all called and they didn't need multiple names." **(Exhibit A, 33:11-24 and 34:1-7; Exhibit 1 to Exhibit A).**

51. Before that text message, Scott and Lynlee believed that a former employee, Jessica, filed the complaint with the DOL. **(Exhibit C, 235:19-22).**

52. The first time Scott and Lynlee learned who filed the complaint with the U.S. DOL was when they received a text from Plaintiff on July 31, 2017 at 11:13 AM. **(Exhibit A, 33:16-23 and 34:1-7 and Exhibit 1).**

53. Plaintiff's employment ended with AWC on July 31, 2017 at approximately 9:30 AM. **(Exhibit A, 98:1-4).**

54. Plaintiff was hired by Peotone Animal Hospital on July 31, 2017 when the office manager called Plaintiff at approximately 4:00 PM, the very same day Plaintiff's employment ended with AWC. **(Exhibit A, 11:1-24 and 12:1-6).**

55. On August 3, 2017, Plaintiff called the DOL and stated that the funds have been deposited and she is no longer with the company. Plaintiff also stated that this was by choice and was in no way related to her contacting the DOL. **(Exhibit A, 78:7-24 and Exhibit 6).**

56. Plaintiff testified that the only "right" that was interfered with was relating to the fact that the contributions were not put into her account until July 27, 2017. **(Exhibit A, 99: 17-24 and 100:1).**

57. Schmelzer contacted the U.S. DOL on three (3) occasions. **(Exhibit A, 27:14-18).**

58. On April 12, 2018, through Plaintiff's FOIA request, the U.S. DOL provided a document that provides the conversation that Plaintiff had with the U.S. DOL. **(Exhibit A, 74:16-24; 75:1-2 and Exhibit 6).**

59. The U.S. DOL provided the information:

> P called and states that funds have been deposited and she is no longer with the company. ***P states this was by choice*** and was in no way related to her contacting USDOL. P states that she went to the ER and used the F-word because it has been so difficult working with her since she found out the money was owed. P states the owner did not respond. She asked the owner if she wanted her to leave. The owner responded yes.   P thanked BA for assistance and states that the last person in the plan will be leaving the company soon as well.  **(Exhibit A, at Exhibit 6).**

60. Plaintiff did not suffer an adverse action, as her leaving AWC was her choice, nothing more.  Plaintiff chose to walk into the owner's office and say "why the fuck are you not talking to me." **(Stmt. of Material Facts 35-46, 48 and 56).**

61. Schmelzer did not attempt to obtain any funds from her IRA account or take a loan from her IRA account**.  (Exhibit A, 20-19:20-24;1-8).**

62. Scott and Lynlee did not know who filed the complaint with the U.S. DOL. **(Exhibit A, 32-33:21-24;1-2. Exhibit 1).**

63. Schmelzer became upset when Lynlee gave a note to another receptionist regarding upcoming surgeries.  **(Exhibit, B, 145:7-12); also see (Exhibit. A, 62:4-19).**

64. Schmelzer followed Lynlee into her office where she stated "why the fuck are you not talking to me." **(Exhibit A, 62:4-19).**

65. Lynlee did not know what Schmelzer was talking about. **(Exhibit B, 135:10-12).**

Respectfully submitted,

**THE ANIMAL WELLNESS CENTER OF MONEE, LLC, LYNLEE WESSELS, and SCOTT MARHANKA**

By: /s/ Sean F. Darke

Sean F. Darke
LITCHFIELD CAVO LLP
303 W. Madison St., Suite 300
Chicago, Illinois 60606
Tel: (312) 781-6554
Darke@LitchfieldCavo.com

## CERTIFICATE OF SERVICE

I certify that on March 9, 2020, I electronically filed the foregoing document with the Clerk of the United States District Court for the Northern District of Illinois by using the CM/ECF system, which will send a notice of electronic filing to the attorneys of record.

/s/ Sean F. Darke

Sean F. Darke
LITCHFIELD CAVO LLP
303 W. Madison St., Suite 300
Chicago, Illinois 60606
Tel: (312) 781-6554
Darke@LitchfieldCavo.com

1    IN THE UNITED STATES DISTRICT COURT
2      NORTHERN DISTRICT OF ILLINOIS
3           EASTERN DIVISION
4  JOYCE E. SCHMELZER,        )
5           Plaintiff,       )
6  vs.                        ) No. 1:18-CV-01253
7  ANIMAL WELLNESS CENTER     )
8  OF MONEE, LLC, LYNLEE      )
9  WESSELS-MARHANKA and       )
10 SCOTT MARHANKA,            )
11          Defendants.      )
12
13      The deposition of JOYCE SCHMELZER, called
14 for examination pursuant to the Rules of Civil
15 Procedure for the United States District Courts
16 pertaining to the taking of depositions, taken
17 before Johnetta Stafford Taylor, a Registered
18 Professional Reporter within and for the State
19 of Illinois, at 303 West Madison Street, Suite
20 300, Chicago, Illinois, on October 18, 2018, at
21 the hour of 11:12 a.m.
22
23 Johnetta Stafford Taylor
24 License No:  084-001583

1

---

1  APPEARANCES:
2
3      GAFFNEY & GAFFNEY, P.C.
4      BY:  MR. GLENN R. GAFFNEY,
5      1771 Bloomingdale Road
6      Glendale Heights, Illinois  60139
7      (630) 462-1200
8      glenn@gaffneylawpc.com
9          Representing the Plaintiff;
10
11     LITCHFIELD CAVO, LLP
12     BY:  MR. SEAN F. DARKE,
13     303 West Madison Street
14     Suite 300
15     Chicago, Illinois  60606
16     (312) 781-6677
17     darke@litchfieldcavo.com
18         Representing the Defendants.
19
20 ALSO PRESENT:
21     MR. DONALD C. SCHMELZER
22     MR. SCOTT MARHANKA
23     DR. LYNLEE WESSELS-MARHANKA
24          *******

2

---

1              I N D E X
2  WITNESS                    EXAMINATION
3  JOYCE SCHMELZER
4    By Mr. Darke                   4
5    By Mr. Gaffney               111
6    By Mr. Darke (Further)       142
7
8
9            E X H I B I T S
10 NUMBER                  MARKED FOR ID
11 Schmelzer Deposition
12   Exhibit No. 1               33
13   Exhibit No. 2               51
14   Exhibit No. 3               54
15   Exhibit No. 4               56
16   Exhibit No. 5               64
17   Exhibit No. 6               74
18   Exhibit No. 7               81
19   Exhibit No. 8               83
20   Exhibit No. 9               89
21   Exhibit No. 10              92
22   Exhibit No. 11              93
23   Exhibit No. 12             103
24   (Exhibits retained by Mr. Sean F. Darke.)

3

---

1              (whereupon, the witness
2               was duly sworn.)
3           JOYCE SCHMELZER,
4  called as a witness herein, was examined and
5  testified as follows:
6              EXAMINATION
7  BY MR. DARKE:
8      Q.   Can you just state your name and spell
9  your last name for the record?
10     A.   Joyce Schmelzer, S-C-H-M-E-L-Z-E-R.
11 And I go by Joey, J-O-E-Y.
12     Q.   Do you mind if I call you Joey?
13     A.   Not at all.
14     Q.   Okay.  So, Joey, have you ever been
15 deposed before?
16     A.   No.
17     Q.   Have you ever been in a deposition
18 before?
19     A.   No.
20     Q.   Have you ever been in a trial before?
21     A.   No.
22     MR. DARKE:  So in a deposition, we have a
23 certain amount of ground rules.  And the reason
24 we have these ground rules is even though it

4



1  looks like an informal setting here, because
2  we're not in a court or anything, all the stuff
3  that is being taken down is probably going to be
4  presented to a judge.  So it is formal in the
5  sense that a judge will be seeing all of this.
6          So as a result the individual, the
7  court reporter next to me, she cannot take down
8  any shake of the head or anything like that.  So
9  any answer you have has to be in audible form.
10         THE WITNESS:  Okay.
11         MR. DARKE:  If you don't understand a
12 question that I have --
13         THE WITNESS:  Uh-huh.
14         MR. DARKE:  -- make sure that you say listen,
15 I don't understand.
16         I'll explain it better.  I'll ask it in
17 a different way.
18         Because when we look at this as black
19 and white, just line by line, we're going to
20 assume that you understood the question if you
21 answered it.
22         Is that fair?
23         THE WITNESS:  Yes.
24         MR. DARKE:  At any time you need to take a

5

1  BY MR. DARKE:
2     Q.   And are you married?
3     A.   Yes.
4     Q.   And who are you married to?
5     A.   Donald Schmelzer.
6     Q.   Okay.  And how long have you been
7  married?
8     A.   Today is our anniversary.  48 years.
9     Q.   Well, congratulations.  Happy
10 anniversary.
11    A.   Thank you.
12    Q.   And do you have any children?
13    A.   Yes.
14    Q.   How old are they?
15    A.   He is 43.  43 years old.
16         THE WITNESS:  How old is he?
17         MR. SCHMELZER:  46.
18         THE WITNESS:  I'm sorry.  He's 46 years old.
19         MR. DARKE:  That happens.  That happens to
20 all of us.
21         MR. GAFFNEY:  Let's go off the record for a
22 second.
23         (Whereupon, a discussion was had
24          off the record.)

7

1  break, just let us know.  As long as there's not
2  a question that's pending.  I would want you to
3  answer that question before you took a break,
4  but just say listen, hey, I need a break.
5          If you need any water, let me know.  We
6  can get you water or anything of that sort.
7  Okay?
8          THE WITNESS:  Okay.
9  BY MR. DARKE:
10    Q.   What's your date of birth?
11    A.   12/13/49.
12    Q.   And where do you currently live?
13    A.   I live in Manteno, Illinois.
14    Q.   What's the address?
15    A.   550 South Walnut Street.
16    Q.   And who do you live there with?
17    A.   Donald.  (Indicating.)
18    Q.   And before we go --
19         MR. GAFFNEY:  Do you want the record reflect
20 that Donald Schmelzer is in the room?
21         MR. DARKE:  That's fine.
22         MR. GAFFNEY:  Along with the two named
23 individual Defendants.
24         MR. DARKE:  Yes.

6

1  MR. DARKE:  Back on the record.
2  BY MR. DARKE:
3     Q.   And what's your highest level of
4  education?
5     A.   Associate degree.
6     Q.   And what's the associate degree in?
7     A.   Business.
8     Q.   And where did you get that at?
9     A.   Southern Illinois University.
10    Q.   And do you remember what year you
11 received that?
12    A.   1970.
13    Q.   And where do you currently work?
14    A.   I work at Avenue Animal Hospital.
15    Q.   And where is that?
16    A.   That's in Tinley Park, Illinois.
17    Q.   And how long have you worked there?
18    A.   Nine months.
19    Q.   And what do you do there?
20    A.   Client care services.
21    Q.   And what does that mean?
22    A.   That means I work the front desk.
23    Q.   And what are your hours of work?
24    A.   My hours are Monday from 8:00 to 7:30,

8

1  Wednesday 8:00 to 6:30, Friday 8:00 to 6:30 and
2  one Saturday every other month from 8:00 to
3  1:30.
4      Q.   And how do you get paid?  What's the
5  pay method they pay you?
6      A.   They pay directly into my account.
7      Q.   Okay.  And do they pay you hourly or
8  salary?
9      A.   Hourly.
10     Q.   And what is that hourly rate?
11     A.   $14.
12     Q.   Has it been $14 the entire time you've
13 been there?
14     A.   Yes.
15     Q.   Do you ever work any overtime?
16     A.   I work extra time every now and then.
17 Same rate of pay.  Extra time usually a couple
18 of hours a week here and there.
19     Q.   So you never work over 40 hours in
20 one week?
21     A.   Never have.  No.
22     Q.   And where did you work before that?
23     A.   Animal Wellness Center of Monee.
24     Q.   Did you ever work at a place in

9

1      Q.   Okay.  And what were you doing for
2  Peotone?
3      A.   Receptionist.
4      Q.   And what were the job duties as a
5  receptionist?
6      A.   Mostly paperwork and filling
7  prescriptions and checking people in.  That was
8  about all I did there.
9      Q.   How did you find work at Peotone?
10     A.   They called me.  They knew I had left
11 and they called me.
12     Q.   Do you remember when they called you?
13     A.   I got a call from them the afternoon I
14 left them.
15     Q.   And do you remember what afternoon that
16 was, what day that was that you left them?
17     A.   July 31, '17.
18     Q.   And do you remember who called you from
19 Peotone Animal Hospital?
20     A.   Oh, what's her name?  The office
21 manager called me.  I will be able to come up
22 with her name.  I'm sorry I don't have it on the
23 tip of my tongue.
24     Q.   That's totally fine.

11

1  Peotone?
2      A.   I worked at Peotone Animal Hospital in
3  Peotone for four days in August of 2017.
4      Q.   And was that before or after you were
5  working at the Animal Wellness Center?
6      A.   That was after.
7      Q.   Do you remember when you started at --
8  what's the place in Tinley Park called?  Avenue?
9      A.   Avenue Animal Hospital.
10     Q.   Animal Hospital?
11     A.   I believe it was about January 27.
12     Q.   Of what year?
13     A.   2018.
14     Q.   And you mentioned you worked at Peotone
15 Animal --
16     A.   Peotone Animal Hospital.
17     Q.   -- Animal Hospital.
18          And when did you start there?  Do you
19 remember what day in August?
20     A.   I don't know exactly.  I worked the
21 first week of August of 2017, a Thursday and a
22 Friday.  And then I came back the following week
23 and I worked two days because we had a vacation
24 planned in between there.

10

1          And do you remember approximately what
2  time she called you?
3      A.   She called me, I remember in the middle
4  of the afternoon because I was sobbing when the
5  phone rang.  4:00 o'clock probably that
6  afternoon.
7      Q.   Did you ask her how she knew you were
8  no longer at the Animal Wellness Center?
9      A.   I did not ask her.  I don't know how
10 she knew.
11     Q.   And what was your hourly rate at
12 Peotone?
13     A.   $17.
14     Q.   Did you work any overtime in those
15 four days?
16     A.   No, I did not.
17     Q.   And why did you leave Peotone Animal
18 Hospital?
19     A.   We had worked with Peotone from Monee
20 for their small animals, dogs, cats.  I thought
21 that's what it mostly was.  I got in there and
22 it was mostly -- it was dogs and cats but it was
23 mostly goats, cows, horses.  I know nothing
24 about them.  I'm getting calls for prescriptions

12



**Page 13**

1  on these animals and I don't even know what they
2  mean, and I did not feel comfortable doing that.
3  I felt like I was going to cause harm if I
4  stayed.  And they spelled these names of
5  medicines for me.  I wouldn't even know what it
6  was and I'm supposed to fill it for them.  I
7  couldn't do it.  I couldn't take that chance.
8      Q.   And when you say we -- you said we work
9  with them.  Who are you referring to as we?
10     A.   Animal Wellness Center of Monee.
11          By working with them, I mean we would
12  call them for records, they would call us for
13  records.  We borrowed things from them and vice
14  versa.
15     Q.   Did you like working there?
16     A.   Yes.  It was fine.  The people there
17  were super nice.  I loved the doctor.  The
18  doctor was incredible.  One reason I didn't want
19  to do it.  He was so, so kind and I didn't want
20  to do anything to hurt him.
21     Q.   So you didn't want to leave because of
22  that reason, one of the reasons?
23     A.   Yes.  But I talked to him when I left.
24  He called me the following day, talked to me

**Page 14**

1  again to find out what he had to do to get me
2  back.  And I just couldn't do it.  I was afraid.
3      Q.   Now, you mentioned that you started at
4  Avenue Animal Hospital January of 2018.
5      A.   Yes.
6      Q.   So from September through December --
7  or actually through January 27 --
8      A.   Uh-huh.
9      Q.   2018 --
10     A.   Yes.
11     Q.   -- did you work anywhere?
12     A.   I did not.
13     Q.   Were you looking for work during that
14  time?
15     A.   Yes, sir.
16     Q.   So starting -- let's just roughly in
17  August of 2017, explain to me your job search.
18  What you were doing.  Whether it's daily,
19  weekly, monthly to try to find work.
20     A.   I had to do it weekly, because I was
21  trying to get unemployment, which they put the
22  kibosh on that.  But while I was trying to get
23  unemployment, I had to answer to them.  I had to
24  give them a list.  I had to tell them everywhere

**Page 15**

1  that I applied.  Some of it was phone calls,
2  some of it I would drop off my résumés, mostly
3  animal hospitals.  I have a list somewhere.  But
4  I had to.  They won't let you continue to try to
5  collect unemployment if you don't apply for
6  jobs.
7          Once I was denied unemployment because
8  of them, then I just kind of sporadically went
9  places and dropped off my résumé, but it was not
10 weekly.
11     Q.   And how many jobs, if you had to just
12 guess or estimate, did you look for during
13 August to January --
14     A.   To January?
15     MR. GAFFNEY:  I'm going to object to the form
16 of that question.  Speculation.
17     MR. DARKE:  You can still answer.
18     THE WITNESS:  Probably, and I am really not
19 sure, I would say probably a dozen jobs.  Most
20 of the reason I wasn't hired is because they
21 were not hiring at that time.
22 BY MR. DARKE:
23     Q.   And you filled out I'm assuming it was
24 a work search for the Illinois Department of

**Page 16**

1  Employment Security?
2      A.   I have, yes.
3      Q.   And would that have all of the jobs
4  that you were looking for during that time
5  period?
6      A.   Uh-huh --
7      MR. GAFFNEY:  Objection.  When you say that
8  time frame, she said that there were two
9  separate time frames.  So it's vague.
10         what time --
11     MR. DARKE:  The time frame from August to
12 January of 2018.
13     THE WITNESS:  Would they have a list of where
14 I applied?
15     MR. DARKE:  Yes.
16     THE WITNESS:  Illinois would.  Yes.
17 BY MR. DARKE:
18     Q.   And when you say Illinois, are you
19 referring to the unemployment office?
20     A.   Yes.
21     Q.   And you're referring to the job work
22 search that you had to fill out in order to
23 maintain any benefits?
24     A.   Yes.

1    Q.   Now, you mentioned you worked for the
2  Animal Wellness Center of Monee?
3    A.   Yes.
4    Q.   Do you remember when you started there?
5    A.   Labor Day.  14 years ago.  2004.
6    Q.   And who are the owners of Animal
7  Wellness Center?
8    A.   Lynlee Wessels.  Ed Wessels.
9    Q.   Anyone else to your knowledge?
10   A.   No, sir.
11   Q.   And back in 2004, what position were
12 you hired for?
13   A.   I was hired to work front desk at that
14 time.
15   Q.   And what did those job duties entail?
16   A.   They entailed doing all the paperwork;
17 taking out the patients ready to come in;
18 checking in the patients, checking out the
19 patients; dealing with the clients as they came
20 in; helping set up some of the lab like the
21 stool samples when they came in.  Anything that
22 would be related to the veterinary field front
23 desk.
24   Q.   Okay.  And in 2004, do you recall what

17

1    Q.   Did you get a pay increase?
2    A.   No.
3    Q.   Do you remember what your hourly rate
4  was --
5    MR. GAFFNEY:  Objection.  Time frame?
6    MR. DARKE:  Can I finish the question?
7    MR. GAFFNEY:  Okay.  I'm sorry.
8  BY MR. DARKE:
9    Q.   -- in 2004?
10   A.   In 2004, I do not remember.  I'm sorry.
11   Q.   Do you remember what it was when you --
12 in 2017 when you mentioned your employment
13 ended?
14   A.   17.50 an hour -- 17.25.  I'm sorry.
15   Q.   Was it always 17.25 during your
16 employment?
17   A.   No.  We got pay increases yearly.
18   Q.   Now, you mentioned an IRA.
19        What is an IRA?  Do you know?
20   A.   It's a retirement plan.
21   Q.   And do you recall at all what year you
22 were offered the IRA from the company?
23   A.   I do not remember what year it started.
24   Q.   But you know it was not in 2004; is

19

1  your benefits were, any benefits that you
2  received when you first started working there?
3    A.   Not sure.  At that point, I don't
4  believe we had an IRA.  We were given sick
5  leave.  We were given vacation.  I don't recall
6  how much that was at that time.
7    Q.   Okay.  Now in 2004, did you ever get
8  promoted?
9    A.   Not in 2004, no.
10   Q.   At any time after 2004 did you get
11 promoted?
12   A.   I was promoted to office manager.  I'm
13 sorry.  I don't know what year that was.
14   Q.   And as an office manager, what were
15 your job duties?
16   A.   Well, as it was put to me:  You're
17 doing office manager duties anyway, you might as
18 well be office manager.
19   Q.   So it was the same duties --
20   A.   Same duties.
21   Q.   -- as the front desk person?
22   A.   Yes.  Because I always did have the
23 responsibilities in doing reports and a lot of
24 things like that that the other girls didn't do.

18

1  that correct?
2    A.   That's correct.
3    Q.   What was the IRA?  Explain to me how
4  that whole thing worked.
5    A.   We could decide how much we wanted them
6  to take out up to a certain amount.  Up to that
7  amount, they would match it.  I took the full
8  amount that was allowed to me.  I believe it was
9  3 percent.  I took the full amount that was
10 allowed to me, and then they matched it.
11   Q.   Okay.  When you say they, you're
12 talking about --
13   A.   Animal Wellness Center of Monee.
14   Q.   And do you recall -- strike that.
15        So you had them removing 3 percent from
16 your paycheck to put into your IRA?
17   A.   That's right.
18   Q.   And then they would match that amount?
19   A.   That's right.
20   Q.   Do you know whether or not you could
21 take a loan against that IRA account?
22   A.   I don't believe so.
23   Q.   Did you ever try?
24   A.   No, sir.

20



1    Q.   Did you ever try to take out money from
2  the IRA plan for any reason?
3    A.   No, sir.
4    Q.   Did you ever tell the Animal Wellness
5  Center to stop taking money out?
6    A.   I told them to stop taking money out
7  the day they fired me because -- no, not the day
8  they fired me.  Sorry.
9         The day we discovered that they were
10 not putting the funds, that they were not paying
11 us.  I said I don't want you to do it anymore, I
12 don't want you to take any more of my money.
13   Q.   After that time you told them, did they
14 take any more money?
15   A.   No, sir.
16   Q.   So they listened to what you said?
17   A.   Yes.
18   Q.   Do you know what day that was that you
19 told them that?
20   A.   I could give you an approximate day.
21 I'm not exactly sure.
22   Q.   Okay.
23   A.   It was probably -- it was probably
24 around the middle of July.  Because we found out

21

1  about it July 5.  So I would say -- I'm going to
2  say probably July 10 or 11 is when I told them
3  to stop it.
4    Q.   Did you put that in writing?
5    A.   No, I did not.
6    Q.   And who did you tell?
7    A.   I told Scott Marhanka.
8    Q.   And where were you when you told him
9  that?
10   A.   I don't remember.
11   Q.   Was it on the phone?
12   A.   No.  It was in person.
13   Q.   Was it at the Animal Wellness Center?
14   A.   Yes, sir.
15   Q.   And your employment ended on July 31?
16   A.   That's correct.
17   Q.   2017?
18   A.   That's correct.
19   Q.   And do you recall -- the whole reason
20 we're here.
21        You filed a lawsuit against them?
22   A.   That's right.
23   Q.   And what was the reason for filing the
24 lawsuit against them?

22

1    MR. GAFFNEY:  Objection to the form of the
2  question.
3    MR. DARKE:  You can answer.
4    THE WITNESS:  My reason for filing the
5  lawsuit?
6    MR. DARKE:  Yes.
7    THE WITNESS:  Because I thought I had IRA
8  money.  I'm two years from retirement.  I'm
9  finding out there is nothing been put in it for
10 over a year.  I asked them when I was going to
11 get my money.  They didn't know.  They said they
12 were trying.  I gave them a payment plan asking
13 for them to fill it out so I knew I was going to
14 get my money.  Nothing happened.  So I had no
15 choice but to call the Department of Labor --
16 can I elaborate on it or not?
17   MR. GAFFNEY:  Well, you need to answer the
18 question that's asked.
19   THE WITNESS:  Uh-huh.
20   MR. GAFFNEY:  Specifically the question
21 that's asked.
22   THE WITNESS:  Uh-huh.
23   MR. GAFFNEY:  And then stop there.
24   THE WITNESS:  All right.

23

1    MR. GAFFNEY:  And wait for the next question.
2    THE WITNESS:  All right.  Then I will not.
3    MR. GAFFNEY:  Complete your answer though.
4    THE WITNESS:  Okay.
5    MR. GAFFNEY:  Complete your answer.
6    THE WITNESS:  It's just that everyone was
7  intending to call.  I was first.  When I called,
8  they said nobody needed to -- all four of us
9  were going to make that phone call; but since I
10 went first, no one else had to.
11 BY MR. DARKE:
12   Q.   Now, the lawsuit was filed February 19,
13 2018; is that right?
14   A.   I am not sure.
15   MR. GAFFNEY:  If you know.
16   THE WITNESS:  I do not know.
17   MR. DARKE:  Okay.
18   THE WITNESS:  I don't recall.
19 BY MR. DARKE:
20   Q.   But it was sometime after you -- the
21 employment ended at the Animal Wellness Center,
22 correct?
23   A.   Yes, sir.
24   Q.   So sometime after July 31, 2017?

24

1    A.   Yes, sir.
2    Q.   Now, as of, let's say, January 1, 2018,
3  wasn't all the money from the IRA that was not
4  initially in there put in there?
5    A.   Yes, sir.
6    Q.   Okay.  And when was that -- to the best
7  of your knowledge, when was that, the
8  contributions and everything put back into the
9  IRA plan?
10    A.   It was put back in shortly after I
11  reported them.  They gave them no choice.
12  Probably the middle of August 2017.
13    Q.   Okay.  And you said they gave them no
14  choice.
15         What do you mean by that?
16    A.   The Department of Labor called them.
17    Q.   And how do you know they gave them no
18  choice?
19    A.   Because the Department of Labor -- the
20  Department of Labor told me that.
21    Q.   Do you know who at the Department of
22  Labor told you that?
23    A.   I believe her name was Nicole.
24    Q.   Would that be Nicole Lindsay?

25

1    A.   Yes.
2    Q.   And do you remember what date you
3  talked to her when she told you that?
4    A.   July 26 I believe.
5    Q.   And that's of 2017?
6    A.   Yes, sir.
7         No, that's not correct.  I'm sorry.
8         I'm not sure when I talked to Nicole.
9  I talked to her two times.
10    Q.   And when you talked to her, were all
11  the conversations in the year 2017?
12    A.   Yes, sir.
13    Q.   Now, you said you were the first one to
14  call the DOL, correct?
15    A.   Yes.
16    Q.   And do you remember what day you called
17  the DOL?
18    A.   I reported them on July 26, 2017 or
19  somewhere thereabouts.  I'm not exactly sure.
20    Q.   And did you call them on the telephone?
21    A.   Yes.
22    Q.   And do you remember what you told them
23  the first time you called them now?
24    MR. GAFFNEY:  Are you -- it's a confusing

26

1  question because now you're saying the first
2  time she called them or are you talking about
3  July 26?
4    MR. DARKE:  Well, we can have it read back.
5         I believe she testified that sometime
6  around July 26 is the first time that she called
7  the DOL.
8    MR. GAFFNEY:  I don't believe that's what she
9  said.  I don't believe that's her testimony.
10    MR. DARKE:  Then I'll ask her.
11  BY MR. DARKE:
12    Q.   When was the first time, if you can
13  recall, that you called the Department of Labor?
14    A.   I believe the first time I called --
15  because I called them a total of three times
16  counting the time after.  So I called them on
17  the 21st of July is when I made the report, the
18  final report.
19         I'm sorry.  I'm not sure of that date.
20    Q.   That's fine.
21         So roughly around July 21 you called
22  the Department of Labor?
23    A.   No.  That's not right.  I'm sorry.  Let
24  me think.  I'm sorry.  Because I wasn't fired

27

1  until July 31.  So it was -- oh, I'm trying to
2  remember.  It was a couple of weeks before that
3  that I called the Department of Labor, but I
4  don't know the exact date.
5    Q.   And when you called them, do you
6  remember what you told them?
7    A.   Which phone call?
8    Q.   The first time.  Whenever that was.
9         Whenever the first time was, can you
10  recall what your conversation was?
11    A.   Yes.  The first time I called them I
12  told them my situation.  I told them that myself
13  and three others were planning to file.  She
14  immediately told me:  well, nobody else needs to
15  because you did.
16         And then I told the other girls.  I
17  told her what was happening, asked her what I
18  could do, what -- you know, can I do this,
19  should I do that.  Because I wasn't ready.  I
20  wasn't sure.  I got answers from her and I hung
21  up the phone.
22    Q.   And then was there a second time that
23  you talked to her?
24    A.   Yes.  I talked to the other girls.  By

28

1  the other girls, I'm talking about Mandy Holt,
2  Dr. Matthews, and Jessica McCaslin.  The ones
3  who are in the same situation as me.
4       They were getting ready to call.  I
5  explained to them that they don't need to call
6  and that I would have it taken care of.  I
7  re-called the Department of Labor with their
8  permission and then I told them the exact what
9  happened as far as them taking the money out of
10 our IRA for a year, not giving it to us, saying
11 that they would but so far it hadn't happened
12 and they would not fill anything out saying that
13 it would happen.
14      And I told her that I wanted to file.
15 I asked her if it could be -- if they could not
16 find out it was me.
17      Q.   And what did the Department of Labor
18 say?
19      A.   She said we do our best, we can't
20 promise you anything.
21      Q.   DOL actually said that?
22      A.   She said that.  Yes, she did say that.
23      And there was a third phone call.
24      Q.   Okay.  And --

29

1       A.   After we were paid.
2       The third phone call was my calling her
3  and saying:  Okay, we've got our money.  What's
4  going to happen now to them?  Do they get any
5  punishment whatsoever or do they just get a slap
6  on the wrist?
7       And those were my words.
8       And Nicole replied:  Scott was so nice
9  on the phone, so we didn't do anything else.
10      Q.   Now, when you talked to the DOL --
11      A.   Uh-huh.
12      Q.   -- was everything that you told them,
13 was that a hundred percent true from your
14 perspective?
15      A.   Yes.
16      Q.   Was there anything you told them that
17 they may have misheard or just didn't
18 understand?
19      MR. GAFFNEY:  Object to the form of the
20 question because it calls for her to understand
21 what they heard.
22      How could you ask that?
23      THE WITNESS:  I don't know.  I don't know
24 what you mean.

30

1       MR. DARKE:  Okay.
2  BY MR. DARKE:
3       Q.   I'm just wondering did Nicole or anyone
4  in the Department of Labor say:  Listen, hey, I
5  don't know what you mean that they didn't pay
6  your IRA or I don't know what you mean or what
7  your complaint is about?
8       A.   I don't recall they had any problem
9  understanding it.
10      Q.   Did they, the Department of Labor, ever
11 send you anything?
12      A.   They sent me a paper saying that it had
13 been settled.  They also told me but that they
14 have much bigger fish to fry, that the smaller
15 cases like this they don't punish.
16      Q.   Did the Department of Labor ever tell
17 you that your conversations were being recorded?
18      A.   I don't recall.
19      Q.   Do you recall if your attorney ever
20 asked the Department of Labor for the
21 information that they had on your complaint?
22      MR. GAFFNEY:  Objection.  Calls for
23 attorney-client privilege.
24      MR. DARKE:  Don't answer that.

31

1       MR. GAFFNEY:  Okay.  Thank you.
2  BY MR. DARKE:
3       Q.   Do you recall when you told -- the
4  first time you told the Animal Wellness Center,
5  either Lynlee or Scott, that you're the one that
6  called the Department of Labor?
7       A.   Well, they knew it.  I didn't have to
8  tell them.
9       Q.   How did they know it?
10      A.   I'm not in their heads.  I can't tell
11 you what they were thinking.  I can tell you my
12 perception of --
13      Q.   Okay.  Tell me what your perception is.
14 Because you just testified they knew and I'm
15 wondering how you know they knew and now you're
16 saying you don't know.
17      MR. GAFFNEY:  Objection.  That misstates her
18 testimony, but -- is there a question pending?
19      MR. DARKE:  Yes.
20 BY MR. DARKE:
21      Q.   When was the first time you told Lynlee
22 or Scott that you called the Department of
23 Labor?
24      A.   I sent them an email to confirm it

32



1 after I had been fired.
2    Q.   And do you remember what day you sent
3 that email?
4    A.   I do not.  I have a copy and you
5 probably do, too.  I don't know the day.
6    Q.   I'm going to show you a -- one second
7 before we go there.  Strike that.
8        When you said you told them, was it via
9 email, a text message, orally?  How was it?
10    A.   It was via email.
11    MR. DARKE:  I'm going to show you a document
12 that we're going to mark as Exhibit 1.
13        And let me know if you recognize that
14 document.
15              (whereupon, Schmelzer Deposition
16               Exhibit No. 1 was marked for
17               identification.)
18    THE WITNESS:  Well, they called.  Are you
19 talk talking about the part where the girl says
20 they called?
21    MR. DARKE:  I'm just asking you if you
22 recognize that document.
23    THE WITNESS:  I do not.
24

33

1 BY MR. DARKE:
2    Q.   Do you recognize that text at the
3 bottom where it says FOI the Department of Labor
4 has my name, but we all called and they didn't
5 need multiple names.
6        Did you ever send that text to --
7    A.   Apparently I did.  And it's true.
8    Q.   That's fine.
9    MR. GAFFNEY:  Just answer the question.
10    THE WITNESS:  Okay.
11    MR. GAFFNEY:  Don't jump around or try to add
12 more than answering the question.  Just listen
13 to the question --
14    THE WITNESS:  No.  I don't recognize it.
15    MR. GAFFNEY:  -- understand the question, and
16 then answer the question.  That's all your job
17 is.  That's all you have to do.
18    THE WITNESS:  Okay.
19 BY MR. DARKE:
20    Q.   Do you recall sending them an email or
21 a text message saying that?
22    A.   I do not.
23    Q.   You do not.
24        But you mentioned you sent an email to

34

1 them telling them that?
2    A.   Yes, sir.
3    Q.   And do you remember specifically what
4 time of day in the afternoon of or the evening
5 of July 31 that you sent that email?
6    A.   Was it July 31?  Because I --
7    Q.   Well, you testified to that earlier.
8 I'm just assuming it was.
9    A.   I don't know what day I sent them the
10 email saying yes, you're right, I am the one who
11 did it.
12        Is that what you're asking?
13    Q.   I'm just trying to find out when Lynlee
14 and Scott first learned that you're the one who
15 made the complaint to the Department of Labor.
16 If you know.
17    A.   I do not know the date they found out
18 for sure.
19    Q.   But you sent them an email --
20    A.   After I was fired, yes.
21    Q.   Okay.  And do you remember what day you
22 sent that email?
23    A.   I do not.
24    Q.   Do you remember what you said in that

35

1 email?
2    A.   I said something to the effect of yes,
3 you are right, I am the one who turned you in.
4    Q.   Could it have been a text message?
5    A.   No.  No, sir.  I did not text them.
6 No, sir.
7    Q.   So you never sent them a text message?
8    A.   I don't believe I did.
9    Q.   Now, if you had that email, could you
10 provide it to your attorney so he can provide it
11 to us?
12    MR. GAFFNEY:  I think I've seen it.  It's
13 been produced.
14    MR. DARKE:  Not an email.
15    MR. GAFFNEY:  I believe there's an email out
16 there.  Yes.
17 BY MR. DARKE:
18    Q.   When you say -- you mentioned that you
19 said yes, you are right, I'm the one who called.
20        What did you mean by that?
21    A.   They were right, I'm the one who
22 reported them.
23    Q.   Did they ask you if you reported them?
24    A.   No.

36



1    Q.   Did they have any conversation for you
2  to send an email like that?
3    A.   No.
4    Q.   So you just responded -- you just sent
5  an email saying yes, you're right.
6         You weren't answering any question
7  anyone asked you?
8    A.   I was not.  No.  There was no question
9  asked.
10    Q.   Now, prior to that email, did you ever
11  talk to them that you filed a complaint with the
12  Department of Labor?
13    A.   No, sir.
14    Q.   Do you know if anyone else at the
15  Animal Wellness Center told them that you had
16  filed a complaint with the Department of Labor?
17    A.   I don't know.
18    Q.   Do you have any personal knowledge
19  whether or not they knew that you're the one
20  that filed a complaint with the Department of
21  Labor regarding the IRA not being funded?
22    A.   I am going to the circumstances
23  surrounding it as to why they knew it was me.
24    Q.   What are those circumstances?
                                                    37

1    A.   The circumstances are my husband is the
2  one who discovered it.  He's the one who
3  confronted them with it.  I'm the one who was
4  the assertive one at the meeting.  Nobody else
5  really spoke up very much.  I'm the one who had
6  the two years before retirement.  I'm the one
7  who had the most --
8         (Interruption.)
9    MR. GAFFNEY:  Let the record reflect that the
10  witness's testimony was interrupted by some
11  intercom statement that is irrelevant to this
12  proceeding.
13         Please proceed.
14    THE WITNESS:  I'm the one that was to suffer
15  the most because I was getting ready to retire.
16  And that put that to an end.
17    MR. DARKE:  Okay.
18  BY MR. DARKE:
19    Q.   So do you know whether or not anyone
20  told them that -- strike that.
21         So how would they know, if you have any
22  personal knowledge how would they know that
23  you're the one that filed the Department of
24  Labor complaint?
                                                    38

1    MR. GAFFNEY:  Objection to the extent asked
2  and answered.
3         Are you asking her to repeat what she
4  just said?
5    MR. DARKE:  She didn't answer the question.
6  She talked about the circumstances.
7    MR. GAFFNEY:  She told you -- okay.  So
8  what's your next question?
9    MR. DARKE:  If she has any personal
10  knowledge --
11    MR. GAFFNEY:  Personal knowledge.
12    MR. DARKE:  -- of when Lynlee and Scott --
13  how Lynlee and Scott would have known that the
14  Department of Labor, that she was the one that
15  filed the complaint.
16    MR. GAFFNEY:  Right.  And I think that's been
17  fully explored and she's answered it.
18    MR. DARKE:  She hasn't answered.
19    MR. GAFFNEY:  Is there any additional I guess
20  is what he's asking for.
21    THE WITNESS:  They knew I had the most to
22  lose.  They knew I was the most assertive at the
23  meeting.  I was the only one who said anything
24  at the meeting out of the three of us.
                                                    39

1  Dr. Matthews wasn't invited to that meeting.
2  She wasn't aware of it at all.  So she wasn't
3  even there.  And they knew how angry and sad he
4  was that they did this to us.  The other girls
5  were yeah, that's too bad.  They knew it was me.
6  BY MR. DARKE:
7    Q.   And I'm asking:  How did they know?
8    A.   I don't know what else you want me to
9  say.
10    Q.   So you're just speculating that they
11  knew because of the circumstances because your
12  husband was upset, your husband is the one who
13  brought it up front, you're the one that was
14  assertive in the meeting?
15    MR. GAFFNEY:  Objection.  Now you're trying
16  to rephrase her testimony and asking her to now
17  apparently put a circle around that and then say
18  that that's all there is even though she said
19  other things.
20         So can you rephrase the question,
21  please?
22    MR. DARKE:  I'm just trying to figure out how
23  she knows.  She keeps saying I know because of
24  the circumstances.
                                                    40



1    MR. GAFFNEY:  Okay.
2  BY MR. DARKE:
3       Q.   So those are the only circumstances why
4  you believe you knew?
5       A.   I don't believe I knew.  I knew.
6       Q.   That's what I'm trying to -- how did
7  you know?  Did anyone tell you?
8       A.   No one told me.  The way she treated me
9  said it all.
10      Q.   Okay.  So that's how you knew because
11 of the way she was treating you after that
12 meeting?
13      A.   That's not the only reason.  No.  The
14 other ones I just told you.
15      Q.   What are the other reasons?
16      MR. GAFFNEY:  Well, she's already given you
17 additional.  Do you want her to regurgitate what
18 she already said?
19      MR. DARKE:  I do.
20      MR. GAFFNEY:  No.  Wait a second.  That's
21 asked and answered.  You can't have the witness
22 continually repeat the same circumstances that
23 she's already put on the record once.
24      MR. DARKE:  She keeps saying those

41

1  circumstances and then others.  I want to know
2  if she's exhausted her answer, then say that's
3  all of them.
4       MR. GAFFNEY:  Then you can ask other than
5  what you've already testified to is there
6  anything else.  She just said the way she was
7  treated was an additional circumstance.  You can
8  either explore that or ask is there anything
9  else.
10      MR. DARKE:  I did and she said there's other
11 things.
12      THE WITNESS:  There's nothing else.
13      MR. DARKE:  Okay.  That's all I wanted to --
14 nothing else.
15 BY MR. DARKE:
16      Q.   But isn't it true -- well, strike that.
17           Now, do you remember when that meeting
18 took place, the meeting regarding when you first
19 learned from the Animal Wellness Center that the
20 IRA was not funded?
21      A.   Well, we knew it when we saw the
22 statement.
23      Q.   When was that date?  Do you remember?
24      A.   July 5 or somewhere near that is when

42

1  we saw the statement, when my husband saw the
2  statement.
3       Q.   Okay.  And after July 5 or after you
4  found out about the statement --
5       A.   Uh-huh.
6       Q.   -- was there ever a meeting with Animal
7  Wellness Center?
8       A.   Well, my husband talked to Scott.  But
9  do you mean that?  Or do you mean a meeting with
10 all of us?
11      Q.   Just you.
12      A.   Me?
13      Q.   A meeting with Animal Wellness Center.
14      A.   Not just me and Animal Wellness Center.
15 No.
16      Q.   Well did Animal Wellness Center have a
17 meeting with all the participants regarding the
18 IRA?
19      MR. GAFFNEY:  Objection.  Do you mean all the
20 participants or do you mean some of the
21 participants?
22      MR. DARKE:  With any of the participants.
23      THE WITNESS:  With all of them, no.  With
24 some of them, yes.  With all of them, no.

43

1  BY MR. DARKE:
2       Q.   And what date was that?
3       A.   That was July 26, '17.
4       Q.   July 26, 2017?
5       A.   Yes.
6       Q.   Do you remember how that meeting was
7  told to you or how you learned about that
8  meeting?
9       A.   Yes.
10      Q.   And how did you learn about that
11 meeting?
12      A.   I believe Dr. Wessels told us we're
13 going to have a meeting on Saturday to discuss
14 this.
15      Q.   And when she said to discuss this, what
16 did you take that to mean?
17      A.   We knew what it was.
18      Q.   How did you know what it was?
19      A.   Because that's all -- the air was so
20 thick you could cut it with a knife.
21      Q.   Okay.  Did you guys ever have a meeting
22 prior to July 26 regarding the IRA plan?
23      A.   No, sir.
24      Q.   Did you have a meeting around July 6,

44

1  2017?

2      A.  Not that I recall.

3      MR. GAFFNEY:  Do you mean the 8th, by the

4  way, which is a Saturday?

5      MR. DARKE:  Yes, it would be.

6      MR. GAFFNEY:  Do you want to see a calendar?

7      MR. DARKE:  No.

8  BY MR. DARKE:

9      Q.  So you first learned when your husband

10  found out on the statements?

11      A.  Yes.

12      Q.  Correct?

13      A.  Yes.

14              (Short pause.)

15      THE WITNESS:  That meeting was on July 8.

16  BY MR. DARKE:

17      Q.  What meeting is that?

18      A.  Go ahead.  I'll just answer your

19  question.

20      MR. GAFFNEY:  No.  Go ahead.  He asked you a

21  question.

22              What meeting was that?

23      THE WITNESS:  The meeting with the three of

24  us.

45

1  BY MR. DARKE:

2      Q.  And the three of you, who do you mean?

3      A.  Jessica McCaslin, myself, Mandy Holt,

4  Dr. Wessels, and Scott.

5          Dominique Matthews was not invited to

6  that meeting, knew nothing about it.

7      Q.  And what was discussed at that meeting?

8      A.  The IRA.

9      Q.  And did someone at the Animal Wellness

10  Center tell you about the IRA?

11      A.  Dr. Wessels explained it.

12      Q.  And what did she tell you?

13      A.  She told us that she was in jeopardy of

14  losing her home and she had no way of not losing

15  her home other than to take our money from the

16  IRA, that they were hoping that they would be

17  able to pay it back, that her dad began this and

18  they had known about it for two months --

19  two years.  Sorry.

20      Q.  Well, that would put it back in July

21  of Two Thousand --

22      A.  Actually, one year.  I'm sorry.  They

23  had known about it for a year.

24      Q.  And what else?  Any additional

46

1  information did she say during that meeting?

2      A.  Not really.  She never said she was

3  sorry.  Most of the rest of it was back and

4  forth between us and her.  Nothing directly

5  herself.

6      Q.  Did she ever talk about a loan that

7  they were taking out?

8      A.  She said there was a loan but they were

9  having trouble getting money from it.  They were

10  having trouble getting a loan.

11      Q.  Did she ever mention when they first

12  started trying to obtain that loan?

13      A.  No, sir.  They did not.

14      Q.  Do you know whether or not they started

15  to get -- well, strike that.

16          All right.  Then after Dr. Wessels

17  talked, did anyone else in the meeting talk?

18      A.  I did.

19      Q.  Okay.  And what did you say?

20      A.  I said I would not steal so much as a

21  postage stamp from you, why would you do this to

22  us.  I would sell my house before I would do

23  this to you.  I said what you should do is take

24  the boarding dogs, do them yourselves.

47

1          And by that I mean Scott walks dogs,

2  Lynlee feeds them, which is exactly what he and

3  I did.  He walks dogs, she feeds them.  They

4  paid us money to do that.  I said you take that

5  money, you put it in a pot and you pay us with

6  some of that to help.  I suggested that.

7          Mandy, who was sitting next to me, said

8  why wouldn't you come to us, we were friends,

9  why wouldn't you come to us and talk to us about

10  this rather than letting it go on and on.

11          The main thing was saying we didn't

12  understand how they could do this to us and not

13  talk to us and explain it to us when they had

14  known for two months that it had been going on.

15      Q.  Did they only know about it for

16  two months?

17      MR. GAFFNEY:  Objection.  Calls for

18  speculative as to somebody else's state of mind.

19      THE WITNESS:  I have no idea how long they

20  knew.

21  BY MR. DARKE:

22      Q.  So earlier you testified that they knew

23  this had been going on for a year?

24      A.  It had been going on for a year.  I

48

1  don't know that they knew it had been going on
2  for a year.  I don't know whatever's in their
3  heads.
4      Q.  Okay.
5      A.  But it had been going on for a year but
6  they told us they had known about it for
7  two months.
8      Q.  And did you ever talk -- did they ever
9  talk about, did anyone in that meeting ever talk
10  about a payment plan?
11      A.  No.  Not at that meeting, no.
12      Q.  At any time while this was going on did
13  anyone talk about a payment plan?
14      A.  No, sir.
15      Q.  Did you ever provide them a payment
16  plan option?
17      A.  Yes.
18      Q.  And do you remember when that was?
19      A.  It was probably a few days after when
20  we were not hearing any more about receiving any
21  money I gave him a payment plan.
22      Q.  And do you remember what that payment
23  plan said?
24      A.  I believe it gave them a payment

49

1  like -- I'm not exactly sure.  Like once a
2  little bit a month until it was paid off.  Maybe
3  it was three months divided up.  I'm not sure.
4      Q.  Do you know how much -- how much money,
5  if you know, was not put into your IRA plan?
6      A.  Mine in particular or in total?
7      Q.  Yours in particular.  Just yours.
8      A.  I believe mine was $2500.
9      Q.  And were you paid all that money back?
10      A.  Yes, sir.
11      Q.  Was it all put back in your IRA?
12      A.  Yes, sir.
13      Q.  Was there any additional money placed
14  in there for interest or anything do you know?
15      A.  Yes.  We asked at the meeting that we
16  not lose money on this, that we be paid
17  interest, they pay whatever you call it.
18      Q.  Did they provide that 3 percent match
19  that you were talking about before?
20      A.  Yes, sir.  They had to.  The Department
21  of Labor had them do that.
22      Q.  And did you ever send them an email
23  regarding that meeting on July 8?
24      A.  Not that I recall.

50

1      MR. DARKE:  I'm going to provide with you a
2  document and mark it as Exhibit No. 2.
3          Let me know if you recognize that
4  document.
5              (whereupon, Schmelzer Deposition
6               Exhibit No. 2 was marked for
7               identification.)
8      THE WITNESS:  Well, this wasn't anything to
9  do with the meeting, it was more the fact that
10  you screwed up and I'm not going anywhere.
11  BY MR. DARKE:
12      Q.  Is this -- the email address up there
13  says Joey Schmelzer, jeshoundog@sbcglobal.net.
14          Is that your email?
15      A.  Yes, sir.
16      Q.  Is that your personal email?
17      A.  Yes, sir.
18      Q.  Is that how you communicate when you're
19  sending emails out?
20      A.  Yes, sir.
21      Q.  Are there any other email accounts that
22  you would send emails out on?
23      A.  No -- there is now.  I have one at
24  work, but there was not then.

51

1      Q.  And you did send this to the people
2  listed in the two boxes there?
3      A.  Scott, Lynlee, and her father.
4      Q.  And who is newday1?
5      A.  That would be Scott.
6      Q.  And who is the second one?  Doggy --
7      A.  Dr. Wessels.
8      Q.  And then the last one there?
9      A.  Her father, Ed Wessels.
10      Q.  And that is what -- at the Yahoo
11  account there?
12      A.  Yes.
13      Q.  The last one?
14      A.  Yes.
15      Q.  Now, in this first paragraph the last
16  line says:  I have decided it would be in my
17  best interest to continue.
18      A.  Uh-huh.
19      Q.  What did you mean by that?
20      A.  I mean that I didn't think at my age
21  that I would be able to get a job anywhere else
22  so I was going to stay there.
23      Q.  It also says you have a plan to retire
24  in about two and a half years; is that correct?

52

1  A.  Yes.  I did then.
2  Q.  It also says in there that you felt
3  betrayed?
4  A.  Yes.
5  Q.  Was that part of the theme regarding
6  that July 8 meeting that everyone sort of felt a
7  little betrayed?
8  MR. GAFFNEY:  Objection to the form of the
9  question about everyone.
10  Are you asking about her personally?
11  MR. DARKE:  I'll get your personal.
12  THE WITNESS:  I felt betrayed as a friend.
13  Not as an employee.  It was the same with me as
14  anybody else, but I felt betrayed as a friend.
15  BY MR. DARKE:
16  Q.  Did you ever get over that feeling?
17  A.  I'm still not over it.  I still cry
18  about it.
19  Q.  The second to last paragraph says: I
20  hope you will agree that I always give
21  110 percent.  I promise to give you 100 percent,
22  but for now going that extra mile isn't in my
23  heart.
24  A.  Yes.

53

1  Q.  So did your performance at all decrease
2  because of that betrayal that you were feeling?
3  A.  Well, there really wasn't a whole lot
4  of time in between there.  The answer is the
5  extra things I did, I never had an opportunity
6  to do or not do during that time.
7  Q.  Okay.  Now, can you tell me what the
8  date this email was that you sent?
9  A.  July 9.
10  Q.  Now, after July 9, do you recall ever
11  sending any other email to Scott or Lynlee
12  regarding this IRA issue?
13  A.  Regarding the IRA?  I don't recall
14  sending any other emails regarding the IRA.
15  Q.  Do you ever remember receiving any
16  note, in a mailbox or any note handed to you
17  regarding the IRA plan?
18  A.  I don't recall.
19  MR. DARKE:  Now, I'm going to show you a
20  document.
21  Will you mark that as Exhibit 3.
22  (Whereupon, Schmelzer Deposition
23  Exhibit No. 3 was marked for
24  identification.)

54

1  MR. DARKE:  And tell me if you recognize this
2  document.
3  THE WITNESS:  This was the payment plan that
4  they did not agree to.
5  BY MR. DARKE:
6  Q.  So when you say payment plan, are you
7  referring to the non-payment of the IRA
8  contribution?
9  A.  This is repayment.  Yes.
10  Q.  And who created this document?
11  A.  I did.
12  Q.  And who did you provide this document
13  to?
14  A.  Scott.
15  Q.  And in the upper left-hand corner, it
16  says July 10.
17  Is that when you provided it to Scott
18  and Lynlee?
19  A.  Yes.  That's when I wrote it.  It might
20  have been the following day.  I don't know.
21  Because I wrote this from home.
22  Q.  And did they agree to this?
23  A.  No.
24  Q.  When you provided this to them, what

55

1  did they say to you, if anything?
2  A.  Scott said I'm working on getting you
3  paid.
4  Q.  Did he agree to that payment plan?
5  A.  No, sir.
6  Q.  Did he provide you any letter or note
7  regarding a different payment plan?
8  A.  Not that I recall.
9  Q.  Did he ever say that he wanted to pay
10  you faster than what this payment plan said?
11  A.  He said he was working on it.
12  MR. DARKE:  Mark this as Exhibit 4.
13  (Whereupon, Schmelzer Deposition
14  Exhibit No. 4 was marked for
15  identification.)
16  MR. DARKE:  Just take a look at this and let
17  me know if you recognize what this document is.
18  (Short pause.)
19  THE WITNESS:  I do not remember this.  No,
20  sir.
21  BY MR. DARKE:
22  Q.  Do you recognize the handwriting in the
23  upper portion of --
24  A.  That is Scott's handwriting.

56



1    Q.   So you do recognize it?
2    A.   Yes.
3    Q.   And what about the handwriting at the
4  bottom?
5    MR. GAFFNEY:  Object --
6    THE WITNESS:  Dr. Wessels.
7    MR. GAFFNEY:  Never mind.
8  BY MR. DARKE:
9    Q.   You don't ever recall seeing this
10  before?
11   A.   No, sir.  I do not.
12   MR. GAFFNEY:  If this hasn't been produced,
13  can we have an agreement that if you're going to
14  show her things that you haven't previously
15  produced, you show it to me first?
16   MR. DARKE:  It certainly was produced.
17   MR. GAFFNEY:  There's no Bates label on it,
18  but --
19   MR. DARKE:  I grabbed the Bates labeled one.
20   MR. GAFFNEY:  I don't think so.
21   MR. DARKE:  As a matter of fact, I think you
22  produced this to us.  Although I'll double-check
23  it.
24   MR. GAFFNEY:  Let's keep going.  I'm not

57

1    A.   It was --
2    MR. GAFFNEY:  Object to the form of the
3  question.
4        I mean I think I know what the question
5  is, but can you -- what's the topic?
6    MR. DARKE:  The IRA plan.  Talking to Mandy
7  about the IRA plan and whether or not it was
8  less than five times.
9    MR. GAFFNEY:  All right.
10   THE WITNESS:  It was probably more than five
11  times.
12  BY MR. DARKE:
13   Q.   And what did you talk about regarding
14  the IRA plan?
15   A.   First of all, we talked about the
16  Department of Labor and who was going to do what
17  and when.  If it was the best route to go
18  because we felt we were never going to get the
19  funds if we didn't.  We talked about how to fix
20  Mandy.  Because she quit.  She had to change her
21  whole life.  On how it would affect me.  Those
22  are the things we talked about.  It wasn't
23  meetings.  It was co-workers, friends, talking.
24  And yes, we discussed the IRA.

59

1  making a huge issue out of this.  I just want to
2  be aware of anything we're going to use at the
3  dep today.  That's all.
4    MR. DARKE:  Yep.
5  BY MR. DARKE:
6    Q.   So you don't remember ever seeing that
7  document?
8    A.   No, sir.
9    Q.   Now, did you have or did you
10  participate in any meeting from July 8 through
11  your last day of employment on July 31 regarding
12  the IRA plan?  Were you involved?
13   A.   In the one we just discussed?  No.
14   Q.   Other than July 8, were there any other
15  meetings?
16   A.   No.
17   Q.   Did you ever talk to Mandy about the
18  IRA plan?
19   A.   Sure.
20   Q.   And do you remember how many times you
21  talked to her?
22   A.   Well, Mandy -- no, I don't.
23   Q.   Okay.  Do you think it was less than
24  five times?

58

1    Q.   Now, do you remember the -- do you
2  recall the total number of participants that
3  were in the IRA plan?
4    A.   Well, it was six all together I believe
5  with them.
6    Q.   And when you say with them --
7    A.   With Dr. Wessels and Scott.
8    Q.   Okay.  Now, how many of those
9  participants, if you know, still work for the
10  Animal Wellness Center?
11   A.   Dr. Matthews.  One.
12   Q.   What about Scott?  Does he still work
13  there?
14   A.   Scott still does I believe.
15   Q.   What about Lynlee?
16   A.   I believe she does.
17   Q.   What about Mandy?
18   A.   No, sir.
19   Q.   And do you know how Mandy's employment
20  ended?
21   A.   I don't get inside Mandy's head.  I can
22  only tell you what she told me.
23   Q.   That's fine.
24   A.   All right.  She told me that she told

60

1 them that she was leaving for reasons that would
2 make them happy and the real reason she left is
3 because she didn't trust them.
4     Q.   Do you remember when she left?
5     A.   She left probably less than a week
6 after I was fired.  She gave notice though.
7     Q.   Okay.  What about Jessica?  Do you know
8 when she left?
9     A.   Jessica left before I did.
10     Q.   Do you remember how long before you?
11     A.   Maybe a week.  That's an estimate.
12     Q.   So Jessica was the first to leave?
13     A.   Yes, sir.
14     Q.   Or Jessica's employment ended first and
15 then your employment ended and then Mandy?
16     A.   Mandy's, yes.
17     Q.   So on July 31, your employment ended.
18 How did your employment end?
19     A.   How far back do you want me to start?
20 That day?
21     Q.   Let's start July 31.
22     A.   All right.  As had happened for the
23 previous weeks after this all happened, all
24 right -- can I do a little diagram?  Is that

61

1 okay?
2     MR. GAFFNEY:  No.  Don't do a diagram.  Just
3 testify.
4     THE WITNESS:  All right.  Three of us at the
5 front desk.  Me, Lindsay Wilke -- two of us.
6 I'm sorry.  Lindsay Wilke, me.  Dr. Wessels and
7 I were close.  I mean close and personal.  Okay?
8 I had given her a note as I always do, put it on
9 the counter, and I said when are we going to
10 begin doing surgeries again because our surgery
11 schedule had been altered.  And as she had done,
12 she didn't come to me.  She comes over to the
13 right-hand side to Lindsay, hands her the note
14 and gives her the answer.
15     Now, I had dealt with this for -- ever
16 since this went down.  So I went over to her
17 desk and I said why the fuck are you not talking
18 to me.  She was sitting at her desk.  Scott was
19 standing over to the right.
20     Q.   Okay.
21     A.   She looked at me, stared at me with the
22 coldest eyes you've ever seen, stared at me and
23 said nothing.  I said do you want me to leave.
24 And finally she said yes.  I looked at Scott and

62

1 I -- I said why.  Scott said maybe because of
2 the way you just talked to her.  And then I
3 turned to him, because I thought he and I, you
4 know.  I'm sorry.  We're close.  I said you,
5 too, meaning you're going along with this.  So I
6 just walked out.  Scott walked behind me and
7 said give me your key.
8     Q.   How many times -- strike that.
9          Was there anyone else in that area?
10     A.   No, sir.
11     Q.   Do you know if anyone else was in the
12 building?
13     A.   I know the employees that were in the
14 building.
15     Q.   Okay.  Who were the employees in the
16 building?
17     A.   Lindsay Wilke was at the front desk.
18 Mandy Holt was in the pharmacy.  She had been in
19 an exam room; but when I came out, she was in
20 the pharmacy.  Dr. Nykaza was in the pharmacy.
21 I believe that's all.
22     Q.   Were there any customers in the
23 building?
24     A.   I believe there was one customer in the

63

1 exam room.  I did not see her.
2     MR. DARKE:  To make it a little easier, I'm
3 going to mark this as Exhibit 5.  And it's
4 really just to get a bearing of what the office
5 space looks like.
6          (whereupon, Schmelzer Deposition
7          Exhibit No. 5 was marked for
8          identification.)
9     MR. GAFFNEY:  Can I ask, just for the record,
10 are you suggesting that this chart is to scale
11 or maybe to scale or maybe not to scale?  Do you
12 know if this is to scale?
13     MR. DARKE:  I don't know if it's to scale.  I
14 think it just gives a rough estimate or I'll
15 ask.
16     MR. GAFFNEY:  Do you understand what the term
17 to scale means?
18     THE WITNESS:  Uh-huh.
19     MR. GAFFNEY:  Which would be more like an
20 architectural diagram and has dimensions and
21 such.  So...
22 BY MR. DARKE:
23     Q.   Does this drawing, does it represent
24 some type of scale of the Animal Wellness

64



1 Center?
2 A. Yes.
3 Q. Okay. Now, if you see on the top of
4 the document it says exit.
5 Is that also the entrance?
6 A. Here?
7 Q. Yes.
8 A. No. That is the back door that goes
9 back to the fenced-in area for the dogs.
10 MR. GAFFNEY: That one?
11 THE WITNESS: This is the entrance.
12 MR. GAFFNEY: At the top of the page you're
13 asking about now?
14 MR. DARKE: Yes. At the top of the page.
15 MR. GAFFNEY: Okay.
16 BY MR. DARKE:
17 Q. Point to me on the diagram where you
18 just said -- a note was passed?
19 A. Uh-huh.
20 Q. Where was that?
21 A. Right here (indicating).
22 MR. GAFFNEY: Let the record reflect she's
23 pointing to the area where there's an arrow
24 saying reception desk.

65

1 MR. DARKE: Yes.
2 BY MR. DARKE:
3 Q. Now, who was in that reception area?
4 A. I was by the curve that you see. And
5 then there's a space and then Lindsay Wilke was
6 to the left of me and you're looking at it.
7 Q. Now if you look above where it says on
8 the right-hand side reception desk, it says
9 client waiting area?
10 A. Yes.
11 Q. You mentioned you were at the curve.
12 Are you behind what looks like the
13 actual desk?
14 A. Yes.
15 Q. So after the note was placed there,
16 what did you do after that?
17 A. Which note? The one I gave her or the
18 one --
19 Q. The one you gave -- let's do the one
20 that you gave her.
21 A. The one I gave her I placed -- I placed
22 up on a little counter directly opposite the
23 curve. That's where we put our little notes.
24 She also had a mailbox right here. It could

66

1 have been in there. I'm not sure. That's where
2 I placed it.
3 Q. And then what happened next with that
4 note?
5 A. I didn't see her but apparently she
6 picked it up, read it.
7 Q. Okay. And who did she hand it back to?
8 A. She came back over to the far left and
9 handed it to Lindsay.
10 Q. Still within this reception desk area?
11 A. Yes.
12 Q. Okay. And then if you recall, where
13 did Lynlee walk to next?
14 A. Her office.
15 Q. Now, where is her office located?
16 A. If you go around, this little dotted
17 line right here?
18 Q. Yes.
19 A. That's her office.
20 Q. On the left side, it says Lynlee's desk
21 with an arrow pointing to it.
22 Is that accurate?
23 A. Yes.
24 Q. And what did you do after she walked

67

1 out?
2 A. I looked at Lindsay and I said I can't
3 take this anymore. And I said I've got to talk
4 to her. Then I walked around to her desk.
5 Q. Were you upset?
6 A. I was confused.
7 Q. Okay. And then what did you do when
8 you walked around? What did you say? Is that
9 when you said --
10 A. That's when I said that. Yes.
11 Q. And -- why the fuck aren't you talking
12 to me?
13 A. Yes.
14 Q. And she never responded?
15 A. No, sir. She just stared at me.
16 Q. Did you ever say do you want me to
17 quit?
18 A. No. I said do you want me to leave.
19 Q. How many times did you say that?
20 A. One time. It only took one time.
21 Q. Now, do you know where -- when you
22 walked out to go around to Lynlee's desk --
23 A. Uh-huh.
24 Q. Do you know what Lindsay did?

68

1    A.   I don't think she did anything.  She
2  just sat there.
3    Q.   Now, when you were in that reception
4  area do you remember if any customer or clients
5  were in the waiting area?
6    A.   No.
7    Q.   Now, where were the other individual
8  employees, if you know --
9    A.   Uh-huh.
10    Q.   -- if you can point on this map, where
11  were they located?
12    A.   Mandy was going into the exam room.
13  The one client that was there.  And the exam
14  room is right here.  And Dr. Nykaza --
15    Q.   Uh-huh.
16    A.   -- this is the pharmacy.  She was
17  sitting over here at the computer in the
18  pharmacy right there.
19    Q.   Now, if someone is in the exam room,
20  are those doors shut?  Open?
21    A.   Shut.
22    Q.   Shut?
23    A.   Uh-huh.
24    Q.   Now, if you go back to Lynlee's desk,

69

1  it looks like there's an opening.
2         Is there a door there at all?
3    A.   No, sir.
4    Q.   So is that wide open?
5    A.   Yes, sir.
6    Q.   Now, when you walked back into Lynlee's
7  desk area and you said why the fuck aren't you
8  talking to me --
9    A.   Uh-huh.
10    Q.   -- how loud did you say it?
11    A.   I didn't say it loud at all.  I just
12  said it matter of fact.
13    Q.   So you weren't angry at her?  Confused?
14    A.   I wasn't angry yet.  No.  I was angry
15  later.
16    Q.   When you say later, when was that?
17    A.   When she told me to leave.
18    Q.   When she said yes --
19    A.   Uh-huh.
20    Q.   -- did you say anything in response to
21  her?
22    A.   Not to her.
23    MR. GAFFNEY:  Objection.
24

70

2    Q.   Okay.  And then after Scott asked for
3  your key, what did you do next?
4    A.   I said Scott, I'll get your key.  I
5  gave him his key.  I gave Mandy a hug.  I got my
6  cup.  Lindsay turned around and said Joey, your
7  cup, because it was kind of a special one.  I
8  took the cup from Lindsay and I left.
9    Q.   Okay.  Now, you mentioned you gave
10  Mandy a hug?
11    A.   Uh-huh.
12    Q.   Where was Mandy when you gave her a
13  hug?
14    A.   She was in the pharmacy at that point.
15  She had come out of the exam room and gone into
16  the pharmacy.
17    Q.   Now on the right side, it looks like
18  there's two exam rooms.
19         Do you know which exam room she was
20  actually in?
21    A.   She was in the one closest to the
22  lobby.  This one here.
23    Q.   And how do you know that?
24    A.   I saw her walk in there.  She was

71

1  walking in there with a client whenever I would
2  see Dr. Wessels.  So that's how I knew there was
3  no client listening.
4    Q.   When you have a patient in an exam
5  room, is there any schedule or anything that you
6  block that exam room off?
7    A.   Yes.
8    Q.   Is it pretty accurate?
9    A.   The exam room itself is not blocked
10  off.  Just the time.
11    Q.   Okay.
12    A.   Whether it's a cat or a dog is what
13  makes the difference.
14    Q.   Okay.  And there's records of that?
15    A.   There should be.
16    Q.   All right.  You gave Mandy a hug and
17  then what did you do after that?
18    A.   I left.
19    Q.   And did you go home?
20    A.   Yes.
21    Q.   Did you talk to anyone?  Did you call
22  anyone after you got home to talk about what
23  just happened?
24    A.   I told my neighbor.  Yes.  I told my

72

1  neighbor.
2      Q.   And what did you tell your neighbor?
3      A.   I said Lynlee fired me.
4      Q.   Did you tell her anything else or him?
5      A.   Her.
6           I wasn't really able to talk very much
7  at that point.
8      Q.   And what's your neighbor's name?
9      A.   Veronika Dorr.
10     Q.   And then did you talk to anyone else
11 that day on July 31?
12     A.   No.  I just sat and cried all day.
13     Q.   Did you tell your husband?
14     A.   He was there when I walked in.  Yes, I
15 told him when I walked in the door.
16     Q.   And what did you tell him?
17     A.   I walked in.  I said Lynlee fired me.
18 And then I couldn't talk anymore.  We talked
19 about it later.
20     Q.   Okay.  And what did you talk about
21 later then?
22     A.   Well, he knew what was going on with
23 the IRA.  So I told him that she fired me
24 because of what I said to her, apparently.

73

1      Q.   And did you believe -- I mean is that
2  what you believed?
3      A.   No.  I believe she fired me because I
4  reported her.
5      Q.   That you reported her to the Department
6  of Labor?
7      A.   Yes.
8      Q.   Isn't it true that you told the
9  Department of Labor that she fired you and it
10 had nothing to do with you filing the complaint
11 with the DOL?
12     A.   I don't recall.
13     MR. DARKE:  I'm going to mark this as
14 Exhibit 6.
15          (Whereupon, Schmelzer Deposition
16          Exhibit No. 6 was marked for
17          identification.)
18     MR. DARKE:  And let me know if you recognize
19 what this document is.
20          (Short pause.)
21     THE WITNESS:  I don't.  I don't understand
22 what this is.
23 BY MR. DARKE:
24     Q.   This was provided by your attorney

74

1  through a FOIA request of the U.S. Department of
2  Labor.
3           Turn to the second page.  And if you
4  look on the bottom, it says file notes.
5           Do you see where that is?
6      A.   Yes.
7      Q.   Now, right below that it has a date.
8           Can you tell me what date and time that
9  says?
10     A.   7/14/17, 9:46 and 53 seconds a.m.
11     Q.   Can you read the next -- what's written
12 down there?
13     A.   What P -- I don't know what that stands
14 for.
15     Q.   Okay.
16     A.   P is participating in a simple IRA
17 plan.  Employee contributions taken out, but the
18 ER has failed to deposit EE and ER matching
19 contributions since 6/2016.  Caller is not
20 looking to file a complaint at this time and
21 wants to know the process.
22          That was the first call.
23     Q.   And that was the first time you made --
24     MR. GAFFNEY:  Answer his question.

75

1      THE WITNESS:  Yes.
2  BY MR. DARKE:
3      Q.   Does that sound familiar to the call
4  that you placed with the Department of Labor?
5      A.   Yes.  If I can understand what all
6  those letters mean, yes.
7      Q.   Okay.  Now, turn the page.
8      A.   Uh-huh.
9      Q.   And there's more writing.
10          Can you read that?
11     A.   Beginning?
12     Q.   For filing.
13     A.   Advised of the informal resolution
14 process and encouraged P to call our agency back
15 if she decided to pursue the complaint.  P is
16 concerned because she is two years away from
17 retirement.  P states that there are only a
18 total of four people in the plan.  One has left
19 and another one is leaving on Monday.  Caller is
20 hoping that the co-workers file a complaint so
21 that she does not have to.
22     Q.   Now, earlier you testified that you did
23 not want to file a complaint; is that true?
24     A.   I didn't want to.  None of us wanted

76



1 to.
2    Q.   Does that sound familiar of something
3 when you called the Department of Labor and
4 talked to them?
5    MR. GAFFNEY:  Objection to the form of the
6 question.
7        Does what sound familiar?
8    MR. DARKE:  The statement she just read.
9    THE WITNESS:  I was hoping that co-workers
10 filed a complaint?
11            (Short pause.)
12    THE WITNESS:  Yes.
13 BY MR. DARKE:
14    Q.   Was there anyone else two years away
15 from retirement to your knowledge?
16    A.   No.
17    Q.   Okay.  Now go down to the next one that
18 starts with the date 7/21/2017 at 1:28 p.m.
19        Can you read that?
20    A.   P called back and requested that BA
21 contact ER regarding ER's failure to deposit
22 funds in the plans since 6/2016.  P states that
23 both she and another co-worker are owed $2600
24 each.  She is not sure how much the other two

77

1 employees are owed.
2    Q.   Okay.  And that was around July 21st.
3        Do you think you called the Department
4 of Labor on that date to talk to them about
5 that?
6    A.   Probably.
7    Q.   Now, if you go down six more little
8 chunks of paragraph to 8/3/2017 at 2:30 p.m.,
9 can you read that statement?
10    A.   P called and states that funds have
11 been deposited and she is no longer with the
12 company.  P states this was by choice and was in
13 no way related to her contacting USDOL.  P
14 states that she went to the ER and used the
15 F-word because it has been so difficult working
16 with her since she found out the money was and
17 P states the owner did not respond.  She asked
18 the owner if she wanted her to leave.  The owner
19 responded yes.  P thanked BA for assistance and
20 states that the last person in the plan will be
21 leaving the company soon as well.
22    Q.   Do you recall telling the Department of
23 Labor that?
24    A.   Yes.

78

1    Q.   Okay.
2    A.   I can explain if you want.
3    Q.   I don't need an explanation.
4        But everything you told the DOL was
5 truthful, correct?
6    MR. GAFFNEY:  Objection to the form of the
7 question.
8        Are we talking about this entry or all
9 entries?  Which entry?
10    MR. DARKE:  Do you know what?  I'll strike
11 it.  She has already said everything she said is
12 truthful.
13    THE WITNESS:  She apologized for getting me
14 fired.
15    MR. DARKE:  There's no question pending.
16    THE WITNESS:  Oh, well.
17 BY MR. DARKE:
18    Q.   Now, do you have any knowledge -- well,
19 strike that.
20        Do you recall on that July 31 date --
21 do you know what?  Strike that as well.
22        Did you ever talk to anyone else
23 regarding why you were or what your perception
24 was of why you were let go at the Animal

79

1 Wellness Center?
2    A.   Yes.
3    Q.   Do you ever remember talking to a Cindy
4 Walters?
5    A.   Yes -- no.  Not directly, no.  Not
6 directly.
7    Q.   What do you mean not directly?
8    A.   Text.
9    Q.   Text messages?
10    A.   (No audible response.)
11    Q.   Did you use any other form of
12 communication with individuals regarding
13 communicating with them on what happened with
14 the Animal Wellness Center and your employment?
15    A.   There could have been a Facebook PM.
16 I'm not sure.
17    Q.   Do you ever remember receiving a note
18 regarding the checks that were going to be
19 deposited into your IRA account?
20    A.   I believe I got one with the check.
21 Yes, I did get a note.  Yes.
22    MR. DARKE:  Can you mark this as Exhibit 7.
23
24

80



1          (Whereupon, Schmelzer Deposition
2          Exhibit No. 7 was marked for
3          identification.)
4  BY MR. DARKE:
5      Q.   I'm going to show you what's been
6  marked as Exhibit 7.  Take a look and let me
7  know if you recognize that document?
8      A.   Yes.
9      Q.   Okay.  What is this document?
10     A.   What is it?
11     Q.   Yes.
12     A.   It's telling me this check was put into
13 the account.
14     Q.   And did you receive this?
15     A.   Yes.
16     Q.   Who did you receive it from?
17     A.   I believe I received it in the mail
18 from Scott.
19     Q.   Were there any other communications
20 that you received regarding this check or any
21 check being placed into your IRA account?
22     A.   Not that I recall.
23     Q.   Did you ever receive a letter from the
24 Department of Labor saying here's a check for

81

1  your IRA fund?
2      A.   No.
3      Q.   And to the best of your knowledge, is
4  that the correct information on there of what
5  was deposited into your account?
6      A.   Yes.
7      Q.   Do you recognize the handwriting up in
8  the upper portion --
9      A.   Scott.
10     Q.   Scott's handwriting?
11     A.   (No audible response.)
12          (Short pause.)
13     MR. GAFFNEY:  Let the record reflect we're at
14 like 12:40.  We started right around 11:00.
15          Is this a good time for a break?
16     MR. DARKE:  Yes.  We can take a break.
17     MR. GAFFNEY:  We can take a break?
18     MR. DARKE:  Yes.
19          (Whereupon, a short break was
20          taken.)
21     MR. DARKE:  Back on the record.
22 BY MR. DARKE:
23     Q.   Joey, regarding -- did anything happen
24 between you and Lynlee after July 31 regarding

82

1  the Monee Police Department?
2      A.   Yes.
3      Q.   What was that about?
4      A.   I want my dog's x-rays.  They're my
5  dog's x-rays.  They're mine.  They weren't from
6  another doctor and they're not hers.  They're
7  mine.  But I filed them at work.  I needed
8  those.
9          I also wanted my continuing education
10 unit certificates.  I had a folder at work that
11 had those in there quite clearly.  I can
12 transfer those.  This was later because this was
13 after I started working.  I can transfer those
14 where I work now.  I wanted those so I could
15 transfer those.  I wrote her an email asking her
16 to get those to me.
17     Q.   Did you ever get those?
18     A.   No, sir.  I did not.
19     MR. DARKE:  Okay.  Mark this as Exhibit 8.
20          (Whereupon, Schmelzer Deposition
21          Exhibit No. 8 was marked for
22          identification.)
23 BY MR. DARKE:
24     Q.   Let me know if you recognize that

83

1  document.
2      A.   Yes.
3      Q.   And is this the document -- the email
4  that you just referred to when you said you sent
5  her an email regarding this --
6      A.   No, sir.
7      Q.   What is this email then?
8      A.   This is in response to her letter
9  saying she was going to have me arrested for
10 harassing her.
11     Q.   Now, in the second paragraph?
12     A.   Yes.
13     Q.   It says after where it says you're a
14 thief?
15     A.   Uh-huh.
16     Q.   It says:  I could have taken you
17 stealing our funds further, but I chose not to.
18          What do you mean by that?
19     A.   I don't remember.
20     Q.   Now, you mentioned walking dogs.
21          Was that part of your job duties?
22     A.   Periodically, yes.
23     Q.   And when would that occur?  What day of
24 the week?

84

1    A.   Weekends.  Saturday night, Sunday
2  morning, and Sunday night.
3    Q.   And who was responsible for walking the
4  dogs?
5    A.   We took turns.
6    Q.   And who do you mean by we?
7    A.   All the staff except for them.
8    Q.   Now --
9    A.   And Lindsay Wilke.  She did not.
10   Q.   She did not either?
11   A.   No.
12   Q.   And is it hard to walk dogs?
13   A.   It depends on how many there are.
14 Usually not.
15   Q.   Explain to me what it's like, just a
16 normal average Saturday and you're going to walk
17 the dogs.  What does that entail?
18   A.   He helps me.  Scott helps her on the
19 rare occasion that they do it.
20        You go in.  And what we do is he takes
21 the dogs out, mostly the big ones.  But he takes
22 most of the dogs out to the backyard.  I stay
23 in.  I give them their water, I give them their
24 food, and I clean their cages, and I give them

85

1  their medicine.  He brings them in.  He puts
2  them back in the cage.  Go to the next one.  He
3  takes that one outside, bring them in.  Same
4  deal.  We keep a log so we know what dog did
5  what during that time and we sent that home with
6  the owners.
7    Q.   Can it be physical at times?
8    A.   For him it was.  Not for me.
9    Q.   Why was that?
10   A.   Because I never did anything strenuous.
11 I just fed 'em and cleaned their cages.
12   Q.   Now, when you -- you mentioned earlier
13 that you referenced that Scott and Lynlee should
14 walk the dogs?
15   A.   Yes.
16   Q.   Could Lynlee walk dogs at that time?
17 Do you know?
18   A.   I was not asking her to.  No.
19        Walking dogs is a terminology meaning
20 taking care of weekend dogs.  That's what we
21 called walking dogs.  But it was actually taking
22 care of boarding dogs is what it was.
23   Q.   You said you were asking Scott.
24        Why weren't you asking Lynlee?

86

1    A.   Well, I asked them both to, but I
2  figured they would do it the same way we did it.
3  They can do it whatever way they want to.  I
4  don't care.
5    Q.   Were you aware of any medical condition
6  that Lynlee was --
7    A.   She always had some medical condition.
8  Yes.
9    MR. GAFFNEY:  You have to, first of all, wait
10 for him to finish the question.
11   THE WITNESS:  I'm sorry.
12   MR. GAFFNEY:  And take your time, think, and
13 then answer.
14        Thank you.
15   MR. DARKE:  If you know.
16 BY MR. DARKE:
17   Q.   Do you ever remember her having a back
18 issue?
19   A.   Yes.
20   Q.   Do you remember what that back issue
21 was?
22   A.   I do not know the details of her
23 health.  No.
24   Q.   Did she ever share that with you, her

87

1  medical issues?
2    A.   No.  I don't know her medical issues.
3  No.
4    Q.   Did she ever talk to you or send you an
5  email regarding any medical procedure she was
6  going to have on her back?
7    A.   I don't recall her having a medical
8  procedure, but I have a feeling I'm about to.
9    Q.   Okay.  Do you know who Debbie Wilke is?
10   A.   Yes.
11   Q.   Who is Debbie Wilke?
12   A.   Debbie Wilke is the trainer at Animal
13 Wellness Center.  The dog trainer.
14   Q.   And what was her job at the Animal
15 Wellness Center?
16   A.   Debbie does all the training.  Does it
17 back in the warehouse for the training.
18   Q.   Explain to me.  What does that mean?
19 Is it just like training dogs to sit, stand?
20 Things like that?
21   A.   Yes.  Sometimes she trains them how to
22 do things where they go through tunnels and jump
23 over hurdles.  That kind of thing.  But she
24 trains them how to behave and how to act.  Yes.

88



1    Q.   Is she related to Lindsay Wilke?
2    A.   She's her mother.
3    Q.   Did you ever talk to Debbie Wilke
4  regarding the situation of your employment
5  ending at the Animal Wellness Center?
6    A.   Yes.
7    Q.   And what did you tell her, if you
8  recall?
9    A.   She knew almost everything from her
10  daughter.  She called me and asked me what
11  happened, and I told her what happened.
12    Q.   And what did you tell her?
13    A.   It's in an email, if you have it.
14       I told her that there was some mistrust
15  issues and that Dr. Wessels fired me.
16    MR. DARKE:  All right.  I'm going to mark
17  this as Exhibit 9.
18              (Whereupon, Schmelzer Deposition
19              Exhibit No. 9 was marked for
20              identification.)
21    MR. DARKE:  Take a look at it.
22  BY MR. DARKE:
23    Q.   Is this the email you were just
24  referencing?

89

1    MR. GAFFNEY:  Before you answer, make sure
2  that you read the --
3    MR. DARKE:  Read the whole thing.  We're not
4  going anywhere.  Make sure you...
5              (Short pause.)
6    THE WITNESS:  Okay.
7  BY MR. DARKE:
8    Q.   Do you recognize that document?
9    A.   Yes.
10    Q.   What is that document?
11    A.   This is the email that I sent to Debbie
12  Wilke.
13    Q.   And do you remember when you sent this
14  email?
15    A.   It looks like it was July 31.
16    Q.   At what time?
17    A.   1:19 p.m.
18       I did not send it right away.
19    Q.   So you typed it before and you waited
20  to send it?
21    A.   I waited a little bit.  I wanted her to
22  know she and I were pretty close.
23    Q.   Now, if you look down in the fourth
24  paragraph there?

90

1    A.   Uh-huh.
2    Q.   It says I made a point of saying I did
3  not quit.
4       Why did you make it a point of saying
5  you did not quit?
6    A.   Her history precedes her.
7    Q.   What does that mean?
8    A.   Anybody who has ever been fired there
9  had to fight for everything because she would
10  fight 'em tooth and nail in order not to get any
11  benefits or anything.  I wanted to make sure
12  that she didn't lie about me.  She is anyway.
13    Q.   And when you talk about benefits,
14  you're talking about unemployment benefits?
15    A.   Yes.  Either unemployment.  One case
16  was disability.  No matter what it was, nobody
17  ever got anything.
18    Q.   Now, later in that paragraph it says:
19  I totally was considering leaving anyways.
20       How many times did you consider
21  leaving?
22    A.   I considered leaving when I found out
23  what they had done to us, but I decided not to.
24    Q.   Did you ever consider to leave prior to

91

1  that?
2    A.   No.  I love my job.  No.
3    Q.   Okay.  Now, we talked about Lynlee's
4  medical condition.
5       I'm going to show you a document.
6    MR. DARKE:  Mark that Exhibit 10.
7              (Whereupon, Schmelzer Deposition
8              Exhibit No. 10 was marked for
9              identification.)
10    MR. DARKE:  Take a look at this document and
11  tell me if you recognize what that document is.
12              (Short pause.)
13    THE WITNESS:  I'm assuming the first part is
14  what you want me to read.  Is that correct?
15    MR. DARKE:  You can read the second part as
16  well.
17              (Short pause.)
18    THE WITNESS:  Okay.
19  BY MR. DARKE:
20    Q.   Now if you look at the second half,
21  upper portion of that email, it looks like it
22  was a response from Lynlee.
23    A.   Uh-huh.
24    Q.   Did you ever talk about her back issue

92



1 other than this email?

2    A.   She always had something wrong.  You
3 know, her back issue, her heart issue, her head
4 issue.  Apparently yes, judging from this email.

5    Q.   So what's the date of this email?

6    A.   June 30.

7    Q.   Now, do you believe that she would --
8 if someone had some spine condition, would they
9 be able to walk dogs?

10    A.   I didn't expect her to walk dogs.  No,
11 sir.  I did not expect anybody with a spine
12 condition would ever be able to walk dogs.  Not
13 walk dogs.  Feed them, yes.

14    Q.   Take care of them?

15    A.   Yes.

16    Q.   Now you also mentioned an individual by
17 the name of Cindy Walters.  I'm going to --

18         (Short pause.)

19    MR. DARKE:  I'll mark these as Exhibit 11.
20 It's a group of documents.

21         So mark that as Exhibit 11.

22         (Whereupon, Schmelzer Deposition
23          Exhibit No. 11 was marked for
24          identification.)

93

1    MR. DARKE:  Take a second.  Just go through
2 page by page and just read that information.

3    MR. GAFFNEY:  Do you want her to read the
4 whole --

5    MR. DARKE:  She doesn't have to.  Just tell
6 me if you recognize what this document is.

7    THE WITNESS:  I've read this recently.  So...

8 BY MR. DARKE:

9    Q.   And what is this document?

10    A.   This, I believe, is Facebook PMs or --
11 yes.  I believe that's what it is.

12    Q.   And what does PM mean?

13    A.   Private message.

14    Q.   And I actually don't use Facebook,
15 so --

16    A.   It's something that nobody else is
17 supposed to see.

18    Q.   Okay.  And explain to me how private
19 messaging even works?

20    A.   When you private message somebody, you
21 tell them something that is between you and them
22 and for no one else's eyes.

23    Q.   Okay.  Now if you look on the bottom
24 right-hand corner, it says 1 of 10.

94

1    Q.   Can you go to the document that says
2 7/10?

3    A.   Okay.

4    Q.   Go 1, 2, 3, 4 paragraphs down.  It says
5 Joey and then it has:  "Hey tri girl.  OMG!"

6    A.   Uh-huh.  Uh-huh.

7    Q.   It continues to say:  I left Peotone AH
8 after four days.  Basically I pretty much hated
9 it there.

10    A.   Uh-huh.

11    Q.   Why did you hate it there?

12    A.   I didn't know how to do my job.

13    Q.   And is this when roughly you filed for
14 unemployment, around the same time?

15         (No audible response.)

16    MR. GAFFNEY:  Around the same time?  August?

17    THE WITNESS:  Yes.

18    MR. GAFFNEY:  What time?  There's no time on
19 the record.

20    MR. DARKE:  August 19, 2017 at 8:57 p.m.

21    THE WITNESS:  I don't know.  I don't know for
22 sure when that all happened, but it probably was
23 right around that time.

24

95

1 BY MR. DARKE:

2    Q.   Now if you go to the next page and up
3 on the top, it looks like you wrote --

4    MR. GAFFNEY:  Are we at 8 of 10 or 6 of 10?

5    MR. DARKE:  8 of 10.

6    MR. GAFFNEY:  8.  Okay.

7 BY MR. DARKE:

8    Q.   Then back to Peotone Monday, 35 hours a
9 week, which is perfect?

10    A.   Uh-huh.

11    Q.   So if it was perfect, why would you
12 want to leave?

13    A.   Well, I had only been there for like a
14 day and a half at that point.

15    Q.   Okay.

16    A.   I had no clue what I was going to be
17 doing.

18    Q.   Okay.  Now, if you go to the document
19 that is 10/10.

20         And can you see the first entry there?

21    A.   Uh-huh.

22    Q.   What date was that?

23    A.   July 31, 3:30.

24    Q.   Okay.  And do you recall writing this?

96



1    A.   I had -- I remember I was out on the
2  patio and I said something and emailed her.
3  This is a girl who we thought stole, but later I
4  found out she probably didn't.  I was forbidden
5  from seeing her.  So after I left, I felt I
6  could contact her and all she said was are you
7  okay.  And I told her this.
8    Q.   Are you referring to Cindy Walters?
9    A.   I am referring to Cindy Walters.  I
10 have since saw -- never mind.
11    MR. GAFFNEY:  Why don't you just wait until
12 the next question.  Okay?
13    THE WITNESS:  I'm learning, slowly.
14 BY MR. DARKE:
15    Q.   If you look on the bottom part of that
16 email, it says:  Also, I start at Peotone 8/14.
17         What does that mean?
18    A.   It must have been the 14th and 15th
19 that I worked in Peotone, because I wasn't sure
20 of the exact dates.  And then I went back --
21 then I went on vacation, then I went back for
22 two more days.  I just was never sure of the
23 exact dates that I worked at Peotone.
24    Q.   Okay.  So by -- do you recall what time

97

1  you were -- that your employment ended at the
2  Animal Wellness Center --
3    A.   What the time of the day?
4    Q.   -- on July 31?
5         Yes.
6    A.   About 9:30 a.m.
7    Q.   By almost 3:30 that same day, you were
8  already hired at Peotone?
9    A.   She called me on the phone.  Yes.  And
10 her name by the way, I just came up with it, is
11 Karen.
12    Q.   She didn't call you before July 31?
13    A.   No.
14    Q.   You didn't have any plans of leaving
15 prior --
16    A.   I had no plans of leaving.  She just
17 happened to call because somebody told her I
18 wasn't in Monee anymore.  And yes, it was fast.
19    Q.   So in the complaint, you talk about
20 your rights under the ERISA plan.
21         What are your rights, if you know, that
22 were interfered with under the IRA plan?
23    MR. GAFFNEY:  I'm going to object to the form
24 of the question.

98

1         This calls for a legal conclusion of a
2  lay witness.  You're asking her what her ERISA
3  rights are on a complaint that's drafted by a
4  lawyer that she doesn't even have in front of
5  her.  It's totally improper.
6    MR. DARKE:  I'm asking her what rights were
7  interfered with.
8    MR. GAFFNEY:  Well, I'm going to object to
9  the form of the question.
10         If you want to try to make it more
11 specific, you can.  If you want her to try to
12 answer that, I think it's a highly objectionable
13 question.  But obviously I cannot tell her not
14 to answer.
15    MR. DARKE:  If you know.
16 BY MR. DARKE:
17    Q.   I mean how did the Animal Wellness
18 Center interfere with your IRA plan?
19    A.   How did they interfere with my IRA
20 plan?  They had my money for a year and I didn't
21 even know it and they didn't put anything into
22 my account.
23    Q.   Is there any additional way that they
24 interfered?

99

1    A.   No.
2    Q.   Okay.
3    A.   They fired me because of it.
4    Q.   And in August, that money was back into
5  that IRA account?
6    A.   After we reported them, yes.
7    Q.   And we also talked about possible
8  additional benefits that you were receiving at
9  the Animal Wellness Center.
10         Did you ever receive any vacation?
11    A.   Yes.  I had a month of vacation coming
12 at the time that I left.
13    Q.   And did that vacation time get paid out
14 to you?
15    A.   Yes.
16    Q.   And was that just in a check that was
17 sent to you from the Animal Wellness Center?
18    A.   Yes.
19    Q.   What about medical benefits?  Did you
20 ever have medical benefits?
21    A.   I had insurance.
22    Q.   And who paid for that insurance?
23    A.   Animal Wellness Center.
24    Q.   Did they pay for the whole thing?

100

1     A.   Yes.  They paid for all of my
2  insurance.  Yes.  All of my health insurance.
3     Q.   Was that during your entire employment?
4     A.   I believe it was.  Yes.  That was one
5  of the conditions when I came to them.
6     Q.   Do you know when, if you even have any
7  knowledge of it, when the Department of Labor
8  first contacted the Animal Wellness Center
9  regarding the IRA issue?
10    A.   I believe it was July 26, but I'm not
11  sure.
12               (Short pause.)
13    MR. DARKE:  Give me about two minutes.  I
14  think I might be done.
15    MR. GAFFNEY:  All right.  We'll take a few
16  more than two because I'll probably need to look
17  through my notes to see about what if any
18  additional questions I may ask.  So I'll
19  probably take a little -- so we'll leave and
20  give you some time and we'll be back in a little
21  bit.
22    MR. DARKE:  Okay.  Off the record.
23               (Whereupon, a short break was
24               taken.)

101

1     MR. DARKE:  All right.  Back on the record.
2               Will you mark this as Exhibit 12.  And
3  this is just the complaint.
4               Will you just take a look at that.
5  BY MR. DARKE:
6     Q.   Let me know.  Do you recognize what
7  this document is?
8     A.   Yes, I do.
9     Q.   What is this document?
10    A.   This is the complaint that I made
11  against the Animal Wellness Center of Monee.
12    Q.   And it's regarding this litigation?
13    A.   Yes, sir.
14    Q.   If you go to Paragraph 8 or No. 8?
15    A.   Uh-huh.
16    Q.   The second sentence says:  Plaintiff
17  worked for AWC until involuntarily terminated on
18  July 24, 2017.
19    A.   That originally was incorrect.
20    Q.   Okay.
21    MR. GAFFNEY:  I think this was amended.
22  There's an Amended Complaint.
23    MR. DARKE:  Is there?
24    MR. GAFFNEY:  Yes.  I'm pretty sure there is.

102

1     MR. DARKE:  Are you sure?
2     MR. GAFFNEY:  I'm pretty sure there is.  I'll
3  have to check the docket.
4     MR. DARKE:  Let's go back off the record.
5               (Whereupon, a short break was
6               taken.)
7     MR. DARKE:  We're going to go back on the
8  record.
9               Can we mark this -- can we strike that
10  last exhibit and mark this as Exhibit 12.
11               (Whereupon, Schmelzer Deposition
12               Exhibit No. 12 was re-marked
13               for identification.)
14  BY MR. DARKE:
15    Q.   Do you recognize this document?
16    A.   Yes, sir.
17    Q.   And what is this document?
18    A.   This is a complaint of myself against
19  Animal Wellness Center of Monee.
20    Q.   So is this the First Amended Complaint?
21    A.   I don't know the answer to that.
22    Q.   If you look about a quarter of the way
23  down the page in the middle, it's got a title on
24  it.

103

1               Do you see what that title says?
2     A.   It is.  Yes.  The First Amended
3  Complaint.
4     Q.   For you if you look at Paragraph No. 9.
5  The second sentence says:  Plaintiff received
6  glowing annual performance reviews of
7  outstanding including the one most recent prior
8  to her termination of February 28, 2017.
9               Is that just a -- are you referring to,
10  if you know, are you referring to the last
11  performance review?
12    MR. GAFFNEY:  I'm going to object to the
13  extent that she is not the drafter of this but
14  yet may have facts -- know facts as to some of
15  these allegations.  So -- you can ask her about
16  the facts, but you haven't established that she
17  drafted this.
18  BY MR. DARKE:
19    Q.   Well, did you have your attorney file
20  this on behalf of your name?
21    A.   Yes.
22    Q.   Against the Animal Wellness Center?
23    A.   And this was probably the last review.
24  Because we had 'em yearly.

104



1    Q.   And did you review this document before
2  it was filed?  Do you know?
3    A.   Yes.
4    Q.   So you're familiar with what this
5  document is?
6    A.   Yes.
7    Q.   Now, with the IRA plan, did you have a
8  separate account for your IRA plan?
9    A.   Yes.
10    Q.   And were you able to get into it on the
11  computer or something?
12    A.   I don't know.  I never did.
13    Q.   Okay.  But you were able to receive
14  statements?
15    A.   Yes.  We got statements.
16    Q.   On the IRA plan?
17    A.   Yes.
18    Q.   And who is the administrator of that
19  plan?  Do you remember?
20    A.   Scott.  Do you mean to me or do you
21  mean Franklin Templeton?
22    Q.   Franklin Templeton.
23         Was that the company that would be
24  sending you these statements and everything?

105

1    A.   Yes.
2    Q.   Now, in Paragraph 18, you talk about
3  that you learned that the IRA plan was not being
4  funded in July 2016; is that correct?  Is that
5  to your knowledge?
6    MR. GAFFNEY:  In what paragraph?
7    MR. DARKE:  18.
8    THE WITNESS:  Since that date.
9  BY MR. DARKE:
10    Q.   Since July -- approximately July 21,
11  2016?
12    A.   Yes.
13    Q.   And then eventually it was funded,
14  correct?
15    A.   Yes.
16    Q.   Now, in Paragraph 20, it states that
17  after learning that AWC did not contribute any
18  funds into Franklin Templeton investment account
19  pursuant to the AWC IRA plan, the Plaintiff
20  exercised her right, ERISA rights, by contacting
21  the LLC manager of AWC both individually and
22  with the assistance of her husband and demanding
23  that the managers make all required
24  contributions.

106

1         Were there any other rights that you
2  were exercising at that time?
3    MR. GAFFNEY:  Objection to the form of the
4  question.
5         Do you understand the question?
6    THE WITNESS:  I don't understand the
7  question.
8    MR. GAFFNEY:  I don't blame you.
9  BY MR. DARKE:
10    Q.   So this is your Complaint.
11         What rights were being violated other
12  than you have testified earlier regarding the
13  non-payment of your IRA?
14    A.   The nonpayment of my IRA was being
15  violated.  The fact that I was not being treated
16  the way I was used to being treated was being
17  violated.  But as far as ERISA goes, they
18  weren't putting funds in for me.
19    Q.   Okay.  And it also says that you
20  contacted the Department of Labor -- strike
21  that.
22         So the last sentence there says:  The
23  DOL then contacted the AWC manager and notified
24  them of this clear ERISA violation.

107

1    A.   Yes.
2    Q.   Okay.
3    A.   Where are you at?  What number?
4    Q.   The last sentence in Paragraph 20.
5    A.   All right.  Yes.
6    Q.   How do you know that the DOL contacted
7  them and notified them that it was a clear ERISA
8  violation?
9    A.   I have to think about that.  I don't
10  know if -- they sent me something I believe
11  saying that they had been contacted, that Animal
12  Wellness Center of Monee had been contacted.
13    MR. DARKE:  So if there's any documents from
14  the DOL that were sent to her --
15    MR. GAFFNEY:  Everything I have in that
16  regard has already been produced.
17  BY MR. DARKE:
18    Q.   So if you look at Paragraph 24.  The
19  last sentence.
20         She, and it's referring to Lynlee, was
21  either openly hostile to Plaintiff or would not
22  speak directly to Plaintiff in her initiated
23  ERISA inquiry.
24         When you talk about openly hostile, how

108

1  was she hostile to you?  What were the facts of
2  how she was hostile to you?
3      A.   Hostile is relative compared to the way
4  we were, which was best buds to I'm not going to
5  talk to you, I'm not going to look you in the
6  eye, and we're not going to do business
7  together.
8      Q.   So not looking -- her not looking you
9  in your eyes.
10          What else, if anything, in addition was
11  hostile?
12      A.   Well, we had animals to take care of,
13  we had patients to take care of.  It's very,
14  very difficult to do if you're not communicating
15  and we were not communicating.  She wouldn't
16  talk to me.  To me that's hostile.  Maybe it's
17  according to the definition.
18      Q.   No.  That's...
19          So other than not communicating with
20  you, are there any additional reasons that you
21  would think were open and hostile?
22      MR. GAFFNEY:  You mean other than what she's
23  already testified to?  You don't want her to
24  repeat anything more than what she's said?

109

1      MR. DARKE:  Correct.
2      MR. GAFFNEY:  Okay.  Thank you.
3      THE WITNESS:  Then no.
4  BY MR. DARKE:
5      Q.   Did Lynlee -- on July 31, did Lynlee
6  ever tell you that you were fired?
7      A.   She told me to leave and asked for my
8  key.  And Scott asked for my key.  Did I need to
9  hear the word fired?  No, I did not.
10      Q.   She just responded yes to your inquiry
11  if you were --
12      A.   It was more like yes.
13      MR. GAFFNEY:  Let the record reflect that the
14  word yes was stated with extra emphasis and
15  strength.
16  BY MR. DARKE:
17      Q.   Do you think she, if you know, when you
18  came in on July 31 and you said why the fuck are
19  you not talking to me, do you think that could
20  have been the reason she said yes?
21      MR. GAFFNEY:  Object to the form of the
22  question.
23      THE WITNESS:  No.
24

110

1  BY MR. DARKE:
2      Q.   No?
3      A.   No.
4      Q.   It couldn't have been the reason at
5  all?
6      A.   No.  No.
7      MR. DARKE:  Okay.  I don't have any other
8  questions.
9      MR. GAFFNEY:  I need to follow up on a few of
10  these areas, please.
11                  EXAMINATION
12  BY MR. GAFFNEY:
13      Q.   First I want to ask you, there were
14  some questions about your job search?
15      A.   Uh-huh.
16      Q.   And the records that you took, you kept
17  or didn't keep regarding your job search?
18      A.   Yes.
19      Q.   For some period of time you were -- you
20  said you were creating a list that was somehow
21  communicated to the Illinois Department of
22  Employment Security for unemployment
23  compensation purposes; is that true?
24      A.   Yes.

111

1      Q.   Okay.  So in that regard, would you
2  describe what you did and how you communicated
3  with the Department of Employment Security?
4      A.   When you register with the Department
5  of Employment Security, every other Tuesday you
6  have to go online and you have to write -- you
7  have to preregister every two weeks and then you
8  have to list where you have applied for a job.
9  That is online.  After you're done, you hit
10  send.  It's gone.
11          So I did that every two weeks on a
12  Tuesday.
13      Q.   Did you keep those -- did you keep any
14  documentation as far as what you sent to the
15  Department of Employment Security?
16      A.   I did not.  I sent it.  They have it.
17  I do not.
18      Q.   Approximately how long after you were
19  terminated did you continue to certificate as
20  you just said?
21      A.   Probably at least two months.  It took
22  time for -- they said I couldn't get
23  unemployment, Animal Wellness Center of Monee
24  said I couldn't collect.  Then they gave me an

112



1  opportunity to appeal, and I appealed it.  And
2  then that also they didn't let me have.  So
3  probably another month.
4      Q.    Did you ever have a hearing with a
5  referee where you testified under oath with
6  anyone from Animal Wellness Center on the other
7  line?
8      A.    Yes.
9      Q.    You did?
10     A.    We did have a conference.
11     Q.    And the referee asked you questions,
12 et cetera?
13     A.    Yes.
14     Q.    After that concluded, did you continue
15 to search for employment?
16     A.    I continued to search until I got the
17 letter that said I was not going to be able to
18 get it, and then I stopped.
19     Q.    And did you then use any private agency
20 to try to find work?
21     A.    There was an online employment search,
22 and I wish I could think of the name of it right
23 now but I can't.  I have it written down.  But
24 there was an online search, and they would send

113

1  me places and then I would send them résumés.
2      Q.    And did you then during that time frame
3  after you were denied benefits finally by the
4  Department of Employment Security --
5      A.    Uh-huh.
6      Q.    -- did you continue to try to drop off
7  résumés, et cetera?
8      A.    I dropped off résumés at every animal
9  hospital in the general vicinity of my house.
10     Q.    Did you keep any list of where you
11 dropped off some of these résumés?
12     A.    Yes.  I had a list.
13     Q.    And that list has been produced,
14 correct?
15     A.    That's correct.
16     Q.    And did the private search entity
17 also -- did you also communicate with the
18 private search company regarding your efforts to
19 find employment?
20     A.    Yes.
21     Q.    And did you continue to drop off
22 résumés and look for work through the date that
23 you obtained your current employment in --
24     A.    There was a space in between there

114

1  where I didn't, probably a couple of months
2  where I didn't.  I was extremely discouraged.  I
3  had to take a little break from it, and then I
4  was told by Margie Minett that she would like to
5  have me work at Avenue Animal Hospital, and I
6  applied there.
7      Q.    In terms of your relationship with
8  Dr. Wessels during the years, let's just say
9  2015, 2016, and through June of 2017, would you
10 describe what the nature of your relationship
11 was with Dr. Wessels during that time frame?
12     A.    She was my boss.  She was one of my
13 best friends.  We did things together.  We went
14 to concerts together.  I took care of her dog.
15 I took care of her cat.  We were close.
16     Q.    And -- go ahead.
17     A.    We had one weekend in Indianapolis that
18 we spent together.  We did things together as a
19 couple.  We went to dinner.  We were friends.
20     Q.    And then at work, would you describe
21 what the nature of your relationship was like?
22     A.    We were busy and then we were relaxed
23 as friends are when they work together.  We were
24 relaxed.

115

1      Q.    And during that time frame, would you
2  describe how you and her would communicate back
3  and forth?
4      A.    I'm not sure I understand.
5      Q.    In other words, regarding work-related
6  issues, how would you approach her and how would
7  she approach you regarding work-related issues
8  during that time frame?
9      A.    Well, she would tell me what she needed
10 done or I would ask her a question on how I
11 should do this or how I should do that.  We
12 joked around because sometimes it was a pain in
13 the butt because she was busy.  And we joked
14 around about it.  It was just a really fun place
15 and we had a good time, but we got work done.
16     Q.    And would you tell me then during --
17 you would have an annual performance review
18 process that had been ongoing for years?
19     A.    Yes.
20     Q.    And would you describe what that was
21 like typically?
22     A.    Pretty much I would go in the room and
23 she would say here's your performance review
24 what else would you like to talk about.  I never

116



1  had anything bad on any review.
2      Q.    Did you ever receive any written
3  warnings or discipline at any time at your place
4  of employment?
5      A.    No.
6      Q.    Did you always receive outstanding on
7  your overall performance?
8      A.    Yes.
9      Q.    Now, in regards to the first occasion
10  in which this whole problem with the simple IRA
11  plan was brought up by anyone at Animal Wellness
12  Center, can you tell me, did you receive a
13  telephone call from your husband at some point?
14      A.    He called me at work the day he
15  found -- we hadn't been checking statements
16  because we didn't think we had to.  We trusted
17  them.  He saw the statement, called me
18  immediately at work.  Yes.
19      Q.    And do you have a belief as to
20  approximately when that occurred?
21      A.    I think it was about July 5, 2017, but
22  we're not exactly sure what date that was.
23      Q.    And what did you and your husband say
24  at that time?

117

1      A.    I told him to handle it.  I said talk
2  to Scott and see what you can do, see what
3  happened and what happened to my IRA.
4      Q.    And do you have any understanding of
5  what -- your husband's name is Don, correct?
6      A.    Yes.
7      Q.    And he's seated here at this deposition
8  today with us, correct?
9      A.    Yes.
10      Q.    And can you tell us to your knowledge
11  then what if anything did your husband, Don
12  Schmelzer, do on your behalf?
13      A.    He called Scott I believe right away,
14  asked him what was going on.  And from what he
15  could remember when I talked to him, he just
16  remembered silence.  He doesn't remember a lot
17  of explanation on the phone at that time.  I
18  think that -- I won't say what I think, but it
19  was a surprise I believe that we found out.
20      Q.    And then was there an occasion that you
21  saw your husband, Don, at Animal Wellness Center
22  within the next few days?
23      A.    He came by.  He had a door bell that he
24  was -- he did a lot of work at the animal

118

1  hospital and he was finishing up a door bell
2  job.  So when he got in there, he did talk to
3  Scott a little bit while he was there.  That was
4  a few days after the initial phone call.
5      Q.    Was it your understanding that he
6  brought any paperwork with him when he met with
7  Scott at the Animal Wellness Center?
8      A.    I don't believe he had any paperwork
9  with him.
10      Q.    Do you know whether or not -- did Don
11  ever relate to you that he communicated again
12  with Scott regarding the non-payment of funds
13  into the IRA plan?
14      A.    Yes.  He went to Scott's desk and Scott
15  was visibly upset, said he didn't know where
16  they were going to get the money.  And they were
17  friends.
18      MR. DARKE:  Objection.
19      THE WITNESS:  It was hard for them.  I know.
20      MR. DARKE:  Objection.  Hearsay.
21  BY MR. GAFFNEY:
22      Q.    Was it your understanding and belief
23  that before the July 8 meeting that you
24  testified to, that it was Scott -- I'm sorry --

119

1  it was Don that brought this matter to the
2  attention of Scott Marhanka at Animal Wellness
3  Center?
4      A.    He did, because I asked him to.
5      Q.    And then did you then start
6  communicating with your co-workers who you knew
7  also to be participants in the AWC IRA plan
8  between July 5 and July 8?
9      A.    Yes.  I waited until I was sure, and
10  then I talked to both Mandy and Jessica and then
11  eventually I talked with Dr. Matthews who, as it
12  turns out, was never in the plan to begin with.
13  She was in it but -- she was put on it at the
14  time that there were no funds being put in.  But
15  yes, we discussed it quite a bit.
16      Q.    what did you say to Mandy -- it's Mandy
17  Holt, correct?
18      A.    Uh-huh.
19      Q.    And between July 5 and July 8, what did
20  you say to Mandy Holt?
21      A.    I said you better check your statements
22  on your IRA when you get home.
23      Q.    Did you say why?
24      A.    I said because they have not been

120

1  putting money into mine.
2      Q.   And between July 5 and July 8, did you
3  talk with Jessica McCaslin regarding the IRA
4  plan?
5      A.   We had a little powwow.  Yes.
6      Q.   And what did you say and what did she
7  say at that time?
8      A.   I told them that my IRA had not had any
9  money put into it for a year, that Donny looked
10 at the statement and noticed it and I talked to
11 Scott.  I told them both that they better go
12 home, check their statements, and they wanted to
13 talk with their husband's as well.
14     Q.   After you told them to check their
15 statements and prior to the Saturday morning
16 meeting of July 8, 2017, did they come back and
17 explain to you what their observations were of
18 their statements?
19     A.   They said there's a --
20     MR. DARKE:  Objection to hearsay.
21     MR. GAFFNEY:  Go ahead.
22     THE WITNESS:  They said they had not had
23 anything put into theirs for a year either.
24
                                              121

1  BY MR. GAFFNEY:
2      Q.   Prior to July 8, then, did you suggest
3  to them what if anything you thought you or
4  anyone else should do?
5      A.   We didn't talk about it immediately,
6  about, you know, reporting them because we
7  thought they were going to pay it to us.  We
8  didn't talk about reporting it to the Department
9  of Labor until they hesitated at the meeting on
10 the 8th saying they didn't know when they were
11 going to get it to us.
12     Q.   And then after your husband -- after
13 you were aware that your husband had brought
14 this issue to the attention of Scott Marhanka --
15     A.   Uh-huh.
16     Q.   -- did you notice any change in either
17 the relationship or demeanor of Dr. Wessels
18 after that?
19     A.   Yes.
20     Q.   What did you observe?
21     A.   Cold.  She was very cold to us.  She
22 was very probably extra cold to me.  She would
23 talk everything through Lindsay Wilke, who up
24 until that point Lindsay was kind of the black
                                              122

1  sheep.  She became the go-to girl.  It was just
2  a different place to work than it had ever been
3  before.
4      Q.   And then after the meeting of July 8
5  through the date of your termination, did the
6  relationship with Dr. Wessels ever go back to
7  the way it was prior to the day Don Schmelzer
8  brought this problem to the attention of Scott
9  Marhanka?
10     A.   No.
11     Q.   Would you describe then during the
12 month of July what the relationship was like
13 with Dr. Wessels?
14     A.   Extremely strained, hard to do our job.
15 Because we couldn't talk to each other.  You
16 can't very well talk to each other -- you can't
17 take care of an animal if you can't talk to each
18 other there --
19     Q.   Go ahead.
20     A.   There was no communication.  Except if
21 she absolutely had to answer me for business,
22 she would answer me.  Otherwise she would go to
23 someone else.
24     Q.   In the morning when you said hello,
                                              123

1  what would occur?
2      A.   Nothing.
3      Q.   What do you mean?
4      A.   She didn't acknowledge me.
5      Q.   Were there any occasions on which you
6  heard doors slamming?
7      A.   Oh, yes.  But that's -- it was always
8  that way.  That wasn't new.
9      Q.   All right.  Were there occasions in
10 which you tried to communicate with her like you
11 had previously before this problem arose, was
12 brought to their attention in July of 2017?
13     A.   There's one day I remember I was at the
14 desk and she yelled from the pharmacy hey, Joe,
15 and asked me a question and I almost cried
16 because she called me Joe and talked to me
17 again.
18     Q.   That was one occasion?
19     A.   One time.  That's all.
20     Q.   Other than that one occasion, were
21 there times where you tried to communicate with
22 her --
23     A.   I did -- excuse me.
24     Q.   Hum?
                                              124



1    A.   Go ahead.
2         I did at first, but I quit trying.
3    Q.   What type of responses were you
4  getting?
5    A.   None.
6    Q.   Would you describe the look on
7  Dr. Wessels's face when you tried to talk to
8  her?
9    A.   She was not there.  She was like not
10 there for me.  She was cold.
11   Q.   Did this impact how you felt at work?
12   A.   I didn't exactly look forward to going
13 in, but I kept thinking it would get better.
14   Q.   Now, at the meeting of July 8, you
15 indicated that Dr. Wessels had said that they
16 would try to pay it back.
17        Do you recall saying that?
18   A.   Yes.
19   Q.   Was there any time frame stated in
20 terms of when they thought they could pay back
21 the funds into the IRA account?
22   A.   No.
23   Q.   Was there an indication as to what they
24 needed do, if anything, in order to pay the

125

1  funds back?
2    A.   They said they had tried 1 Loan Avenue
3  and it fell through and they were still trying
4  other ways.
5    Q.   Did anyone suggest when, when the loan
6  could -- when the unpaid funds could be returned
7  to the account?
8    A.   No.
9    Q.   And did you indicate that you thought
10 it was like stealing?
11   A.   Yes, I did.
12   Q.   And when you said like stealing, was
13 that because they had not only -- that they had
14 taken money out of your paycheck and withheld
15 money from your paycheck and not deposited it
16 into the IRA account?
17   A.   Yes, that's right.
18   Q.   In regards to the issue of walking the
19 dogs, you used the term, and I think on a couple
20 of occasions you said like he and I did?
21   A.   Uh-huh.
22   Q.   By using the word he in that context,
23 who are you referring to?
24   A.   I was talking about my husband, Don.

126

1  He always helped.  He always walked them.
2    Q.   And so when you suggested that that
3  would be one way for the clinic to save money,
4  were you suggesting that Dr. Wessels would do it
5  alone or with anyone's assistance?
6    A.   With Scott's assistance.  I thought
7  that's the way they had done it in the past.
8    Q.   You saw Exhibit 2.  Yes.  Exhibit 2
9  there's an email.  Here it is.  And you make a
10 statement about you've always given 110 percent,
11 I promise to give you 100 percent but for now
12 going that extra mile isn't in my heart.
13        So by using the term extra mile, would
14 you explain what you meant by that term?
15   A.   I took her dog to the vet.  I took
16 Stella to the vet for her -- not Stella.  The
17 other one.  I took Tuna to the vet for her.  One
18 was in Champaign.  Tuna.  Tuna the cat.  I took
19 Edith Ann, the dog, to Purdue with them.  I
20 would go to the nursery.  I would by mums at
21 their expense, of course.  I would bring the
22 mums back.  I would plant 'em, take care of 'em.
23        I mean I can go on and on if you want
24 me to.

127

1    Q.   What you just said in terms of these
2  activities, were these on the clock?  Were these
3  compensated activities or were these volunteer
4  activities by going the extra mile?
5    A.   I did them because I wanted to.
6    Q.   So were you paid for those activities?
7    A.   No.  I didn't expect to be.
8    Q.   And were there other -- you don't have
9  to give me any more examples, but were there
10 other activities like that where you provided
11 services that you didn't expect compensation?
12   A.   Yes.
13   Q.   And is that what you meant by the term
14 extra mile?
15   A.   That's what I meant.
16   Q.   Would you describe then from when you
17 first found out in early July that funds were
18 not being deposited into the Franklin Templeton
19 account of your IRA account at Franklin
20 Templeton through the date of the your
21 termination on July 31, during that time frame,
22 would you describe your effort at work?
23   A.   I tried as hard as I ever tried at
24 work.  I didn't do anything any differently.

128



1  Communication was a little tough, but we got
2  through.
3      Q.   Did you give anyone any bad attitude?
4  How was your attitude?
5      MR. DARKE:  Objection.  Argumentative.
6  BY MR. GAFFNEY:
7      Q.   Describe your attitude.
8      A.   My attitude is friendly, and it always
9  is.  It always was at work.
10     Q.   How hard did you try at your job?
11     A.   I tried as hard as I possibly could at
12  my job.
13     Q.   Had any of your co-workers complained
14  about how you were performing your job during
15  the month of July 2017?
16     A.   No.
17     Q.   Did Scott Marhanka ever complain about
18  your performance during July of 2017?
19     A.   Scott was friendly to me.
20     Q.   Did he ever complain about your
21  performance?
22     A.   No.
23     Q.   Did Dr. Wessels ever complain about
24  your performance during July of 2017?

129

1  communicated.  It was through a note.  It was
2  because she was always busy and it was easier to
3  write a note.
4      Q.   Well, did she typically communicate
5  with you with notes or you to her with notes?
6  Which way?
7      A.   I would usually write a note and she
8  would come back to me with the answer.
9      Q.   Now, the answer that you would -- prior
10  to July of 2017, after you communicated with the
11  note, would Dr. Wessels then come back with a
12  written note or would she come back with a
13  verbal answer?
14     A.   It could be either one.
15     Q.   Now, on this particular occurrence
16  after you left the note regarding the surgery
17  issue, you indicated that you and your
18  co-worker --
19     A.   Lindsay.
20     Q.   Lindsay Wilke --
21     A.   Yes.
22     Q.   Were both in the front desk area,
23  correct?
24     A.   Yes.

131

1      A.   No.
2      Q.   Did you receive any warnings or
3  discipline from anyone during the month of
4  July 2017?
5      A.   No.
6      Q.   Now, in regards to July 31, 2017, you
7  indicated that you had prepared a written note
8  pertaining to the issue of surgeries; is that
9  correct?
10     A.   Yes.
11     Q.   And to the best of your recollection,
12  what did this written note say?
13     A.   We had forgone surgeries for a few days
14  and the note said:  Lynlee, let me know when
15  we're going to begin surgeries again.  Joey.
16     Q.   And where did you put that note?
17     A.   I believe I put it up on the desk where
18  we usually do.  I may have put it in her
19  mailbox.
20     Q.   And why did you write out a written
21  note of that nature as opposed to communicate
22  with Dr. Wessels verbally on that particular
23  issue?
24     A.   That's typically the way we

130

1      Q.   Lindsay Wilke was to your left and she
2  was -- Lindsay Wilke was to your left?
3      A.   Yes.
4      Q.   And what was the distance between you
5  and Lindsay Wilke at that time?
6      A.   Probably three feet.
7      Q.   Okay.  And then what did you observe
8  next?
9      A.   Dr. Wessels came around with the note I
10  had written, went to Lindsay's left, handed it
11  to her, and said we can start doing surgeries
12  again.
13     Q.   This note that you had left, did you
14  put your name on it?
15     A.   Yes.
16     Q.   Do you always put your name on notes to
17  Dr. Wessels?
18     A.   We had to because she had to know who
19  to give the answer back to.
20     Q.   So even though you had written the note
21  and signed your name to it, you're saying
22  Dr. Wessels came back with the note, handed it
23  to Lindsay Wilke on her left, and then where was
24  she looking -- where was Dr. Wessels looking

132

1  when she said those words?
2      A.  Looking at Lindsay.
3      Q.  Were you surprised?
4      A.  Yes.  I was surprised actually.  You
5  wouldn't have thought I would be.
6      Q.  Why were you surprised?
7      A.  I don't know.  I just thought she would
8  come to me with the answer, the way it always
9  was.
10      Q.  Was it another indication to you that
11  Dr. Wessels was no longer interested in
12  communicating with you directly?
13      A.  Yes.
14      Q.  And is that what caused you additional
15  frustration at that time?
16      A.  Yes.  That is when I turned to Lindsay
17  and said I can't do this anymore, I've got to
18  talk to her, and I went over to her --
19      Q.  You admit that you went to her desk
20  area and you admit that you used the F-word in
21  the context of your statement, correct?
22      A.  Yes.
23      Q.  And by using the F-word, were you
24  trying to be demonstrative or were you trying to
                                                    133

1      A.  It was a casual work environment.  Yes.
2      Q.  And did some of your co-workers use the
3  F-word in your presence?
4      A.  Yes.
5      Q.  And did some of your co-workers use the
6  F-word in your presence while Dr. Wessels was
7  present?
8      A.  Sure.  Yes.
9      Q.  At any time did any employee ever
10  receive any warning or discipline about using
11  the F-word at the clinic?
12      A.  Not that I'm aware of.
13      Q.  And so when you used the F-word, did
14  you believe that you were doing anything that
15  was insubordinate --
16      A.  No.
17      Q.  -- or that you were trying to be
18  aggressive with Dr. Wessels?
19      A.  No.  It just flew out.
20      Q.  Were you frustrated with the way she
21  was not communicating with you?
22      A.  Yes.  I was frustrated.  I was confused
23  as to why.  I needed to know why.
24      Q.  You used the word confused previously.
                                                    135

1  be insubordinate?
2      A.  I don't use the F-word.  It just flew
3  out.
4      Q.  Okay.
5      A.  It wasn't intentional at all.
6      Q.  Now, in terms of the usage of the
7  F-word, was it -- when patients weren't around,
8  was it common to hear the F-word at the clinic?
9      A.  Yes.
10      Q.  How common was it?
11      A.  Very common when there were no clients
12  around.
13      Q.  Did Dr. Wessels use the F-word at the
14  clinic?
15      A.  Yes.
16      Q.  Was that regular or was it rare?
17      A.  Regular.
18      Q.  Did she use other words that also could
19  be construed as swear words or vulgarities at
20  the workplace as well?
21      A.  Yes.
22      Q.  Was it a casual work environment?
23      A.  A what kind?
24      Q.  Casual.
                                                    134

1  You said that the way she left the note for
2  Lindsay Wilke and spoke directly with her caused
3  you to be confused.
4          Would you explain what you mean by
5  that?
6      A.  I just didn't understand why she went
7  from being the one who took money from us to the
8  victim.  And that wasn't just me.  It was all
9  of -- all three of us girls that were involved
10  in it.
11          She became the one that was now sullen,
12  that would sit at her desk all the time, that
13  would be poor me.  And we were the ones that
14  were stolen from by our boss and friend.  And I
15  was confused because I needed to know what was
16  going on in her head that she wouldn't talk to
17  me.  I never found out.
18      Q.  In addition to Dr. Wessels using the
19  F-word verbally in the place of employment, did
20  you also receive a number of email
21  communications where she easily used the F-word
22  in those communication?
23      A.  Yes.
24      Q.  And have at least some of those that
                                                    136

1  you've found recently been produced in the
2  course of this discovery?
3      A.   Yes.
4      Q.   Of you, Mandy Holt, Dr. Matthews,
5  and -- I'm drawing a blank regarding the other
6  participant.
7      A.   Jessica.
8      Q.   Jessica McCaslin, right.  Participants
9  who were not owner participants.
10          Of those participants regarding this
11  problem that arose regarding the non-payment of
12  funds into the IRA account, were you considered
13  sort of the ringleader of bringing this matter
14  to a head with AWC?
15      A.   Yes.
16      Q.   Why do you say that?
17      A.   Well, my husband, Don, is the one who
18  initiated it.  My husband, Don, is the one
19  who confronted Scott.  It was because of my
20  husband, Don, that I found out about it.  It was
21  because of my husband, Don, that they found out
22  we knew.
23      MR. DARKE:  Objection.  Speculation.
24

137

1  BY MR. GAFFNEY:
2      Q.   And what about your personal
3  communications with your co-workers?
4      A.   Well, they -- I'm not sure what you
5  mean.  I'm sorry.
6      Q.   So I think you already testified that
7  it was you that brought to their attention that
8  there was a problem.
9      A.   I bought it to their attention that
10  there was a problem.  Their initial response was
11  they didn't believe that that could possibly
12  happen, there had to be a mistake.  But then
13  they checked and it was true.
14      Q.   And then at the meeting of July 8, were
15  your co-workers looking to you to basically
16  voice their concerns and objections?
17      A.   It seemed that way when we were there
18  because I did most of the talking.  And then
19  when we got out in the parking lot after the
20  meeting, they all gave me a group hug and said
21  thank you for having the nerve to talk.  So yes,
22  I was the one.
23      Q.   And were there continued discussions
24  about this problem during the month of

138

1  July with -- between you and your co-workers
2  until ultimately the funds were eventually
3  repaid?
4      A.   Yes.
5      Q.   On Exhibit 9, you used the word
6  invisible.
7          Do you recall that?
8      A.   Yes.
9      Q.   And why did you use the word invisible?
10  In context, it says:  Lynlee, as you know, has
11  pretty much found me to be invisible since this
12  whole thing went down.
13          That was your statement to Debbie Wilke
14  on July 31, 2017 at 1:19 p.m., correct?
15      A.   Yes.
16      Q.   So, first of all, when you used the
17  term since this whole thing went down, what did
18  you mean by that?
19      A.   I meant since we found out that they
20  had not put funds in our account.
21      Q.   So -- but you didn't explain that to
22  Debbie Wilke.
23          Is it your belief that Debbie Wilke
24  already knew about the problem with AWC not

139

1  contributing funds into the IRA account as of
2  July 31, 2017?
3      A.   I believe that her daughter told her.
4  Yes.
5      Q.   And you say:  Lynlee, as you know, has
6  pretty much found me to be invisible.
7          What made you believe that Debbie
8  Wilke, the dog trainer, would have known that
9  Lynlee pretty much found you to be invisible
10  since the whole thing went down?
11      A.   Debbie spent a certain amount of time
12  at the animal hospital.  She would just stay in
13  back at night and do her training.  She came up
14  front, we did her scheduling for her.  She
15  called us about her scheduling.  And she came up
16  to me and said:  Honey, please don't go.
17          So she knew from being around there how
18  I was being -- as if I couldn't be seen.  And
19  that's what I meant by invisible.
20      Q.   When you put in your statement that
21  to -- when you put in your email, I should say,
22  to Debbie Wilke:  I made a point of saying I did
23  not quit, Scott asked for my key, and I was
24  gone.

140



1  Would you describe what -- where you
2 were, who you were talking to, and what occurred
3 when you referred to the statement I made a
4 point of saying I did not quit?
5  A.  When I said those words?
6  Q.  Yes.  Where were you?
7  A.  Oh, I was coming out of Lynlee's office
8 into the general hallway, back into the
9 pharmacy.  And I was saying to Mandy I did not
10 quit.
11  Q.  Okay.  And was it before or after you
12 said to Mandy I did not quit that Scott asked
13 for your key?
14  A.  It was -- I believe he asked me for the
15 key right after that.
16  Q.  Did you also say to others that you
17 were fired?
18  A.  Yes.
19  Q.  What words did Scott use in asking for
20 the key?
21  A.  He said:  Joey, give me the key.
22  MR. GAFFNEY:  No further questions.
23  MR. DARKE:  Just quick followups.
24
141

1  A.  Usually it's a description if I use it.
2 Like referring to traffic.  If I do say it, it
3 would be as an adjective.
4  Q.  Now, during your employment, have you
5 seen anyone go up to either Lynlee or Scott and
6 say those similar words why the fuck aren't you
7 talking to me?
8  A.  No.
9  Q.  Okay.  During the July 31 meeting -- or
10 July 8 meeting --
11  A.  Uh-huh.
12  Q.  -- you mentioned that you're the one
13 that -- you did most of the talking; is that
14 correct?
15  A.  Yes.
16  Q.  Did you ever during that talking ever
17 call Scott or Lynlee a thief or a liar or
18 anything to that extent?
19  A.  Yes.  Which I apologized for later.
20  Q.  Who did you apologize to?
21  A.  Both Scott and Lynlee.
22  Q.  And did they accept your apology?
23  A.  Scott did.  I got nothing from
24 Dr. Wessels at all.  Scott said thank you.
143

1  EXAMINATION (Further)
2 BY MR. DARKE:
3  Q.  So you said you rarely use the F-word?
4  A.  Yes.
5  Q.  How many times in a year do you think
6 you would use the F-word?
7  MR. GAFFNEY:  Objection.  Like maybe we
8 should say what year because that could have
9 varied over the years.
10  MR. DARKE:  Just on average.  Any year.  I
11 mean you rarely said it.
12  THE WITNESS:  If I say the F-word twice a
13 year, I know I get teased because I don't swear.
14 So...
15 BY MR. DARKE:
16  Q.  So have you used it this year, 2018?
17  A.  Let me think.
18  Well, I probably have used it twice
19 this year.
20  Q.  And do you remember when you used that?
21  A.  No.  I do not.  I'm sorry.
22  Q.  When you typically use it, it's rare.
23  Are you upset when you use it because
24 it just slips out?
142

1  Q.  Was that on that same day or when was
2 that?
3  A.  It was like a couple of -- that was a
4 Saturday, the meeting was on a Saturday.  It was
5 on a Monday I believe that I apologized for it.
6  Q.  Now, you talk about Lynlee being cold
7 at work.
8  Did that start the next day after that
9 meeting on July 8?
10  A.  No.
11  Q.  When did that actually start?
12  A.  It started as soon as she found out
13 that we knew about the IRA.
14  Q.  So let's say roughly around July 5 or
15 6?
16  A.  Whenever Scott told her that we knew.
17  Q.  And was her demeanor the same all the
18 way through when you -- the July 31 --
19  A.  I don't know that it got any --
20  MR. GAFFNEY:  Let him finish the question.
21 You're jumping in.
22  THE WITNESS:  I'm sorry.
23 BY MR. DARKE:
24  Q.  Was her demeanor the same from that
144



1  time all the way until the end of your
2  employment?
3      A.  It was worse after the meeting.
4      Q.  After the July 8 meeting?
5      A.  Yes.
6      Q.  And then after the July 8 meeting, was
7  it the same demeanor all the way through
8  July 31?
9      A.  Yes.
10     Q.  So it never got better?
11     A.  No.
12     Q.  Did it ever get worse?
13     A.  Actually, I would say no.
14     MR. DARKE:  Okay.  I don't have any other
15  questions.
16     MR. GAFFNEY:  Nothing further.
17         In federal depositions, signature is
18  reserved.
19         Thank you.
20         (FURTHER DEPONENT SAITH NOT.)
21         (Deposition concluded at 2:33 p.m.)
22
23
24

145

---

1         IN THE UNITED STATES DISTRICT COURT
2           NORTHERN DISTRICT OF ILLINOIS
3                 EASTERN DIVISION
4
5  JOYCE E. SCHMELZER,          )
6         Plaintiff,            )
7      vs.                      ) No. 1:18-CV-01253
8  ANIMAL WELLNESS CENTER       )
9  OF MONEE, LLC, et al.,       )
10        Defendants.           )
11   This is to certify that I have read the
12  transcript of my deposition taken in the
13  above-entitled cause by Johnetta Stafford
14  Taylor, Certified Shorthand Reporter, on
15  October 18, 2018 and that the foregoing
16  transcript accurately states the questions asked
17  and the answers given by me as they now appear
18  with any attached errata sheet(s).
19         _____
20                 JOYCE SCHMELZER
21  SUBSCRIBED AND SWORN TO
    before me this _____ day
22  of _____ 2018.
23  _____
        Notary Public
24

146

---

1  STATE OF ILLINOIS  )
2                     )  SS:
3  COUNTY OF C O O K  )
4         I, JOHNETTA STAFFORD TAYLOR, a
5  Certified Shorthand Reporter within and for the
6  County of Cook County and State of Illinois, do
7  hereby certify that heretofore, to-wit, on
8  October 18, 2018 personally appeared before me,
9  at 303 West Madison Street, Suite 300, Chicago,
10  Illinois, JOYCE SCHMELZER in a cause now pending
11  and undetermined in the U.S. District Court,
12  Northern District of Illinois, Eastern Division
13  wherein JOYCE E. SCHMELZER is the Plaintiff, and
14  ANIMAL WELLNESS CENTER OF MONEE, LLC, et al. are
15  the Defendants.
16     I further certify that the said witness was
17  first duly sworn to testify the truth, the whole
18  truth and nothing but the truth in the cause
19  aforesaid; that the testimony then given by said
20  witness was reported stenographically by me in
21  the presence of the said witness, and afterwards
22  reduced to typewriting by Computer-Aided
23  Transcription, and the foregoing is a true and
24  correct transcript of the testimony so given by

147

---

1  said witness as aforesaid.
2     I further certify that the signature to the
3  foregoing deposition was reserved by counsel for
4  the respective parties.
5     I further certify that the taking of this
6  deposition was pursuant to Notice, and that
7  there were present at the deposition the
8  attorneys hereinbefore mentioned.
9     I further certify that I am not counsel for
10  nor in any way related to the parties to this
11  suit, nor am I in any way interested in the
12  outcome thereof.
13     IN TESTIMONY WHEREOF:  I have hereunto set my
14  hand and affixed my notarial seal this 23rd day
15  of October 2018.
16
17
18  _____
19     NOTARY PUBLIC, COOK COUNTY, ILLINOIS
20
21
22
23
24

148



1        McCorkle Litigation Services, Inc.
           200 N. LaSalle Street  Suite 2900
2             Chicago, Illinois 60601-1014
3    CERTIFIED MAIL
4    October 23, 2018
5    Ms. Joyce Schmelzer
     550 South Walnut Street
6    Manteno, Illinois  60950
7    IN RE:  Schmelzer v. The Animal Wellness Center
     DATE OF DEPOSITION: 10/18/18
8
     Dear Ms. Schmelzer:
9
     Your deposition in the above-entitled cause is
10   now ready for reading and signing as required by
     law.
11
     Please call the Signature Department upon
12   receipt of this letter to schedule an
     appointment to come to the above address to read
13   and sign your deposition.  You have 28 days from
     the date of this correspondence in which to
14   appear for reading and signing.
15   If you fail to appear or notify us so that we
     may make arrangements for another appointment,
16   your deposition will be completed and forwarded
     to the attorneys and will be "... used as fully
17   as though signed."
18        _____  Procedure outlined in Rule 207 (a)
           of the Illinois Supreme Court Rules;
19
          ___XX_  Procedure outlined in Rule 30 (e) of
20         the Rules of Civil Procedure for the U.S
           District Courts.
21
     Sincerely,
22
     Cynthia Alicea calicea2@mcdeps.com,
23   Signature Department
24   cc:  All Attorneys Ordering Transcript
                                          149



**$**

**$14**
9:11,12
**$17**
12:13
**$2500**
50:8
**$2600**
77:23

**1**

**1**
25:2 33:12,16 94:24
95:4 126:2
**10**
22:2 55:16 92:6,8
94:24 96:4,5
**10/10**
96:19
**100**
53:21 127:11
**11**
22:2 93:19,21,23
**110**
53:21 127:10
**11:00**
82:14
**12**
102:2 103:10,12
**12/13/49**
6:11
**12:40**
82:14
**14**
17:5
**14th**
97:18
**15th**
97:18
**17**
11:17 44:3
**17.25**
19:14,15
**17.50**
19:14
**18**
106:2,7
**19**
24:12 95:20
**1970**
8:12
**1:19**
90:17 139:14
**1:28**
77:18
**1:30**
9:3

**2**

**2**
51:2,6 95:4 127:8
**20**
106:16 108:4
**2004**
17:5,11,24 18:7,9,10
19:9,10,24
**2015**
115:9
**2016**
106:4,11 115:9
**2017**
10:3,21 14:17 19:12
22:17 24:24 25:12
26:5,11,18 44:4 45:1
95:20 102:18 104:8
115:9 117:21 121:16

124:12 129:15,18,24
130:4,6 131:10
139:14 140:2
**2018**
10:13 14:4,9 16:12
24:13 25:2 142:16
**21**
27:21 106:10
**21st**
27:17 78:2
**24**
102:18 108:18
**26**
26:4,18 27:3,6 44:3,
4,22 101:10
**27**
10:11 14:7
**28**
104:8
**2:30**
78:8
**2:33**
145:21

**3**

**3**
20:9,15 50:18 54:21,
23 95:4
**30**
93:6
**31**
11:17 22:15 24:24
28:1 35:5,6 58:11
61:17,21 73:11
79:20 82:24 90:15
96:23 98:4,12 110:5,
18 128:21 130:6
139:14 140:2 143:9
144:18 145:8
**35**
96:8
**3:30**
96:23 98:7

**4**

**4**
56:12,14 95:4
**40**
9:19
**43**
7:15
**46**
7:17,18
**48**
7:8
**4:00**
12:5

**5**

**5**
22:1 42:24 43:3
64:3,7 117:21 120:8,
19 121:2 144:14
**53**
75:10
**550**
6:15

**6**

**6**
44:24 74:14,16 96:4
144:15
**6/2016**
75:19 77:22
**6:30**
9:1

**7**

**7**
80:22 81:2,6
**7/10**
95:2
**7/14/17**
75:10
**7/21/2017**
77:18
**7:30**
8:24

**8**

**8**
45:15 50:23 53:6
58:10,14 83:19,21
96:4,5,6 102:14
119:23 120:8,19
121:2,16 122:2
123:4 125:14 138:14
143:10 144:9 145:4,
6
**8/14**
97:16
**8/3/2017**
78:8
**8:00**
8:24 9:1,2
**8:57**
95:20
**8th**
45:3 122:10

**9**

**9**
54:9,10 89:17,19
104:4 139:5
**9:30**
98:6
**9:46**
75:10

**A**

**a.m.**
75:10 98:6
**absolutely**
123:21
**accept**
143:22
**account**
9:6 20:21 52:11
80:19 81:13,21 82:5
99:22 100:5 105:8
106:18 125:21
126:7,16 128:19
137:12 139:20 140:1
**accounts**
51:21
**accurate**
67:22 72:8
**acknowledge**
124:4
**act**
88:24
**activities**
128:2,3,4,6,10
**actual**
66:13
**add**
34:11
**addition**
109:10 136:18
**additional**
39:19 41:17 42:7
46:24 50:13 99:23

100:8 101:18 109:20
133:14
**address**
6:14 51:12
**adjective**
143:3
**administrator**
105:18
**admit**
133:19,20
**Advised**
76:13
**affect**
59:21
**afraid**
14:2
**afternoon**
11:13,15 12:4,6 35:4
**age**
52:20
**agency**
76:14 113:19
**aggressive**
135:18
**agree**
53:20 55:4,22 56:4
**agreement**
57:13
**ahead**
45:18,20 115:16
121:21 123:19 125:1
**air**
44:19
**allegations**
104:15
**allowed**
20:8,10
**altered**
62:11
**amended**
102:21,22 103:20
104:2
**amount**
4:23 20:6,7,8,9,18
140:11
**angry**
40:3 70:13,14
**animal**
8:14 9:23 10:2,5,9,
10,15,16,17 11:19
12:8,17 13:10 14:4
15:3 17:2,6 20:13
21:4 22:13 24:21
32:4 37:15 42:19
43:6,13,14,16 46:9
60:10 64:24 79:24
80:14 88:12,14 89:5
98:2 99:17 100:9,17,
23 101:8 102:11
103:19 104:22
108:11 112:23 113:6
114:8 115:5 117:11
118:21,24 119:7
120:2 123:17 140:12
**animals**
12:20 13:1 109:12
**Ann**
127:19
**anniversary**
7:8,10
**annual**
104:6 116:17
**answering**
34:12 37:6
**answers**
28:20
**anymore**
21:11 68:3 73:18
98:18 133:17
**anyone's**
127:5

**apologize**
143:20
**apologized**
79:13 143:19 144:5
**apology**
143:22
**apparently**
34:7 40:17 67:5
73:24 93:4
**appeal**
113:1
**appealed**
113:1
**applied**
15:1 16:14 112:8
115:6
**apply**
15:5
**approach**
116:6,7
**approximate**
21:20
**approximately**
12:1 106:10 112:18
117:20
**architectural**
64:20
**area**
63:9 65:9,23 66:3,9
67:10 69:4,5 70:7
131:22 133:20
**areas**
111:10
**Argumentative**
129:5
**arose**
124:11 137:11
**arrested**
84:9
**arrow**
65:23 67:21
**assertive**
38:4 39:22 40:14
**assistance**
78:19 106:22 127:5,
6
**associate**
8:5,6
**assume**
5:20
**assuming**
15:23 35:8 92:13
**attention**
120:2 122:14 123:8
124:12 138:7,9
**attitude**
129:3,4,7,8
**attorney**
31:19 36:10 74:24
104:19
**attorney-client**
31:23
**audible**
5:9 80:10 82:11
95:15
**August**
10:3,19,21 14:17
15:13 16:11 25:12
95:16,20 100:4
**Avenue**
8:14 10:8,9 14:4
115:5 126:2
**average**
85:16 142:10
**aware**
40:2 58:2 87:5
122:13 135:12
**AWC**
102:17 106:17,19,21
107:23 120:7 137:14

**139:24**

**B**

**BA**
77:20 78:19
**back**
8:1 10:22 14:2 17:11
25:8,10 27:4 46:17,
20 47:3 50:9,11
61:19 65:8,9 67:7,8
69:24 70:6 76:14
77:20 82:21 86:2
87:17,20 88:6,17
92:24 93:3 96:8
97:20,21 100:4
101:20 102:1 103:4,
7 116:2 121:16
123:6 125:16,20
126:1 127:22 131:8,
11,12 132:19,22
140:13 141:8
**backyard**
85:22
**bad**
40:5 117:1 129:3
**basically**
95:8 138:15
**Bates**
57:17,19
**bearing**
64:4
**began**
46:17
**begin**
62:10 120:12 130:15
**Beginning**
76:1
**behalf**
104:20 118:12
**behave**
88:24
**belief**
117:19 119:22
139:23
**believed**
74:2
**bell**
118:23 119:1
**benefits**
16:23 18:1 91:11,13,
14 100:8,19,20
114:3
**betrayal**
54:2
**betrayed**
53:3,7,12,14
**big**
85:21
**bigger**
31:14
**birth**
6:10
**bit**
50:2 90:21 101:21
119:3 120:15
**black**
5:18 122:24
**blame**
107:8
**blank**
137:5
**block**
72:6
**blocked**
72:9
**boarding**
47:24 86:22
**borrowed**
13:13



**boss**
115:12 136:14
**bottom**
34:3 57:4 75:4 94:23
97:15
**bought**
138:9
**boxes**
52:2
**break**
6:1,3,4 82:15,16,17,
19 101:23 103:5
115:3
**bring**
86:3 127:21
**bringing**
137:13
**brings**
86:1
**brought**
40:13 117:11 119:6
120:1 122:13 123:8
124:12 138:7
**buds**
109:4
**building**
63:12,14,16,23
**business**
8:7 109:6 123:21
**busy**
115:22 116:13 131:2
**butt**
116:13

**C**

**cage**
86:2
**cages**
85:24 86:11
**calendar**
45:6
**call**
4:12 11:13 13:12
23:15 24:7,9 26:14,
20 28:7 29:4,5,23
30:2 50:17 72:21
75:22 76:3,14 98:12,
17 117:13 119:4
143:17
**called**
4:4 10:8 11:10,11,
12,18,21 12:2,3,
13:24 24:7 25:16
26:16,23 27:2,6,13,
14,15,16,21 28:3,5,
11 32:6,22 33:18,20
34:4 36:19 77:3,20
78:3,10 86:21 89:10
98:9 117:14,17
118:13 124:16
140:15
**Caller**
75:19 76:19
**calling**
30:2
**calls**
12:24 15:1 30:20
31:22 48:17 99:1
**care**
8:20 29:6 86:20,22
87:4 93:14 109:12,
13 115:14,15 123:17
127:22
**case**
91:15
**cases**
31:15
**casual**
134:22,24 135:1

**cat**
72:12 115:15 127:18
**cats**
12:20,22
**cause**
13:3
**caused**
133:14 136:2
**Center**
9:23 10:5 12:8 13:10
17:2,7 20:13 21:5
22:13 24:21 32:4
37:15 42:19 43:7,13,
14,16 46:10 60:10
65:1 80:1,14 88:13,
15 89:5 98:2 99:18
100:9,17,23 101:8
102:11 103:19
104:22 108:12
112:23 113:6 117:12
118:21 119:7 120:3
**certificate**
112:19
**certificates**
83:10
**cetera**
113:12 114:7
**Champaign**
127:18
**chance**
13:7
**change**
59:20 122:16
**chart**
64:10
**check**
80:20 81:12,20,21,
24 100:16 103:3
120:21 121:12,14
**checked**
138:13
**checking**
11:7 17:18 117:15
**checks**
80:18
**children**
7:12
**choice**
23:15 25:11,14,18
78:12
**chose**
84:17
**chunks**
78:8
**Cindy**
80:3 93:17 97:8,9
**circle**
40:17
**circumstance**
42:7
**circumstances**
37:22,24 38:1 39:6
40:11,24 41:3,22
42:1
**clean**
85:24
**cleaned**
86:11
**clear**
107:24 108:7
**client**
8:20 66:9 69:13
72:1,3
**clients**
17:19 69:4 134:11
**clinic**
127:3 134:8,14
135:11
**clock**
128:2

**close**
62:7 63:4 90:22
115:15
**closest**
71:21
**clue**
96:16
**co-worker**
77:23 131:18
**co-workers**
59:23 76:20 77:9
120:6 129:13 135:2,
5 138:3,15 139:1
**cold**
122:21,22 125:10
144:6
**coldest**
62:22
**collect**
15:5 112:24
**comfortable**
13:2
**common**
134:8,10,11
**communicate**
51:18 114:17 116:2
124:10,21 130:21
131:4
**communicated**
111:21 112:2 119:11
131:1,10
**communicating**
80:13 109:14,15,19
120:6 133:12 135:21
**communication**
80:12 123:20 129:1
136:22
**communications**
81:19 136:21 138:3
**company**
19:22 78:12,21
105:23 114:18
**compared**
109:3
**compensated**
128:3
**compensation**
111:23 128:11
**complain**
129:17,20,23
**complained**
129:13
**complaint**
31:7,21 35:15 37:11,
16,20 38:24 39:15
74:10 75:20 76:15,
20,23 77:10 98:19
99:3 102:3,10,22
103:18,20 104:3
107:10
**Complete**
24:3,5
**computer**
69:17 105:11
**concerned**
76:16
**concerns**
138:16
**concerts**
115:14
**concluded**
113:14 145:21
**conclusion**
99:1
**condition**
87:5,7 92:4 93:8,12
**conditions**
101:5
**conference**
113:10

**confirm**
32:24
**confronted**
38:3 137:19
**confused**
68:6 70:13 135:22,
24 136:3,15
**confusing**
26:24
**congratulations**
7:9
**considered**
91:22 137:12
**construed**
134:19
**contact**
77:21 97:6
**contacted**
101:8 107:20,23
108:6,11,12
**contacting**
78:13 106:20
**context**
126:22 133:21
139:10
**continually**
41:22
**continue**
15:4 52:17 112:19
113:14 114:6,21
**continued**
113:16 138:23
**continues**
95:7
**continuing**
83:9
**contribute**
106:17
**contributing**
140:1
**contribution**
55:8
**contributions**
25:8 75:17,19
106:24
**conversation**
28:10 37:1
**conversations**
26:11 31:17
**copy**
33:4
**corner**
55:15 94:24
**correct**
20:1,2 22:16,18
24:22 26:7,14 45:12
52:24 79:5 82:4
92:14 106:4,14
110:1 114:14,15
118:5,8 120:17
130:9 131:23 133:21
139:14 143:14
**counter**
62:9 66:22
**counting**
27:16
**couple**
9:17 28:2 115:1,19
126:19 144:3
**court**
5:2,7
**cows**
12:23
**created**
55:10
**creating**
111:20
**cried**
73:12 124:15

**cry**
53:17
**cup**
71:6,7,8
**current**
114:23
**curve**
66:4,11,23
**customer**
63:24 69:4
**customers**
63:22
**cut**
44:20

**D**

**dad**
46:17
**daily**
14:18
**DARKE**
4:7,22 5:11,14,24
6:9,21,24 7:1,19 8:1,
2 15:17,22 16:11,15,
17 19:6,8 23:3,6
41:14,17,19 27:4,10,
11 31:1,2,24 32:2,
19,20 33:11,21 34:1,
19 36:14,17 38:17,
18 39:5,9,12,18
40:6,22 41:2,19,24
42:10,13,15 43:22
44:1 45:5,7,8,16,
46:1 48:21 51:1,11
53:11,15 54:19 55:1,
5 56:12,16,21 57:8,
16,19,21 58:4,5,
59:6,12 64:2,13,22
65:14,16 66:1,2 71:1
74:13,18,23 76:2
77:8,13 79:10,15,17
80:22 81:4 82:16,18,
21,22 83:19,23
87:15,16 89:16,21,
22 90:3,7 92:6,10,
15,19 93:19 94:1,5,8
95:20 96:1,5,7 97:14
99:6,15,16 101:13,
22 102:1,5,23 103:1,
4,7,14 104:18 106:7,
9 107:9 108:13,17
110:1,4,16 111:1,7
119:18,20 121:20
129:5 137:23 141:23
142:2,10,15 144:23
145:14
**date**
6:10 26:2 27:19 28:4
35:17 42:23 44:2
54:8 75:7,8 77:18
78:4 79:20 93:5
96:22 106:8 114:22
117:22 123:5 128:20
**dates**
97:20,23
**daughter**
89:10 140:3
**day**
10:19 11:16 13:24
17:5 21:7,9,18,20
26:16 33:2,5 35:4,9,
21 55:20 58:11
61:20 73:11,12
84:23 96:14 98:3,7
117:14 123:7 124:13
144:1,8
**days**
10:3,23 12:15 49:19
95:8 97:22 118:22
119:4 130:13

**deal**
86:4
**dealing**
17:19
**dealt**
62:15
**Debbie**
88:9,11,12,16 89:3
90:11 139:13,22,23
140:7,11,22
**December**
14:6
**decide**
20:5
**decided**
52:16 76:15 91:23
**decrease**
54:1
**Defendants**
6:23
**definition**
109:17
**degree**
8:5,6
**demanding**
106:22
**demeanor**
122:17 144:17,24
145:7
**demonstrative**
133:24
**denied**
15:7 114:3
**dep**
58:3
**Department**
15:24 23:15 25:16,
19,20,21 27:13,22
28:3 29:7,17 31:4,
10,16,20 32:6,22
34:3 35:15 37:12,16,
20 38:23 39:14
50:20 59:16 74:5,9
75:1 76:4 77:3 78:3,
22 81:24 83:1 101:7
107:20 111:21
112:3,4,15 114:4
122:8
**depends**
85:13
**DEPONENT**
145:20
**deposed**
4:15
**deposit**
75:18 77:21
**deposited**
78:11 80:19 82:5
126:15 128:18
**deposition**
4:17,22 33:15 51:5
54:22 56:13 64:6
74:15 81:1 83:20
89:18 92:7 93:22
103:11 118:7 145:21
**depositions**
145:17
**describe**
112:2 115:10,20
116:2,20 123:11
125:6 128:16,22
129:7 141:1
**description**
143:1
**desk**
8:22 17:13,23 18:21
62:5,17,18 63:17
65:24 66:8,13 67:10,
20 68:4,22 69:24
70:7 119:14 124:14
130:17 131:22



**details**
87:22
**diagram**
61:24 62:2 64:20
65:17
**difference**
72:13
**differently**
128:24
**difficult**
78:15 109:14
**dimensions**
64:20
**dinner**
115:19
**directly**
9:6 47:4 66:22 80:5,
6,7 108:22 133:12
136:2
**disability**
91:16
**discipline**
117:3 130:3 135:10
**discouraged**
115:2
**discovered**
21:9 38:2
**discovery**
137:2
**discuss**
44:13,15
**discussed**
46:7 58:13 59:24
120:15
**discussion**
7:23
**discussions**
138:23
**distance**
132:4
**divided**
50:3
**docket**
103:3
**doctor**
13:17,18 83:6
**document**
33:11,14,22 51:2,4
54:20 55:2,10,12
56:17 58:7 65:4
74:19 81:7,9 84:1,3
90:8,10 92:5,10,11
94:6,9 95:1 96:18
102:7,9 103:15,17
105:1,5
**documentation**
112:14
**documents**
93:20 108:13
**dog**
72:12 86:4 88:13
115:14 127:15,19
140:8
**dog's**
83:4,5
**Doggy**
52:6
**dogs**
12:20,22 47:24 48:1,
3 65:9 84:20 85:4,
12,17,21,22 86:14,
16,19,20,21,22
88:19 93:9,10,12,13
**DOL**
26:14,17 27:7 29:21
30:10 74:11 79:4
107:23 108:6,14
**Dominique**
46:5

**Don**
118:5,11,21 119:10
120:1 123:7 126:24
137:17,18,20,21
**Donald**
6:17,20 7:5
**Donny**
121:9
**door**
65:8 70:2 73:15
118:23 119:1
**doors**
69:20 124:6
**Dorr**
73:9
**dotted**
67:16
**double-check**
57:22
**dozen**
15:19
**drafted**
99:3 104:17
**drafter**
104:13
**drawing**
64:23 137:5
**drop**
15:2 114:6,21
**dropped**
15:9 114:8,11
**duly**
4:2
**duties**
11:4 17:15 18:15,17,
19,20 84:21

**E**

**earlier**
35:7 48:22 76:22
86:12 107:12
**early**
128:17
**easier**
64:2 131:2
**easily**
136:21
**Ed**
17:8 52:9
**Edith**
127:19
**education**
8:4 83:9
**EE**
75:18
**effect**
36:2
**effort**
128:22
**efforts**
114:18
**elaborate**
23:16
**else's**
48:18 94:22
**em**
86:11 91:10 104:24
127:22
**email**
32:24 33:3,9,10
34:20,24 35:5,10,19,
22 36:1,9,14,15
37:2,5,10 50:22
51:12,14,16,21 54:8,
11 83:15 84:3,5,7
88:5 89:13,23 90:11,
14 92:21 93:1,4,5
97:16 127:9 136:20
140:21

**emailed**
97:2
**emails**
51:19,22 54:14
**emphasis**
110:14
**employee**
53:13 75:17 135:9
**employees**
63:13,15 69:8 78:1
**employment**
16:1 19:12,16 22:15
24:21 58:11 60:19
61:14,15,17,18
80:14 89:4 98:1
101:3 111:22 112:3,
5,15 113:15,21
114:4,19,23 117:4
136:19 143:4 145:2
**encouraged**
76:14
**end**
38:16 61:18 145:1
**ended**
19:13 22:15 24:21
60:20 61:14,15,17
98:1
**ending**
89:5
**entail**
17:15 85:17
**entailed**
17:16
**entire**
9:12 101:3
**entity**
114:16
**entrance**
65:5,11
**entries**
79:9
**entry**
79:8,9 96:20
**environment**
134:22 135:1
**ER**
75:18 77:21 78:14
**ER's**
77:21
**ERISA**
98:20 99:2 106:20
107:17,24 108:7,23
**established**
104:16
**estimate**
15:12 61:11 64:14
**evening**
35:4
**eventually**
106:13 120:11 139:2
**exact**
28:4 29:8 97:20,23
**exam**
63:19 64:1 69:12,13,
19 71:15,18,19 72:4,
6,9
**EXAMINATION**
4:6 111:11 142:1
**examined**
4:4
**examples**
128:9
**excuse**
124:23
**exercised**
106:20
**exercising**
107:2
**exhausted**
42:2

**exhibit**
33:12,16 51:2,6
54:21,23 56:12,14
64:3,7 74:14,16
80:22 81:2,6 83:19,
21 89:17,19 92:6,8
93:19,21,23 102:2
103:10,12 127:8
139:5
**exit**
65:4
**expect**
93:10,11 128:7,11
**expense**
127:21
**explain**
5:16 14:17 20:3
48:13 79:2 85:15
88:18 94:18 121:17
127:14 136:4 139:21
**explained**
29:5 46:11
**explanation**
79:3 118:17
**explore**
42:8
**explored**
39:17
**extent**
39:1 104:13 143:18
**extra**
9:16,17 53:22 54:5
110:14 122:22
127:12,13 128:4,14
**extremely**
115:2 123:14
**eye**
109:6
**eyes**
62:22 94:22 109:9

**F**

**F-WORD**
78:15 133:20,23
134:2,7,8,13 135:3,
6,11,13 136:19,21
142:3,6,12
**face**
125:7
**Facebook**
80:15 94:10,14
**fact**
51:9 57:21 70:12
107:15
**facts**
104:14,16 109:1
**failed**
75:18
**failure**
77:21
**fair**
5:22
**familiar**
76:3 77:2,7 105:4
**fast**
98:18
**faster**
56:10
**father**
52:3,9
**February**
24:12 104:8
**fed**
86:11
**federal**
145:17
**Feed**
93:13

**feeds**
48:2,3
**feel**
13:2
**feeling**
53:16 54:2 88:8
**feet**
132:6
**fell**
126:3
**felt**
13:3 53:2,6,12,14
59:18 97:5 125:11
**fenced-in**
65:9
**field**
17:22
**fight**
91:9,10
**figure**
40:22
**figured**
87:2
**file**
28:13 29:14 75:4,20
76:20,23 104:19
**filed**
27:21 24:12 37:1,
16,20 38:23 39:15
77:10 83:7 95:13
105:2
**filing**
22:23 23:4 74:10
76:12
**fill**
13:6 16:22 23:13
29:12
**filled**
15:23
**filling**
11:6
**final**
27:18
**finally**
62:24 114:3
**find**
11:9 14:1,19 29:16
35:13 113:20 114:19
**finding**
23:9
**fine**
6:21 11:24 13:16
27:20 34:8 60:23
**finish**
59:6 87:10 144:20
**finishing**
119:1
**fired**
21:7,8 27:24 33:1
35:20 61:6 73:3,17,
23 74:3,9 79:14
89:15 91:8 100:3
110:6,9 141:17
**fish**
31:14
**fix**
59:19
**flew**
134:2 135:19
**FOI**
34:3
**FOIA**
75:1
**folder**
83:10
**follow**
111:9
**followups**
141:23

**food**
85:24
**forbidden**
97:4
**forgone**
130:13
**form**
5:9 15:15 23:1 30:19
53:8 59:2 77:5 79:6
80:11 98:23 99:9
107:3 110:21
**formal**
5:4
**forward**
125:12
**found**
21:24 35:17 43:4
45:10 78:16 91:22
97:4 117:15 118:19
128:17 136:17
137:1,20,21 139:11,
19 140:6,9 144:12
**fourth**
90:23
**frame**
16:8,11 19:5 114:2
115:11 116:1,8
125:19 128:21
**frames**
16:9
**Franklin**
105:21,22 106:18
128:18,19
**Friday**
9:1 10:22
**friend**
53:12,14 136:14
**friendly**
129:8,19
**friends**
48:8 59:23 115:13,
19,23 119:17
**front**
8:22 17:13,22 18:21
40:13 62:5 63:17
99:4 131:22 140:14
**frustrated**
135:20,22
**frustration**
133:15
**fry**
31:14
**fuck**
62:17 68:11 70:7
110:18 143:6
**full**
20:7,9
**fully**
39:17
**fun**
116:14
**fund**
82:1
**funded**
37:21 42:20 106:4,
13
**funds**
21:10 59:19 77:22
78:10 84:17 106:18
107:18 119:12
120:14 125:21
126:1,6 128:17
137:12 139:2,20
140:1

**G**

**GAFFNEY**
6:19,22 7:21 15:15
16:7 19:5,7 23:1,17,
20,23 24:1,3,5,15



26:24 27:8 30:19
31:22 32:1,17 34:9,
11,15 36:12,15 38:9
39:1,7,11,16,19
40:15 41:1,16,20
42:4 43:19 45:3,6,20
48:17 53:8 57:5,7,
12,17,20,24 59:2,9
62:2 64:9,16,19
65:10,12,15,22
70:23 75:24 77:5
79:6 82:13,17 87:9,
12 90:1 94:3 95:16,
18 96:4,6 97:11
98:23 99:8 101:15
102:21,24 103:2
104:12 106:6 107:3,
8 108:15 109:22
110:2,13,21 111:9,
12 119:21 121:21
122:1 129:6 138:1
141:22 142:7 144:20
145:16

**gave**
23:12 25:11,13,17
49:21,24 61:6 66:17,
19,20,21 71:5,9,12
72:16 112:24 138:20

**general**
114:9 141:8

**girl**
33:19 95:5 97:3
123:1

**girls**
18:24 28:16,24 29:1
40:4 136:9

**give**
14:24 21:20 53:20,
21 63:7 85:23,24
101:13,20 127:11
128:9 129:3 132:19
141:21

**giving**
29:10

**glowing**
104:6

**go-to**
123:1

**goats**
12:23

**good**
82:15 116:15

**grabbed**
57:19

**ground**
4:23,24

**group**
93:20 138:20

**guess**
15:12 39:19

**guys**
44:21

---

### H

**half**
52:24 92:20 96:14

**hallway**
141:8

**hand**
67:7

**handed**
54:16 67:9 132:10,
22

**handle**
118:1

**hands**
62:13

**handwriting**
56:22,24 57:3 82:7,
10

---

**happen**
29:13 30:4 82:23
138:12

**happened**
23:14 29:9,11 61:22,
23 67:3 72:23 80:13
89:11 95:22 98:17
118:3

**happening**
28:17

**happy**
7:9 61:2

**harassing**
84:10

**hard**
85:12 119:19 123:14
128:23 129:10,11

**harm**
13:3

**hate**
95:11

**hated**
95:8

**head**
5:8 60:21 93:3
136:16 137:14

**heads**
32:10 49:3

**health**
87:23 101:2

**hear**
110:9 134:8

**heard**
30:21 124:6

**hearing**
49:20 113:4

**hearsay**
119:20 121:20

**heart**
53:23 93:3 127:12

**helped**
127:1

**helping**
17:20

**helps**
85:18

**hesitated**
122:9

**hey**
6:4 31:4 95:5 124:14

**highest**
8:3

**highly**
99:12

**hired**
15:20 17:12,13 98:8

**hiring**
15:21

**history**
91:6

**hit**
112:9

**Holt**
29:1 46:3 63:18
120:17,20 137:4

**home**
46:14,15 55:21
72:19,22 86:5
120:22 121:12

**Honey**
140:16

**hope**
53:20

**hoping**
46:16 76:20 77:9

**horses**
12:23

**hospital**
8:14 10:2,9,10,16,17
11:19 12:18 14:4

---

114:9 115:5 119:1
140:12

**hospitals**
15:3

**hostile**
108:21,24 109:1,2,3,
11,16,21

**hour**
19:14

**hourly**
9:7,9,10 12:11 19:3

**hours**
8:23,24 9:18,19 96:8

**house**
47:22 114:9

**hug**
71:5,10,13 72:16
138:20

**huge**
58:1

**hundred**
30:13

**hung**
28:20

**hurdles**
88:23

**hurt**
13:20

**husband**
38:1 40:12 43:1,8
45:9 73:13 106:22
117:13,23 118:11,21
122:12,13 126:24
137:17,18,20,21

**husband's**
118:5 121:13

---

### I

**idea**
48:19

**identification**
33:17 51:7 54:24
56:15 64:8 74:17
81:3 83:22 89:20
92:9 93:24 103:13

**Illinois**
6:13 8:9,16 15:24
16:16,18 111:21

**immediately**
28:14 117:18 122:5

**impact**
125:11

**improper**
99:5

**including**
104:7

**incorrect**
102:19

**increase**
19:1

**increases**
19:17

**incredible**
13:18

**Indianapolis**
115:17

**indicating**
6:17 65:21

**indication**
125:23 133:10

**individual**
5:6 6:23 69:7 93:16

**individually**
106:21

**individuals**
80:12

**informal**
5:1 76:13

---

**information**
31:21 47:1 82:4 94:2

**initial**
119:4 138:10

**initially**
25:4

**initiated**
108:22 137:18

**inquiry**
108:23 110:10

**inside**
60:21

**insubordinate**
134:1 135:15

**insurance**
100:21,22 101:2

**intending**
24:7

**intentional**
134:5

**intercom**
38:11

**interest**
50:14,17 52:17

**interested**
133:11

**interfere**
99:18,19

**interfered**
98:22 99:7,24

**interrupted**
38:10

**Interruption**
38:8

**investment**
106:18

**invisible**
139:6,9,11 140:6,9,
19

**invited**
40:1 46:5

**involuntarily**
102:17

**involved**
58:12 136:9

**IRA**
18:4 19:18,19,22
20:3,16,21 21:2 23:7
25:3,9 29:10 31:6
37:21 42:20 43:18
44:22 46:8,10,16
50:5,11 54:12,13,14,
17 55:7 58:12,18
59:6,7,14,24 60:3
73:23 75:16 80:19
81:21 82:1 88:22
99:18,19 100:5
101:9 105:7,8,16
106:3,19 107:13,14
117:10 118:3 119:13
120:7,22 121:3,8
125:21 126:16
128:19 137:12 140:1
144:13

**irrelevant**
38:11

**issue**
54:12 58:1 87:18,20
92:24 93:3,4 101:9
122:14 126:18
130:8,23 131:17

**issues**
88:1,2 89:15 116:6,7

---

### J

**J-O-E-Y**
4:11

**January**
10:11 14:4,7 15:13,
14 16:12 25:2

---

**jeopardy**
46:13

**jeshoundog@
sbcglobal.net.**
51:13

**Jessica**
29:2 46:3 61:7,9,12
120:10 121:3 137:7,
8

**Jessica's**
61:14

**job**
11:4 14:17 16:21
17:15 18:15 34:16
52:21 84:21 88:14
92:2 95:12 111:14,
17 112:8 119:2
123:14 129:10,12,14

**jobs**
15:6,11,19 16:3

**Joe**
124:14,16

**Joey**
4:11,12,14 51:13
71:6 82:23 95:5
130:15 141:21

**joked**
116:12,13

**Joyce**
4:3,10

**judge**
5:4,5

**judging**
93:4

**July**
11:17 21:24 22:1,2,
15 24:24 26:4,18
27:3,6,17,21 28:5
35:5,6 42:24 43:3
44:3,4,22,24 45:15
46:20 50:23 53:6
54:9,10 55:16 58:10,
11,14 61:17,21
73:11 78:2 79:20
82:24 90:15 96:23
98:4,12 101:10
102:18 106:4,10
110:5,18 117:21
119:23 120:8,19
121:2,16 122:2
123:4,12 124:12
128:17,18 121:21
129:15,18,24 130:4,
6 131:10 138:14
139:1,14 140:2
143:9,10 144:9,14,
18 145:4,6,8

**jump**
34:11 88:22

**jumping**
144:21

**June**
93:6 115:9

---

### K

**Karen**
98:11

**key**
63:7 71:3,4,5 110:8
140:23 141:13,15,
20,21

**kibosh**
14:22

**kind**
13:19 15:8 71:7
88:23 122:24 134:23

**knew**
11:10 12:7,10 23:13
32:7,14,15 37:19,23
39:21,22 40:3,5,11

---

41:4,5,10 42:21
44:17 46:6 48:20,22
49:1 72:2 73:22 89:9
120:6 137:22 139:24
140:17 144:13,16

**knife**
44:20

**knowledge**
17:9 25:7 37:18
38:22 39:10,11
77:15 79:18 82:3
101:7 106:5 118:10

---

### L

**lab**
17:20

**label**
57:17

**labeled**
57:19

**Labor**
17:5 23:15 25:16,19,
20,22 27:13,22 28:3
29:7,17 31:4,10,16,
20 32:6,23 34:3
35:15 37:12,16,21
38:24 39:14 50:21
59:16 74:6,9 75:2
76:4 77:3 78:4,23
81:24 101:7 107:20
122:9

**lawsuit**
22:21,24 23:5 24:12

**lawyer**
99:4

**lay**
99:2

**learn**
44:10

**learned**
35:14 42:19 44:7
45:9 106:3

**learning**
97:13 106:17

**leave**
12:17 13:21 18:5
61:12 62:23 68:18
70:17 78:18 91:24
96:12 101:19 110:7

**leaving**
61:1 76:19 78:21
91:19,21,22 98:14,
16

**left**
11:10,14,16 13:23
61:2,4,5,8,9 66:6
67:8,20 71:8 72:18
76:18 95:7 97:5
100:12 131:16
132:1,2,10,13,23
136:1

**left-hand**
55:15

**legal**
99:1

**letter**
56:6 81:23 84:8
113:17

**letters**
76:6

**letting**
48:10

**level**
8:3

**liar**
143:17

**lie**
91:12

**life**
59:21

---



**Lindsay**
25:24 62:5,6,13
63:17 66:5 67:9
68:2,24 71:6,8 85:9
89:1 122:23,24
131:19,20 132:1,2,5,
23 133:2,16 136:2
**Lindsay's**
132:10
**list**
14:24 15:3 16:13
111:20 112:8
114:10,12,13
**listed**
52:2
**listen**
5:14 6:4 31:4 34:12
**listened**
21:16
**listening**
72:3
**litigation**
102:12
**live**
6:12,13,16
**LLC**
106:21
**loan**
20:21 47:6,8,10,12
126:2,5
**lobby**
71:22
**located**
67:15 69:11
**log**
86:4
**long**
6:1 7:6 8:17 48:19
61:10 112:18
**longer**
12:8 78:11 133:11
**looked**
62:21,24 68:2 121:9
**lose**
39:22 50:16
**losing**
46:14
**lot**
18:23 54:3 118:16,
24 138:19
**loud**
70:10,11
**love**
92:2
**loved**
13:17
**Lynlee**
17:8 32:5,21 35:13
39:12,13 48:2 52:3
54:11 55:18 60:15
67:13 73:3,17 82:24
86:13,16,24 87:6
92:22 108:20 110:5
130:14 139:10
140:5,9 143:5,17,21
144:6
**Lynlee's**
67:20 68:22 69:24
70:6 92:3 141:7

**M**

**made**
27:17 35:15 75:23
91:2 102:10 140:7,
22 141:3
**mail**
81:17
**mailbox**
54:16 66:24 130:19

**main**
48:11
**maintain**
16:23
**make**
5:14 24:9 61:2 64:2
90:1,4 91:4,11 99:10
106:23 127:9
**makes**
72:13
**making**
58:1
**manager**
11:21 18:12,14,17,
18 106:21 107:23
**managers**
106:23
**Mandy**
29:1 46:3 48:7
58:17,22 59:6,20
60:17 61:15 63:18
69:12 71:5,10,12
72:16 120:10,16,20
137:4 141:9,12
**Mandy's**
60:19,21 61:16
**Manteno**
6:13
**map**
69:10
**Margie**
115:4
**Marhanka**
22:7 120:2 122:14
123:9 129:17
**mark**
33:12 51:2 54:21
56:12 64:3 74:13
80:22 83:19 89:16
92:6 93:19,21 102:2
103:9,10
**marked**
33:16 51:6 54:23
56:14 64:7 74:16
81:2,6 83:21 89:19
92:8 93:23
**married**
7:2,4,7
**match**
20:7,18 50:18
**matched**
20:10
**matching**
75:18
**matter**
57:21 70:12 91:16
120:1 137:13
**Matthews**
29:2 40:1 46:5 60:11
120:11 137:4
**Mccaslin**
29:2 46:3 121:3
137:8
**meaning**
63:5 86:19
**means**
8:22 64:17
**meant**
127:14 128:13,15
139:19 140:19
**medical**
87:5,7 88:1,2,5,7
92:4 100:19,20
**medicine**
86:1
**medicines**
13:5
**meeting**
38:4 39:23,24 40:1,
14 41:12 42:17,18
43:6,9,13,17 44:6,8,

11,13,21,24 45:15,
17,22,23 46:6,7
47:1,17 49:9,11
50:15,23 51:9 53:6
58:10 119:23 121:16
122:9 123:4 125:14
138:14,20 143:9,10
144:4,9 145:3,4,6
**meetings**
58:15 59:23
**mention**
47:11
**mentioned**
10:14 14:3 17:1
19:12,18 34:24
36:18 66:11 71:9
84:20 86:12 93:16
143:12
**message**
33:9 34:21 36:4,7
94:13,20
**messages**
80:9
**messaging**
94:19
**met**
119:6
**method**
9:5
**middle**
12:3 21:24 25:12
103:23
**mile**
53:22 127:12,13
128:4,14
**mind**
4:12 48:18 57:7
97:10
**mine**
50:6 83:5,7 121:1
**Minett**
115:4
**minutes**
101:13
**misheard**
30:17
**misstates**
32:17
**mistake**
138:12
**mistrust**
89:14
**Monday**
8:24 76:19 96:8
144:5
**Monee**
9:23 12:19 13:10
17:2 20:13 83:1
98:18 102:11 103:19
108:12 112:23
**money**
21:1,5,6,12,14 23:8,
11,14 25:3 29:9 30:3
46:15 47:9 48:4,5
49:21 50:4,9,13,16
78:16 99:20 100:4
119:16 121:1,9
126:14,15 127:3
136:7
**month**
9:2 50:2 100:11
113:3 123:12 129:15
130:3 138:24
**monthly**
14:19
**months**
8:18 46:18 48:14,16
49:7 50:3 112:21
115:1
**morning**
85:2 121:15 123:24

**mother**
89:2
**multiple**
34:5
**mums**
127:20,22

**N**

**nail**
91:10
**named**
6:22
**names**
13:4 34:5
**nature**
115:10,21 130:21
**needed**
24:8 83:7 116:9
125:24 135:23
136:15
**neighbor**
72:24 73:1,2
**neighbor's**
73:8
**nerve**
138:21
**newday1**
52:4
**nice**
13:17 30:8
**Nicole**
25:23,24 26:8 30:8
31:3
**night**
85:1,2 140:13
**non-payment**
55:7 107:13 119:12
137:11
**nonpayment**
107:14
**normal**
85:16
**note**
54:16 56:6 62:8,13
65:18 66:15,17 67:4
80:17,21 130:7,12,
14,16,21 131:1,3,7,
11,12,16 132:9,13,
20,22 136:1
**notes**
66:23 75:4 101:17
131:5 132:16
**notice**
61:6 122:16
**noticed**
121:10
**notified**
107:23 108:7
**number**
60:2 108:3 136:20
**nursery**
127:20
**Nykaza**
63:20 69:14

**O**

**oath**
113:5
**object**
15:15 30:19 57:5
59:2 98:23 99:8
104:12 110:21
**Objection**
16:7 19:5 23:1 31:22
32:17 39:1 40:15
43:19 48:17 53:8
70:23 77:5 79:6
107:3 119:18,20

**mother**
121:20 129:5 137:23
142:7
**objectionable**
99:12
**objections**
138:16
**observations**
121:17
**observe**
122:20 132:7
**obtain**
47:12
**obtained**
114:23
**occasion**
85:19 117:9 118:20
124:18,20
**occasions**
124:5,9 126:20
**occur**
84:23 124:1
**occurred**
117:20 141:2
**occurrence**
131:15
**offered**
19:22
**office**
11:20 16:19 18:12,
14,17,18 64:4 67:14,
15,19 141:7
**OMG**
95:5
**ongoing**
116:18
**online**
112:6,9 113:21,24
**open**
69:20 70:4 109:21
**opening**
70:1
**openly**
108:21,24
**opportunity**
54:5 113:1
**opposed**
130:21
**opposite**
66:22
**option**
49:16
**orally**
33:9
**order**
16:22 91:10 125:24
**originally**
102:19
**outstanding**
104:7 117:6
**overtime**
9:15 12:14
**owed**
77:23 78:1,16
**owner**
78:17,18 137:9
**owners**
17:6 86:6

**P**

**p.m.**
77:18 78:8 90:17
95:20 139:14 145:21
**paid**
9:4 30:1 48:4 50:2,9,
16 56:3 100:13,22
101:1 128:6
**pain**
116:12

**paper**
31:12
**paperwork**
11:6 17:16 119:6,8
**paragraph**
52:15 53:19 78:8
84:11 90:24 91:18
102:14 104:4 106:2,
6,16 108:4,18
**paragraphs**
95:4
**Park**
8:16 10:8
**parking**
138:19
**part**
33:19 53:5 84:21
92:13,15 97:15
**participant**
137:6
**participants**
43:17,20,21,22 60:2,
9 120:7 137:8,9,10
**participate**
58:10
**participating**
75:16
**passed**
65:18
**past**
127:7
**patient**
72:4
**patients**
17:17,18,19 109:13
134:7
**patio**
97:2
**pause**
45:14 56:18 74:20
77:11 82:12 90:5
92:12,17 93:18
101:12
**pay**
9:5,6,7,17 19:1,17
31:5 46:17 48:5
50:17 56:9 100:24
122:7 125:16,20,24
**paycheck**
20:16 126:14,15
**paying**
21:10
**payment**
23:12 49:10,13,15,
21,22,24 55:3,6
56:4,7,10
**pending**
6:2 32:18 79:15
**people**
11:7 13:16 52:1
76:18
**Peotone**
10:1,2,3,14,16 11:2,
9,19 12:12,17,19
95:7 96:8 97:16,19,
23 98:8
**percent**
20:9,15 30:13 50:18
53:21 127:10,11
**perception**
32:12,13 79:23
**perfect**
96:9,11
**performance**
54:1 104:6,11
116:17,23 117:7
129:18,21,24
**performing**
129:14
**period**
16:5 111:19



**Periodically**
84:22
**permission**
29:8
**person**
18:21 22:12 78:20
**personal**
37:18 38:22 39:9,11
51:16 53:11 62:7
138:2
**personally**
53:10
**perspective**
30:14
**pertaining**
130:8
**pharmacy**
63:18,20 69:16,18
71:14,16 124:14
141:9
**phone**
12:5 15:1 22:11 24:9
28:7,21 29:23 30:2,9
98:9 118:17 119:4
**physical**
86:7
**picked**
67:6
**place**
9:24 10:8 42:18
116:14 117:3 123:2
136:19
**places**
15:9 114:1
**Plaintiff**
102:16 104:5 106:19
108:21,22
**plan**
19:20 21:2 23:12
25:9 44:22 49:10,13,
16,21,23 50:5 52:23
54:17 55:3,6 56:4,7,
10 58:12,18 59:6,7,
14 60:3 75:17 76:18
78:20 98:20,22
99:18,20 105:7,8,16,
19 106:3,19 117:11
119:13 120:7,12
121:4
**planned**
10:24
**planning**
28:13
**plans**
77:22 98:14,16
**plant**
127:22
**PM**
80:15 94:12
**PMS**
94:10
**point**
18:3 65:17 69:10
71:14 73:7 91:2,4
96:14 117:13 122:24
140:22 141:4
**pointing**
65:23 67:21
**Police**
83:1
**poor**
136:13
**portion**
56:23 82:8 92:21
**position**
17:11
**possibly**
129:11 138:11
**postage**
47:21

**pot**
48:5
**powwow**
121:5
**precedes**
91:6
**prepared**
130:7
**preregister**
112:7
**prescriptions**
11:7 12:24
**presence**
135:3,6
**present**
135:7
**presented**
5:4
**pretty**
72:8 90:22 95:8
102:24 103:2 116:22
139:11 140:6,9
**previous**
61:23
**previously**
57:14 124:11 135:24
**prior**
37:10 44:22 91:24
98:15 104:7 121:15
122:2 123:7 131:9
**private**
94:13,18,20 113:19
114:16,18
**privilege**
31:23
**problem**
31:8 117:10 123:8
124:11 137:11
138:8,10,24 139:24
**procedure**
88:5,8
**proceed**
38:13
**proceeding**
38:12
**process**
75:21 76:14 116:18
**produced**
36:13 57:12,15,16,
22 108:16 114:13
137:1
**promise**
29:20 53:21 127:11
**promoted**
18:8,11,12
**provide**
36:10 49:15 50:18
51:15 52:16 56:6
**provided**
55:17,24 74:24
128:10
**punish**
31:15
**punishment**
30:5
**Purdue**
127:19
**purposes**
111:23
**pursuant**
106:19
**pursue**
76:15
**put**
14:21 18:16 20:16
22:4 23:9 25:4,8,10
38:16 40:17 41:23
46:20 48:5 50:5,11
62:8 66:23 81:12
99:21 120:13,14
121:9,23 130:16,17,

18 132:14,16 139:20
140:20,21
**puts**
86:1
**putting**
21:10 107:18 121:1

**Q**
**quarter**
103:22
**question**
5:12,20 6:2,3 15:16
19:6 23:2,18,20 24:1
27:1 30:20 32:18
34:9,12,13,15,16
37:6,8 39:5,8 40:20
45:19,21 53:9 59:3,4
75:24 77:6 79:7,15
87:10 97:12 98:24
99:9,13 107:4,5,7
110:22 116:10
124:15 144:20
**questions**
101:18 111:8,14
113:11 141:22
145:15
**quick**
141:23
**quit**
59:20 68:17 91:3,5
125:2 140:23 141:4,
10,12

**R**
**rang**
12:5
**rare**
85:19 134:16 142:22
**rarely**
142:3,11
**rate**
9:10,17 12:11 19:3
**re-called**
29:7
**re-marked**
103:12
**read**
27:4 67:6 75:11
76:10 77:8,19 78:9
90:2,3 92:14,15
94:2,3,7
**ready**
17:17 28:19 29:4
38:15
**real**
61:2
**reason**
4:23 13:18,22 15:20
21:2 22:19,23 23:4
41:13 61:2 110:20
111:4
**reasons**
13:22 41:15 61:1
109:20
**recall**
17:24 18:5 19:21
20:14 22:19 24:18
27:13 28:10 31:8,18,
19 32:3 34:20 45:2
50:24 54:10,13,18
56:8 57:9 60:2 67:12
74:12 78:22 79:20
81:22 88:7 89:8
96:24 97:24 125:17
139:7
**receive**
81:14,16,23 100:10
105:13 117:2,6,12
130:2 135:10 136:20

**received**
8:11 18:2 81:17,20
104:5
**receiving**
49:20 54:15 80:17
100:8
**recent**
104:7
**recently**
94:7 137:1
**reception**
65:24 66:3,8 67:10
69:3
**receptionist**
11:3,5
**recognize**
33:13,22 34:2,14
51:3 55:1 56:17,22
57:1 74:18 81:7 82:7
83:24 90:8 92:11
94:6 102:6 103:15
**recollection**
130:11
**record**
4:9 6:19 7:21,24 8:1
38:9 41:23 64:9
65:22 82:13,21
95:19 101:22 102:1
103:4,8 110:13
**recorded**
31:17
**records**
13:12,13 72:14
111:16
**referee**
113:5,11
**referenced**
86:13
**referencing**
89:24
**referred**
84:4 141:3
**referring**
13:9 16:19,21 55:7
97:8,9 104:9,10
108:20 126:23 143:2
**reflect**
6:19 38:9 65:22
82:13 110:13
**regard**
108:16 112:1
**register**
112:4
**regular**
134:16,17
**regurgitate**
41:17
**relate**
119:11
**related**
17:22 78:13 89:1
**relationship**
115:7,10,21 122:17
123:6,12
**relative**
109:3
**relaxed**
115:22,24
**remember**
8:10 10:7,19 11:12,
15,18 12:1,3 17:4
19:3,10,11,23 22:10
26:2,16,22 28:2,6
33:2 35:3,21,24
42:17,23 44:6 49:18,
22 54:15 56:19 58:6,
20 60:1 61:4,10 69:4
80:3,17 84:19 87:17,
20 90:13 97:1
105:19 118:15,16
124:13 142:20

**remembered**
118:16
**removing**
20:15
**repaid**
139:3
**repayment**
55:9
**repeat**
39:3 41:22 109:24
**rephrase**
40:16,20
**replied**
30:8
**report**
27:17,18
**reported**
25:11 26:18 36:22,
23 74:4,5 100:6
**reporter**
5:7
**reporting**
122:6,8
**reports**
18:23
**represent**
64:23
**request**
75:1
**requested**
77:20
**required**
106:23
**reserved**
145:18
**resolution**
76:13
**respond**
78:17
**responded**
37:4 68:14 78:19
110:10
**response**
70:20 80:10 82:11
84:8 92:22 95:15
138:10
**responses**
125:3
**responsibilities**
18:23
**responsible**
85:3
**rest**
47:3
**result**
5:6
**retire**
38:15 52:23
**retirement**
19:20 23:8 38:6
76:17 77:15
**returned**
126:6
**review**
104:11,23 105:1
116:17,23 117:1
**reviews**
104:6
**right-hand**
62:13 66:8 94:24
**rights**
98:20,21 99:3,6
106:20 107:1,11
**ringleader**
137:13
**room**
6:20 63:19 64:1
69:12,14,19 71:15,
19 72:5,6,9 116:22

**rooms**
71:18
**rough**
64:14
**roughly**
14:16 27:21 95:13
144:14
**route**
59:17
**rules**
4:23,24
**résumé**
15:9
**résumés**
15:2 114:1,7,8,11,22

**S**
**S-C-H-M-E-L-Z-E-R**
4:10
**sad**
40:3
**SAITH**
145:20
**salary**
9:8
**samples**
17:21
**sat**
69:2 73:12
**Saturday**
9:2 44:13 45:4 85:1,
16 121:15 144:4
**save**
127:3
**scale**
64:10,11,12,13,17,
24
**schedule**
62:11 72:5
**scheduling**
140:14,15
**Schmelzer**
4:3,10 6:20 7:5,17
33:15 51:5,13 54:22
56:13 64:6 74:15
81:1 83:20 89:18
92:7 93:22 103:11
118:12 123:7
**Scott**
22:7 30:8 32:5,22
35:14 39:12,13 43:8
46:4 48:1 52:3,5
60:7,12,14 62:18,24
63:1,6 71:2,4 81:18
82:9 85:18 86:13,23
105:20 110:8 118:2,
13 119:3,7,12,14,24
120:2 121:11 122:14
123:8 129:17,19
137:19 140:23
141:12,19 143:5,17,
21,23,24 144:16
**Scott's**
56:24 82:10 119:14
127:6
**screwed**
51:10
**search**
14:17 15:24 16:22
111:14,17 113:15,
16,21,24 114:16,18
**seated**
118:7
**seconds**
75:10
**Security**
16:1 111:22 112:3,5,
15 114:4



**sell**
47:22
**send**
31:11 34:6 37:2
50:22 51:22 52:1
88:4 90:18,20
112:10 113:24 114:1
**sending**
34:20 51:19 54:11,
14 105:24
**sense**
5:5
**sentence**
102:16 104:5 107:22
108:4,19
**separate**
16:9 105:8
**September**
14:6
**services**
8:20 128:11
**set**
17:20
**setting**
5:1
**settled**
31:13
**shake**
5:8
**share**
87:24
**sheep**
123:1
**short**
45:14 56:18 74:20
77:11 82:12,19 90:5
92:12,17 93:18
101:12,23 103:5
**shortly**
25:10
**show**
33:6,11 54:19 57:14,
15 81:5 92:5
**shut**
69:20,21,22
**sick**
18:4
**side**
62:13 66:8 67:20
71:17
**signature**
145:17
**signed**
132:21
**silence**
118:16
**similar**
143:6
**simple**
75:16 117:10
**sir**
14:15 17:10 20:24
21:3,15 22:14 24:23
25:1,5 26:6,12 35:2
36:5,6 37:13 44:23
47:13 49:14 50:10,
12,20 51:15,17,20
56:5,20 57:11 58:8
60:18 61:13 63:10
68:15 70:3,5 83:18
84:6 93:11 102:13
103:16
**sit**
88:19 136:12
**sitting**
48:7 62:18 69:17
**situation**
28:12 29:3 89:4
**slamming**
124:6

**slap**
30:5
**slips**
142:24
**slowly**
97:13
**small**
12:20
**smaller**
31:14
**sobbing**
12:4
**sort**
6:6 53:6 137:13
**sound**
76:3 77:2,7
**South**
6:15
**Southern**
8:9
**space**
64:5 66:5 114:24
**speak**
108:22
**special**
71:7
**specific**
99:11
**specifically**
23:20 35:3
**speculating**
40:10
**Speculation**
15:16 137:23
**speculative**
48:18
**spell**
4:8
**spelled**
13:4
**spent**
115:18 140:11
**spine**
93:8,11
**spoke**
38:5 136:2
**sporadically**
15:8
**staff**
85:7
**stamp**
47:21
**stand**
88:19
**standing**
62:19
**stands**
75:13
**stared**
62:21,22 68:15
**start**
10:18 61:19,21
97:16 120:5 132:11
144:8,11
**started**
10:7 14:3 17:4 18:2
19:23 47:12,14
82:14 83:13 144:12
**starting**
14:16
**starts**
77:18
**state**
4:8 48:18
**stated**
110:14 125:19
**statement**
38:11 42:22 43:1,2,4
77:8 78:9 117:17
121:10 127:10

133:21 139:13
140:20 141:3
**statements**
45:10 105:14,15,24
117:15 120:21
121:12,15,18
**states**
76:17 77:22 78:10,
12,14,17,20 106:16
**stay**
52:22 85:22 140:12
**stayed**
13:4
**steal**
47:20
**stealing**
84:17 126:10,12
**Stella**
127:16
**stole**
97:3
**stolen**
136:14
**stool**
17:21
**stop**
21:5,6 22:3 23:23
**stopped**
113:18
**strained**
123:14
**Street**
6:15
**strength**
110:15
**strenuous**
86:10
**strike**
20:14 33:7 38:20
42:16 47:15 63:8
79:10,19,21 103:9
107:20
**stuff**
5:2
**suffer**
38:14
**suggest**
122:2 126:5
**suggested**
48:6 127:2
**suggesting**
64:10 127:4
**sullen**
136:11
**Sunday**
85:1,2
**super**
13:17
**supposed**
13:6 94:17
**surgeries**
62:10 130:8,13,15
132:11
**surgery**
62:10 131:16
**surprise**
118:19
**surprised**
133:3,4,6
**surrounding**
37:23
**swear**
134:19 142:13
**sworn**
4:2

**T**

**takes**
85:20,21 86:3

**taking**
17:17 21:5,6 29:9
47:7 86:20,21
**talk**
33:19 37:11 47:6,17
48:9,13 49:8,9,13
58:17 59:13 68:3
72:21,22 73:6,10,18,
20 78:4 79:22 88:4
89:3 91:13 92:24
98:19 106:2 108:24
109:5,16 116:24
118:1 119:2 121:3,
13 122:5,8,23
123:15,16,17 125:7
133:18 136:16
138:21 144:6
**talked**
13:23,24 26:3,8,9,10
28:23,24 30:10 39:6
43:8 47:17 58:21
59:15,19,22 63:2
73:18 77:4 92:3
100:7 118:15
120:10,11 121:10
124:16
**talking**
20:12 27:2 29:1
33:19 50:19 59:6,23
62:17 68:11 70:8
79:8 80:3 91:14
110:19 126:24
138:18 141:2 143:7,
13,16
**teased**
142:13
**telephone**
26:20 117:13
**telling**
35:1 78:22 81:12
**Templeton**
105:21,22 106:18
128:18,20
**term**
64:16 126:19
127:13,14 128:13
139:17
**terminated**
102:17 112:19
**termination**
104:8 123:5 128:21
**terminology**
86:19
**terms**
115:7 125:20 128:1
134:6
**testified**
4:5 27:5 32:14 35:7
42:5 48:22 76:22
107:12 109:23 113:5
119:24 138:6
**testify**
62:3
**testimony**
27:9 32:18 38:10
40:16
**text**
33:9 34:2,6,21 36:4,
5,7 80:8,9
**thanked**
78:19
**theme**
53:5
**thereabouts**
26:19
**thick**
44:20
**thief**
84:14 143:17
**thing**
20:4 48:11 88:23

90:3 100:24 139:12,
17 140:10
**things**
13:13 18:24 40:19
42:11 54:5 57:14
59:22 88:20,22
115:13,18
**thinking**
32:11 125:13
**thought**
12:20 23:7 63:3 97:3
122:3,7 125:20
126:9 127:6 133:5,7
**Thousand**
46:21
**Thursday**
10:21
**time**
5:24 9:12,16,17 12:2
14:14 15:21 16:4,8,
9,10,11 17:14 18:6,
10 19:5 21:13 26:23
27:2,6,12,14,16
28:8,9,11,22 32:4,21
35:4 49:12 54:4,6
68:20 72:10 75:8,20,
23 82:15 86:5,16
91:16 95:14,
16,18,23 97:24 98:3
100:12,13 101:20
107:2 111:19 112:22
114:2 115:11 116:1,
8,15 117:3,24
118:17 120:14 121:7
124:19 125:19
128:21 132:5 133:15
135:9 136:12 140:11
145:1
**times**
26:9 27:15 58:20,24
59:8,11 63:8 68:19
86:7 91:20 124:21
142:5
**Tinley**
8:16 10:8
**tip**
11:23
**title**
103:23 104:1
**today**
7:8 58:3 118:8
**told**
21:6,13,19 22:2,7,8
25:20,22 26:3,22
28:6,12,14,16,17
29:8,14 30:2,16
31:13 32:3,4,21 33:8
37:15 38:20 39:7
41:8,14 44:7,12
46:13 49:6 60:22,24
70:17 72:24 73:15,
23 74:8 79:4 89:11,
14 97:7 98:17 110:7
115:4 118:1 121:8,
11,14 140:3 144:16
**tongue**
11:23
**tooth**
91:10
**top**
65:3,12,14 96:3
**topic**
59:5
**total**
27:15 50:6 60:2
76:18
**totally**
11:24 91:19 99:5
**tough**
129:1

**traffic**
143:2
**trainer**
88:12,13 140:8
**training**
88:16,17,19 140:13
**trains**
88:21,24
**transfer**
83:12,13,15
**treated**
41:8 42:7 107:15,16
**treating**
41:11
**tri**
95:5
**trial**
4:20
**trouble**
47:9,10
**true**
30:13 34:7 42:16
74:8 76:23 111:23
138:13
**trust**
61:3
**trusted**
117:16
**truthful**
79:5,12
**Tuesday**
112:5,12
**Tuna**
127:17,18
**tunnels**
88:22
**turn**
75:3 76:7
**turned**
36:3 63:3 71:6
133:16
**turns**
85:5 120:12
**type**
64:24 125:3
**typed**
90:19
**typically**
116:21 130:24 131:4
142:22

**U**

**U.S.**
75:1
**Uh-huh**
5:13 14:8 16:6
23:19,22 30:11 43:5
52:18 64:18 65:19
68:23 69:9,15,23
70:9,19 71:11 76:8
84:15 91:1 92:23
95:6,10 96:10,21
102:15 111:15 114:5
120:18 122:15
126:21 143:11
**ultimately**
139:2
**understand**
5:11,15 30:18,20
34:15 48:12 64:16
74:21 76:5 107:5,6
116:4 136:6
**understanding**
31:9 118:4 119:5,22
**understood**
5:20
**unemployment**
14:21,23 15:5,7
16:19 91:14,15



95:14 111:22 112:23
**unit**
83:10
**University**
8:9
**unpaid**
126:6
**upper**
55:15 56:23 82:8
92:21
**upset**
40:12 68:5 119:15
142:23
**usage**
134:6
**USDOL**
78:13

**V**

**vacation**
10:23 18:5 97:21
100:10,11,13
**vague**
16:9
**varied**
142:9
**verbal**
131:13
**verbally**
130:22 136:19
**Veronika**
73:9
**versa**
13:14
**vet**
127:15,16,17
**veterinary**
17:22
**vice**
13:13
**vicinity**
114:9
**victim**
136:8
**violated**
107:11,15,17
**violation**
107:24 108:8
**visibly**
119:15
**voice**
138:16
**volunteer**
128:3
**vulgarities**
134:19

**W**

**wait**
24:1 41:20 87:9
97:11
**waited**
90:19,21 120:9
**waiting**
66:9 69:5
**walk**
67:13 71:24 85:12,
16 86:14,16 93:9,10,
12,13
**walked**
63:6 67:24 68:4,8,22
70:6 73:14,15,17
127:1
**walking**
72:1 84:20 85:3
86:19,21 126:18
**walks**
48:1,3

**Walnut**
6:15
**Walters**
80:4 93:17 97:8,9
**wanted**
20:5 29:14 42:13
56:9 76:24 78:18
83:9,14 90:21 91:11
121:12 128:5
**warehouse**
88:17
**warning**
135:10
**warnings**
117:3 130:2
**water**
6:5,6 85:23
**ways**
126:4
**Wednesday**
9:1
**week**
9:18,20 10:21,22
61:5,11 84:24 96:9
**weekend**
86:20 115:17
**Weekends**
85:1
**weekly**
14:19,20 15:10
**weeks**
28:2 61:23 112:7,11
**Wellness**
9:23 10:5 12:8 13:10
17:2,7 20:13 21:4
22:13 24:21 32:4
37:15 42:19 43:7,13,
14,16 46:9 60:10
64:24 80:1,14 88:13,
15 89:5 98:2 99:17
100:9,17,23 101:8
102:11 103:19
104:22 108:12
112:23 113:6 117:11
118:21 119:7 120:2
**Wessels**
17:8 44:12 46:4,11
47:16 52:7,9 57:6
60:7 62:6 72:2 89:15
115:8,11 122:17
123:6,13 125:15
127:4 129:23 130:22
131:11 132:9,17,22,
24 133:11 134:13
135:6,18 136:18
143:24
**Wessels's**
125:7
**whatever's**
49:2
**whatsoever**
30:5
**white**
5:19
**wide**
70:4
**Wilke**
62:5,6 63:17 66:5
85:9 88:9,11,12
89:1,3 90:12 122:23
131:20 132:1,2,5,23
136:2 139:13,22,23
140:8,22
**withheld**
126:14
**witness's**
38:10
**wondering**
31:3 32:15
**word**
110:9,14 126:22

135:24 139:5,9
**words**
30:7 116:5 133:1
134:18,19 141:5,19
143:6
**work**
8:13,14,22,23 9:15,
16,19,22,24 11:9
12:14 13:8 14:11,13,
19 15:24 16:21
17:13 51:24 60:9,12
83:7,10,14 113:20
114:22 115:5,20,23
116:15 117:14,18
118:24 123:2 125:11
128:22,24 129:9
134:22 135:1 144:7
**work-related**
116:5,7
**worked**
8:17 10:2,14,20,23
12:19 17:1 20:4
97:19,23 102:17
**working**
10:5 13:11,15 18:2
56:2,11 78:15 83:13
**workplace**
134:20
**works**
94:19
**worse**
145:3,12
**wrist**
30:6
**write**
112:6 130:20 131:3,
7
**writing**
22:4 76:9 96:24
**written**
75:11 113:23 117:2
130:7,12,20 131:12
132:10,20
**wrong**
93:2
**wrote**
55:19,21 83:15 96:3

**X**

**x-rays**
83:4,5

**Y**

**Yahoo**
52:10
**year**
8:10 10:12 18:13
19:21,23 23:10
26:11 29:10 46:22,
23 48:23,24 49:2,5
99:20 121:9,23
142:5,8,10,13,16,19
**yearly**
19:17 104:24
**years**
7:8,15,18 17:5 23:8
38:6 46:19 52:24
76:16 77:14 115:8
116:18 142:9
**yelled**
124:14



IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOYCE E. SCHMELZER,                    )
                                       )
            Plaintiff;                 )
                                       )
     vs.                               ) No. 1:18 cv 01253
                                       )
ANIMAL WELLNESS CENTER OF              )
MONEE, LLC, LYNLEE WESSELS             )
MARHANKA and SCOTT MARHANKA,           )
                                       )
            Defendants.                )


THE DEPOSITION OF
LYNLEE WESSELS MARHANKA, DVM
October 15, 2018
10:00 a.m.


     Called as a witness by the Plaintiff herein,
pursuant to the provisions of the Federal Rules of
Civil Procedure pertaining to the taking of
depositions, before JANET L. HAYDEN, C.S.R., License
No. 084-004483, qualified and commissioned for the
State of Illinois, taken at 1771 Bloomingdale Road,
Glendale Heights, Illinois.

1  COUNSEL PRESENT:

2

3      GAFFNEY & GAFFNEY, by
       MR. GLENN R. GAFFNEY

4      1771 Bloomingdale Road
       Bloomingdale, IL  60139

5

              appeared on behalf of the Plaintiff;

6

7      LITCHFIELD CAVO, LLP, by
       MR. SEAN F. DARKE

8      303 W. Madison Street, Suite 300
       Chicago, Illinois  60606-3300

9      darke@litchfieldcavo.com

10             appeared on behalf of the Defendants.

11

12

13

14

15

16

17

18

19

20

21

22

1    **A.    Yes.**

2    Q.    Dated April 6, 2017.  Correct?

3    **A.    Yes.**

4    Q.    And it's titled:  Conditions for Mindy White

5    to continue full-time employment at AWCM.  Correct?

6    **A.    Yes.**

7    Q.    And then underneath the three conditions it

8    says:  Consequences if above conditions are not met.

9    Correct?

10    **A.    Yes.**

11    Q.    Did you provide a copy of this to Mindy

12    White?

13    **A.    I assume.**

14    Q.    And did you have a meeting with her in April

15    of 2017 pertaining to these concerns?

16    **A.    Yes.**

17    Q.    What did you say, and what did she say at

18    that time?

19    **A.    I said that -- actually, I don't recall what**

20    **I said.  I can just stand by what was written.**

21    Q.    And do you recall anything that Mindy White

22    said in response?

1      MR. DARKE:  Objection to hearsay.  You can answer.

2      THE WITNESS:  She cried and said, "Give me another

3  chance."

4  BY MR. GAFFNEY:

5      Q.   And you did that.  Correct?

6      **A.   Yes.**

7      Q.   And she continued to be employed by the

8  clinic until she ultimately resigned.  Correct?

9      **A.   Yes.**

10                      **(Whereupon, the document was marked**

11                       **as Deposition Exhibit No. 16 for**

12                       **identification.)**

13  BY MR. GAFFNEY:

14      Q.   And then Exhibit 16, can you tell me what

15  that is?  That's in May of 2017.  Subject is LJW.

16      **A.   Can you give me a minute to read, please?**

17      Q.   Sure.

18      **A.   Okay.**

19      Q.   Can you tell me what that is?

20      **A.   Regarding?**

21      Q.   What is it regarding, do you know?

22      **A.   The subject matter LJW stands for Lindsey**

1  **Wilke.**

2      Q.   And what was happening regarding Lindsey

3  Wilke at that time?

4      **A.   At that time Joey was complaining about**

5  **Lindsey Wilke, and was not working well with her.**

6      Q.   So, she listed -- the document listed her

7  complaints?

8      **A.   From what I recall.  Joey made her own**

9  **document, because I scheduled a meeting with Joey and**

10 **Lindsey to work out their differences.**

11     Q.   What was the nature of the differences that

12 was occurring at that time?

13     **A.   I do not recall.**

14     Q.   How was the issue resolved, if it was?

15     **A.   It was resolved.  I felt both of them had a**

16 **good conversation, explained their concerns with each**

17 **other, and ended amicably.**

18     Q.   Then continuing on into June and July, how

19 did -- what were your observations of their

20 relationship?

21     **A.   They were professional.**

22     Q.   Were there any additional complaints in June

1    or July?

2        **A.    Not that I recall.**

3        MR. DARKE:  Hey, Glenn, can we take a quick break?

4        MR. GAFFNEY:  Yeah.

5                        (There was a break taken, after

6                         which the deposition was resumed

7                         as follows:)

8        MR. GAFFNEY:  Back on the record then after a

9    short recess.

10                       (Whereupon, the document was marked

11                        as Deposition Exhibit No. 17 for

12                        identification.)

13   BY MR. GAFFNEY:

14       Q.    I want to show you what's been marked as

15   Exhibit 17.  Actually, I'll take that one and give you

16   this fresh one.

17                 So, this is a letter from the U.S.

18   Department of Labor received in July of 2017.  Correct?

19       **A.    Yes.**

20       Q.    On or about July 27, 2017, exactly.  Right?

21       **A.    I'm sorry?**

22       Q.    You received it on July 27, 2017?

1      **A.   I do not believe I received it that day.  It**

2  **was mailed that day.**

3      MR. DARKE:  Objection.  Foundation.

4                      (Whereupon, the document was marked

5                      as Deposition Exhibit No. 17(a)

6                      for identification.)

7  BY MR. GAFFNEY:

8      Q.   Let me show you what's been marked as

9  Exhibit 17(a).  In the bottom e-mail, it appears

10 there's an e-mail from a Nicole Lindsey(phonetic) from

11 EBSA(phonetic).

12              Do you -- you know who that is.  Right?

13 She works for the Department of Labor?

14     **A.   Uh-huh.**

15     Q.   That's a yes?

16     **A.   Yes.**

17     Q.   And it's says:  Sent Thursday July 27, 2017,

18 at 4:12 p.m.  Correct?

19     MR. DARKE:  Again, I'm going to object to

20 foundation.

21 BY MR. GAFFNEY:

22     Q.   You can -- and it's directed to

1  Scott@AWCM.net.  Correct?

2      **A.    Yes.**

3      Q.    And do you recognize the e-mail:

4  Scott@AWCM.net?

5      **A.    Yes.**

6      Q.    And it's subject is simple IRA for Animal

7  Wellness Center of Monee.  Correct?

8      **A.    Yes.**

9      Q.    And it says:  Attached is a letter of request

10  for missing contributions to the simple IRA plan.

11  Right?

12      **A.    That's what it says, yes.**

13      Q.    Did he forward you a copy of this?

14      **A.    At that time I don't believe so.**

15      Q.    Don't you believe that if Scott received this

16  on July 27, 2017, that he would have made you aware of

17  it?

18      **A.    He spoke to me about it.**

19      Q.    On July 27.  Correct?

20      **A.    It was either the 26th or the 27th.**

21      Q.    Thank you.  Okay.  So, the letter then,

22  Exhibit 17, asks that the clinic provide certain

1    information by Thursday, August 10, 2017.  Correct?

2        **A.    Yes.  That is correct.**

3        Q.    And that the U.S. Department of Labor has

4    received information that Animal Wellness Center of

5    Monee, the sponsor of the plan, has failed to forward

6    contributions to the plan on a timely basis since

7    June 2016, and that there are currently delinquent

8    employee contributions owed to the plan.  Correct?

9        **A.    That's what it says, yes.**

10        Q.    And after -- upon receipt of this, you

11    determined that actually the contribution for June of

12    2016 had been made; is that right?

13        **A.    I did not come to that determination.**

14        Q.    Did anyone?

15        **A.    Scott did.**

16        Q.    But that -- it's true that at least as of

17    July of 2016 through July 27, 2017, the clinic had not

18    been making contributions to the plan.  Correct?

19        **A.    Correct.**

20        Q.    And you -- as of July of 2017, you had

21    already been aware of that.  Correct?

22        **A.    Yes.**

1    Q.   You -- I believe from what I read, you

2  acknowledge that you aware of it at least at some point

3  in May of 2017?

4    **A.   Yes.**

5    Q.   And how did it first come to your attention

6  that the clinic had not been making contributions to

7  the simple IRA plan?

8    **A.   Scott retained the books from my father, and**

9  **he told me.**

10    Q.   Scott retained or --

11    **A.   Scott took over the bill paying job.**

12    Q.   When did that happen?

13    **A.   The first week of May 2017.**

14    Q.   And why did Scott take over the books for the

15  company?

16    **A.   We both thought we could do a better job.**

17    Q.   As of May of 2017, how was payroll being

18  accomplished?  How was that being effectuated?

19    **A.   I had nothing to do with payroll.**

20    Q.   That was Scott's job?

21    **A.   Yes.**

22    Q.   And when you said you took over the books for

1  the company from your father because you thought you

2  could do a better job, why did you think you could do a

3  better job?

4      **A.   We knew there were some financial**

5  **difficulties.  I didn't communicate very well with my**

6  **father, so Scott and I thought it would simpler for**

7  **both of us to handle it.**

8      Q.   What was the nature of the financial

9  difficulties that were occurring?

10     **A.   We had two vendors that we knew of pull our**

11 **credit.**

12     Q.   When you use the term "pull credit," in other

13 words, you couldn't get credit from them anymore?

14     **A.   We had credit.  We had a bill and they called**

15 **us on it, and we had to pay it.**

16     Q.   And then from that point forward it was cash

17 only?

18     **A.   Yes.**

19     Q.   Any other financial difficulties?

20     **A.   Not specifically.**

21     Q.   What was the failure to pay the vendor just

22 an oversight, or was there a lack of funding to be able

1 to pay the vendor?

2     MR. DARKE:  Objection to foundation regarding

3 finances of the company.

4     THE WITNESS:  I did not have anything to do with

5 the bill paying.

6 BY MR. GAFFNEY:

7     Q.   So, you don't know?

8     **A.   I can't answer that.**

9                    **(Whereupon, the document was marked**

10                    **as Deposition Exhibit No. 18 for**

11                    **identification.)**

12 BY MR. GAFFNEY:

13     Q.   Let me show you what's been marked as

14 Exhibit 18.

15          Do you know who prepared that document?

16 **A.   Scott.**

17     Q.   You've seen it before.  Correct?

18 **A.   Yes.**

19     Q.   It indicates that the June 2016 IRA

20 contribution was made on July 16th, 2016, Check

21 No. 5031 in the amount of $1,106.55.  Correct?

22 **A.   Yes.**

1     Q.   That was then the last contribution made to

2  the Franklin Templeton account pertaining to the simple

3  IRA plan of the clinic.  Correct?

4     **A.   Correct.**

5     MR. DARKE:  Objection to foundation:  One,

6  regarding what this document said, and whether or not

7  she has personal knowledge regarding when those checks

8  were paid.

9     MR. GAFFNEY:  Well, I think she does.  She said

10  correct, so I think she has knowledge.

11     MR. DARKE:  Well, she can answer it now.

12     MR. GAFFNEY:  She said correct, so she knows.

13  BY MR. GAFFNEY:

14     Q.   Right?  That's true.  Correct?

15     **A.   What's your question?**

16     Q.   I mean, just basically, this is a true

17  statement that there was a payment made in mid-July in

18  that amount of money, which came out of the bank in

19  July of 2016.  Correct?

20     **A.   According to Scott.**

21     Q.   And to your knowledge, that was the last

22  contribution that the company made into the simple IRA

1  plan on behalf of any employees.  Correct?

2  **A.    To the best of my knowledge.**

3                    **(Whereupon, the document was marked**

4                       **as Deposition Exhibit No. 19 for**

5                       **identification.)**

6  BY MR. GAFFNEY:

7      Q.    Exhibit 19, titled DOL correspondence.  Let

8  me show you that at this time.

9                    Did you prepare that?

10     **A.    If you'd give me a minute to read it, please?**

11     Q.    Sure.

12     **A.    I did not prepare this.**

13     Q.    This was prepared by Scott.  Correct?

14     **A.    Yes.**

15     Q.    And he's shown you a copy of this.  Correct?

16     **A.    Yes.**

17     Q.    You've seen it before.  Right?

18     **A.    Yes.**

19     Q.    And it indicates that on July 26 at 2:35 p.m.

20 that Scott received a call from Nicole at the

21 Department of Labor, informing him that an employee had

22 called to file an informal complaint regarding a lapse

1  in payment to a company sponsored 401(k) retirement

2  plan, and I told her that was true.

3              You've read that before.  Correct?

4    **A.    Yes.**

5    Q.    And to your knowledge, everything that Scott

6  says in that sentence is correct.  Right?

7    **A.    To my knowledge, yes.**

8    Q.    And as of July 26, 2017, it didn't come as a

9  surprise to you that the company was behind in its

10 payments to the 401(k) plan.  Correct?

11   **A.    Correct.**

12   Q.    Scott indicates further that the company had

13 applied for a loan.  Correct?

14   **A.    Correct.**

15   Q.    And that -- was that loan applied for in May,

16 or some other time?

17   **A.    May 2017.**

18   Q.    And did the company eventually obtain the

19 loan?

20   **A.    It was a personal loan.**

21   Q.    So, was it a home equity loan on your

22 personal residence?

1    A.    That's how we originally started.  It ended

2  with just a personal loan.

3    Q.    So, the signature loan eventually was

4  received?

5    A.    Yes.

6    Q.    And was that -- when was that personal loan

7  received?

8    A.    I do not recall.

9    Q.    Was it before or after the money was refunded

10  to the plan in late July or early August 2017?

11    A.    Can you explain your question?

12    Q.    Well, the question is:  Did you use the loan

13  proceeds to pay back the money into the plan, or did

14  you find money elsewhere?

15    A.    We found money elsewhere.

16    Q.    Where did you find money elsewhere?

17    A.    We borrowed it from a family friend.

18    Q.    Who was that family friend?

19    A.    Pat German.

20    Q.    S-h-e-r-m-a-n?

21    A.    G-e-r-m-a-n.

22    Q.    How did you know Pat German?

1      A.   He's a family friend.

2      Q.   When -- did you approach Pat German regarding

3 your difficulty, or did someone else?

4      A.   Scott.

5      Q.   Did you speak personally with Pat German

6 regarding a personal loan?

7      A.   I don't recall.

8      Q.   And when was that personal loan obtained?

9      A.   She was asked for the personal loan

10 approximately July 18th.

11     Q.   Was that by you, or someone else?

12     A.   Scott.

13     Q.   And when was the loan received?

14     A.   Immediately.

15     Q.   July 18th?

16     A.   Give or take a few days.

17     Q.   Was it ever repaid?

18     A.   Yes.

19     Q.   From what source was the funds repaid?

20     A.   From a personal loan through a lending

21 institution called Freedom Plus.

22     Q.   Did you ever speak to your father regarding

1  why these monies weren't paid into the Franklin

2  Templeton?

3      **A.   In generalities, yes.**

4      Q.   What does that mean, "generalities"?

5      **A.   We had a brief discussion.**

6      Q.   What did you say and what did he say at that

7  time?

8      **A.   I had two concerns that I discussed with him**

9  **in May -- early May of 2017.**

10     Q.   What were the two concerns?

11     **A.   We didn't have any money saved for property**

12 **taxes, which were due, and the 401(k) was not funded.**

13     Q.   When you say "property taxes," is that on --

14 what property are you talking about?

15     **A.   The animal hospital.**

16     Q.   So, you and Scott own the animal hospital?

17     **A.   I own 90 percent of the business, and I own**

18 **100 percent of the property.**

19     Q.   Do you have a mortgage on that property?

20     **A.   Yes.**

21     Q.   And you lease the property then to the

22 business?

1      A.    I believe so.

2      Q.    And then is there a written lease agreement,

3  or is it just a verbal understanding?

4      A.    I do not recall.

5      Q.    And then between the business or you

6  personally, whose job is it under the lease agreement

7  to pay the property taxes?

8      A.    Can you explain your question, please?

9      Q.    Yeah.  I mean, if you own the building, who

10  pays the property taxes under the arrangement with the

11  business?  You or the business?

12      A.    You mean me personally?

13      Q.    Right.

14      A.    The business does.

15      Q.    And how did Ed respond -- Ed Wessels respond

16  after you broached these two issues?

17      MR. DARKE:  Objection.  Hearsay.

18  BY MR. GAFFNEY:

19      Q.    You can respond.

20      A.    From what I recall from my best recollection,

21  he explained that in approximately late to 2016, two of

22  our major vendors were pushing for us to pay our bill,

1   which was at that point 90 days behind.  And then in

2   January approximately, 2017, both vendors informed him

3   that we could no longer have credit.  We needed to pay

4   the 90 days, and pay cash from there forward.  And that

5   subsequently put us on a very aggressive payment plan,

6   and the bills were more than the income.

7       Q.   Had that ever happen before at the clinic?

8       A.   We've had financial difficulties since day

9   one, but we've always paid eventually.  It was the

10  first time somebody called our credit.

11      Q.   Now, in the year 2016, were you taking a

12  regular salary?

13      A.   Yes.

14      Q.   What was your regular salary in 2016?

15      A.   Approximately 80,000.

16      Q.   And was Scott taking a regular salary?

17      A.   Yes.

18      Q.   What was Scott's regular salary?

19      A.   Approximately 40,000.

20      Q.   Was Ed Wessels taking any compensation for

21  his services?

22      A.   No.

1     Q.  Did Ed Wessels receive any benefit for either

2  his services or ownership interest in the year 2016?

3  Any financial benefit?

4     **A.  No.**

5     Q.  In 2017 -- well, strike that.

6            In 2016 did you ever miss a salary

7  payment?

8     **A.  Can you explain your question?**

9     Q.  Did you receive all of your salary in 2016?

10    **A.  Did I?**

11    Q.  Yeah.

12    **A.  Yes.**

13    Q.  And did Scott, to your knowledge?

14    **A.  Yes.**

15    Q.  And in 2017, did your salary remain the same,

16  or did it change?

17    **A.  It remained the same.**

18    Q.  And did you receive all of your salary

19  throughout 2017?

20    **A.  Yes.**

21    Q.  And did Scott's salary remain the same, or

22  change in 2017?

1      **A.    I have to make a correction.  I don't recall**

2  **when.  It might have been in 2017, but Scott and I**

3  **switched salaries.**

4      Q.    So --

5      **A.    The total was the same.**

6      Q.    The total was 120 between the two of you,

7  husband and wife.  Correct?

8      **A.    Yes.**

9      Q.    So, that remained consistent throughout 2017?

10     **A.    Yes.**

11     Q.    And you received payments on a biweekly basis

12  throughout 2017?

13     **A.    Technically, yes.**

14     Q.    I don't understand the word -- how does the

15  word "technically" come into play?

16     **A.    The checks were distributed on a biweekly**

17  **basis.  Scott deposited our personal checks when the**

18  **money was available, which wasn't always on a biweekly**

19  **basis.**

20     Q.    What was the reason why the compensation

21  changed between you and Scott where you flipped it, and

22  where he made more than you?

1    **A.    Scott had student loans that needed to be**

2    **consolidated, and he didn't make enough money to**

3    **consolidate them.**

4    Q.    So it made it more credit worthy in order to

5    consolidate the loans then?

6    **A.    I guess, yes.**

7    Q.    That makes sense.  And then do you recall

8    approximately what month you started doing that?

9    **A.    Please explain your question.**

10    Q.    When you -- approximately what month was it

11    when you started -- when Scott started to receive

12    80,000 annual salary, and you started to receive 40,000

13    annual salary in 2017?

14    **A.    I don't recall.**

15    Q.    Do you recall -- do you remember if it was

16    before or after Joey Schmelzer left the employ of the

17    clinic?

18    **A.    It was before.**

19    Q.    Other than your salary, did you receive any

20    other employee -- any other employee benefits from the

21    clinic in 2016 or 2017?

22    **A.    Health insurance.**

1      Q.   And --

2      **A.   And the 401(k).**

3      Q.   You and Scott both received health insurance

4   fully paid by the clinic?

5      **A.   I believe.**

6      Q.   And that's true throughout 2016 and 2017.

7   Correct?

8      **A.   Yes.**

9      Q.   And obviously we know that you and Scott were

10  plan participants in the 401(k) plan as well.  Correct?

11     **A.   Yes.**

12     Q.   Any other benefits that you or Scott received

13  in 2016 or 2017?

14     **A.   Not that I recall.**

15     Q.   With Joey Schmelzer, other than her hourly

16  pay, what other benefit did she receive in 2016?

17     **A.   Health insurance.**

18     Q.   Was it fully paid, or partially paid?

19     **A.   Fully.**

20     Q.   Any other benefits?

21     **A.   She received discounts for veterinary**

22  **services.**

1    Q.   Anything else?

2    **A.   Discretionary Christmas bonuses.**

3    Q.   Did you distribute any discretionary

4 Christmas bonus for Christmas of 2016?

5    **A.   Yes.**

6    Q.   Did you and Scott receive a bonus as well?

7    **A.   No.**

8    Q.   How much did the employees receive,

9 approximately?

10    **A.   Approximately $200.**

11    Q.   Each?

12    **A.   Full-time.  $100 part-time.**

13    Q.   Was that the same in 2017, or did it change?

14    **A.   I'm not entirely sure, but I believe we cut**

15 **it in half.**

16                  **(Whereupon, the document was marked**

17                    **as Deposition Exhibit No. 20 for**

18                    **identification.)**

19 BY MR. GAFFNEY:

20    Q.   I'm going to show you what's been marked as

21 Exhibit 20.

22        Do you know who prepared these charts?

1   It's a multipage exhibit.

2       **A.    These were prepared by Scott.**

3       Q.    Have you seen it before?

4       **A.    I have seen the first page.  I actually don't**

5   **recall these other ones.**

6       Q.    On the first page, there is a column for

7   Jess.

8               Do you see that?

9       **A.    Yes.**

10      Q.    And that's Jessica McCaslin.  Correct?

11      **A.    Correct.**

12      Q.    Do you know why it is that the match is less

13  than the total amount taken out of her account?  I'm

14  sorry.

15              Why the match amount is less than the

16  total deducted from checks?

17      **A.    I believe that she wanted more removed from**

18  **her check than the 3 percent.**

19                      **(Whereupon, the document was marked**

20                       **as Deposition Exhibit No. 21 for**

21                       **identification.)**

22

1    BY MR. GAFFNEY:

2         Q.    Next I'm going to show you Exhibit 21.

3               So, the top is just a forwarding e-mail,

4    but underneath that there's an e-mail from you to Ed

5    Wessels dated July 11, 2017.  Correct?

6         **A.    Correct.**

7         Q.    And what was the purpose of this

8    communication with Ed Wessels?

9         **A.    Let me read it, please.  Can you repeat your**

10   **question, please?**

11        Q.    What was the purpose of this communication to

12   Ed Wessels?

13        **A.    Informative.**

14        Q.    You still -- even though he was no longer

15   doing the books and records for the company, you still

16   wanted to keep him apprised of what was occurring?

17        **A.    I was updating him.  Correct.**

18        Q.    What involvement did he have in the clinic as

19   of July 2017?

20        **A.    He was given information only.**

21        Q.    In your e-mail to Ed Wessels, you state Scott

22   pulled the three girls aside to tell them we will not

1  sign their contract because we are planning on

2  finalizing everything in a few days.

3             Do you see that statement?

4    **A.    Yes.**

5    Q.    First of all, by the term "three girls," what

6  did you mean by that?

7    **A.    Joey, Mandy, Jessica.**

8    Q.    And why didn't you include Dominique in that?

9    **A.    Dominique had no issue with the 401(k) not**

10 **being funded and our repayment plan.**

11   Q.    And how do you know that?

12   **A.    She told Scott.**

13   Q.    Did you ever speak to Dominique regarding the

14 issue that had arisen regarding the 401(k) plan?

15   **A.    The only thing I remember telling her was**

16 **that I was sorry.**

17   Q.    Do you recall when your conversation with

18 Dominique was?

19   **A.    It would have been around this time of July**

20 **2017.**

21   Q.    And did she bring it up with you, or did you

22 bring it up with her?

1    **A.    I don't recall.**

2    Q.    Was it just you and her, or was there anyone

3  else present?

4    **A.    I don't recall.**

5    Q.    And what did you say and what did she say at

6  that time?

7    **A.    All I remember saying was I was sorry.**

8    Q.    And do you recall how Dominique responded?

9    MR. DARKE:  Objection to hearsay.

10   THE WITNESS:  I don't recall.

11 BY MR. GAFFNEY:

12   Q.    When you said "we will not sign their

13 contract," those words, when you use the term "their

14 contract," what did you mean?

15   **A.    On July 10 of 2017, Joey gave Scott a**

16 **contract with a repayment schedule.**

17   Q.    How do you know that?

18   **A.    Scott told me.**

19   Q.    On July 10?

20   **A.    That was the date.  I believe it was marked**

21 **July 10.**

22   Q.    Did you talk to Joey about her proposed

1  contract?

2      **A.   No.**

3      Q.   Do you know if Scott talked to Joey about her

4  proposed contract?

5      **A.   I assume.**

6      Q.   Did you talk to Scott about Joey's proposed

7  contract?

8      **A.   Scott showed it to me, and said he was going**

9  **to give them a counter-proposal, stating we'll pay them**

10 **back sooner than Joey asked.**

11     Q.   Then you indicate:  Afterward Mandy spoke

12 with him privately, and said Jessica is planning on

13 suing us.

14          So, you weren't present during that

15 conversation, I take it?

16     **A.   Correct.**

17     Q.   But Scott apprised you of what Mandy had said

18 to him.  Correct?

19     **A.   Correct.**

20     Q.   Did you speak to Mandy directly about that

21 particular topic, about Jessica planning on suing the

22 company?

1    **A.   No.**

2    Q.   Did you ever speak to Jessica about that

3 topic?

4    **A.   No.**

5    Q.   So, on or about July -- or in the first two

6 weeks of July I should say, you and Scott made the

7 decision to fund Jessica's 401(k) plan first.  Correct?

8    **A.   We made that decision when she resigned on**

9 **July 10.**

10    Q.   Did you know prior to July 10 that she

11 intended to resign?

12    **A.   On July 8, during the meeting she threatened**

13 **to resign.**

14    Q.   What words did she use?

15    **A.   She said, "I don't know if I can work for you**

16 **anymore.  I don't trust you."**

17    Q.   Did you respond to that?

18    **A.   No.**

19    Q.   So, you indicated that:  I am telling her not

20 to come back tonight, and giving her documentation

21 regarding the deposit.  Right?

22    **A.   Yes.**

1      Q.   So, you had a conversation then with Jessica,

2  telling her not to come back tonight?

3      **A.   No.**

4      Q.   You intended to say that?

5      **A.   I intended to say that.**

6      Q.   How come you never said it?

7      **A.   She left the building on July 11th on her own**

8  **accord.**

9      Q.   Why were you going to give her documentation

10 to not come back tonight?

11     **A.   She resigned on July 10th, and I noticed her**

12 **attitude was poor, and she was not performing her job.**

13 **So, I had to decided that I would just let her go on**

14 **July 11th.**

15     Q.   On July 10th, did she give a date certain

16 that she wanted to resign?

17     **A.   She gave one week's notice.**

18     Q.   Now, do you recall that on or about June 5,

19 2017, Don Schmelzer came into the clinic to speak with

20 Scott?

21     **A.   I do not recall the that.**

22     Q.   Did Scott ever indicate to you that Don

1   Schmelzer had come in regarding the Franklin Templeton

2   account?

3       **A.    In June?**

4       Q.    In June.

5       **A.    It was not in June.**

6       Q.    When was it?

7       **A.    Scott had a conversation with Don in July.**

8       Q.    And where was that conversation, to your

9   knowledge?

10      **A.    I don't recall.**

11      Q.    You weren't present, I take it?

12      **A.    No.**

13      Q.    Did you see Don come into the clinic?

14      **A.    No.**

15      Q.    Did you -- did Scott tell you that Don came

16  into the clinic?

17      **A.    Scott told me he called.**

18      Q.    Do you recall when in July that Don -- strike

19  that.

20             Do you know when in July that Scott told

21  you Don called?

22      **A.    It would have been approximately July 6.**

1    Q.   How do you know that?

2    **A.   Because it was around the same time that the**

3 **IRA statements came out.**

4    Q.   You received IRA statements around that time

5 as well?

6    **A.   On July 5th.**

7    Q.   And that would be -- that IRA statement would

8 be for what period of time?

9    **A.   I don't know.**

10    Q.   So, when you received your IRA statements on

11 or about July 5th, 2017, did you believe that the other

12 plan participants would have received them as well?

13    **A.   Yes.**

14    Q.   And when you received your IRA statement on

15 or about July 5th, did it indicate that there had been

16 no company contributions to the plan since

17 mid-June 2016?

18    **A.   I never read the statement.**

19    Q.   Did you -- do you know if Scott read the

20 statement?

21    **A.   I don't know.**

22    Q.   Did you and Scott talk about what was in the

1  statement?

2      **A.   Yes.**

3      Q.   On or about July 5th?

4      **A.   Yes.**

5      Q.   So, did Scott indicate to you that the

6  Franklin Templeton account statement for the IRA plan

7  indicated that there had been no contributions to the

8  plan?

9      **A.   We didn't discuss what was in the statement.**

10      Q.   What did you discuss?

11      **A.   We had been working on repayment at that**

12  **point for almost eight weeks.  When the statements were**

13  **delivered, Scott called me and said, "We need to have a**

14  **conversation with the staff, because they will have**

15  **receive their statements too, and we need to explain**

16  **ourselves."**

17      Q.   And then the meeting occurred on a Saturday?

18      **A.   Correct.**

19      Q.   Was that July 8th?

20      **A.   Yes.**

21      Q.   Who was present at that meeting?

22      **A.   Mandy Holt, Jessica McCaslin, Joey Schmelzer,**

1  Scott, and myself.

2      Q.   Did you speak to Mandy, Jessica, or Joey

3  about scheduling this meeting?

4      A.   Scott put a note in their mailboxes on

5  July 6th.  I believe -- I did not write this note, but

6  I believe he scheduled it for noon, July 8th, and asked

7  them to save their questions and concerns for the

8  meeting.

9      Q.   You never saw a copy of the note?

10     A.   No.

11     Q.   As of July 6th, you knew that Joey Schmelzer

12  -- well, strike that.

13              As of July 6th, did you know that staff

14  was already talking about the fact that there hadn't

15  been contributions to the plan?

16     A.   I did not know that.

17     Q.   I mean, they were aware prior to July 8th

18  that there hadn't been contributions to the Franklin

19  Templeton account into the IRA plan.  Correct?

20     A.   Assuming they read their statements.

21     Q.   You had not observed any talk between them

22  about that issue?

1      **A.    No.**

2      Q.    Nobody ever came to you or discussed it in

3 any way prior to July 8th?

4      **A.    No.**

5      Q.    Was Dominique Matthews invited to the

6 meeting?

7      **A.    Yes.**

8      Q.    How do you know?

9      **A.    Scott told me.**

10      Q.    Did you ever speak with Dominique Matthews

11 regarding her attendance at the meeting?

12      **A.    No.**

13      Q.    Do you know if she spoke with Scott regarding

14 her attendance at the meeting?

15      **A.    I believe so.**

16      Q.    What makes you believe that?

17      **A.    Scott told me she was not concerned, and knew**

18 **we would pay her back as we told her we would.  She was**

19 **not interested.**

20      Q.    Now, how long did the meeting last?

21      **A.    To the best of my knowledge, 20 to**

22 **25 minutes.**

1    Q.   Who initially spoke at the meeting?

2    A.   I did.

3    Q.   And what did you say?

4    A.   I was sitting.  Scott was to my left.  Joey,

5  Jessica, and Mandy were sitting perpendicular to me.  I

6  said their 401(k) had not been funded for one year.  I

7  said that was done by my father.  I explained to them

8  the clinic was in financial distress.  I told them I

9  did not agree with what my father did, but he made that

10  choice to pay the vendors that were threatening to shut

11  us down first.  I told them if he hadn't made that

12  choice, the clinic could have closed.  We all would

13  have lost our jobs.

14          I said that if the clinic had closed,

15  both my dad, Scott, and myself would have lost our

16  homes.  I told them that Scott and I were actively

17  pursuing a loan to pay them back in full, including the

18  3 percent match plus a 10 percent bonus to make up for

19  any potential lost interest.  I told them on the grave

20  of my mother I am sorry.  Please forgive me.  And I am

21  doing this, to the best of my knowledge, right now.

22  And then after that Joey spoke.  Would you like me to

1  continue?

2      Q.   Yeah.  She was the next one to speak?

3      A.   Yes.

4      Q.   All right.  Please continue.

5      A.   Joey said she was speaking for the three

6  girls.  She had a folder in her hand.  She said in that

7  folder she had information to have Scott and I

8  arrested.  Let me backtrack a little bit.  During my

9  talk, at one point Joey yelled out and called us liars.

10     Q.   What had you said when -- before she said

11  "liars"?

12     A.   I don't recall.  It was at some point during

13  my talk.  Back to Joey.  Is that okay?

14     Q.   Yeah.  I mean, is there anything further you

15  can recall regarding the word "liars"?

16     A.   No.  She just blurted it out.  Yelled at us.

17     Q.   Just said "liars"?  Just said the word?

18     A.   Yep.

19     Q.   Okay.  Please continue.

20     A.   Joey had a folder in her hand, and she said

21  she had information to have us arrested.  She was

22  extremely agitated and angry.  She said she hopes we

1  lose our home.  She hopes the business closes.  She

2  said I ruined her retirement.  She threatened to quit

3  several times.  The other two girls also said they

4  didn't know if they can work for me, because they did

5  not trust me anymore.

6          Joey called us thieves, liars, and

7  betrayers.  She brought up having us arrested multiple

8  times.  She asked us if we wanted to be arrested.  I

9  didn't answer that.  She asked us when we were going to

10  pay her back.  I didn't answer that, because I had

11  actually addressed it in my speech that we could not

12  give them a date for repayment because we were actively

13  working on the loan still.

14          And then Joey said, "I know how to save

15  you money.  We won't walk the dogs on the weekends

16  anymore.  You can do it."  And that was part of their

17  job.  The three girls left, and Scott and I just sat

18  there.

19      Q.  Anything else happen at that meeting that you

20  haven't already told me?

21      A.  That was -- the best of my knowledge, that is

22  what I remember.

1    Q.   During the meeting did Jessica speak?

2    **A.   She said she didn't know if she could work**

3  **for me anymore.  She did not trust me.**

4    Q.   Anything else that you can recall Jessica

5  said?

6    **A.   Not that I recall.**

7    Q.   During the meeting is there anything that

8  Mandy Holt said that you can recall?

9    **A.   She said she didn't know if she could work**

10  **for me anymore because she did not trust us.**

11    Q.   Anything else you can recall that Mandy Holt

12  said?

13    **A.   Not that I recall.**

14    Q.   During the meeting did Scott speak?

15    **A.   Joey asked us a question and said, "When did**

16  **you learn this?  And both he and I answered**

17  **simultaneously.  No, let me correct myself.  Joey said,**

18  **"Why didn't you tell us about this?"  And Scott and I**

19  **simultaneously said, "We didn't know."**

20    Q.   Did she ask:  When did you learn about this?

21    **A.   I don't know if she asked or I told her, but**

22  **we said it was May of 2017.**

1      Q.   Did you ever explain why it is you didn't

2  tell them in May of 2017, when you learned?

3      **A.   I said I wanted to avoid all of this.**

4      Q.   Well, it's true, is it not, that after you

5  learned about it in May of 2017, still you didn't --

6  you still were taking money out of the girls' accounts

7  and not contributing it to Franklin Templeton

8  throughout the remainder of May and June; is that

9  correct?

10     **A.   That is correct.**

11     Q.   And in July as well.  Correct?

12     **A.   That is correct.**

13     Q.   And then it was Joey Schmelzer that contacted

14  the Department of Labor to file a complaint?

15     MR. DARKE:  Objection to foundation regarding any

16  personal knowledge of that.

17  BY MR. GAFFNEY:

18     Q.   Do you know?

19     **A.   No.  I did not know.**

20     Q.   You were aware, obviously, that the

21  Department of Labor had contacted the clinic shortly

22  after the meeting.  Correct?

1      **A.    It was on July 26th they called.   The meeting**
2   **was July 8th.**

3      Q.    And then it was within a matter of two days
4   that Joey Schmelzer presented her proposed repayment
5   plan.  Correct?

6      **A.    It was on July 10.**

7      Q.    So, that would have been the following
8   Monday.  The meeting was on Saturday the 8th.  Right?

9      **A.    Yes.**

10     Q.    And how did you view her submission of a
11  proposal regarding the repayment plan that she was
12  suggesting?

13     **A.    I thought it was a fair request.**

14     Q.    So, what she put in writing, obviously, was
15  different than what she communicated on July 8th.
16  Correct?

17     **A.    I don't understand your question.**

18     Q.    On July 8th you say that she repeatedly said
19  that she was going to have you arrested, she hoped that
20  you lose your home, she hoped that the business would
21  go under.  All these nasty things.  Correct?

22     **A.    Correct.**

1  Q.  But yet two days later on Monday she provides

2  with a very fair payment plan.  Correct?

3  **A.  Yes.  She provided it to Scott, not me.**

4  Q.  Did you discuss that with her, her proposal

5  payment plan?

6  **A.  No.**

7  Q.  And then after the three -- as you called it,

8  the three girls left the meeting, and then you and

9  Scott were left there, what did you say to Scott and

10  what did Scott say to you?

11  **A.  I didn't say anything.  I just cried.**

12  Q.  Do you recall anything Scott said?

13  **A.  No.**

14  Q.  After that meeting you were upset with Joey

15  Schmelzer; is that correct?

16  **A.  I was upset.**

17  Q.  You were upset with Joey Schmelzer.  Correct?

18  **A.  I was upset with the situation.**

19  Q.  Well, did you believe somehow it was Joey

20  Schmelzer's fault, the situation?

21  **A.  No.**

22  Q.  After the meeting your relationship with her

1 changed. Correct?

2    **A.    There was tension.**

3    Q.    How was that tension exhibited?

4    **A.    After the meeting I noticed her performance**

5 **was poor.  I had overheard her talking to a client,**

6 **telling her I stole her money.  She was taking more**

7 **breaks than usual, letting the phone ring.  Small stuff**

8 **like that.**

9    Q.    Did you provide her any warnings or

10 discipline regarding her performance?

11    **A.    No.**

12    Q.    Did you ever mention anything to her

13 regarding her performance?

14    **A.    No.**

15    Q.    What's the name of the client that you claim

16 that she spoke to?

17    **A.    Cathy Welch.**

18    Q.    And when did that occur?

19    **A.    I don't recall.  Sometime between July 8th**

20 **and July 31st.**

21    Q.    And where did that occur?

22    **A.    She was at the front desk.  She was sitting.**

1  **The client was on the other side of the desk, standing.**

2  **And I was a few feet behind Joey.**

3      Q.    What was the context of the conversation?

4      **A.    That I stole her money and -- give or take.**

5  **I was upset, and I walked away.  I didn't want to hear**

6  **it.**

7      Q.    So, this is just a statement out of the blue

8  without anyone else -- was there anything said before

9  or after that, the statement that you stole her money?

10     **A.    I do not recall.**

11     Q.    So, you're suggesting that out of the blue

12 she just blurted out to Cathy Welch that Dr. Wessels

13 stole my money?

14     **A.    Cathy Welch is a former employee.  She knows**

15 **who I am.**

16     Q.    So, with that in mind, was there -- was it

17 still a statement out of the blue?  She just blurted

18 out that you stole her money?

19     **A.    That's what she said, yes.**

20     Q.    But had there been a discussion about any

21 topics before that?

22     **A.    Not that I heard.  That's what I walked into.**

1    Q.    Did you ever speak to Cathy Welch about that?

2    **A.    No.**

3    Q.    Is Cathy Welch still a client?

4    **A.    No.**

5    Q.    When did she no longer become a client?

6    **A.    Shortly after Joey left.**

7    Q.    Do you know what vet clinic she frequented

8  after that?

9    **A.    No.**

10    Q.    Do you believe that Joey had anything to do

11  with Cathy Welch no longer being a client?

12    **A.    That is my assumption.**

13    Q.    It's just an assumption.  You don't have any

14  factual basis for that?

15    **A.    No.**

16    Q.    They were friends?

17    **A.    I believe so.**

18                        **(Whereupon, the document was marked**

19                         **as Deposition Exhibit No. 24 for**

20                         **identification.)**

21  BY MR. GAFFNEY:

22    Q.    Let me show you what's been marked as

1    Exhibit 24.

2              So in -- as of July 18, 2017, you and

3    Scott had decided to make some changes to the employee

4    benefits that would be made available to employees?

5         **A.   Yes.**

6         Q.   And you were using and Aaron Sears,

7    S-e-a-r-s, who's a CPA, to help facilitate these

8    changes?

9         **A.   Correct.**

10        Q.   And what services did Aaron Sears perform for

11   the clinic?

12        **A.   He's an accountant.**

13        Q.   So, he does your tax returns?

14        **A.   Yes.**

15        Q.   Does he also perform some human resource

16   services as well?

17        **A.   He prints out the payroll checks.**

18        Q.   And did you or Scott consult with Aaron Sears

19   regarding potential changes to the employee benefits

20   that would be made applicable in 2017?

21        **A.   Both of us asked him how to figure out paid**

22   **time off.**

1    Q.   Were there any other employee benefit changes

2  that were being discussed as of July 18, 2017?

3    **A.   We had stopped deducting money from the**

4  **checks for the 401(k), as previously discussed.  And**

5  **that was about it that I recall.**

6    Q.   What was the last date that -- when would

7  have been the last deduction from the 401(k) from

8  payroll checks?

9    **A.   I believe the first week of July 2017.**

10   Q.   Was that decision made after the July 8th

11 meeting?

12   **A.   Yes.**

13   Q.   And who made that decision?

14   **A.   Scott told me that Joey told him to stop**

15 **taking money out of her checks.  So we did it for**

16 **everybody.**

17   Q.   Does that include yourself and Scott?

18   **A.   Correct.**

19   Q.   On the second page of Exhibit 24, there's an

20 e-mail at the bottom dated July 18, 2017, where you're

21 writing to Aaron.  Correct?

22   **A.   Correct.**

1      Q.   And you say, "As you may know, Scott and I

2   are having severe staffing issues now."  Correct?

3      **A.   Correct.**

4      Q.   And by "severe staffing issues," what did you

5   mean?

6      **A.   Jessica had resigned and left, and Mandy**

7   **resigned that day.**

8      Q.   When you say "that day," what day are you

9   talking about?

10     **A.   July 18 th she gave me her resignation**

11  **letter.**

12     Q.   And then you state, "We have learned our

13  generosity has not paid off."  Correct?

14     **A.   Correct.**

15     Q.   What do you mean by that?

16     **A.   We had an extremely generous vacation policy,**

17  **and I felt that it was too generous for the staff.  So,**

18  **we decided to change to paid time off policy.**

19     Q.   Was the clinic generous in any other ways

20  that did not payoff?

21     **A.   Not that I recall.**

22     Q.   And then you said, "We are in the process of

111

1   rewriting the handbook."  Correct?

2       **A.    Correct.**

3       Q.    Who was responsible for rewriting the

4   handbook?

5       **A.    Primarily myself.**

6       Q.    When you said that your generosity had not

7   paid off, were you referring in part to what was said

8   at the meeting on July 8th?

9       MR. DARKE:  Objection.  Asked and answered.

10  BY MR. GAFFNEY:

11      Q.    You can answer.

12      **A.    Would you repeat your question, please?**

13      Q.    Yeah.  When you used the words "our

14  generosity has not paid off," were you referring in

15  part to what occurred at the meeting on July 8th?

16      **A.    I was referring to the poor attitude the**

17  **staff was giving me.**

18      Q.    Were you referring in part to what occurred

19  at the meeting on July 8th?

20      **A.    Yes.**

21

22

1              (Whereupon, the document was marked

2                as Deposition Exhibit No. 27 for

3                identification.)

4  BY MR. GAFFNEY:

5      Q.   Let me show you what's been marked as

6  Exhibit 27.

7              This is from you to Scott.  An e-mail

8  from you to Scott dated Friday July 29, 2017.  Correct?

9      **A.   Correct.**

10     Q.   And you said, "Add Patterson."

11             Can you tell me what that means?

12     **A.   Patterson is the vendor that we were on an**

13  **aggressive payment plan with.**

14     Q.   What's the full name of Patterson?

15     **A.   Patterson Veterinarian Supply.**

16     Q.   Where are they located?

17     **A.   I don't know.**

18     Q.   Were there any other vendors that were

19  aggressive with your clinic in 2017?

20     **A.   There was a vendor called Zoetis,**

21  **Z-o-e-t-i-s.**

22     Q.   What type of supplies did you get from

1   Zoetis?

2        A.    **Zoetis supplies me with medication,**

3   **pharmaceuticals.**

4        Q.    And where is Zoetis located?

5        A.    **I don't know.**

6        Q.    What type of supplies did you get from

7   Patterson?

8        A.    **Medications and supplies for the clinic.**

9        Q.    Did the clinic have any other medication

10  suppliers in 2016 and 2017?

11       A.    **Yes.**

12       Q.    Who are the other medication suppliers?

13       A.    **One was called BI.  It's a German name that I**

14  **cannot tell you.  Something -- I can't even tell you.**

15  **Boeing or something like that.  And then there was also**

16  **Merial, M-e-r-i-a-l.**

17       Q.    What type of terms were you on with BI?

18       A.    **We were, from what I recall, behind on both**

19  **of them.**

20       Q.    So, what kind of supplies were you getting

21  from BI?

22       A.    **Those are pharmaceuticals.**

114

1     Q.   What about from Merial?

2     **A.   Pharmaceuticals.**

3     Q.   Why would you need four different suppliers?

4     **A.   They each sell different pharmaceuticals, and**

5 **we order direct.**

6     Q.   What type of terms was Patterson putting you

7 on as of May 2017?

8     **A.   In May of 2017, we had to make payments to**

9 **our debt.  I believe it was once a week, possibly once**

10 **every other week.  And then we had to pay cash from**

11 **there forward for any orders.**

12     Q.   And what type of terms were you on with

13 Zoetis as of May 2017?

14     **A.   We had to pay the debt that we owed.  I do**

15 **not recall, or I was not aware of or knowledgeable of**

16 **what the terms were.  And then we had to pay cash there**

17 **forward.**

18     Q.   And what type of plans -- terms were you on,

19 if any, with BI?

20     **A.   I do recall that we were behind on payments,**

21 **but we just made a monthly payment.**

22     Q.   How about with Merial?

1    **A.    Same.**

2    Q.    Who was the contact person that you were

3  dealing with at Patterson?

4    **A.    I did not have a contact person personally**

5  **regarding statements or billing.  My vendor rep's name**

6  **was Jordan Cavanaugh, but she was not involved in**

7  **billing or payments.**

8    Q.    And who was the contact person at Zoetis?

9    **A.    I was not involved in any of these companies'**

10  **contact regarding billing or payments.**

11    Q.    So, you don't know any contact people at

12  Zoetis?

13    **A.    My rep was named Ryan Booth.  And just like**

14  **Jordan, he had nothing to do with the financial aspect.**

15    Q.    Did you ever talk to Ryan or Jordan regarding

16  the financial difficulties that you were encountering?

17    **A.    No.**

18    Q.    Do you know if Scott did?

19    **A.    I do not know.**

20    Q.    Was Scott in communication as of May, June

21  of 2017 with anyone from Patterson or Zoetis?

22    **A.    I do not know.**

1      Q.   In regards to Exhibit 27, Scott's e-mail of

2  December 29 at 1:56, when you have end of year checks,

3  do you know what those checks were relating to?

4      **A.   I believe that these were payments we were**

5  **supposed to make by the end of the year.**

6      Q.   And who was Pat?

7      **A.   Pat is the person we borrowed money from.**

8      Q.   So, you were still making payment to Pat as

9  of the end of December of 2017?

10     **A.   On a different loan.**

11     Q.   When was -- the loan that paid the money to

12 the Franklin Templeton account for the simple IRA, when

13 was Pat paid back on that?

14     **A.   I'm sorry.**

15     Q.   When was Pat paid back for the loan that she

16 made to help you make the contribution to the IRA

17 account?

18     **A.   Either July or August of 2017.**

19     Q.   And then at the end of 2017, the clinic made

20 payments for your IRA and Scott's IRA?

21     **A.   No.**

22     Q.   Were those ever made?

1    **A.    No.**

2    Q.    Did you ever apply for a loan at U.S. Bank in

3    Governor's Highway in Richton Park?

4    **A.    Yes.**

5    Q.    A Cindy Adams?

6    **A.    I personally had nothing to do with that.**

7    **That was Scott.**

8    Q.    What occurred with that loan, if anything?

9    **A.    From what I recall, we applied the first week**

10   **or two of May 2017.  We applied for a home equity line**

11   **of credit for $25,000.  We applied for $25,000 to pay**

12   **the property taxes, and also to $10,000 to pay the IRA.**

13   **The process of the loan was taking a long time.  We**

14   **were eventually turned down.  However, U.S. Bank**

15   **recommended we apply for a smaller amount.  So, Scott**

16   **applied for just $10,000 to pay the IRA.  The entire**

17   **process started over, which was taking a very long**

18   **time.**

19   Q.    But it was approved?

20   **A.    No.**

21   Q.    It never was approved?

22   **A.    It never was.**

1        Q.   So you went to another institution?

2        **A.   We borrowed money from Pat German after Mandy**

3    **resigned.  And then around that same time, Scott**

4    **applied for a personal loan, not a HELOC, with a**

5    **lending institution called Freedom Plus.  Once that**

6    **loan came through, we paid Pat back.**

7        Q.   You borrowed ten from Pat?  10,000?

8        **A.   Yes.  Approximately ten.**

9        Q.   At the July 8 meeting one of the things that

10   Joey Schmelzer said was, to the effect, that you and

11   Scott can walk the dogs on weekends and save money; is

12   that correct?

13       **A.   That is correct.**

14       Q.   So, who were you -- as of that timeframe, who

15   was walking the dogs on weekends?

16       **A.   Joey, Jessica, Mandy, Mindy, and Kirby.**

17       Q.   And so you were paying their hourly rate to

18   do that?

19       **A.   No.  They were paid more than their hourly**

20   **rate.**

21       Q.   How did you view that suggestion?  Was that a

22   good suggestion?

1     A.    She said it with malice.

2     Q.    What does that mean?

3     A.    It was my perception that she intended to

4  cause me physical harm.

5     Q.    Physical harm.  Why physical harm?

6     A.    I was -- I have a debilitating back

7  condition, and any excessive activity -- forceful

8  activity at that time could have caused me some form of

9  paralysis, and Joey knew this.  I was not supposed to

10  be walking dogs or doing anything excessively physical

11  with them.

12     Q.    How much of your medical condition did you

13  share with Joey?

14     A.    Quite a bit.  Five days after that meeting, I

15  had a surgical procedure on my back.

16     Q.    What was the nature of the procedure?

17     A.    The nature of the procedure was to reduce the

18  swelling in my spinal cord and relieve my pain.

19     Q.    Did you ever talk to Scott about walking

20  dogs?

21     A.    Can you explain your question?

22     Q.    I mean, did you ever ask Scott maybe if you

1  could walk dogs, you could save the clinic some money?

2     **A.    No.**

3     Q.    After the meeting, did the same people

4  continue to walk dogs on weekends?

5     **A.    Joey and Mandy refused.  Jessica had already**

6  **left by the following weekend.**

7     Q.    So, who then walked the dogs on weekends?

8     **A.    Mindy walked a few times.  I do not recall if**

9  **Kirby helped.  Otherwise, it was Scott and myself.**

10    Q.    So, your back was good enough to walk dogs?

11    **A.    No.**

12    Q.    But you did it anyway?

13    **A.    I did it anyway.**

14    Q.    Did a doctor ever specifically say to you:

15 Don't walk dogs?

16    **A.    A doctor had said to me earlier that year**

17 **that any excessive physical stress on my spine could**

18 **cause my herniated disc to rupture, and I was**

19 **instructed by a doctor to not perform orthopedic**

20 **surgery anymore.**

21

22

121

```
 1                    (Whereupon, the document was marked

 2                     as Deposition Exhibit No. 30 for

 3                     identification.)

 4  BY MR. GAFFNEY:

 5      Q.   I'm going to show you what's been marked

 6  Exhibit 30.

 7           Do you recall getting this document on

 8  Sunday, July 9?

 9      A.   Yes.

10      Q.   She says, "As you know, my plan to retire is

11  about two and a half years."

12           Did you know that as of July 2017?

13      A.   It was never a formal discussion.  Joey just

14  told people that she was going to retire at a certain

15  age.

16      Q.   What age was that, do you recall?

17      A.   In her 70s.  I don't recall.

18      Q.   She says, "I will try my very hardest to get

19  over my feelings of betrayal and regain my faith in

20  you.  I have to do this if I'm going to make this

21  work."

22                Was it -- when you read this on or about
```

1  July 9, 2017, did you view that to be a good faith

2  statement, that she was going to work with you moving

3  forward at the clinic?

4    **A.   No.**

5    Q.   So, as of July 9, 2017, you didn't believe

6  that she was willing to get over her hard feelings

7  regarding her feeling of betrayal?

8    **A.   No.   I didn't believe she was going to work**

9  **her hardest.**

10   Q.   Well, she said that she promises to give

11  100 percent.   Correct?

12   **A.   That's what she says.**

13   Q.   And in your view, is 100 percent good enough?

14   **A.   Considering she used to -- in her words --**

15  **give 110 percent.   No.**

16   Q.   And she says, "I've always wanted the best

17  for AWCM and for you.   That hasn't changed."

18        How did you view that statement?

19   **A.   I have no opinion on that.**

20   Q.   So, you didn't view that as a good faith

21  statement regarding her intent to work with you to make

22  everything work out?

1    **A.    No.**

2    Q.    And she expresses a desire to have a good

3    working relations, does she not?

4    **A.    That's what she wrote.**

5    Q.    But you didn't believe it?

6    **A.    No.**

7    Q.    Did anything occur prior to July 8, 2017,

8    that made you believe that she didn't want to have a

9    good working relationship with you?  Excuse me.  Go

10   ahead.

11   **A.    Can you repeat your question, please?**

12   Q.    Had anything occurred prior to July 8, 2017,

13   which made you believe that Joey Schmelzer did not want

14   to have a good working relationship with you?

15   **A.    I believe she didn't want to have a good**

16   **working relationship with me because less than 24 hours**

17   **before this e-mail, she threatened to have me arrested.**

18   Q.    So, it was what occurred on July 8, 2017,

19   that made you believe that she didn't want to have a

20   good working relationship with you?

21   **A.    In part.**

22   Q.    What's the other part?

1      **A.   I had noticed a difference in her work ethic.**

2      Q.   As of what -- when did you first notice that?

3      **A.   Spring of 2017.  I believe spring of 2017.  I**

4  **can't give you an exact time.**

5      Q.   Did you ever comment -- did you ever comment

6  to her regarding any different work ethic?

7      **A.   The only time we spoke was regarding that**

8  **meeting with Lindsey.**

9      Q.   When was the meeting with Lindsey?

10     **A.   I do not recall.**

11     Q.   And the meeting was with you, Joey, and

12  Lindsey.  Correct?

13     **A.   Yes.**

14     Q.   What, if anything, occurred at that meeting?

15     **A.   Joey was extremely aggressive toward Lindsey,**

16  **and Lindsey had some good comments back, defending**

17  **herself, that I didn't realize.  So, after that meeting**

18  **I felt that Joey was too hard on Lindsey, and that**

19  **hopefully that after we discussed our differences that**

20  **those two could work better together.**

21     Q.   And based on your observations, that

22  occurred.  Correct?

1      A.    From my observations.

2      Q.    There was never a need for any other meeting

3  between you, Joey and Lindsey after that, was there?

4      A.    No.

5                    (Whereupon, the document was marked

6                     as Deposition Exhibit No. 31 for

7                     identification.)

8  BY MR. GAFFNEY:

9      Q.    So, then showing you Exhibit 31.

10          This is your communication to your father

11  dated July 10, 2017.  Correct?

12     A.    Correct.

13     Q.    First of all, why is it that you're asking

14  your father now to e-mail you if he needs to

15  communicate?

16     A.    Two reasons.  One is my dad doesn't normally

17  e-mail.  He normally calls if he needs to speak to me.

18     Q.    So, you didn't want him to do that anymore?

19     A.    After the July 8th meeting, Scott told me

20  that Mandy said to him, "You better make sure your dad

21  doesn't call or come by."

22     MR. DARKE:  Off the record real quick.

1      MR. GAFFNEY:  Back on the record after a lunch

2  break.

3  BY MR. GAFFNEY:

4      Q.   Dr. Wessels, I believe you have before you

5  Plaintiff's Exhibit 31.  Correct?

6      **A.   Correct.**

7      Q.   And that's an e-mail from you to your father

8  dated July 10, 2017?

9      **A.   Correct.**

10      Q.   And you indicate that the atmosphere is harsh

11  --

12      **A.   Yes.**

13      Q.   -- on July 10th, and that Jessica resigned

14  today.  Correct?

15      **A.   Correct.**

16      Q.   When you use the term "harsh," and "the

17  atmosphere being harsh," as of July 10th, was that

18  because of what occurred on the 8th?

19      **A.   It was mostly because of Mandy pulling Scott**

20  **aside and saying, to the effect, my dad better not call**

21  **or come by.  It was a kind of an aggressive comment, so**

22  **I felt it was harsh.**

1    Q.    To your recollection, when did Mandy say that
2  to Scott?
3    **A.    I do not recall.**
4    Q.    And then you mentioned that the three girls
5  gave Scott a demand letter for repayment.   Correct?
6    **A.    Correct.**
7    Q.    And that was the document prepared by Joey
8  Schmelzer?
9    **A.    Correct.**
10                    **(Whereupon, the document was marked**
11                     **as Deposition Exhibit No. 33 for**
12                     **identification.)**
13  BY MR. GAFFNEY:
14    Q.    And I'm going to show you what's been marked
15  as Exhibit 33.
16            Is that the -- that's the document she
17  prepared and gave to Scott?
18    **A.    Correct.**
19    Q.    Very good.
20                    (Whereupon, the document was marked
21                     as Deposition Exhibit No. 36 for
22                     identification.)

1  BY MR. GAFFNEY:

2      Q.   Next I'm going to show you a document marked

3  Plaintiff's Exhibit 36.  This is a letter from your

4  attorney dated September 7, 2018.

5              Do you recall receiving a copy of this

6  letter?

7      **A.   Yes.**

8      Q.   So, you would have received this shortly on

9  or about September 7th, 2018?

10     **A.   I do not recall.**

11     Q.   If you look at page 2 where it says:  Request

12 No. 21?  And in regard to request No. 21, the response

13 says:  Defendants state that they do not know of any

14 client that was present at or near the time of the

15 July 31 incident, although clients were in the

16 building.  Defendants state that no clients were at the

17 desk.  Defendants further state that although clients

18 were in the building, to their knowledge, no client

19 witnessed or heard either party."

20             Is that a true statement?

21     **A.   Yes.**

22     Q.   How do you know no client witnessed or heard

 1 either party?

 2      A.   Because the incident on July 31st was at my

 3 desk, and there was no client present at my desk.

 4      Q.   Clients were in the building this says.

 5 Correct?

 6      A.   Yes.

 7      Q.   So by "in the building," what part of the

 8 building were clients?

 9      A.   In the lobby or in the exam room.

10      Q.   Do you know which client was in the exam

11 room?

12      A.   No.

13      Q.   Do you know which client was in the lobby?

14      A.   No.

15      Q.   Now, how far away was the exam room from the

16 desk?

17      A.   The exam room from my desk is on the other

18 side of the building.

19      Q.   So, you reasonably believe that no client in

20 an exam room would have heard anything that occurred on

21 the incident of July 31st?

22      A.   That is correct.  The door would have been

1   **closed.**

2      Q.   And, obviously, when we say the July 31

3   incident, we're talking about the occurrence in which

4   there was an incident between yourself and then Joey

5   Schmelzer.  Correct?

6      **A.   Correct.**

7      Q.   And that as a result of that incident, Joey

8   Schmelzer left?

9      **A.   Correct.**

10      MR. DARKE:  And, Glenn, just so -- I mean, we

11   provided supplemental answers to --

12      MR. GAFFNEY:  I know.  I'm just trying to show the

13   history of this.  So, I mean, I just wanted to -- I'm

14   aware of that.

15   BY MR. GAFFNEY:

16      Q.   So, then the lobby.  How far away was the

17   lobby from the desk where the incident occurred?

18      **A.   15 to 20 feet.**

19      Q.   So, that's fairly close?

20      **A.   Yes.**

21      Q.   Was the door open or closed?

22      **A.   To my desk?**

1    Q.   No.  Between the desk and the lobby was it --

2   is it open air?

3    **A.   It's open.**

4    Q.   So, if somebody is sitting 15 to 20 feet

5   away, and there was words spoken at your desk of any

6   kind of volume whatsoever, you would think that people

7   in the lobby might have heard it?

8    MR. DARKE:  Objection.  Speculation.

9   BY MR. GAFFNEY:

10    Q.   Based on your observations of your own

11   building?

12    **A.   It is possible that they could have heard it.**

13    Q.   Do you know of any clients that would have

14   heard anything on that occasion?

15    **A.   I can only assume they heard.**

16    Q.   Who?  Do you know who?

17    **A.   The four names that you were given were on**

18   **the schedule during that timeframe.**

19    Q.   Do you know when they were on the schedule?

20   What time?

21    **A.   That was between approximately 9:15 and 9:45.**

22    Q.   Did you ever speak with any of those people?

1      **A.   I spoke with one.**

2      Q.   Which one?

3      **A.   Her name was Costello.   The last name was**

4  **Costello.**

5      Q.   What's the first name?  Do you recall?

6      **A.   It begins with an M.**

7      Q.   Male or female?

8      **A.   Female.**

9      Q.   And what did you say, and what did she say?

10     **A.   She was waiting for me after the incident by**

11 **my desk, and I took her into an exam room, and I said,**

12 **"I'm sorry."  And that was it.**

13     Q.   Did she respond?

14     MR. DARKE:  Objection.  Hearsay.

15     THE WITNESS:  I do not recall.

16 BY MR. GAFFNEY:

17     Q.   Did she act like she heard anything?

18     **A.   She acted uncomfortable.**

19     Q.   But you can't recall her saying anything?

20     **A.   No.  I do not recall.**

21     Q.   In response to Request No. 30, on the next

22 page, in the second sentence it says:  Defendants

1 further explain that plaintiff was never disciplined

2 for using vulgarity or swear words at AWC.

3             Is that a true statement?

4     **A.   Yes.**

5     Q.   The use of vulgarity or swear words at AWC

6 was not uncommon, was it?

7     **A.   It was not as common as suggested.**

8     Q.   But it was not uncommon.  Correct?

9     **A.   It was not used commonly, no.**

10     Q.   When you say "as suggested," what are you

11 referring to?

12     **A.   The testimonies of Mindy and Mandy.**

13     Q.   So, you saw their declarations.  Right?

14     **A.   Yes.**

15     Q.   And you saw where they said that vulgarity

16 was often used.  Correct?

17     **A.   I saw that, yes.**

18     Q.   And at times you would use the "F" word.

19 Correct?

20     **A.   Rarely.**

21     Q.   Have you seen the e-mails that Joey Schmelzer

22 produced in discovery that -- from you?

1    **A.    Yes.  One from 2009.**

2    Q.    There was a number of them -- eleven over the

3    years.  There were a number of e-mails that I saw where

4    you used the "F" word.  Correct?

5    **A.    I saw two.**

6    Q.    You only saw two?

7    **A.    I only saw two.**

8                        **(Whereupon, the document was marked**

9                        **as Deposition Exhibit No. 37 for**

10                       **identification.)**

11   BY MR. GAFFNEY:

12   Q.    I'm going to show you what's been marked as

13   Exhibit 37.  This is a subsequent discovery

14   communication from your counsel dated September 18,

15   2018.

16   MR. DARKE:  And again, we'll just make the same

17   objection since we provided a formal supplemental with

18   the same answers, I believe as of Friday.

19   BY MR. GAFFNEY:

20   Q.    Here in request No. 21, it also states kind

21   of in the middle of the paragraph on page 2:

22   Defendants further state that although clients were in

1  the building, to their knowledge, no client witnessed

2  or heard either party.

3             Is that true statement?

4      **A.    I do not have direct knowledge that they**

5  **witnessed or heard.   That is correct.**

6      Q.    During the July 31 incident, did Joey

7  Schmelzer say, "Why the "F" are you not talking to me?"

8             Did she make that statement?

9      **A.    Yes.**

10     Q.    When she made that statement, did you

11  understand what she was referring to?

12     **A.    No.**

13     Q.    During that incident, did Joey Schmelzer say,

14  "If you want me to go, I will"?

15     **A.    She said it several times.**

16     Q.    And you said, "Yes, go"?

17     **A.    After multiple times, I eventually said,**

18  **"Yes, go."**

19                     **(Whereupon, the document was marked**

20                      **as Deposition Exhibit No. 35 for**

21                      **identification.)**

22

1  BY MR. GAFFNEY:

2      Q.   Let me show you what's been marked as

3  Exhibit 35.

4                This document is dated August 22, 2017.

5  And it states, "Regarding:  Joyce Ellen (Joey)

6  Schmelzer."  Correct?

7      **A.   Correct.**

8      Q.   Did you prepare this?

9      **A.   I did.**

10     Q.   And was this prepared as part of the

11 unemployment compensation documentation that was

12 submitted to the Illinois Department of Employment

13 Security?

14     **A.   If you'll give me a moment to read it real**

15 **quick?**

16     MR. DARKE:  And just to make an objection to that.

17 In accordance with the Illinois Unemployment Act,

18 nothing inside that hearing can be used outside of the

19 hearing.  So, we're just going to make a standing

20 objection regarding anything regarding the IDES and

21 relating to this claim.

22     THE WITNESS:  Would you repeat your question,

1  please?

2  BY MR. GAFFNEY:

3     Q.   Sure.  Do you know -- did you prepare it on

4  or about August 22, 2017?

5     **A.   Yes.**

6     Q.   And for what purpose did you prepare it?

7     **A.   I prepared this for the Illinois Department**

8  **of Employment Security.**

9     Q.   And you prepared it regarding your

10  recollection of events and occurrences pertaining to

11  Joey Schmelzer.  Correct?

12     **A.   Correct.**

13     Q.   After the first two paragraphs, you state:

14  Two weeks later, I received notification from the

15  Department of Labor that a complaint was made against

16  Animal Wellness Center of Monee regarding the last IRA

17  contributions.  Correct?

18     **A.   Correct.**

19     Q.   And you believe that was a relevant statement

20  to make in this document to submit to the Department of

21  Employment Security pertaining to the claim of

22  unemployment compensation benefits filed by Joey

1  Schmelzer.  Correct?

2      **A.    Correct.**

3                      **(Whereupon, the document was marked**

4                      **as Deposition Exhibit No. 39 for**

5                      **identification.)**

6  BY MR. GAFFNEY:

7      Q.    Let me show you what's been marked as

8  Exhibit 39.  This is a document titled "Timeline," and

9  it's dated January 3, 2018.

10                     And that's your e-mail to Scott Marhanka.

11  Correct?

12      **A.    Correct.**

13      Q.    And you say, "To keep things easy for you,

14  here is a basic timeline of Joey's harassment to give

15  Gruca, G-r-u-c-a.  Correct?

16      **A.    Correct.**

17      Q.    Who is Gruca?

18      **A.    His name is Sergeant Gruca.  He's with the**

19  **Monee Police Department.**

20                     **(Whereupon, the document was marked**

21                     **as Deposition Exhibit No. 43 for**

22                     **identification.)**

1

2  BY MR. GAFFNEY:

3      Q.   And I'm showing you what's been marked as

4  Exhibit 43.

5            Do you recognize that document?

6      **A.   Yes.**

7      Q.   This is a letter that you signed that was

8  delivered to the Monee Police Department in January

9  of 2018.  Correct?

10     **A.   Correct.**

11     Q.   And it states that it's -- it's actually to

12 Joey Schmelzer but copied to Monee Police Department.

13 Correct?

14     **A.   Correct.**

15     Q.   Is that that same Sergeant Gruca that you

16 gave this to?

17     **A.   That is the address where he would be**

18 **working.**

19     Q.   Understood.  And in your letter to her on

20 January 8, 2018, you remind her that her personal and

21 professional relationship with you, Scott Marhanka,

22 current employees, Animal Wellness Center of Monee was

1  terminated.  Correct?

2      **A.    Correct.**

3      Q.    And then you threatened that if you come to

4  the Center, she will be arrested.  Correct?

5      **A.    Correct.**

6      Q.    And then on Exhibit 39, back to Exhibit 39,

7  there's a document that's attached titled:  Plaintiff's

8  Exhibit 40.

9                  (Whereupon, the document was marked

10                  as Deposition Exhibit No. 40 for

11                  identification.)

12  BY MR. GAFFNEY:

13      Q.    And that's the attachment to the JS harassing

14  timeline doc. that was referred to in Exhibit 39.

15  Correct?

16      **A.    Correct.**

17      Q.    And you prepared that document?

18      **A.    I did.**

19      Q.    And this was something that you wanted to

20  give to Sergeant Gruca?

21      **A.    Correct.**

22      Q.    And is the information in here correct?

1      **A.    Regarding which part?**

2      Q.    All of it.

3      **A.    Yes.**

4                         **(Whereupon, the document was marked**

5                          **as Deposition Exhibit No. 41 for**

6                          **identification.)**

7   BY MR. GAFFNEY:

8      Q.    In Exhibit 40 -- I'm going to give you

9   Exhibit 41.  This is a statement that you prepared

10  dated July 31, 2017?

11     **A.    Yes.  I prepared this.**

12     Q.    And in this statement, you claim that at the

13  front desk on July 31, Schmelzer said, "I've been

14  fired.  I've been fired."  Correct?

15     **A.    Just let me read that.**

16     Q.    Yeah.  It's at the end of the first

17  paragraph.

18     **A.    Yes.**

19     Q.    And you then state, "It was in front of

20  clients."  Correct?

21     **A.    Correct.**

22     Q.    But actually it wasn't in front of any

1  clients, was it?

2      **A.    I assumed it was.**

3      Q.    When you say "in front of clients," are you

4  saying that clients would be able to see you and her

5  where they were sitting in the lobby?

6      **A.    No.  At this point we had ended our incident,**

7  **and she had gone to the front desk to collect her**

8  **things, and I overheard her say, "I've been fired.**

9  **I've been fired."**

10      Q.    So, which clients then would have been at the

11  front desk?

12      **A.    It could have been any of the four names that**

13  **I gave you or anybody who come in to pick up.**

14      Q.    But you're actually not aware of any clients

15  that were at the front desk when she said that, are

16  you?

17      **A.    I assumed that.**

18      Q.    What makes you assume that?

19      **A.    I assumed it because before her tirade, I was**

20  **at the front desk returning a note, and there were**

21  **clients present.**

22      Q.    You said that there was a client in an exam

1  room.  Correct?

2     **A.    Uh-huh.**

3     Q.    And then you said there was some clients that

4  were in the lobby.  Correct?

5     **A.    Correct.**

6     Q.    But in the lobby, you cannot see to the front

7  desk, can you?

8     **A.    The lobby and the front desk is in the same**

9  **room.**

10    Q.    So, if you're sitting in the lobby, you're

11  able to see you and Joey Schmelzer at the front desk;

12  is that what you're saying?

13    **A.    If you are sitting in the lobby, you can see**

14  **anybody that is at the front desk.**

15    Q.    When you were at the front desk with Joey

16  Schmelzer, did you ever look into the lobby to see if

17  any clients were looking?

18    **A.    I was not at the front desk with Joey**

19  **Schmelzer.**

20    Q.    When you were with Joey Schmelzer, what room

21  were you in?

22    **A.    We were at my desk.**

1     Q.    And where is your desk located compared to

2   the front desk?

3     **A.    It's on the other side of the wall of the**

4   **front desk.**

5     Q.    So, the incident between you and her occurred

6   on the other side of the wall you said at the front

7   desk?

8     **A.    The incident between Joey and me occurred at**

9   **my desk, which is on the other side of the wall of the**

10  **front desk.**

11    Q.    Is it a full wall, or a partial wall?

12    **A.    It's a full wall to the ceiling, but there is**

13  **no door.    There's just a hallway.**

14    Q.    If you are at the front desk, are you able to

15  -- if you were sitting at the front desk, would you be

16  able to see you and Joey Schmelzer when you were having

17  the words spoken at your desk?

18    **A.    No.**

19    Q.    If you were seated in the lobby, would you be

20  able to see you and Joey Schmelzer at your desk?

21    **A.    No.**

22    Q.    Did you ever speak with Joey Schmelzer at the

1  front desk?

2       **A.    Before the incident at my desk.**

3       Q.    No, no.  My question is:  Did you ever speak

4  with Joey Schmelzer on the July 31st incident at the

5  front desk?

6       **A.    Before the incident, yes.**

7       Q.    So, before the incident, what did you say --

8  what did you talk about at the front desk?

9       **A.    I was returning a note regarding surgical**

10  **scheduling.  I gave both Joey and Lindsey my answer to**

11  **whatever the question was, and then I went back to my**

12  **desk.**

13       Q.    So, at that point she had not yet said

14  anything to you at the front desk?

15       **A.    Correct.**

16       Q.    And it was only when she came into your room

17  -- I presume it's a room where your desk is.  Correct?

18       **A.    It's a hallway.**

19       Q.    And she came in to -- were you seated, or

20  were you standing at your desk?

21       **A.    I was seated.**

22       Q.    And was there anyone else present at your

1  desk when you and her were exchanging words?

2      **A.    Scott was.**

3      Q.    And where normally is Scott's desk?

4      **A.    He's in the end of the building.**

5      Q.    For what reason was Scott there that morning?

6      **A.    We were talking.**

7      Q.    At any point during this incident at your

8  desk, did Scott say anything?

9      **A.    He did say a few words to Joey.**

10     Q.    What words do you recall Scott saying?

11     **A.    To the best of my knowledge, she said**

12 **something like:  Your wife is not being nice to me.**

13 **And he said, "I do not know what you're talking about."**

14     Q.    Any other words that Joey Schmelzer said to

15 your husband Scott at your desk during the July 31st

16 incident?

17     **A.    She said, "Your wife just fired me."  And he**

18 **said, "No, she didn't."**

19     Q.    And any other words spoken between Joey and

20 Scott on July 31st at your desk?

21     **A.    I do not recall.**

22     Q.    Now, normally when someone resigns, they sign

1  a resignation letter.  Correct?

2      **A.    No.**

3                      **(Whereupon, the document was marked**

4                      **as Deposition Exhibit No. 42 for**

5                      **identification.)**

6  BY MR. GAFFNEY:

7      Q.    Let me show you what's been marked

8  Exhibit 42.  This is dated back in May of 2016.  It's

9  your communication to Scott Marhanka and Jessica

10  Schmelzer.  Correct?

11     **A.    Joey Schmelzer.**

12     Q.    Yeah.  Joey Schmelzer.  Okay.  Sorry, yeah.

13  Thank you.

14                  Subject is DD, which stands for?

15     **A.    I believe that was an employee named Dana**

16  **Drew.**

17     Q.    Did she resign?

18     **A.    She did.**

19     Q.    And you say, "The resignation letter needs to

20  be in her file.  Not sure who has it."  Correct?

21     **A.    Correct.**

22     Q.    Don't you normally ask for a letter of

1  resignation when employees resign?

2      **A.    Most employees do not give me a resignation**

3  **letter.**

4      Q.    Did you ask?

5      **A.    If it's an appropriate situation, I do.**

6      Q.    Did you ever ask Joey Schmelzer for a

7  resignation letter?

8      **A.    No.**

9      Q.    When you said that Joey Schmelzer was saying

10 things at the front desk, where were you at that time?

11     **A.    I was at my desk.**

12     Q.    So, there was a wall in between you and Joey

13 Schmelzer at that time?

14     **A.    Correct.**

15     Q.    To your knowledge, were any customers ever

16 contacted to determine what, if anything, they heard

17 during the July 31 incident?

18     **A.    To my knowledge, no.**

19     Q.    And the only way you could determine who was

20 present would be to go back and look at the schedule?

21     **A.    Correct.**

22     Q.    And did you ever determine whether or not any

1  of the people who were on the schedule actually brought

2  their pet in that morning?

3      **A.   Yes.  The schedule notes if they checked in.**

4      Q.   There would also be veterinarian records for

5  the services rendered.  Correct?

6      **A.   If they saw a veterinarian.**

7      Q.   Or even if they saw another employee?

8      **A.   Sometimes they just come in to purchase**

9  **things, so there would be an invoice generated.**

10     Q.   But the schedule wouldn't show that, would

11 it?

12     **A.   No.**

13     Q.   So, you just went off the schedule to see who

14 was there between -- what time and what time?

15     **A.   Approximately 9:15 and 9:45.**

16     Q.   Do you recall servicing any of these

17 customers that morning?

18     **A.   I recall Ms. Costello.**

19     Q.   What's the name of her pet?

20     **A.   I do not know.**

21     Q.   And do you recall what the nature of the

22 service was?

1      **A.    I was examining the pet for a tumor.**

2      Q.    Do these customers that are -- that you named

3  still frequent the AWC?

4      **A.    Could you tell me their names, please?**

5      Q.    Carrie Evans.

6      **A.    Yes.**

7      Q.    Mr. Neil and Nicole Cassidy?

8      **A.    I do not recall.**

9      Q.    Melissa Costello?

10     **A.    Yes.**

11     Q.    And Jody Baurle, B-a-u-r-l-e?

12     **A.    Yes.**

13     Q.    Has anyone ever said anything to you

14  regarding the incident, other than what you already

15  testified to regarding -- you already told me about

16  Ms. Costello?

17     **A.    Are you referring to the clients?**

18     Q.    Yeah, the clients.

19     **A.    No.**

20                      **(Whereupon, the documents were**

21                       **marked as Deposition Exhibit**

22                       **No. 66, 67, and 68 for**

1                        **identification.)**

2     BY MR. GAFFNEY:

3         Q.    I'm going to give you Exhibit 66, which is an

4     employee handbook, and then Exhibit 67, which is a form

5     signed by Joey Schmelzer regarding the employee

6     handbook.  And another employee handbook which is

7     marked as Exhibit 68.

8               I just wanted to clarify that I would

9     think then the 68 says revised 8/15/17.  Correct?

10        **A.    Correct.**

11        Q.    So, Joey Schmelzer last signed for an

12    employee handbook on January 10, 2016.  Correct?

13        **A.    Correct.**

14        Q.    So, it's your belief that she would have

15    signed for the version that's marked Plaintiff's

16    Exhibit 66?

17        **A.    Let me read a minute, please.**

18        Q.    Page 10 has a vacation policy, if that helps.

19        **A.    Correct.  66 would be the last version Joey**

20    **saw.**

21        Q.    And then the one that came into effect after

22    she left the employ of AWC is Exhibit 68?

1    **A.    Correct.**

2    Q.    What is -- in 20 -- strike that.

3             What is Lindsey Wilke -- what is her

4  current hourly rate?

5    **A.    I believe she makes $15 an hour now.**

6    Q.    And then what did she make before it was 15?

7    **A.    To the best of my knowledge, it has to be**

8  **give or take, because I don't recall.  She made around**

9  **$14 an hour, and now she's 15.**

10    Q.    When did the transition occur?

11    **A.    She received a 50 cent raise in August**

12  **of 2017, and then she received a 50 cent raise in**

13  **January of 2018, during her performance review.**

14    Q.    Did her hours change at all in 2017?

15    **A.    She worked some overtime.**

16    Q.    Otherwise, did they change?

17    **A.    No.**

18    Q.    And did any of her other employee benefits

19  change in 2017 or 2018?

20    **A.    In 2017 of September, she became of the age**

21  **to need health insurance.  So, we gave her a stipend**

22  **toward health insurance.**

1    Q.   Per year or per month?

2    **A.   Per year.**

3    Q.   2,000?

4    **A.   Correct.**

5    Q.   When you say "the age," what are you

6  referring to?

7    **A.   I don't know what the answer is when you can**

8  **no longer be on your parents' insurance.  That's**

9  **whatever age she reached.**

10    Q.   Any other changes in her employee benefits

11  that you can recall in 2017 or 2018?

12    **A.   Not that I recall.**

13    Q.   Did you ever speak with Lindsey Wilke

14  regarding what she heard on July 31st?

15    **A.   Yes.**

16    Q.   When did you speak with her?

17    **A.   After Joey left, I asked her to write down**

18  **what occurred at the front desk.**

19    Q.   And other than asking her to write down what

20  occurred, did you speak to her regarding what she heard

21  or observed?

22    **A.   Not that I recall.**

1      Q.   Did you ever speak with Dr. Donna -- I can't

2  pronounce the last --

3      **A.   Nykaza.**

4      Q.   -- Nykaza regarding what occurred on

5  July 31st?

6      **A.   No.**

7      Q.   She was there that morning though.  Correct?

8      **A.   Correct.**

9                    **(Whereupon, the documents were**

10                   **marked as Deposition Exhibit**

11                   **No. 64 and 65 for identification.)**

12  BY MR. GAFFNEY:

13     Q.   Can you tell me what Exhibit 64 and 65 is all

14  about?

15     **A.   This is an e-mail Scott sent to me as a joke.**

16     Q.   And he copied Joey Schmelzer?

17     **A.   Scott told me it was inadvertently.**

18     Q.   Why is -- and the joke is Exhibit 65.

19  Correct?

20     **A.   Correct.**

21     Q.   Why did he think that would be a good joke

22  for you?

1    **A.    Because of the testimonies from Mandy and**

2  **Mindy stating I walk around swearing all day.**

3    Q.    Well, I don't know if it said all day, but it

4  did say you swear.

5    **A.    Yes.**

6    Q.    Has any employee ever been disciplined for

7  using any swear words of vulgarity in the workplace?

8    **A.    No.**

9    Q.    Have you heard employees at AWC use the "F"

10  word?

11    **A.    On a rare occasion.**

12    Q.    When you overheard employees at AWC use the

13  "F" word at AWC, have you ever said anything in

14  response?

15    **A.    I can't recall ever hearing anyone using it.**

16    Q.    You said it happens on rare occasion.

17    **A.    Swear words happen on rare occasion.**

18    Q.    But I asked you about the "F word actually.

19    **A.    I do not recall anyone using the "F" word.**

20    Q.    So you read the declaration of Jessica

21  McCaslin.  Right?

22    **A.    May I see it?**

1                    **(Whereupon, the document was marked**

2                      **as Deposition Exhibit No. 47 for**

3                      **identification.)**

4    BY MR. GAFFNEY:

5        Q.    Sure.  I'll show you what's been marked as

6    Exhibit 47.

7        **A.    No.  I have not seen this.**

8                        **(Whereupon, the document was marked**

9                          **as Deposition Exhibit No. 46 for**

10                          **identification.)**

11   BY MR. GAFFNEY:

12       Q.    Let me show you what's been marked as

13   Exhibit 46.

14               This purports to be a transcript of a

15   voicemail message you left for Jessica McCaslin on

16   July 11.

17               Have you read this before?

18       **A.    Yes.**

19       Q.    Do you believe that that's an accurate

20   transcription of what the voicemail message that you

21   left?

22       **A.    Yes.**

1    Q.    When you said that she was busy hiding and

2  plotting revenge, what did you mean by "plotting

3  revenge"?

4    **A.    I had been told by Scott that Mandy had a**

5  **talk with Scott that, to the best of my knowledge,**

6  **Mandy said to Scott:  I do not approve of what Jessica**

7  **is going to do.  I would not sue you.  And I'm**

8  **paraphrasing.**

9                        **(Whereupon, the document was marked**

10                       **as Deposition Exhibit No. 48 for**

11                       **identification.)**

12 BY MR. GAFFNEY:

13   Q.    Let me show you what's been marked as

14 Exhibit 48, which is an e-mail from Mandy Holt.

15                  Have you read this before?

16   **A.    I have.**

17   Q.    She states:  There was no one yelling or

18 screaming.  Joey did seem upset.  She was walking

19 around, collecting her things relatively quietly, then

20 left.  There was one client sitting in the lobby, and

21 all she could have seen was Joey collecting her things.

22                  Do you believe that to be an accurate

1  statement?

2       **A.    No.**

3       Q.    Do you believe Mandy Holt is purposely lying?

4       **A.    Yes.**

5       Q.    What would make you believe that Mandy Holt

6  would purposely lie?

7       **A.    Because she was in the exam room with**

8  **Dr. Nykaza during the incident.  She couldn't have**

9  **heard.**

10      Q.    Well, she does say that she was in an exam

11 room with a client when the event happened, and she

12 believes it was the only client in the hospital.  But

13 she then states she walked into the pharmacy and was

14 looking under the microscope when Joey came around the

15 corner and told me she was fired.

16            Do you believe that might have been true?

17      **A.    Yes.**

18      Q.    And so if she was in the pharmacy looking

19 under the microscope, where is that in relation to the

20 front desk?

21      **A.    Approximately ten feet.**

22      Q.    And so she was ten feet from the front desk.

1       Would she have been able to state whether

2    or not Joey was or was not yelling or screaming?

3    **A.    If she were in the pharmacy, then yes, she**

4    **would have been able to hear.**

5    Q.    So, in light of that then, do you believe

6    that Mandy Holt is testifying to the best -- or making

7    a statement here to the best of her recollection?

8    **A.    It's hard for me to say, since she didn't**

9    **even get the date right.**

10    Q.    I get it that she didn't get the date right.

11    On the other hand, do you have any reason to believe

12    that she would purposely lie in a statement like this?

13    **A.    I can't speak for her.**

14    Q.    So, you don't know of any reason why she

15    would lie, do you?

16    **A.    Correct.**

17    Q.    How was your relationship with Melinda White

18    between July 31st and August 7?

19    **A.    Professional.**

20    Q.    She gave her resignation notice on August 7?

21    **A.    She told both Scott and myself personally,**

22    **and then we asked her to put it in writing.**

1      Q.    So, when someone does resign, you do ask her

2   to put it in writing.  Correct?

3      **A.    If the situation calls, yes.**

4      Q.    When you use the term "situation calls," what

5   do you mean by that term?

6      **A.    A lot of people don't come back, don't show,**

7   **don't call, walk out.  It's not always an appropriate**

8   **situation to ask for a resignation letter.**

9      Q.    Have you read the declaration of Melinda

10  White?

11     **A.    Yes.**

12     Q.    Do you believe that to be accurate?

13     **A.    It is completely inaccurate.**

14     Q.    What reason would you have to believe that

15  Melinda White would sign an inaccurate declaration

16  under penalty of law?

17     **A.    Because she quoted me, and it is untrue.**

18     Q.    Other than the quote of you, do you believe

19  that she's lying?

20     **A.    She wasn't involved in any of this, so**

21  **everything she is saying is not necessarily true since**

22  **she wasn't there.**

1     Q.   She provides a paragraph where she talks

2  about your use of the "F" word.  Correct?

3     **A.   Correct.**

4     Q.   So, you believe that she's lying there?

5     **A.   Yes.**

6     Q.   What reason would you have to believe that

7  Melinda White would lie under oath for this case?

8     **A.   I can't tell you what she's thinking.**

9     Q.   So, you don't really -- you don't know of any

10  reason why she would lie then?

11    **A.   I don't know why she's lying.**

12    Q.   And then I'm going to show you the statement

13  of Donna, DMV.

14    MR. DARKE:  Just for the record, you didn't show

15  her the affidavit of Melinda White.

16    MR. GAFFNEY:  She didn't ask for it, but she's

17  read it.  I guess just to clarify, I'll go ahead and --

18                    (Whereupon, the document was marked

19                     as Deposition Exhibit No. 50 for

20                     identification.)

21  BY MR. GAFFNEY:

22    Q.   Do you recognize -- show it to her.

1        Do you recognize Exhibit 50 then to be

2   the declaration of Melinda White that you previously

3   read?

4        A.    Yes.

5                      **(Whereupon, the document was marked**

6                      **as Deposition Exhibit No. 52 for**

7                      **identification.)**

8   BY MR. GAFFNEY:

9        Q.    In regards to the exhibit that you have in

10  front of you, which is No. 52?

11       **A.    Correct.**

12       Q.    Plaintiff's Exhibit 52.  It's a statement

13  from the DMV with a first name of Donna.  And she

14  indicates that she and Mandy came out of the canine

15  exam room on the opposite side of the building where

16  the doctor's office area is, but went to the centrally

17  located pharmacy area, and Joey came in visibly upset

18  and trembling.

19            Did you believe that to be accurate?

20       **A.    Yes.**

21       Q.    And then she says:  She -- apparently Joey,

22  stated several times to both of us that we -- just so

163

1  we know, she did not quit.

2          Do you believe that her statement there

3  is false or true?

4      **A.    True.**

5      Q.    "And that Joey left abruptly.  That was all I

6  saw or heard of the incident."

7          Do you believe that to be a true

8  statement?

9      **A.    Yes.**

10     Q.    So, apparently, according to DMV Donna, she

11 didn't hear any screaming or yelling in front of any

12 clients, did she?

13     **A.    I can't speak for her.**

14     Q.    She didn't put it in her statement, did she?

15     **A.    No.**

16                      **(Whereupon, the document was marked**

17                      **as Deposition Exhibit No. 45 for**

18                      **identification.)**

19 BY MR. GAFFNEY:

20     Q.    And then Exhibit 45.  That's Jessica

21 McCaslin's resignation letter?

22     **A.    Correct.**

1     Q.   And did you and/or Scott ask Jessica McCaslin

2 to provide a letter of resignation?

3     **A.   No.**

4     Q.   Did she continue to work through July 15th?

5     **A.   No.**

6     Q.   And did you terminate her employment before

7 July 15th?

8     **A.   No.**

9     MR. DARKE:  Objection to form of the question.

10 BY MR. GAFFNEY:

11     Q.   So, after the July 8th meeting, with the

12 exception of yourself and Scott, and Dr. Dominique, all

13 of the other participants in the 401(k) plan were no

14 longer employed by the clinic after mid-August of 2017.

15 Correct?

16     **A.   None of the planned participants, other than**

17 **Dr. Matthews, were employed after July 31st, 2017.**

18     Q.   July 31st.  Okay.  And you said before that

19 Dr. Matthews did not have a problem with what occurred

20 regarding the IRA plan contributions.  Correct?

21     **A.   Correct.**

22     Q.   The other three did have a problem with it

1 though.  Correct?

2    **A.    Yes.**

3    Q.    And then in addition, after July 31, 2017,

4 the clinic no longer made any more IRA contributions

5 for any employees.  Correct?

6    **A.    Correct.**

7    Q.    And of the three that left, it was only Joey

8 Schmelzer you don't have a letter of resignation from.

9 Correct?

10    **A.    Correct.**

11    Q.    You have a letter of resignation from the

12 other two?

13    **A.    Correct.**

14    Q.    And prior to her last day of employment at

15 the clinic, Joey Schmelzer had never received any

16 warnings or discipline of any nature?

17    **A.    Correct.**

18    MR. GAFFNEY:  No further questions.

19    MR. DARKE:  I don't have any questions.  We'll

20 reserve.

21

22         (AND FURTHER THE DEPONENT SAITH NOT.)

166

1  STATE OF ILLINOIS   )

                       ) SS.

2  COUNTY OF DU PAGE   )

3      I, JANET L. HAYDEN, C.S.R., in and for the State

4  of Illinois do hereby certify that LYNLEE WESSELS

5  MARHANKA, DVM was first duly sworn by me to testify the

6  truth; that the above deposition was recorded

7  stenographically and reduced to typewriting by me; that

8  the deposition is a true, correct and complete

9  transcript of the entire testimony given by the said

10  witness at the time and place hereinabove set forth,

11  and that signature is hereby reserved by said witness.

12      I further certify that I am not counsel for nor

13  in any way related to any of the parties to this suit,

14  nor am I in any way interested in the outcome thereof.

15      In witness hereof, I have hereunto set my hand and

16  affixed my Notarial Seal this 12th day of February,

17  A.D., 2020.

18

    _____

19              JANET L. HAYDEN

                Notary Public

20          CSR License No. 084-004483

21

22

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOYCE E. SCHMELZER,              )
                                 )
            Plaintiff;           )
                                 )
     vs.                         ) No. 1:18-CV-01253
                                 )
ANIMAL WELLNESS CENTER OF        )
MONEE, LLC, LYNLEE WESSELS       )
MARHANKA and SCOTT MARHANKA,     )
                                 )
            Defendants.          )

THE DEPOSITION OF
SCOTT MARHANKA
October23, 2018
10:00 a.m.


     Called as a witness by the Plaintiff herein,
pursuant to the provisions of the Federal Rules of
Civil Procedure pertaining to the taking of
depositions, before JANET L. HAYDEN, C.S.R., License
No. 084-004483, qualified and commissioned for the
State of Illinois, taken at 1771 Bloomingdale Road,
Glendale Heights, Illinois.

2

1  COUNSEL PRESENT:

2

3       GAFFNEY & GAFFNEY, by
        MR. GLENN R. GAFFNEY

4       1771 Bloomingdale Road
        Bloomingdale, IL  60139

5

            appeared on behalf of the Plaintiff;

6

7       LITCHFIELD CAVO, LLP, by
        MR. SEAN F. DARKE

8       303 W. Madison Street, Suite 300
        Chicago, Illinois  60606-3300

9       darke@litchfieldcavo.com

10           appeared on behalf of the Defendants.

11

12

13

14

15

16

17

18

19

20

21

22

1    Q.    Then after you made that determination, you

2  spoke to Ed Wessels.

3            Did you ever ask him:  Why did you do

4  that?  Why didn't you find it another way instead of

5  using the employee 401(k) money to fund the payment of

6  vendors accounts?

7    **A.    His explanations was that he had to pay the**

8  **vendors to keep the doors open of the clinic.**

9    Q.    So, his explanation was that the only way

10  possible to pay the vendors to keep the doors open of

11  the clinic is to not contribute the 401(k) money into

12  the Franklin Templeton account; is that correct?

13    **A.    To the best of my recollection.**

14    Q.    Did you accept that explanation?

15    MR. DARKE:  Objection to form of the question.

16  BY MR. GAFFNEY:

17    Q.    Did you challenge that at all?

18    **A.    Did we have a choice?**

19    Q.    Yeah.  You had a number of choices.  Do you

20  want me to explain some of the choices you had?  Did

21  you ask him, for example, well, maybe we should have

22  been late on the real estate tax payment, and pay that

1  interest down the road?  Did you ever say that?

2      MR. DARKE:  Objection to form of the question that

3  he already testified that he was late on the property

4  taxes.

5      MR. GAFFNEY:  No, not in September of 2016 he

6  wasn't.

7      MR. DARKE:  Correct, but after that he was.

8  BY MR. GAFFNEY:

9      Q.  So, let's talk about September 2016.  You

10  could have not paid the second installment of the

11  September 2016 tax bill, right, and use that money to

12  pay into the 401(k) money.  Right?

13      MR. DARKE:  Objection to speculation as to what Ed

14  Wessels could or could not have done back in 2016 when

15  --

16  BY MR. GAFFNEY:

17      Q.  No.  I'm asking Mr. Marhanka.  He knows that

18  there were other options other than not sending the

19  money to the Franklin Templeton account, particularly

20  in light of the fact that the money that you didn't

21  send in was money that was taken out of the paychecks

22  of your employees.  Correct?

1      MR. DARKE:  Objection.  Hypothetical.  He had no

2  knowledge of it back in 2016.  He's already testified

3  he didn't have knowledge of it.

4      MR. GAFFNEY:  All right.  Right now I would like

5  to say this:  Let's stop with the talking objections.

6  If you have a real objection that you would like to put

7  on the record, please feel free to do so.  But let's

8  make it succinct and appropriate so that we can just

9  move on with this deposition.  Okay so far?

10     MR. DARKE:  Speculation and hypothetical is a

11  proper objection.

12     MR. GAFFNEY:  Okay.  Let me ask my next question.

13  BY MR. GAFFNEY:

14     Q.   Did you ever suggest to Ed that he could have

15  been late on the September 1 real estate tax payment

16  instead of what he did?

17     MR. DARKE:  Can we get a year of what September 1

18  tax payment you're referring to?

19     MR. GAFFNEY:  The witness knows what I'm talking

20  about.

21     MR. DARKE:  Provide a timeline, please.

22

1  BY MR. GAFFNEY:

2      Q.   September 1, 2016, tax payment.

3      **A.   We never -- to my knowledge, that never came**

4  **up.**

5      Q.   Did you ever ask Ed why he never told you

6  what he was doing?

7      **A.   I don't -- I don't remember.**

8      Q.   Do you know if Ed ever provided Lynlee with

9  an explanation as to why he never told you or Lynlee

10 what he was doing regarding the Franklin Templeton

11 accounts?

12     **A.   I don't recall whether he told her or not.**

13     Q.   So, after you became aware of the problem in

14 May of 2017, did you look for opportunities to make

15 good on the past due contributions?

16     **A.   Yes.**

17     Q.   So, it's my understanding that you applied

18 for a loan -- a personal loan at U.S. Bank.  Correct?

19     **A.   Yes.**

20     Q.   And that loan was not approved; is that

21 right?

22     **A.   It was approved but not for amount that we**

92

1    requested.

2        Q.    When was the loan approved?

3        **A.    I believe it was in May.  The end of May.  I**

4    **don't have an exact timeframe.**

5        Q.    How much was it approved at the end of May?

6        **A.    It was approved for 10,000.**

7        Q.    Was it a secured or unsecured loan?

8        **A.    I don't recall.**

9        Q.    And do you recall what the interest rate

10   would have been on that loan?

11       **A.    I don't recall.**

12       Q.    And after that was approved at the end of May

13   for 10,000, what did you do?

14       **A.    Well, we had asked for 25,000.  So, we waited**

15   **and wanted to see if we could be approved for 25,000.**

16       Q.    When you say you waited and wanted to see,

17   what did you have to -- who were you communicating

18   with?  Is there a Cindy -- Cynthia Adams?

19       **A.    Cindy, yes.**

20       Q.    So, what -- after you were apprised that you

21   were approved for a $10,000 loan, what exactly then did

22   you communicate to Cynthia Adams?

1     **A.   Also I'd like to go back and say that was a**

2 **pre-approval.  She said we were approved, but they**

3 **didn't have all the information yet.  So that was a**

4 **preapproval.**

5     Q.   Then after you were pre-approved for the

6 10,000, you asked for 25,000.  Correct?

7     **A.   Yes.**

8     Q.   Why you did need the extra 15?

9     **A.   To pay for the property taxes that we didn't**

10 **have funds for.**

11     Q.   And then what occurred regarding the 25,000

12 loan request?

13     **A.   U.S. Bank drug their feet.  They kept asking**

14 **for paperwork, more paperwork.  The underwriters would**

15 **ask for more information, and then they would decline**

16 **the loan.  Cindy would contact me and say, "Wait a**

17 **minute.  The underwriters didn't do this right."  And**

18 **she would go back to them, and it would start over**

19 **again.  And we went back and forth like this for**

20 **months.**

21     Q.   Was this a home equity loan, or was it just a

22 personal line of credit?

1      **A.    We were trying for a home equity loan, yes.**

2      Q.    And did you ever get a final resolution

3  regarding your loan request for 25,000?

4      **A.    Not from U.S. Bank.**

5      Q.    So, they never gave you approval or

6  disapproval at any time?

7      **A.    No.**

8      Q.    Did you apply anywhere else?

9      **A.    We went to First Midwest Bank.**

10     Q.    What did you apply for at First Midwest?

11     **A.    At that point we were just asking for $10,00.**

12     Q.    Was this a personal line of credit, or was it

13  a secured or unsecured?

14     **A.    Home equity.  We were declined.**

15     Q.    Did they say why?

16     **A.    Expense to income ratio was too high.**

17     Q.    When did you apply at First Midwest?

18     **A.    I would have to say probably June.**

19     Q.    And did you apply anywhere else?

20     **A.    Eventually in July we applied with Freedom**

21  **Plus.**

22     Q.    Where's Freedom Plus?

1    **A.    I don't know where they're located.**

2    Q.    How did you apply to Freedom Plus?

3    **A.    On-line.**

4    Q.    Who -- did you personally apply?

5    **A.    Yes.**

6    Q.    Were you doing this?

7    **A.    Yes.**

8    Q.    You were doing the applications to the banks?

9    **A.    Correct.**

10   Q.    Was Ed Wessels involved at this point, or no?

11   **A.    No.**

12   Q.    And what occurred with Freedom Plus?

13   **A.    We were approved.**

14   Q.    For what amount?

15   **A.    10,000.**

16   Q.    Did you take it?

17   **A.    Yes.**

18   Q.    When did you receive the money?

19   **A.    Well, that actually would have been -- I**

20   **apologize.  We applied for that in August.  Yeah.  And**

21   **that was to pay back the personal loan that we had.**

22   Q.    So, did you receive the full 10,000?

96

1     **A.**   **Yes.**

2     Q.   And you believe you received the full 10,000

3  in August?

4     **A.**   **I believe so, yes.**

5     Q.   And what did you do with the 10,000 after you

6  received it?

7     **A.**   **We paid Pat German back.**

8     Q.   When did you receive notice from First --

9  Freedom Plus that you were going to be approved for

10  10,000?

11     **A.**   **I don't recall an exact date.**

12     Q.   Was it in July?

13     **A.**   **No.  August.**

14     Q.   Other than U.S. Bank, First Midwest and

15  Freedom Plus, did you apply for any other loans?

16     **A.**   **No.**

17     Q.   When did you speak with Pat German?

18     **A.**   **Sometime around July 18th.**

19     Q.   Was it you or someone else that first brought

20  up this issue with Pat German?

21     **A.**   **I did.**

22     Q.   And why did you go to Pat German for this

1  problem?

2      **A.    Because we couldn't get a loan from a bank.**

3  **I was hoping she could help us out.**

4      Q.    How did you know that she would have had the

5  wherewithal within which to help you out?

6      **A.    She had given us a loan before.**

7      Q.    What year was that?

8      **A.    I don't recall an exact year.**

9      Q.    How many -- approximately how many years ago?

10     **A.    Approximately, four years ago.**

11     Q.    What was the amount?

12     **A.    40,000.**

13     Q.    And was it repaid?

14     **A.    We were still repaying that.**

15     Q.    You didn't ask Ed Wessels for a loan?

16     **A.    No.**

17     Q.    How come?

18     **A.    He doesn't have the money.**

19     Q.    So, on or about July 18, you spoke with Pat

20  German?

21     **A.    Yes.**

22     Q.    Did you do any of this by e-mail, or was it

1  all by phone?

2     **A.    By phone.**

3     Q.    What did you say at that time?

4     **A.    I just explained to Pat that we needed to**

5  **repay the 401(k)s, and asked if I could borrow $10,000**

6  **from her.**

7     Q.    And what did she say?

8     MR. DARKE:  Objection.  Hearsay.

9     THE WITNESS:  She said yes.

10 BY MR. GAFFNEY:

11    Q.    And then approximately how long thereafter

12 did she pay the funds?

13    **A.    I know I deposited her check on July 26.**

14    Q.    When did you receive the check?

15    **A.    I don't recall an exact date.**

16    Q.    Was it a check in the mail?  A check dropped

17 off?  A check that she deposit for you?  How was it

18 effectuated?

19    **A.    It was a check that she or Ed -- I don't**

20 **remember who -- dropped off.**

21    Q.    And then you deposited it into the clinic

22 account, or the Ed Wessel's account?

1      **A.    The clinic account.**

2      Q.    The check that you received from Pat German,

3 was it received more or less a week before it was

4 deposited?

5      **A.    No.  She gave it to me, and I deposited it**

6 **right away.**

7      Q.    So, within a few days?

8      **A.    Yes.**

9      Q.    Was the loan documented in any way?

10      **A.    Yes.**

11      Q.    What is the document that you have?

12      **A.    It's just documented in the check registry as**

13 **a loan.  Loan from Pat.**

14      Q.    Is there a loan document between you and Pat?

15      **A.    No.**

16      Q.    Or I should say the clinic and Pat?

17      **A.    No.**

18      Q.    So, there's no promissory note or anything of

19 that nature?

20      **A.    No.**

21      Q.    And has that -- that's been repaid now.

22 Correct?

1    **A.    Yes.**

2    Q.    And is there any balance left on the 40,000

3  that you borrowed some years ago?

4    **A.    Yes.**

5    Q.    What's the approximate balance on the $40,000

6  loan?

7    **A.    Approximately 25,000.**

8    Q.    Is there a promissory note for that one?

9    **A.    No.**

10    Q.    Is there a regular payment plan?

11    **A.    Yes.**

12    Q.    What's the regular payment plan amount?

13    **A.    $1,000 a month.**

14    Q.    Has the clinic not made regular payments at

15  any time on that $1,000 a month payment plan?

16    **A.    Yes.**

17    Q.    During what timeframe?

18    **A.    20-- the second half of 2016 through 2017.**

19    Q.    What happened during that time?

20    **A.    We didn't have the funds, so she didn't get**

21  **paid.  Then we started a new payment plan in 2018.**

22    Q.    What was the new payment plan?

1    **A.    That is the new.  It's $1,000 a month.**

2    Q.    What was the old payment plan?

3    **A.    Whenever we could, we would send her a check.**

4    **There was no regular monthly payment.**

5    Q.    So, you're suggesting that between the second

6    half of 2016 and the first half of 2017 there were no

7    payments to Pat German during any of those months?

8    **A.    To the best of my knowledge.  That would be a**

9    **question for Ed.**

10    Q.    So, during the months of May and June, you

11    were trying to obtain loans to pay taxes and the 401(k)

12    fund.  Correct?

13    **A.    2017, yes.**

14    Q.    Yeah, 2017.  Were there any expenses that

15    regularly would have been paid that were not paid

16    during May or June of 2017?

17    **A.    Repeat the question.**

18    Q.    Do you know of any expenses that normally

19    were paid but not paid during May or June of 2017?

20    **A.    I don't recall.**

21    Q.    The -- in Exhibit 2 it shows one associate

22    veterinarian, Dominique Bieri, B-i-e-r-i, and then

102

1   whose now married name is Dominique Matthews.  Correct?

2        **A.    Yes.**

3        Q.    This organizational chart of 2016, do you

4   recall if this chart was applicable during the first

5   half of 2016?

6        **A.    Yes.**

7        Q.    And then at some point the clinic hired a

8   second associate veterinarian.  Correct?

9        **A.    Yes.**

10       Q.    And that's Dr. Donna Nykaza?

11       **A.    Nykaza.**

12       Q.    And she was hired when?

13       **A.    I believe it was October 2016.**

14       Q.    Who made the decision to hire the second

15   associate veterinarian?

16       **A.    Lynlee.**

17       Q.    So, for the remainder of 2016, the clinic had

18   two associate veterinarians.  Correct?

19       **A.    Correct.**

20       Q.    And then during the first half of 2017, the

21   clinic had two associate veterinarians.  Correct?

22       **A.    Yes.**

1    Q.   And having two associate veterinarians was an

2  added expense that the clinic had that it didn't have

3  in the first half of 2016.  Correct?

4    **A.   Yes.**

5    Q.   And did you discuss the decision to hire a

6  second associate veterinarian in October of 2016 with

7  Lynlee?

8    **A.   No.**

9    Q.   Did you discuss it with Ed Wessels?

10    **A.   No.**

11    Q.   So, it was strictly Lynlee's decision?

12    **A.   Yes.**

13    Q.   What is your understanding of what were the

14  factors that induced Lynlee to hire a second associate

15  veterinarian in October of 2016?

16    MR. DARKE:  Objection to speculation.

17    THE WITNESS:  Dr. Nykaza was a local -- a

18  well-known local veterinarian who would bring a lot of

19  business with her.

20  BY MR. GAFFNEY:

21    Q.   So, you were hoping then -- your

22  understanding is that Dr. Nykaza was hired, hoping that

1  the new business that she would generate would more

2  than offset her expense?

3      **A.   Correct.**

4      Q.   Did that work out for the remaining months of

5  2016, or was the expense more than what she generated?

6      **A.   I'm not sure.**

7      Q.   How about during the first half of 2017?  Did

8  Dr. Nykaza bring in revenue that offset the amount of

9  her expense during the first half of 2017?

10     **A.   Yes.**

11     Q.   How do you know?

12     **A.   We track that.**

13     Q.   How do you track that?

14     **A.   We can -- we have a proprietary software that**

15  **we can go in and see how much each doctor has brought**

16  **in.**

17     Q.   When you use the term "brought in," what do

18  you mean by that term?

19     **A.   How much revenue they generate.**

20     Q.   When you say "generated revenue," that means

21  generated revenue by treating patients?

22     **A.   Sales of pharmaceuticals, treating patients**

105

1  **and so forth.  Yes.**

2      Q.    So, Dr. Nykaza treated patients that

3  previously were treated by Dr. Wessels.  Correct?

4      **A.    Some, yes.**

5      Q.    And treated patients that previously were

6  treated by Dr. Nykaza as well?  I'm sorry, by Dr. Bieri

7  as well?

8      **A.    Possibly, yes.**

9      Q.    During -- after Dr. Nykaza was hired, through

10  the reminder of 2016 and the first half of 2017, was

11  Lynlee able to work less hours as a result of having a

12  second associate veterinarian?

13      **A.    Yes.**

14      Q.    But yet during that timeframe Lynlee Wessels

15  continued to receive the same salary as she had during

16  the first half of 2016.  Correct?

17      **A.    Yes.**

18      Q.    You recall a meeting at the clinic on

19  Saturday, July 8, 2017.  Correct?

20      **A.    Yes.**

21      Q.    And the purpose of that meeting was in

22  relation to the simple IRA plan that hadn't been funded

1    for a period of time.  Correct?

2        **A.    Yes.**

3        Q.    And prior to that Saturday, that Saturday

4    morning, July 8, meeting, you had spoken with Don

5    Schmelzer.  Correct?

6        **A.    Yes.**

7        Q.    And Don Schmelzer called you on the telephone

8    regarding his observations of his Franklin -- his

9    wife's Franklin Templeton account statement?

10       **A.    Yes.**

11       Q.    And approximately how many days prior to

12   Saturday, July 8, did Don Schmelzer call you?

13       **A.    I believe that call was on July 5th or**

14   **July 6th.  I don't remember exactly.**

15       Q.    And you were at the clinic when this

16   happened?

17       **A.    I was.**

18       Q.    And then when Don called, what did he say?

19       **A.    He said, "Is it true that the 401(k) has not**

20   **been funded?"  At that time he said six months.**

21       Q.    And what did you say?

22       **A.    I told him that we had been -- already tried**

1    **to get a loan to repay it.  And we had already been**

2    **turned down for one loan, and were in the process of**

3    **waiting for an approval for another loan.**

4         Q.   So, first, you had to confirm that what he

5    thought was true.  Correct?

6         **A.   Yes.**

7         Q.   And how did you express yourself in that

8    regard?

9         **A.   I was very sorry that it happened.**

10        Q.   So, you effectively said, yes, I know.  I'm

11   sorry about that?

12        **A.   Yes.**

13        Q.   Or words of that import?

14        **A.   Yes.**

15        Q.   Did Don indicate to you how it was that he

16   believed that the 401(k) fund had not been funded for a

17   period of time?

18        **A.   He said that he received the statement.**

19        Q.   And that's the Franklin Templeton statement?

20        **A.   Yes.**

21        Q.   What else did Don say during that

22   conversation?

1      **A.   It was a very short conversation, and that's**

2   **really all I remember.**

3      Q.   So, is there anything else that you can

4   recall that you said during that conversation that you

5   haven't already testified to?

6      **A.   No.**

7      Q.   Now, was there an occasion then within the

8   next day or so prior to the Saturday, July 8th meeting,

9   that Don Schmelzer was at the clinic for one reason or

10  another?

11     **A.   Not that I recall.**

12     Q.   Did Don ever come into the clinic to talk to

13  you about the 401(k) account?

14     **A.   He came into the clinic on July 13th or 14th**

15  **to fix a doorbell, and we discussed the 401(k) account**

16  **at that time.**

17     Q.   Where was that discussion?

18     **A.   In the back, by my desk.  The back of the**

19  **building.**

20     Q.   What makes you believe that it was July 13 or

21  14 when this occurred?

22     **A.   Because I had sent Donny a text on the 12th,**

1  and told him we were having some problems with the

2  doorbell.  I know he came in a day or two after that,

3  that text, to take a look at it.

4      Q.   When Don came in that day, did he bring any

5  paperwork of any nature, from the Franklin Templeton

6  account or had the statement -- Joey's statement from

7  Franklin Templeton at that time?

8      A.   I don't recall seeing anything, no.

9      Q.   So, he never showed you anything from Joey's

10 account, any paperwork?

11     A.   No.

12     Q.   So, back by your desk on either the 13th or

13 14th, what did Don say at that time?

14     A.   When I saw him walk up, I actually got very

15 emotional and I apologized to him, and told him that

16 this should have never happened.  I'm sorry it

17 happened, and that we were doing everything we could to

18 try to pay back the money as soon as possible.  And

19 then I reminded him again that we already turned down

20 for one loan, and waiting for an approval on another

21 loan from the bank.

22     Q.   What did Don say in response?

1     A.   I don't recall what his response was.   I do

2   remember that we talked, and I gave him the analogy

3   that it's like getting something back from someone that

4   you loaned, and it's broken, and they give it back to

5   you and say, Here you go.   It's yours.   And all of a

6   sudden it's your responsibility to fix it.

7     Q.   What did you mean by that?

8     A.   I knew that he would understand that analogy

9   of loaning somebody a power tool or something like

10  that, and them giving it back to you broken.   And that

11  happened to you, and then it's your responsibility to

12  fix it.

13    Q.   And by saying that, you were referring to Ed

14  Wessels?

15    A.   That's what --

16    Q.   That was your intent?

17    A.   Yes.

18    Q.   That he broke it, and then gave it back to

19  you to fix it?

20    A.   Correct.

21    Q.   So, is there anything else that you said or

22  Don Schmelzer said during that meeting that you haven't

111

1  already testified to?

2    **A.   I believe I remember Donnie, just before he**

3  **left, he fixed the doorbell.  And he poked his head**

4  **around the corner and said, "Just so you know, I'm on**

5  **your side.  I get it."**

6    Q.   Anything else that you can recall being said

7  during that meeting?

8    **A.   No.**

9    Q.   When he used the term "on your side, I get

10  it," what did you mean -- that to mean?  Were there

11  sides to this issue?

12    **A.   No.  I got the impression that he understood**

13  **that we didn't create this problem, but it was our**

14  **responsibility to fix it.**

15    Q.   Then after Don called you on or about July 5

16  or July 6, after that phone call, did you talk to Ed

17  Wessels about what Don had said to you?

18    **A.   No.**

19    Q.   Did you talk to Lynlee Wessels regarding

20  Don's call?

21    **A.   I actually spoke to Lynlee before Don's call,**

22  **because we had already seen our statements and we knew**

1    **that the employees would be getting theirs also.  And**

2    **that's when we decided that we were going to have to**

3    **have a meeting.**

4         Q.   Going back to the first week of May, after

5    you made observations that the fund had not -- that the

6    401(k) account had not been funded at Franklin

7    Templeton for a period of time, obviously you would

8    have talked to Lynlee about that problem.  Correct?

9         **A.   Yes.**

10        Q.   And you told her right away or within a day,

11   I would presume.  Correct?

12        **A.   Yes.**

13        Q.   And what did Lynlee say in response to that?

14        MR. DARKE:  Objection to hearsay.

15        THE WITNESS:  I don't remember her exact words.  I

16   just -- I don't remember her exact words.  I just knew

17   at that points we realized we were in a lot of

18   financial trouble.

19   BY MR. GAFFNEY:

20        Q.   When did you and Lynlee receive account

21   statements from Franklin Templeton?

22        **A.   Ours came on July 5th.**

1    Q.    How do you remember the day?

2    **A.    I remember the day very well, because that's**

3    **when we made the decision that we were going to need to**

4    **have a meeting with all the employees.**

5    Q.    And the reason why you made that decision is

6    because you were aware that the other employees would

7    have received statements as well.  Correct?

8    **A.    Yes.**

9    Q.    And it would have been readily apparent to

10   them just by reading the statement that they would

11   become aware of the problem?

12   **A.    Yes.**

13   Q.    Who opened their envelope first, you or

14   Lynlee?

15   **A.    I did.  Actually, I didn't even open the**

16   **envelope.  Once I saw the envelope, I knew.  I didn't**

17   **have to open it to know.**

18   Q.    You eventually opened it though.  Right?

19   **A.    I didn't, no, actually.**

20   Q.    Who did?

21   **A.    Lynlee takes care of all the filing.  Whether**

22   **she did or not, I don't know.  We knew what it said.**

1    Q.   When you say "Lynlee takes care of filing,"

2  all the Franklin Templeton accounts are -- statements

3  are put into filing -- in a file?

4    **A.   I'm assuming.  I don't know.**

5    Q.   Was a file maintained at home -- for the

6  Franklin Templeton account for you and Lynlee, was that

7  file maintained at the office, at the clinic -- in the

8  office in the clinic, or at home?

9    **A.   Our personal account is filed at home.**

10    Q.   The statements go to your home address.

11  Correct?

12    **A.   Yes.**

13    Q.   From Franklin Templeton?  Okay.

14          So, it's Lynlee's job to file those at

15  home?

16    **A.   Yes.**

17    Q.   So, upon seeing those account statements come

18  in the mail, you told Lynlee, "We need to have a

19  meeting with the employees affected."  Correct?

20    **A.   Yes.**

21    Q.   And other than you and Lynlee, there were

22  four other plan participants at that time.  Correct?

115

1    **A.    Yes.**

2    Q.    And then who communicated with the employees

3    regarding the meeting?

4    **A.    I typed up a note and put it in everyone's**

5    **mailbox.**

6    Q.    What did that note say?

7    **A.    I think:  There will be a meeting after work**

8    **on Saturday July 8, regarding the 401(k).**

9    Q.    What time did work end on Saturday, July

10   eight?

11   **A.    At noon.**

12   Q.    Did you give a copy of that note to

13   Dr. Matthews?

14   **A.    I did, but I also spoke with her personally**

15   **on July 7.**

16   Q.    And where were you and Dr. Matthews when you

17   spoke?

18   **A.    In the pharmacy.**

19   Q.    And what did you say and what did she say at

20   that time?

21   **A.    I asked her if -- she wasn't scheduled to**

22   **work on July 8th.  So I asked her if she was going to**

1  be at the meeting, and she said she had plans to be out

2  of town, so she wasn't going to attend.

3      Q.   Did you talk about the problem with her?

4      A.   I did.  I explained what happened, and I

5  apologized and told her that we were going to repay

6  them in full plus the 3 percent, plus the 10 percent

7  bonus to cover any lost interest.

8      Q.   When you said the 3 percent, that's the

9  matching portion of the --

10     A.   Three percent match.  Yes.

11     Q.   And then the 1- percent was for investment

12  loss?

13     A.   Yes.

14     Q.   And what did Dr. Matthews say in response to

15  that?

16     A.   She said, "That's fine."  She didn't seem

17  concerned at all.

18     Q.   Did she say that she had gotten her statement

19  from Franklin Templeton?

20     A.   No, she didn't.  There was no mention of

21  that.

22     Q.   Did you ever speak to Dr. Matthews again

1  regarding the 401(k) account?

2      **A.    Only after we had already -- we had mailed**

3  **the checks, and that their accounts were going to be**

4  **paid in full.**

5      Q.    And where were you and Dr. Matthews at that

6  time?

7      **A.    I don't recall exactly.**

8      Q.    And what did you say and what did she say at

9  that time?

10     **A.    I don't recall the conversation.  I probably**

11 **just put a letter in her mailbox, more than likely.**

12     Q.    So, you can't really recall any conversation,

13 but somehow you communicated the fact that the account

14 had been funded?

15     **A.    Correct.  Normally, that's how we**

16 **communicated, with letters in the mailboxes.**

17     Q.    Did Lynlee ever mention that she spoke to

18 Dr. Matthews about the 401(k) issue during this

19 timeframe?

20     **A.    Not that I recall.**

21     Q.    So, to your knowledge, Dr. Matthews did not

22 raise the nonpayment of funds into the 401(k) account

1  with you or Lynlee after she was first apprised of the

2  problem on or about July 7?

3      **A.   Repeat that question.**

4      Q.   Yeah.

5      **A.   That's a long one.**

6      Q.   To your knowledge, Dr. Matthews never raised

7  the issue with anyone after you told her about it on

8  July 7?

9      **A.   To my knowledge, correct.**

10      Q.   And to your knowledge, Dr. Matthews never

11  complained or made any threats or exhibited any

12  frustration or lack of trust after she was apprised of

13  the 401(k) non-funding on or about July 7?

14      **A.   Not to me or Lynlee, no.**

15      Q.   Other than speaking with Dr. Matthews, and

16  other than what occurred -- well, actually, strike

17  that.

18            Before the 1:00 o'clock meeting on

19  July 8th, did you speak with any other employees other

20  than Dr. Matthews?

21      **A.   No.  Just through the memo that we were**

22  **having a meeting.  And in the memo I asked everyone to**

1  hold their questions until the meeting.

2                    (Whereupon, the document was marked

3                    as Deposition Exhibit No. 69 for

4                    identification.)

5  BY MR. GAFFNEY:

6       Q.   I'm going to show you what's previously been

7  marked as Exhibit 69.  This is a year-end statement

8  dated -- or a page of a year-end statement for Joey

9  Schmelzer from Franklin Templeton Investments.

10           Did you receive year-end statements from

11  Franklin Templeton like or similar to this?

12      A.   I'm not sure, because I never opened my

13  statements.  They were filed in the envelope.  I never

14  looked at my statements.

15      Q.   Save that for future reference.

16                    (Whereupon, the document was marked

17                    as Deposition Exhibit No. 70 for

18                    identification.)

19  BY MR. GAFFNEY:

20      Q.   I'm going to show you what's been marked as

21  Exhibit 70.

22           Would you receive -- do you believe you

1  received a statement like this from Franklin Templeton

2  Investments sometime after June 30, 2017?

3  **A.   I would -- yes.**

4      MR. DARKE:  I'm just going to make an objection to

5  both these past documents, because up in the upper

6  right-hand corner of Plaintiff's Exhibit 70, it says 1

7  of 7.  And Exhibit No. 69 is 3 of 12.

8      MR. GAFFNEY:  I'm going to see if I can get you

9  full copies of these.  All right.

10                         (Whereupon, the document was marked

11                          as Deposition Exhibit No. 20 for

12                          identification.)

13  BY MR. GAFFNEY:

14      Q.   And then let me show you what's been marked

15  as Exhibit 20.  Sean, you've got an Exhibit 20.  Right?

16      MR. DARKE:  Yes.

17  BY MR. GAFFNEY:

18      Q.   All right.  Did you prepare this spreadsheet?

19  **A.   Yes, I did.**

20      Q.   And do you recall when you prepared it,

21  approximately?

22  **A.   Approximately, May or June of 2017.**

1  Q. And what did you look at to prepare it?

2  **A. I had retrieved all of the previous**

3 **statements from our accountant stating what was owed,**

4 **what was deducted.**

5  Q. And then what did the accountant provide you?

6  **A. With a statement saying what was owed to whom**

7 **and what the match would be.**

8  Q. So, you asked the accountant to provide you

9 with the monthly contribution from each employee, and

10 what the 3 percent match would be for each, including

11 yourself and Lynlee?

12  **A. Correct.**

13  Q. And then this indicates that Dr. Matthews

14 began becoming a participant on or about November 1,

15 2016.

16   Do you see that?

17  **A. Yes.**

18  Q. And why was she not a participant prior

19 thereto?

20  **A. I don't recall exactly.  Maybe she hadn't**

21 **been there long enough.**

22  Q. So, she needs to be there a year before she

1  was eligible; is that right?

2  **A.  I believe so, yes.**

3  Q.  And then Lindsey Wilke is not listed here.

4  Why was Lindsey Wilke not a participant?

5  **A.  She chose not to participate.**

6  Q.  And Donna Nadalin, N-a-d-a-l-i-n, she was an

7  administrative assistant for a period of time; is that

8  right?

9  **A.  Yes.**

10  Q.  Was she a participant at any time?

11  **A.  No.**

12  Q.  And why was she not a participant?

13  MR. DARKE:  Objection.  Speculation.

14  THE WITNESS:  She's a part-time employee.

15  BY MR. GAFFNEY:

16  Q.  So, you had to be a full-time employee?

17  **A.  Yes.**

18  Q.  And then Mindy White is not a participant.

19  Can you explain that?

20  **A.  She hadn't been there a year.**

21  Q.  And the same would be true of Dr. Nykaza?

22  **A.  Nykaza.**

1    Q.    Nykaza.  Put that on my forehead.

2    **A.    Perfect.**

3    Q.    She hadn't been there a year either.  Right?

4    **A.    I don't believe so, not at that point.  No.**

5    **No, she hadn't.**

6    Q.    The first contribution that the clinic made

7    into anyone's account after this problem came to your

8    attention was into the account of Jessica

9    McCaskin(sic).  Correct?

10    **A.    McCaslin, yes.**

11    Q.    McCaslin.  Yes.

12    **A.    You're fine.**

13    Q.    Thank you.  And you did that because she was

14    threatening to hire a lawyer; is that right?

15    MR. DARKE:  Objection to form of the question.

16    THE WITNESS:  We wanted to get her money to her

17    before she left.  She gave her resignation letter

18    June 10, and then we wanted to get her money to her

19    before she left.

20    Q.    You don't recall her saying she was

21    threatening to sue?

22    **A.    I do, but not at that time.  And actually, it**

1 **was through someone else.**

2     Q.   But Mandy Holt said something to that effect.

3 Correct?

4     **A.   Correct.**

5     Q.   And that was after the July 8th meeting.

6 Correct?

7     **A.   Yes.  It was actually after Mandy gave her**

8 **resignation on July 18.**

9     Q.   All right.  Then so prior to the July 8th

10 meeting, the only participant you spoke with other than

11 Lynlee was Dr. Matthews.  Correct?

12     **A.   Yes.**

13     Q.   And then on the meeting on July 8th, at the

14 clinic you were present, Lynlee was present, Mandy Holt

15 was present, Joey Schmelzer was present, and Jessica

16 McCaslin was present.  Correct?

17     **A.   Correct.**

18     Q.   And how long did the meeting last?

19     **A.   Approximately half-hour, 40 minutes.**

20     Q.   And who initially did the speaking?

21     **A.   Lynlee.**

22     Q.   And at any time during the course of the

1   meeting did you speak?

2        **A.    Briefly.**

3        Q.    When did you speak?

4        **A.    When we were talking about the loan.**

5        Q.    And what did you say about the loan?

6        **A.    I just -- I told them that we had applied for**

7   **a loan.  We were promised that we would get an approval**

8   **soon, but we were still waiting for that approval**

9   **before we could commit to a date of repayment.**

10       Q.    And initially what did Lynlee say?

11       MR. DARKE:  Objection to hearsay.  You can answer.

12       THE WITNESS:  Lynlee apologized for this

13  happening, and she asked -- her words were:  On the

14  grave of my mother, please forgive me.  And she said

15  that we didn't do this, but we are taking full

16  responsibility.

17            And she explained that her father felt

18  that he had to do things this way in order to keep the

19  doors open of the business, otherwise there would be no

20  business and no funds.  But more than anything, she was

21  just very upset that this even happened to begin.  And

22  we apologized and said we were going to fix it.

126

1  BY MR. GAFFNEY:

2      Q.   Anything else that you recall that Lynlee

3  said at that time?

4      MR. DARKE:  Objection.  Hearsay.

5      THE WITNESS:  I can't remember specifics.

6  BY MR. GAFFNEY:

7      Q.   During the meeting can you recall anything

8  that Jessica McCaslin said?

9      MR. DARKE:  Objection to hearsay.

10     THE WITNESS:  Jessica was very quiet.

11 BY MR. GAFFNEY:

12     Q.   During the meeting, is there anything that

13 you can recall that Mandy Holt said?

14     **A.   Not during the meeting, no.**

15     Q.   What about after the meeting?

16     **A.   After the meeting --**

17     MR. DARKE:  Objection to hearsay.

18     THE WITNESS:  Mandy had said that we better tell

19 Ed that he shouldn't come in for a long time.

20 BY MR. GAFFNEY:

21     Q.   Did she say anything else?

22     **A.   Not that I recall.**

1    Q.    And did you and/or Lynlee reply to what Mandy

2    said?

3    **A.    No.**

4    Q.    During the meeting, can you recall anything

5    that Joey or Joyce Schmelzer said?

6    **A.    Yes.    Joey did most of the talking, and asked**

7    **us what we wanted them to do, and threatened.    Said**

8    **that she could have us arrested.    Called us liars,**

9    **thieves, and asked if we wanted them to quit.    That's**

10   **all I recall.**

11   Q.    When she said, "What do you want us to do,"

12   did anyone respond?

13   **A.    I believe Lynlee responded.**

14   Q.    What did Lynlee say?

15   MR. DARKE:    Objection to hearsay.

16   THE WITNESS:    "You do what you feel you need to

17   do."

18   BY MR. GAFFNEY:

19   Q.    After Joey said something to the effect of

20   having you arrested, did anyone respond to that?

21   **A.    No.**

22   Q.    What was the context of the words spoken that

128

1    used the word "liars"?

2        **A.    I don't recall what Lynlee was saying at that**

3    **time.**

4        Q.    Okay.  So, you really can't recall what the

5    context was to that use of that word, "liars"?

6        **A.    No.**

7        Q.    Do you recall Joey subsequently saying --

8    apologizing for using that term?

9        **A.    Yes.**

10       Q.    When did that happen?

11       **A.    July 10.**

12       Q.    And who was present on July 10?

13       **A.    Lynlee and myself.**

14       Q.    Where were you?

15       **A.    At Lynlee's desk.**

16       Q.    And was there anyone else present other than

17   you, Lynlee, and Joey Schmelzer?

18       **A.    Not that I recall.**

19       Q.    And what was the reason why you were all

20   three of you were at Lynlee's desk at that time?

21       **A.    I was having a conversation with Lynlee, and**

22   **Joey came around the corner and said, "Just so you**

1  **know, you're not liars."**

2      Q.   So, she didn't apologize?  She said, "Just so

3  you know, you're not liars"?

4      **A.   She might have.  I don't recall.**

5      Q.   So, she might have apologized.  You just

6  can't recall the words?

7      **A.   Yes.  Exactly.**

8      Q.   And what was the context of the usage of the

9  word "thieves"?  In other words, what was being said

10  which generated the word -- usage of the word "thief"

11  or "thieves"?

12      **A.   It was when we were explaining that we were**

13  **trying to repay the 401(k).  And she called us thieves**

14  **because we had taken her money and not repaid it.**

15      Q.   Did she explain that it would be like her

16  taking money out of the cash drawer?

17      **A.   Yes.**

18      Q.   Is that what you interpret by usage of the

19  word thieves?

20      **A.   That would be my interpretation, yes.**

21      Q.   So, in other words, if I understand your

22  testimony correctly, what you heard with your ears was

1   that Joey said something to the effect that:  You doing

2   this was like something like me or another employee

3   taking money out of the cash drawer.  Right?

4        **A.   Yes.**

5        Q.   And by that statement, you and Lynlee had

6   interpreted that to mean she called you thieves.

7   Correct?

8        **A.   I believe I recall her actually calling us**

9   **thieves.**

10       Q.   So, you think the actual usage of the word

11  occurred as well as that explanation of how she felt

12  about you not funding the money that she had taken out

13  of her -- the money the company had taken out of her

14  payroll account?

15       **A.   It may not have been at the same time, but**

16  **yes.**

17       Q.   When Joey said words to the effect:  Do you

18  want us to quit, did anyone respond to that?

19       MR. DARKE:  Objection.  Asked and answered.

20       THE WITNESS:  I believe we said, "You do what you

21  feel you have to do."  We didn't want anybody to leave,

22  but if they felt like they had to, we couldn't hold

1  them back.

2  BY MR. GAFFNEY:

3      Q.   But the words that were actually communicated

4  by Lynlee was:  You do what you feel you need to do?

5      **A.   To the best of my knowledge, yes.**

6      Q.   Were there any other words spoken by Joey

7  Schmelzer at this July 8 meeting that you haven't

8  already testified to?

9      **A.   She just keep asking what we were going to**

10  **do, and when they were going to get their money back.**

11  **And we didn't respond because we had already said we**

12  **were waiting for approval.  We didn't have a definitive**

13  **time, but it was going to be soon.**

14      Q.   Anything else that you haven't already

15  testified to?

16      **A.   Not that I recall.**

17      Q.   Did you speak with Joey Schmelzer at any time

18  between -- any other time between July 8th and

19  July 10th when you had the short discussion at Lynlee's

20  desk?

21      **A.   Not verbally, no.**

22      Q.   Then did Joey Schmelzer provide you a loan

132

1   repayment document?

2       **A.    Yes.**

3       Q.    And was that received by you on July 10?

4       **A.    Yes, it was.**

5       Q.    Did she hand it to you, or put it in your

6   box?

7       **A.    I believe it was in my mailbox.**

8       Q.    Did you talk to her about that?

9       **A.    I don't recall talking to her about it, but I**

10  **did reply to it.**

11      Q.    And you replied in writing?

12      **A.    Yes.**

13                      **(Whereupon, the document was marked**

14                       **as Deposition Exhibit No. 30 for**

15                       **identification.)**

16  BY MR. GAFFNEY:

17      Q.    Let me show you what's been marked as

18  Exhibit 30.

19                  This is an e-mail from Joey Schmelzer

20  dated Sunday, July 9, 2017, at 7:51 a.m.

21                  You recognize her e-mail address.

22  Correct?

1      **A.    Yes.**

2      Q.    And your e-mail address is first identified

3  -- the first one on the two listed here of

4  newday1@sbcglobal.net?

5      **A.    Yes.**

6      Q.    And you recognize Dr. Wessels' e-mail address

7  as doggiedr78yahoo.com?

8      **A.    Yes.**

9      Q.    And Ed Wessels' e-mail address as

10  fastedy700@yahoo.com.  Correct?

11     **A.    Yes.**

12     Q.    So, you received this e-mail on Sunday,

13  July 9?

14     **A.    Yes.**

15     Q.    And after receiving this on Sunday, July 9,

16  did you talk to Dr. Wessels about it?

17     **A.    I don't recall.**

18     Q.    Did you ever ask Joey Schmelzer about what

19  she meant by this statement:  I promise to give you

20  100 percent, but for now going that extra mile isn't in

21  my heart?

22     **A.    I don't remember having a conversation about**

1    **that, no.**

2    Q.   Did you talk to Dr. Wessels about that

3    statement?

4    **A.   I don't remember.**

5    Q.   She says in here:  As you know, my plan is to

6    retire in about two and a half years.

7            Do you see that?

8    **A.   Yes.**

9    Q.   You were aware of that.  Correct?

10    **A.   I guess I had an idea.  We didn't have an**

11    **exact time.  We knew that she wanted to work longer,**

12    **but I didn't know exactly how long.**

13    **(Whereupon, the document was marked**

14    **as Deposition Exhibit No. 74 for**

15    **identification.)**

16    BY MR. GAFFNEY:

17    Q.   Let me show you what I've marked as

18    Exhibit 74.

19           This appears to be something you received

20    from Franklin Templeton on Monday, July 10 at 5:30 P.M.

21    Correct?

22    **A.   Yes.**

1  Q. And it's in response, apparently, to a recent

2 phone call to the customer service department. Right?

3  **A. Let me read it.**

4  Q. Yeah.

5  **A. Okay.**

6  Q. So, it indicates that you had placed a recent

7 telephone call to the customer service department.

8    Do you see that?

9  **A. Yes.**

10  Q. And in response they sent you a simple IRA

11 and SEP IRA employer's booklet. Correct?

12  **A. Yes.**

13  Q. And do you recall when you made the call to

14 Franklin Templeton preceding this e-mail?

15  **A. No, I don't.**

16  Q. Do you recall what you called Franklin

17 Templeton about?

18  **A. No, I don't.**

19  Q. Did you look at or print the link indicated

20 on the e-mail?

21  **A. I don't remember doing that, no.**

22  Q. Do you recall calling Franklin Templeton

1  during July of 2017?

2      **A.    I don't.  I'm sure I did.  I don't recall**

3  **when or what I called them about.**

4      Q.    During July of 2017, were you and/or Lynlee

5  and/or Ed Wessels talking about whether or not you

6  wanted to continue on with the simple IRA plan?

7      **A.    Yes.  Lynlee and I had that conversation.**

8      Q.    That was in July of 2017?

9      **A.    Yes.**

10     Q.    How about after you learned that it was not

11  funded in May of 2017?  Did you have a conversation

12  during that timeframe about it?

13     **A.    We did.**

14     Q.    And in May of 2017, what did you and Lynlee

15  discuss?

16     **A.    It was our goal -- we honestly thought we**

17  **would get a loan much easier than we did.  And that was**

18  **our goal:  To get all that money paid back as soon as**

19  **possible.**

20     Q.    And what about continuing on in the future?

21  Did you intend to keep the IRA plan in place, or make

22  modifications to it?

1      **A.    We never really discussed that.  Our goal was**

2      **just to get it repaid first, and then take it from**

3      **there.**

4      Q.    Because ultimately you discontinued with the

5      IRA plan.  Correct?

6      **A.    We suspended it.**

7      Q.    When you use the term "suspend," what do you

8      mean?

9      **A.    With the exception of the employees that**

10     **left, which their accounts are still open in their**

11     **name, Lynlee, myself, and Dr. Matthews still have**

12     **accounts.  We're just not making contributions to it.**

13     **It's still open if they want to make contributions.**

14     Q.    So, you and Lynlee voluntarily determined no

15     longer to make contributions into the plan after May of

16     2017?

17     **A.    No.**

18     MR. DARKE:  Objection.  Can we just have

19     clarification regarding them as participants, or as AWC

20     owners?

21     MR. GAFFNEY:  Participants.  Personal

22     participants.

138

BY MR. GAFFNEY:

Q.   So, you and Lynlee made the decision to no longer make deposits from your salary into the plan. Correct?

**A.   We suspended everybody's account after Joey left me a letter:  Stop taking money out of her check for the IRA plan.  So, at that point we decided to suspend everybody's account until this was resolved.**

Q.   When you use the term "suspend the account," are you meaning then that after that, you no longer took money out of anyone's payroll?

**A.   Correct.**

Q.   And who made that decision?

**A.   We did that upon Joey's request.**

Q.   But she can't speak for other humans, can she?

**A.   No.**

Q.   So, she requested don't take any more money out of my account.  Correct?

**A.   We just decided it was in the best interests not to take the money out of anybody's account.  That was Lynlee and my decision.**

1    Q.    So, Joey didn't say:  I'm telling you on

2  behalf of Mandy Holtz or anyone else not to take money

3  out of their accounts.  Correct?

4    **A.    Correct.**

5    Q.    Out of their -- actually, I misspoke.  Out of

6  their payroll?

7    **A.    Paychecks, right.**

8    Q.    How about Dr. Matthews?  Did you speak to

9  Dr. Matthews about no longer taking money out of her

10  account?

11    **A.    I don't recall.**

12    Q.    Strike that.  No longer taking money out of

13  her payroll and putting it into the account?

14    **A.    I don't recall if I had a conversation with**

15  **her or not.**

16    Q.    So, when you use the term "suspended," you

17  suspended the employee benefit?

18    **A.    Yes.**

19    Q.    Did anyone speak with Dr. Matthews as to

20  whether or not she did or did not want to continue to

21  contribute into the 401(k) account?

22    **A.    I don't recall.**

1    Q.   Is the 401(k) account still an employee

2  benefit at this time?

3    **A.   The 401(k) is available, but we are not**

4  **making a 3 percent match at this time.**

5    MR. DARKE:  And you know, Glenn, can we just make

6  a general stipulation that when we're talking about

7  401(k), we're talking about IRA -- the simple IRA?

8    MR. GAFFNEY:  Yeah, the simple IRA.

9  BY MR. GAFFNEY:

10    Q.   So, at some point the company made the

11  decision to discontinue the employee benefit that the

12  company would match payroll withdrawals from an

13  employee's paycheck into the simple IRA?

14    **A.   Correct.**

15    Q.   And that decision was made in May?

16    **A.   No.**

17    Q.   In July?

18    **A.   Correct.**

19    Q.   After the July 8 meeting?

20    **A.   Yes.**

21    Q.   So, on or about the time that Joey Schmelzer

22  said she didn't want any more money taken out of her

1  payroll to be put into the simple IRA?

2      **A.    Yes.**

3      Q.    And what was the reason why you and Lynlee

4  made the decision to no longer match payments into the

5  simple IRA account?

6      **A.    It would have been reckless for us to**

7  **continue making those contributions if we still hadn't**

8  **been able to pay back what we already owed them.**

9      Q.    And has the clinic ever reinstated the

10  matching program of the simple IRA?

11      **A.    No.**

12      Q.    Did the clinic ever notify Franklin Templeton

13  that it was modifying the plan in order to discontinue

14  the match benefit?

15      **A.    Not that I know of.  I don't recall.**

16                              **(Whereupon, the document was marked**

17                              **as Deposition Exhibit No. 33 for**

18                              **identification.)**

19  BY MR. GAFFNEY:

20      Q.    I'm going to show you what's been marked as

21  Exhibit 33.

22                  Is that the document you received from

1  Joey Schmelzer?

2     **A.**   **Yes.**

3     Q.   And after you received that document, did you

4  respond?

5     **A.**   **Yes. We didn't sign the document. I knew**

6  **that we were already working on a plan to pay them back**

7  **faster, which was also discussed at the July 8 meeting.**

8  **Once the loan was approved, which the bank had promised**

9  **it was going to be soon, we were going to pay them back**

10  **all at once. So, I submitted a letter saying that we**

11  **were going to pay them back sooner than what this plan**

12  **suggested.**

13                      **(Whereupon, the document was marked**

14                         **as Deposition Exhibit No. 73 for**

15                         **identification.)**

16  BY MR. GAFFNEY:

17     Q.   I'm going to show you what's been marked as

18  Plaintiff's Exhibit 73.

19     MR. DARKE:  Hey, Glenn, can we go off the record

20  real quick?

21

22

143

1                    (Whereupon, a discussion was held

2                         off the record.)

3    BY MR. GAFFNEY:

4         Q.   Showing you what's been marked as Plaintiff's

5    Exhibit 73.

6                    Do you recognize this document?

7         **A.   Yes.**

8         Q.   It's dated July 11, 2017.  Correct?

9         **A.   Yes.**

10        Q.   And it has someone's handwriting at the top.

11                   Is that your handwriting?

12        **A.   That is my handwriting.**

13        Q.   And it says:  This was put in Joey's mailbox

14   July 11.  Correct?

15        **A.   Yes.**

16        Q.   And then at the bottom it says:  No response.

17   Correct?

18        **A.   Yes.**

19        Q.   And when you use the term "thank you for the

20   contract regarding repayment of the 401(k) plan,"

21   you're referring to that Exhibit 33 I just handed you.

22   Correct?

1      **A.    Correct.**

2      Q.    And you said you would like to suggest a

3   faster plan, if that's okay with you.  But I read

4   through this, and I don't see any faster plan terms.

5              Was there something I'm missing, or is

6   there another document?

7      **A.    No.  There wasn't.**

8      Q.    You were just indicating that you'd like to

9   pay it faster than what she's suggest with a third

10  payment due on September 18, 2017?

11     **A.    Yes.**

12     Q.    But you didn't put in any details of what

13  your plan was at this point.  Correct?

14     **A.    Correct.  I thought I had.**

15     Q.    But as of July 11, you really couldn't

16  provide any details, because you didn't -- you're

17  saying that you didn't have any loan approval?

18     **A.    No.  The bank had made promises.  They said**

19  **it would be soon, but they couldn't give me a**

20  **definitive date.  And as it turned out, they never did**

21  **approve it.**

22     Q.    Well, they did give you preapproval for

145

1    10,000.  Correct?

2         **A.    A couple months earlier, yes.  But**

3    **unfortunately that loan had already expired, that loan**

4    **approval.**

5         Q.    So, from the date that you first learned of

6    this problem with the 401(k) plan through the date that

7    you received the Franklin Templeton statement on

8    July 5th, knowing that the other plan participants

9    received their statements, thereby scheduling the

10   meeting for July 8th to discuss the problem -- so

11   during that two months between the first week of May

12   and July 5th, neither you or Lynlee brought this

13   problem up to any of the plan participants.  Correct?

14        **A.    Correct.**

15        Q.    So, it was your thought process to not tell

16   them during that timeframe that there was this problem?

17        **A.    Correct.**

18        Q.    Because you were hoping that could you solve

19   it without them knowing about it?

20        **A.    We were hoping we could resolve it, yes.**

21        Q.    And you were hoping you could resolve it

22   without them finding out?

1      A.   We were also afraid that if we did bring it

2  to their attention, the same thing would happen that

3  happened on July 8.

4      Q.   Which is what?

5      A.   There was an upheaval.

6      Q.   And so, during that 60-day timeframe you

7  knew, did you not, that the same plan participants

8  continued to have money taken out of their biweekly

9  payroll.  Right?

10     A.   Yes.

11     Q.   And you knew during that 60-day that even

12 though money was being taken out of that biweekly

13 payroll, it was not being deposited into the Franklin

14 Templeton account.  Right?

15     A.   Yes.

16     Q.   And during that 60 days, you were in charge

17 of making payments into Franklin Templeton.  Correct?

18     A.   Yes.

19     Q.   And during that 60 days, even that you knew

20 that money was coming out of participants' payroll

21 accounts, that even the money that they took out, that

22 the company withheld from their payroll accounts, even

1 that money you were not depositing with Franklin

2 Templeton during May and June or July.  Correct?

3     **A.   Correct.**

4     MR. GAFFNEY:  It's a good time for a break.  It's

5 almost 1:00 o'clock.

6                         (There was a break taken, after

7                          which the deposition was resumed

8                          as follows:)

9     MR. GAFFNEY:  Back on the record after a recess.

10 BY MR. GAFFNEY:

11     Q.   One of the questions I forgot to ask, it was

12 regarding Ed Wessels, for what Ed did for the clinic in

13 the year 2015.

14               He did the bills back then, too.

15 Correct?

16     **A.   There was a transition period.  2015?  Yes.**

17 **2015 he was taking care of the bills then.  Yeah.**

18     Q.   Was he compensated in any way in 2015 for his

19 services rendered?

20     **A.   No.**

21     Q.   Did he get any benefits?  Did the company pay

22 his gas or anything like that?

1    **A.   I don't recall.  I'm honestly not sure.**

2    Q.   How about 2016, did he receive any

3 compensation?

4    **A.   Not that I'm aware of.**

5    Q.   Or 2017?

6    **A.   They have a Costco credit card that Pat uses,**

7 **but she pays it back.**

8    Q.   Does she use it for the office as well, or

9 no?  The Costco credit card?

10    **A.   I don't believe so.  I'm not sure.  You'd**

11 **have to ask her.**

12    Q.   It was just for personal use?

13    **A.   You'd have to ask her or ask Ed.  Ed would**

14 **know.**

15    Q.   In 2016, there were three members of the LLC:

16 Lynlee, you, and Ed.  Right?

17    **A.   Yes.**

18    Q.   And then each of you would get a K-1 from the

19 accountant, for example, after the 2016 tax return was

20 prepared?

21    **A.   I don't what that is.**

22    MR. DARKE:  Objection.  Foundation.

BY MR. GAFFNEY:

    Q.   Do you know what a K-1 is?

    **A.   No.**

    Q.   Well, in 2016, you were a 5 percent member of -- owner of the LLC.  Right?

    **A.   Correct.**

    Q.   So, depending on what the overall profit and loss was of the LLC, the LLC would issue a K-1 to the member owners.

    **A.   I don't recall ever seeing one.**

    Q.   So, who pays tax on any income that the LLC earns?

    **A.   We haven't had to pay tax so far.  We've had a loss almost every year.**

    Q.   You declare a loss every year?

    **A.   Yes.**

                  **(Whereupon, the document was marked as Deposition Exhibit No. 45 for identification.)**

BY MR. GAFFNEY:

    Q.   Let me show you what's been marked Exhibit 45.

1          So, you recall saying that the meeting

2     was on Saturday, July 8.  Correct?

3          **A.   Yes.**

4          Q.   And then on Monday, July 10, you received a

5     letter of resignation from Jessica McCaslin?

6          **A.   Yes.**

7          Q.   As of the 8th, did you know that she was

8     going to submit a resignation letter?

9          **A.   No.**

10          MR. DARKE:  Can I get a copy of that too?

11          MR. GAFFNEY:  All right.  Go ahead.  Keep that one

12     then.

13          THE WITNESS:  You can have mine.

14     BY MR. GAFFNEY:

15          Q.   So, then on July 26th, in the afternoon

16     hours, you received a phone call from a Nicole Lindsey

17     from the Department the Labor?

18          **A.   Yes.**

19          Q.   And that's the U.S. Department of Labor.

20     Correct?  Not the State?

21          **A.   I believe so.**

22          Q.   Yeah.  It's the employee benefits security

1  administration.

2      **A.    She just said Department of Labor.  That's**

3  **all I remember.**

4      Q.    And she then brought to your attention the

5  fact that someone had reported that there were -- there

6  was a problem with missing contributions into the

7  simple IRA account?

8      **A.    Yes.**

9      Q.    And you told her that you're trying to get a

10  loan to repay the funds back?

11      **A.    We told her that we actually had just**

12  **received a loan and were in the process of paying that**

13  **back.  It just hadn't been done yet.**

14      Q.    When you said that you just received a loan,

15  that's the Pat German --

16      **A.    German.**

17      Q.    -- German $10,000 personal loan?

18      **A.    Correct.**

19                    **(Whereupon, the document was marked**

20                     **as Deposition Exhibit No. 22 for**

21                     **identification.)**

22

152

BY MR. GAFFNEY:

    Q.    Let me show you what's been marked as
Exhibit 22.  So, this is a narrative report from the
U.S. Department of Labor.  And if you look at where it
says page 3 of 4 in the upper right-hand corner?  You
got it?

    **A.    Uh-huh.**

    Q.    And you see a couple paragraphs down where is
starts 7/26/2017?  Right?

    **A.    Okay.**

    Q.    This purports to be the narrative of Nicole
Lindsey regarding her conversation with you.  She put
in her notes:  They are having trouble getting the loan
approved.

        Do you recall saying that?

    **A.    I don't recall saying that, but I must have.**

    Q.    She goes on to say:  They have gotten loans
from the bank before, and they are usually approved
right away.  He does not understand the reason behind
the delay, but stated that he will contact the bank and
make sure that the funds are deposited within a week.

        Do you believe you said that?

153

1      **A.    Yes.  That's exactly what was happening.**

2      Q.    So, then underneath that it says:  Stated

3  that they had someone else in charge of the books, and

4  they just realized how bad things were in reference to

5  the simple IRA plan.

6              Did you make that statement?

7      **A.    I must have.**

8      Q.    Actually, you said, "just realized as of July

9  26," but actually you had realized back in the first

10  week of May.  Correct?

11      **A.    Yes.  First or second week after we had a**

12  **chance to go through and examine everything.**

13      Q.    So, when you had this conversation with

14  Nicole Lindsey, she didn't tell you who reported the

15  problem to the Department of Labor.  Correct?

16      **A.    Correct.**

17      Q.    You knew it wasn't Dr. Matthews.  Correct?

18      **A.    I didn't know.  I assumed.**

19      Q.    And you assumed it wasn't Ed Wessels?

20      **A.    Correct.**

21      Q.    You assumed it wasn't your wife, Lynlee

22  Wessels.  Correct?

154

1      **A.    Correct.**

2      Q.    So, that would -- the remaining three

3   participants, you assumed it would have been one of

4   those three.  Correct?

5      MR. DARKE:  Objection to the form of the question.

6   BY MR. GAFFNEY:

7      Q.    Can you answer it?

8      **A.    That was a process of elimination.  That was**

9   **the only three left.**

10     Q.    So, you pretty much were sure that it

11  wouldn't have been Mandy Holt.  Correct?  Based on your

12  conversation with her?

13     MR. DARKE:  Objection to form of the question.

14     THE WITNESS:  Yeah, I guess so.

15  BY MR. GAFFNEY:

16     Q.    And was there anything that Jessica McCaslin

17  said or did which would have made you believe it might

18  have been her that called the Department of Labor?

19     **A.    Just based on what Mandy had told us.**

20     Q.    That she said something back in -- that she

21  was going to sue?

22     **A.    She told us to watch out for Jessica, yeah,**

1  **that she might sue.**

2      Q.   And you also were aware of all the statements

3  that Joey Schmelzer made on July 8.  Correct?

4      **A.   Correct.**

5      Q.   And she did most of the talking in terms of

6  speaking on behalf of the participants.  Correct?

7      **A.   Correct.**

8      Q.   And then you also, of course, were aware that

9  Joey Schmelzer was the one that prepared the repayment

10  plan and gave it to you on July 10?

11      **A.   Correct.**

12      Q.   So, with Jessica McCaslin, she actually no

13  longer worked after July 11th; isn't that correct?

14      **A.   Yes.**

15      Q.   And she never returned after Lynlee left a

16  voicemail message on her phone regarding the care of a

17  cat; is that what occurred?

18      **A.   Yes.**

19                        **(Whereupon, the document was marked**

20                         **as Deposition Exhibit No. 46 for**

21                         **identification.)**

22

1  BY MR. GAFFNEY:

2      Q.   Let me show you what's been marked as

3  Exhibit 46.

4              Have you seen that before?

5      **A.   Yes.**

6      Q.   Were you present when Lynlee left this

7  voicemail message for Jessica McCaslin?

8      **A.   No.**

9      Q.   Did you talk to Lynlee about this -- her

10 voicemail message?

11     **A.   Yes.**

12     Q.   What did she say about it?

13     **A.   Lynlee was upset with Jessica because it's**

14 **the technician's responsible to take care of the**

15 **animals post surgery, and Jessica neglected her duties,**

16 **and in result, the cat died.**

17                      **(Whereupon, the document was marked**

18                      **as Deposition Exhibit No. 32 for**

19                      **identification.)**

20 BY MR. GAFFNEY:

21     Q.   Let me show you what's been marked as

22 Exhibit 32.

1          So, the top e-mail is something that you

2    submitted to Lynlee Wessels.  Correct?  On July 11th?

3        **A.    Yes.**

4        Q.    And then the bottom one is your e-mail to Ed

5    Wessels.  Right?

6        **A.    Yes.**

7        Q.    On July 10th at 5:50 p.m.?

8        **A.    Yes.**

9        Q.    And when you use the term "JJM payment

10   contract," what were you referring to when you used the

11   initials JJM?

12       **A.    I would have to say -- I'm not positive.**

13   **Jessica McCaslin.**

14       Q.    Would it be J for Jessica, or J for Joey -- J

15   for Joey, and J for Jessica, M for Mandy?

16       **A.    That could be.**

17       Q.    So, you indicate, "As of July 10, as soon as

18   we hear back on our HELOC," and when you use the term

19   H-E-L-O-C, you're referring to your loan application

20   for 25,000?

21       **A.    Yes.**

22       Q.    You state --

1    **A.   Or --**

2    Q.   Go ahead.

3    **A.   Yes.**

4    Q.   "We will write up our own contract,

5    explaining how we're going to make the payment."

6    Right?

7    **A.   Yes.**

8    Q.   So, even after you got the HELOC, you were

9    planning on writing up a different contract about when

10   you were going to make the payment?

11   **A.   Yes.**

12   MR. GAFFNEY:  Next is Exhibit 21.

13   MR. DARKE:  I got it.

14   MR. GAFFNEY:  You have 21?  Okay.

15                    (Whereupon, the document was marked

16                     as Deposition Exhibit No. 21 for

17                     identification.)

18   BY MR. GAFFNEY:

19   Q.   So, here it indicates that -- you've seen

20   this before.  Correct?

21   **A.   Yes.**

22   Q.   And it was an e-mail from your wife Lynlee to

1   Ed Wessels on July 11 at 3:05 p.m.?

2       **A.   Oh, yes.  Okay.**

3       Q.   So, there's a reference to the fact that

4   Mandy spoke up privately and said Jessica is planning

5   on suing us.  Right?

6       **A.   Yes.**

7       Q.   It was at that point where you indicated that

8   you had 3,000, so you decided to -- first pay Jessica's

9   portion?

10      **A.   Yes.  We wanted to give her money before she**

11  **left.**

12      Q.   Well, okay.  That's what your testimony is

13  today, but I guess the correspondence speaks for

14  itself.

15            Now, Lynlee is saying, "I am telling her

16  not to come back tonight, and giving her documentation

17  regarding the deposit."  Correct?

18      **A.   It does say that.  Yes.**

19      Q.   Did she talk to you first about her telling

20  Jessica not to come back?

21      **A.   No.**

22      Q.   In other words, as of July 11, Lynlee had

160

1  made the decision that Jessica's last day would be the

2  11th.  Correct?

3      MR. DARKE:  Objection.  Asked and answered.

4      THE WITNESS:  Would you repeat the question?

5  BY MR. GAFFNEY:

6      Q.  Yeah.  Is it your understanding that Lynlee

7  made the decision on July 11 that it would be Jessica's

8  last day?

9      **A.  Yes.**

10                    **(Whereupon, the document was marked**

11                     **as Deposition Exhibit No. 75 for**

12                     **identification.)**

13  BY MR. GAFFNEY:

14      Q.  In regards to Exhibit 75, which I'll hand

15  you, these are pay stubs.  In particular, it's the pay

16  stubs from three payments in 2016 for Joey Schmelzer.

17          These pay stubs come from what payroll

18  company?

19      **A.  Our accountant.**

20      Q.  From the accountant.  And are they sent to

21  all employees on a regular basis?

22      **A.  These checkstubs are included with their**

1  **payroll checks.**

2      Q.    Payroll checks are provided in an envelope?

3      **A.    Yes.**

4      Q.    And you receive payroll checks as well.

5  Correct?

6      **A.    Yes.**

7      Q.    And your payroll checks also show any funds

8  that were withheld in the simple IRA company match

9  program?

10     **A.    You mean our personal paychecks.  Yes.**

11     Q.    And then there's a non-taxable company items.

12  It says simple IRA company match, which shows the total

13  amount that the company was to match for the year --

14  for the timeframe in question.  Correct?

15     **A.    Yes.  Year to date.**

16     Q.    Well, there's current and year to date.

17  Right?

18     **A.    Right.**

19     Q.    For each pay stub?

20     **A.    Correct.**

21     Q.    And in her case, the current year to date

22  matches the deductions from gross pay column line item,

1  because she had a 3 percent deduction, which was the

2  amount matched by the clinic.  Right?

3      **A.   Repeat that again.**

4      Q.   Yeah.  So, there was actually two line items.

5  One on the left-hand side of each pay stub where it

6  says:  Deductions from gross, simple IRA, EMP period,

7  there's a current line, and then there's a year to

8  date?

9      **A.   Correct.**

10     Q.   And then to the right of that, in the right

11 column, there's non-taxable company items, which shows

12 simple IRA company match both current and year to date?

13     **A.   Okay.  Yes.**

14     Q.   And those two match up for her because under

15 -- she was contributing 3 percent, which was the amount

16 that the company was matching -- or to match?

17     **A.   Okay.**

18     Q.   And your paycheck would show similarly line

19 items for the deductions coming out of your check on a

20 current and year to date basis.  Correct?

21     **A.   Yes.**

22     Q.   And your paychecks as well would show the

1  amount that the company was to match both currently and

2  year to date.  Correct?

3      **A.    I believe so, yes.**

4      Q.    So, the pay stubs in and of themselves didn't

5  alert anyone to a problem that the money was actually

6  not being deposited with Franklin Templeton.  Correct?

7      **A.    Correct.**

8      Q.    And that was true in 2017 as well?

9      **A.    Correct.**

10      Q.    So, the actual amount for Joey Schmelzer, for

11  example, in pay stub 65615, the amount that actually

12  was taken out of her account is accurately shown under

13  deductions from gross, year-to-date $1,269.72?

14      **A.    Correct.**

15      Q.    But in the non-taxable company items on the

16  right-hand column of the pay stub, the amount actually

17  deposited by the clinic into her simple IRA company

18  match account was not $1,269.72 because it hadn't been

19  actually funded since July.  Correct?

20      MR. DARKE:  Objection to foundation regarding this

21  document.

22      THE WITNESS:  Correct.

164

1                    (Whereupon, the document was marked

2                       as Deposition Exhibit No. 76 for

3                       identification.)

4    BY MR. GAFFNEY:

5        Q.    And then I'm going to show you what's been

6    marked as Exhibit 76.

7                    Do you recognize that form?

8        **A.    Yes.**

9        Q.    And what is this?

10       **A.    This is a payroll summary.**

11       Q.    Did you used to receive payroll summaries for

12   the employees during the year 2016?

13       **A.    Only if I requested them.**

14       Q.    These are prepared by the accountant?

15       **A.    Yes.**

16       Q.    Aaron Sears.  Right?

17       **A.    Yes.**

18                       **(Whereupon, the document was marked**

19                       **as Deposition Exhibit No. 26 for**

20                       **identification.)**

21   BY MR. GAFFNEY:

22       Q.    I'm going to show you what's been marked as

1  Exhibit 26.

2          See if you recognize that.

3     **A.   Okay.  Yes.**

4     Q.   At the bottom there's little numbers.  You

5  see D-12 is the second page?

6     **A.   Yes.**

7     Q.   You prepared that document?

8     **A.   Yes, I did.**

9     Q.   And at that point Jessica McCaslin's account

10  had already -- you already submitted a check for her

11  payment, so you're listing out the payments for the

12  other three plan participants?

13     **A.   Yes.**

14     Q.   And then the next page is just the back page

15  of a check for some reason.  The page after that where

16  it says D-14 at the bottom, that was last deposit into

17  the IRA account made by Ed Wessels on July 16, 2016?

18     **A.   Yes.**

19     Q.   Which would have covered the month of

20  June 2016.  Correct?

21     **A.   Correct.**

22     Q.   And the next page after that is the check

1  that you submitted on or about July 11, 2017, for the

2  account of Jessica McCaslin?

3     **A.   Yes.**

4     Q.   And then the third check is the one that you

5  submitted -- or dated at least July 27, 2017, for the

6  balance of the three other plan participants?

7     **A.   Correct.**

8                 **(Whereupon, the document was marked**

9                   **as Deposition Exhibit No. 17 for**

10                 **identification.)**

11  BY MR. GAFFNEY:

12     Q.   Next I'm going to show you Exhibit 17.  That

13  is letter you received from the U.S. Department of

14  Labor on July 27th by e-mail from the Nicole Lindsey?

15     **A.   Yes.**

16                 **(Whereupon, the document was marked**

17                   **as Deposition Exhibit No. 17(a)**

18                   **for identification.)**

19  BY MR. GAFFNEY:

20     Q.   And then Exhibit 17(a) was the e-mail from

21  Nicole Lindsey at 4:12 p.m. that you received, which

22  had the letter attached.  Correct?

1    **A.    Correct.**

2                        **(Whereupon, the document was marked**

3                        **as Deposition Exhibit No. 19 for**

4                        **identification.)**

5    BY MR. GAFFNEY:

6        Q.    And I show you what's been marked as

7    Exhibit 19.

8                  You prepared this document?

9    **A.    Yes.**

10       Q.    For what purpose did you prepare it?

11   **A.    Just for documentation.**

12       Q.    And when did you prepare it?

13   **A.    I'm not sure what date I prepared this.    I**

14   **didn't date it.**

15       Q.    It would have been sometime after August 27,

16   apparently, because I see a reference to that date in

17   the last paragraph?

18   **A.    Yes.**

19       Q.    And other than having a summary of -- you

20   created it as a summary of what occurred regarding the

21   Department of Labor correspondence?

22   **A.    Yes.**

1    Q.   Did you prepare it before or after this

2  lawsuit was filed?

3    **A.   I don't recall.**

4    Q.   Now, in the first paragraph, you indicate

5  that the lapse was not done by Lynlee or myself but by

6  the previous bookkeeper.

7         So, by -- here you're referring to -- are

8  you referring to Ed Wessels as the bookkeeper?

9    **A.   Yes.**

10   Q.   So, the checks that were written to repay the

11 simple IRA account that we looked at, they were written

12 -- the last one, I should say, the one dated July 27

13 for $8483.43, that check was written after you got the

14 phone call and letter from the Department of Labor?

15   **A.   Yes.**

16              **(Whereupon, the document was marked**

17              **as Deposition Exhibit No. 35 for**

18              **identification.)**

19 BY MR. GAFFNEY:

20   Q.   And I'm going to show you what's been mark as

21 Exhibit 35.

22   MR. DARKE:  Could I see that exhibit?

1      MR. GAFFNEY:  You don't have a 35?

2      MR. DARKE:  No.

3      MR. GAFFNEY:  I thought you did.  So, I'm going to

4  have to run you a copy.

5      MR. DARKE:  I did.  Right.

6      MR. GAFFNEY:  I thought you did.

7  BY MR. GAFFNEY:

8      Q.   Did you prepare Exhibit 35, or did Lynlee?

9      **A.   I did not.**

10     Q.   Have you seen it before?

11     **A.   I have.**

12     Q.   This was submitted to the Illinois Department

13 of Employment Security in August?

14     MR. DARKE:  We'll just have a standing objection

15 regarding anything submitted to the Illinois Department

16 of Employment Security.

17 BY MR. GAFFNEY:

18     Q.   Do you know or --

19     **A.   I don't know if this was submitted to him or**

20 **not.**

21

22

170

1                    (Whereupon, the document was marked

2                        as Deposition Exhibit No. 38 for

3                        identification.)

4    BY MR. GAFFNEY:

5        Q.    Did you submit any documents to the -- let me

6    strike this.  Let me show you Exhibit 38.

7                    Page 1 is a fax cover sheet from Lynlee

8    Wessels dated August 23, 2017, to Pamela Lloyd,

9    Illinois Department of Employment Security.  Correct?

10       **A.    Yes.**

11       Q.    And then the next page is a letter from you

12   dated August 24, 2017, to the Department of Employment

13   Security?

14       MR. DARKE:  Again, we'll just have a standing

15   objection regarding anything sent to the Illinois

16   Department of Employment Security.

17   BY MR. GAFFNEY:

18       Q.    Correct?

19       **A.    Yes.**

20       Q.    So, in your letter of August 24, 2017, you

21   included some exhibits.  Right?

22       **A.    Yes.**

1     Q.   And you included a statement of Lynlee

2  Wessels and a statement of another employee that was

3  present on July 31st.  Correct?

4     MR. DARKE:  I'm going to object to the whole

5  foundation of this document.  There's not confirmation

6  page or anything regarding what this document actually

7  consists of.  It also talks about a total of seven

8  pages.  And on the second page a total of seven,

9  including the cover sheet, but there's only four pages

10  to this document.

11     MR. GAFFNEY:  Well, let me inquire about it.

12  BY MR. GAFFNEY:

13     Q.   I'm looking at page 2 of this Exhibit 38.

14          Did you fax page 2 of Exhibit 38 to the

15  Department of Employment Security?

16     **A.   In my best recollection, it says I did.**

17     Q.   And --

18     **A.   I don't remember exactly what I sent over,**

19  **except what it says on this sheet, I guess.**

20     Q.   Can you read?  What is Item 4 that you sent

21  to the Department of Employment Security?

22     **A.   A copy of termination of employment terms**

1   that are listed in our employee handbook that

2   Ms. Schmelzer has read and signed a confirmation letter

3   of understanding.

4       Q.   And why did you sent that?

5       A.   I'll be honest with you, I'm assuming it's

6   because there must have been something in our employee

7   handbook that was relative to the case.  And I just add

8   that we have a letter that all employees have read and

9   signed, or signed and read the employee handbook.

10      Q.   And then the next page after that, it's dated

11  August 22, 2017.  Correct?

12      A.   Yes.

13      Q.   And then the second page, that's your wife's

14  signature?

15      A.   Yes.

16      Q.   Do you know if this statement was submitted

17  to the Department of Employment Security?

18      A.   I honestly don't know if that was the letter

19  that this page 2 is referring to or not.  I'm assuming

20  it is.  I don't know.

21

22

1                    (Whereupon, the document was marked

2                      as Deposition Exhibit No. 39 for

3                      identification.)

4    BY MR. GAFFNEY:

5        Q.    All right.  I'm going to show you what's been

6    marked Exhibit 39.  Two page document.

7                    Do you recognize it?

8        **A.    Yes.**

9        Q.    And did you receive this from Dr. Wessels?

10       **A.    Yes.**

11       Q.    She references a Gruca.

12                   Is that a member of the Monee Police

13   Department?

14       **A.    Sergeant Gruca, yes.**

15       Q.    And the e-mail contains:  JS harassing

16   timeline document.  Correct?

17       **A.    Yes.**

18       Q.    And then the second page is the document that

19   was attached that Lynlee sent to you?

20       **A.    I'm assuming it's the same document.  Yes.**

21       Q.    And Lynlee states at the top:  Fired for

22   misconduct 7/31/17.

1          Do you see that?

2     **A.   Yes.**

3     Q.   And that's true.  Correct?

4     MR. DARKE:  Objection to form of the question.

5     THE WITNESS:  According to the IDES, yes.

6  BY MR. GAFFNEY:

7     Q.   According to who?

8     **A.   IDES.**

9     Q.   Well, no.  I'm saying:  According to you?

10    **A.   Not originally.**

11    Q.   Well, Lynlee says here:  Fired for misconduct

12 7/31/17.

13          Is she misstating?

14    **A.   No.  After the IDES settlement, we decided**

15 **that's the term they used, so that's why we used the**

16 **term.**

17    Q.   So, you agree she was fired for misconduct on

18 7/31/17?

19    MR. DARKE:  Objection to form of the question.

20    THE WITNESS:  We do agree with that after the

21 ruling.

22 BY MR. GAFFNEY:

1    Q.   Were you present at the IDES hearing?

2    **A.   Yes.**

3    Q.   And who else testified at the hearing?

4    **A.   Just Joey Schmelzer and myself and Lynlee.**

5    Q.   And so based on what you're seeing here --

6  strike that.

7          Lynlee, on the e-mail, is asking you to

8  give this to Officer Gruca of the Monee Police

9  Department?

10    **A.   Yes.**

11    Q.   And did you do that?

12    **A.   Yes.**

13    Q.   So, you wanted Officer Gruca of the Monee

14  Police Department that know that Joey Schmelzer was

15  fired for misconduct 7/31/17?

16    **A.   Yes.**

17    MR. DARKE:  Objection.  Form of the question.  And

18  just for the record, this is Plaintiff's Exhibit 39,

19  and 40 is the attachment.

20              (Whereupon, the document was marked

21               as Deposition Exhibit No. 40 for

22               identification.)

1     MR. GAFFNEY:  Okay.  That's right.  So, we're

2  clarifying.  Thank you for that.

3  BY MR. GAFFNEY:

4     Q.   So, the attachment that we're referring to,

5  Exhibit 39 is the e-mail.  Correct?

6     **A.   Yes.**

7     Q.   And then the second page is actually

8  identified as Plaintiff's Exhibit 40.  That uses the

9  term:  Fired for misconduct 7/31/17.  Right?

10     **A.   Right.**

11     Q.   Now, I'm calling your attention to July 31,

12  2017.

13              You were working that day.  Correct?

14     **A.   Yes.**

15     Q.   And in the morning, around 9:30 a.m., were

16  you present in Lynlee's office area?

17     **A.   Yes.**

18     Q.   And do you recall what you and Lynlee were

19  discussing initially in her office area at that time?

20     **A.   No.**

21     Q.   Before being in Lynlee's office area, had you

22  observed where Joey Schmelzer was?

177

1    A.    No.

2    Q.    Or where any other employees were?

3    A.    No.

4    Q.    Do you recall where you were before you went

5    to the Lynlee's office?

6    A.    My desk.

7                    **(Whereupon, the document was marked**

8                    **as Deposition Exhibit No. 72 for**

9                    **identification.)**

10    BY MR. GAFFNEY:

11    Q.    I show you what's been marked as Exhibit 72.

12         You're familiar with that exhibit.

13    Correct?

14    A.    Correct.

15    Q.    And that is -- did you prepare this chart, or

16    did someone else?

17    A.    I did.

18    Q.    Is it to scale?

19    A.    Yes.

20    Q.    What were you looking at when you prepared

21    it?  Blueprints or something?

22    A.    Yes.  We have a fire escape route.

178

1      Q.   So, is this something that you -- an

2   architect or something had prepared initially?

3      **A.   I don't know for sure.**

4      Q.   Or did you create it?

5      **A.   No.  I did not.**

6      Q.   Someone else created it?

7      **A.   Correct.**

8      Q.   It's a little tough to read.  Do you see

9   where I put a highlighting on my version?

10     **A.   Yeah.**

11     Q.   So, I highlighted an area just to the left of

12  where it shows dog exam room.  Correct?

13     **A.   Yes.**

14     Q.   And does it there say lab and pharmacy?

15     **A.   Yes.**

16     Q.   And it looks like there's a door on the --

17  I'm not sure which direction this is.

18             What direction would be the top?

19     **A.   That would be north.**

20     Q.   North.  The north side of that room, it looks

21  like there's an open door there?

22     **A.   Actually, two open doors.  Oh, which door are**

179

1    **you referring to?**

2         Q.    The north side of the lab pharmacy.

3         **A.    Oh, the lab pharmacy.  Yes.  That is an open**

4    **door.**

5         Q.    Is that always open, or is it a shut-able

6    door?

7         **A.    There's not door there.**

8         Q.    So, it's an open area?

9         **A.    Correct.**

10        Q.    And then there's a -- it looks like a hallway

11   after the open doorway?

12        **A.    Correct.**

13        Q.    And then after the hallway, that's where it

14   says reception desk.  Correct?

15        **A.    Yes.**

16        Q.    And it's got some curved lines on the north

17   side?

18        **A.    Yes.**

19        Q.    And does that represent the half-desk,

20   circular desk?

21        **A.    Yes.**

22

180

1          (Whereupon, the document was marked

2              as Deposition Exhibit No. 77 for

3              identification.)

4  BY MR. GAFFNEY:

5      Q.   And showing you Exhibit 77.

6          Does that truly and accurately depict the

7  reception area as it existed on July 31st, 2017?

8      **A.   Yes.**

9      Q.   And that door that you see to the left in

10 Exhibit 77, is that the door to the pharmacy lab?

11     **A.   No.**

12     Q.   What door is that?

13     **A.   It's a bathroom.**

14     Q.   So, I see at the bottom of Exhibit 72, at the

15 south end of the building, that's where it says Scott's

16 desk is.  Right?

17     **A.   Yes.**

18     Q.   And then -- so, in order for you to -- what's

19 the easiest route from your desk to Lynlee's desk?  The

20 corridor down the left-hand side of the building?

21     **A.   Correct.  That's the only way.**

22     Q.   Oh, I see.  Okay.  I see there's only one

1  open door there in the building, and that's on the west

2  side of building?

3     **A.   Actually, wouldn't it be east?  Yeah.  Either**

4  **way, there's only one open door that goes up front.**

5     Q.   Facing north.  Your left would be west.

6     **A.   Okay.**

7     Q.   All right.  So, when you were at Lynlee's

8  desk, do you know whether or not there were any clients

9  in the waiting area?

10     **A.   Not at that time, no.**

11     Q.   You -- okay.  I'm not sure about your answer.

12     **A.   When I was at her desk, I didn't know if**

13  **there were any clients in the waiting area.**

14     Q.   Do you know if there were any clients

15  anywhere when you were at her desk?

16     **A.   No.**

17     Q.   And then while you were at her desk, did Joey

18  Schmelzer come in?

19     **A.   Yes.**

20     Q.   And then when she came in, who spoke first?

21     **A.   Joey did.**

22     Q.   What did Joey say?

1      A.    "Why the "F" aren't you talking to me?"

2      Q.    And did anyone respond?

3      A.    No.

4      Q.    And then what happened next?

5      A.    Joey looked at me and asked me why I wasn't

6   talking to her.  And my response was, "Maybe it's

7   because you're yelling at her."

8      Q.    And then who spoke next?

9      A.    Joey.

10     Q.    What did she say?

11     A.    She said -- I don't -- she said that:  Do you

12  want me to leave?  If you want me to leave, I will.

13     Q.    And then who spoke next?

14     A.    It was Joey waited for a response.  It was --

15  nobody said anything.

16     Q.    Then who spoke next?

17     A.    Joey said that again:  If you want me to

18  leave, I will.

19     Q.    And then who spoke next?

20     A.    I believe it was Lynlee after that.

21     Q.    What did Lynlee then say?

22     A.    Yes.

1      Q.   And who spoke next?

2      **A.   Joey.**

3      Q.   What did Joey say?

4      **A.   Joey said, "You heard -- you just fired me."**

5  **And Lynlee replied:  No.**

6      Q.   Who spoke next?

7      **A.   Joey asked me, "You heard her.  Your wife**

8  **just fired me."  And I said no.**

9      Q.   Who spoke next?

10     **A.   Nobody.  Joey went around the front desk to**

11 **pack up her things.**

12     Q.   What did you do next when she left to go up

13 front?

14     **A.   I went around and stood behind the counter,**

15 **behind the reception desk.**

16     Q.   So, when you say "behind the reception desk,"

17 can you indicate?

18     **A.   There's a little counter right there.**

19     Q.   So, that would be the counter on the south

20 side of the reception area?

21     **A.   Yes.**

22     Q.   And you stood there?

184

1    A.   I was just watching her to see what she was

2  going to do.  She was very upset.  She was irate.

3    Q.   So, you went, you walked around the wall to

4  see what she was going to do next?

5    A.   Yes.  Just to watch her pack up her things.

6  Yes.

7    Q.   And what was she doing?

8    A.   She was packing up her things, and I heard

9  her saying very loudly, "I was just fired.  She just

10  fired me."

11    Q.   Who was she talking to?

12    A.   Lindsey.

13    Q.   That's Lindsey Wilke.  Right?

14    A.   Yes.

15    Q.   Who spoke next?

16    A.   At that point I believe I asked her for her

17  key.

18    Q.   And what did she do?

19    A.   She gave me her keys.

20    Q.   And then what happened next?

21    A.   I believe she walked in the pharmacy, and I

22  didn't see what she did in there.

185

1    Q.   And then what happened next?

2    **A.   She came out of the pharmacy, and then went**

3  **out the back door.**

4    Q.   When she was in the pharmacy, did you hear

5  anything that she said?

6    **A.   No.**

7    Q.   Did you hear -- who else was in the pharmacy?

8    **A.   I'm not sure.  I didn't see who was in there.**

9    Q.   And then what happened next after she was in

10  the pharmacy?

11    **A.   She came out of the pharmacy, and then walked**

12  **down the hallway and went out the back door.**

13    Q.   Was there any other speaking that you haven't

14  already testified to?

15    **A.   Not that I recall.**

16    Q.   Where was Lynlee during all this?

17    **A.   She was at her desk when I walk around the**

18  **corner.  I don't know where she was at after that.**

19    Q.   Did you speak with Lynlee at that time?

20    **A.   At that time?**

21    Q.   Yeah.  After Joey left, you went back by

22  Lynlee's desk, did you speak to her?  Or did she speak

186

1  with you?

2  **A.  I don't recall.**

3  Q.  Did you speak with Lindsey Wilke at that

4  time?

5  **A.  I don't believe so.**

6  Q.  Did you speak with anyone else at that time?

7  **A.  I don't believe so.  We were busy.  There**

8  **were a lot of clients there.**

9  Q.  When she walked out the door, were there any

10  clients in the waiting area?

11  **A.  I saw two.**

12  Q.  And do you know who they were?

13  **A.  I believe one was Mrs. Baurle.**

14  THE COURT REPORTER:  Baurle?

15  THE WITNESS:  Baurle, yes.  Don't ask me how to

16  spell it.

17  BY MR. GAFFNEY:

18  Q.  Did you ever hear Lindsey Wilke speak to Joey

19  Schmelzer on that occasion?

20  **A.  No.**

21  Q.  After Joey Schmelzer left Lynlee's desk and

22  went to the front desk area, did you continue to see

1   her the entire time until she walked out the door?

2       **A.    With the exception of the time she was in**

3   **pharmacy.**

4       Q.    Oh, you couldn't see her in there?

5       **A.    No.**

6       Q.    How long was she in the pharmacy?

7       **A.    Not long.  A minute or so.**

8       Q.    When she was in the pharmacy, you didn't hear

9   anything?

10      **A.    No.**

11      Q.    And as she was leaving after being in the

12  pharmacy, did you hear anything?  From anyone?

13      **A.    No.  Not that I recall.**

14                          **(Whereupon, the document was marked**

15                          **as Deposition Exhibit No. 78 for**

16                          **identification.)**

17  BY MR. GAFFNEY:

18      Q.    So, I'm going to show you Exhibit 78.

19              Is that a photograph of the waiting area?

20      **A.    Yes.**

21      Q.    So, does that photograph truly and accurately

22  depict the way the waiting area looked as of July 31,

1  2017?

2       A.   Yes.

3       Q.   So, I'm trying to picture now, if I put

4  Exhibit 78 with Exhibit 72, the angle of this camera

5  vis-à-vis the plat, so I'm looking straight at -- in

6  Exhibit 78, I'm looking at a fish tank.  And behind the

7  fish tank there's chairs.  Behind the chairs there

8  appears to be a window.

9            So, when I'm looking that way, where am I

10  at on Exhibit 72?

11       A.   **This is where the camera was at, and there's**

12  **the chairs and the windows there.**

13       Q.   So, the back wall windows in this photograph

14  --

15       A.   **That's the fish tank right there.**

16       Q.   So, okay.  Am I highlighting the fish tank?

17       A.   **Yes, you are.**

18       Q.   So, it's that little rectangular area beneath

19  the arrow that points "client waiting area."  Correct?

20       A.   **Yes.**

21       Q.   And then the exit obviously is marked.

22  Correct?

1    **A.    Correct.**

2    Q.    The exit is not in this picture.  Correct?

3    **A.    Correct.**

4    Q.    So, if -- it looks like on the right-hand

5  side of this Exhibit 78, at the very right edge after

6  the last chair that you see, it looks like there's a

7  wall and a hallway.  Correct?

8    **A.    Correct.**

9    Q.    And that hallway leads where?

10    **A.    To the exam rooms.**

11    Q.    Can you mark on here what hallway you're

12  referring to?

13    **A.    This is the hallway, and this is the cat exam**

14  **room, and a dog exam room.**

15    Q.    So, the exam rooms are those two rooms on the

16  east side of the building, directly to the east of the

17  waiting area.  Correct?

18    **A.    Correct.**

19    Q.    And then so on the wall in question with the

20  chairs, did I just highlight that wall?

21    **A.    Yes.**

22    Q.    So, that's the wall that exists -- the

1  partial wall that exists directly underneath the arrow

2  that says Reception Desk; is that right?

3      **A.    No.   The half wall is right here.   That's a**

4  **full --**

5      Q.    That's a full wall?

6      **A.    Correct.**

7      Q.    Okay.   So, it's a full wall directly beneath

8  the arrow -- the line with the arrow, at the end of the

9  arrow on the right-hand side saying Receptionist Desk?

10     **A.    Correct.**

11                      **(Whereupon, the document was marked**

12                      **as Deposition Exhibit No. 79 for**

13                      **identification.)**

14 BY MR. GAFFNEY:

15     Q.    And Exhibit 79, for what it's worth.   It's a

16 pretty bad version of it.   I'm going to give you one,

17 but I'll let you take a look at the original.   It came

18 out a little clearer.

19     **A.    Okay.   Oh, I see.**

20     Q.    Does that truly and accurately --

21     **A.    Yes.**

22     Q.    -- depict the pharmacy area --

1      **A.    Yes.**

2      Q.    -- as it existed on July 31, 2017?

3      **A.    Yes.**

4      Q.    And then that door we're looking at, that's

5   the pharmacy door on the south side of the room?

6      **A.    Actually, that's the north side.  Since this**

7   **is the north end, this is the north side.  And that's**

8   **the only door that leads into treatment.**

9      MR. DARKE:  Hold on here.  I'm confused.

10  BY MR. GAFFNEY:

11     Q.    Yeah, because you said north was facing --

12     MR. DARKE:  Yeah.

13  BY MR. GAFFNEY:

14     Q.    I had a plat.

15     **A.    You know what, we must have had it switched,**

16  **because in all honestly, what you've got labeled is**

17  **north is south.**

18     Q.    I see.

19     **A.    Which explains why we were confused earlier.**

20     Q.    Yeah.

21     **A.    So, that's the north end.  This is the south**

22  **end.  That explains why we weren't communicating**

192

1  **earlier.**

2     Q.   Yeah.  So, you're right.  So this -- your

3  testimony about east and west is messed up.

4              So, where it says Lynlee's Desk, that's

5  actually the east side of the building?

6     **A.   Correct.**

7     Q.   Where it says Reception Desk, that's actually

8  the west side of the building?

9     **A.   Yes.**

10     Q.   Where it says Scott's Desk, that's actually

11  the north side of the building?

12     **A.   Yes.  Sorry about that.**

13     Q.   I think we got it.  So, the photograph in

14  Exhibit 79 is taken close to the open area that leads

15  through the hallway to the reception area?

16     **A.   Correct.**

17                    **(Whereupon, the document was marked**

18                     **as Deposition Exhibit No. 48 for**

19                     **identification.)**

20  BY MR. GAFFNEY:

21     Q.   I'm going to show you what's been marked

22  previously Exhibit 48, which purports to be an e-mail

1    from Mandy Holt dated September 17th, 2017.

2                    First of all, I'm aware that the date of

3    July 24th is inaccurate.  It really was July 31st when

4    this occurred.  Correct?

5        MR. DARKE:  Objection to the foundation of this

6    document.

7    BY MR. GAFFNEY:

8        Q.   Yeah.  Let me ask you:  Have you seen this

9    before?

10       **A.   Yes.**

11       Q.   This purports to be an e-mail from Mandy

12   Holt.  And the actual occurrence with Joey Schmelzer

13   was July 31st, not July 24th.  Correct?

14       **A.   Yes.**

15       Q.   She states, based on her observation, that

16   the only client in the hospital was in an exam room

17   with her.

18                    Do you know if that's true?

19       **A.   That is incorrect.**

20       Q.   Do you believe there were other clients

21   waiting in the waiting room?

22       **A.   Yes.**

226

1  Schmelzer dated June 30, 2017, where she states:  He

2  also told me wine is good.  And Dr. Milik -- M-i-l-i-k,

3  is full of shit for telling me I can't drink.

4      MR. DARKE:  Objection to foundation.

5  BY MR. GAFFNEY:

6      Q.    Have you seen that one before?

7      **A.    I haven't seen that one before.**

8      Q.    So, you are aware, are you not, that from

9  time to time when clients or customers are not around,

10 people use the "F" word at the clinic?

11     **A.    It can happen from time to time, but it's**

12 **rare.**

13     Q.    Have you ever known of anyone who has been

14 warned or disciplined by use of the "F" word at the

15 clinic?

16     **A.    No.**

17     Q.    And from time to time at the clinic, you've

18 heard Lynlee Wessels use the "F" word?

19     MR. DARKE:  Objection to form of the question.

20     THE WITNESS:  On rare occasion, only when no

21 clients are around.

22

1  BY MR. GAFFNEY:

2      Q.    You indicated that you read some of the

3  declarations of other workers that used to work at the

4  clinic that we produced in this litigation.  Right?

5      **A.    Right.**

6      Q.    And in those declarations, do you recall

7  reading that based on their observations they heard

8  Lynlee Wessels use the "F" word?

9      **A.    I read that, yes.**

10     Q.    And was that one of the reasons why you sent

11  that joke inadvertently to Joey Schmelzer and on

12  purpose to Lynlee Wessels?

13     **A.    Yes.  It was meant to be a joke in reference**

14  **to Mindy White's example.**

15     Q.    Additionally, in the declaration, did you

16  read the other co-workers of Joey Schmelzer provide

17  statements regarding their observations of how Lynlee

18  Wessels treated Joey Schmelzer after the July 8, 2017,

19  meeting?

20     **A.    I read that.**

21     Q.    How many times were you in the presence of

22  Joey Schmelzer and Lynlee Wessels while they were

228

1 working during the course of the day after July 5,

2 2017?

3    **A.    I wasn't a witness to them working together**

4 **very often.**

5    Q.    So, you don't have any recollection of any

6 observations that you made during that timeframe?

7    **A.    No.**

8    Q.    When you and Lynlee Wessels were at or near

9 her desk area on July 31st, when Joey Schmelzer was

10 present that morning where you testified to what

11 everybody said, that area, there's a wall between that

12 area and the front desk area.  Correct?

13    **A.    Yes.**

14    Q.    And it's a wall that goes from the floor to

15 the ceiling?

16    **A.    Yes.**

17    Q.    Are these walls insulated in any way?

18    MR. DARKE:  Objection.  Foundation.

19    THE WITNESS:  I don't know.

20 BY MR. GAFFNEY:

21    Q.    When Lynlee Wessels is at her desk, and she's

22 talking on the phone in a normal telephone voice or

1  talking to someone in that area in a normal voice, do

2  you know if someone at the front desk -- sitting at the

3  front desk would be able to hear it?

4      **A.   I don't believe so.  No.**

5      Q.   If Lynlee Wessels is at her desk speaking

6  loudly, do you know whether or not someone at the front

7  desk would be able to hear it?

8      **A.   Yes.**

9      Q.   What makes you believe that?

10      **A.   Many conversations have gone back and forth**

11  **between Lynlee and the receptionist with neither one of**

12  **them getting out of their chairs.**

13      Q.   So, Lynlee talks through the wall to the

14  receptionist?

15      **A.   Once in a great while.**

16      Q.   You've heard her providing direction or

17  something through the wall, or a request like:  I need

18  something, or something along those lines?

19      **A.   Yes.**

20      Q.   And have you made any other observations of

21  what you can hear through that wall other than that?

22      **A.   No.**

230

1      MR. GAFFNEY:  I think I don't have anymore

2  questions, but give me a little recess.  Are you going

3  to ask anything?

4      MR. DARKE:  Just one or two maybe.

5      MR. GAFFNEY:  Okay.  All right.  Let me see if

6  there's anything that I may have forgotten.

7                          (There was a break taken, after

8                           which the deposition was resumed

9                           as follows:)

10     MR. GAFFNEY:  Back on the record after a short

11 recess.

12 BY MR. GAFFNEY:

13     Q.   I wanted to ask about Melinda White.  You

14 call her Melinda or Mindy?

15     **A.   Mindy.**

16     Q.   There was a period of time where Lynlee had

17 to provide her with some coaching and warnings

18 regarding how she was getting along with her

19 co-workers.  Correct?

20     **A.   Yes.**

21     MR. DARKE:  Objection to foundation.

22

1 BY MR. GAFFNEY:

2      Q.   You were aware that Lynlee requested some of

3 her co-workers to provide her with information about

4 some of the things that Mindy White was saying and

5 doing that others were complaining about?

6      MR. DARKE:  Objection to foundation regarding what

7 someone else is doing.

8      MR. GAFFNEY:  I'm asking about his knowledge based

9 on --

10      MR. DARKE:  On hearsay?

11      MR. GAFFNEY: -- from Lynlee.  Yes.  His knowledge

12 through Lynlee.

13      THE WITNESS:  Yes.  I was aware of that.

14 BY MR. GAFFNEY:

15      Q.   And you were aware that Mindy White did

16 receive warnings regarding some of her conduct.

17 Correct?

18      **A.   Yes.**

19      Q.   Do you know whether or not any warnings were

20 written -- did she ever receive any written warnings?

21      **A.   I don't recall for sure.**

22      Q.   So, she might have, you just don't recall?

1       **A.      Possibly.**

2       Q.      How about Lindsey Wilke, are you aware that

3    she received any written warnings?

4       **A.      I believe she did many years ago, yes.**

5       Q.      I mean, you were the practice manager, at

6    least for part of the time.  Correct?

7       **A.      Correct.**

8       Q.      And as a practice manager, part of your

9    responsibilities is dealing with employees issues?

10      **A.      Certain issues.**

11      Q.      What issues did you deal with primarily?

12      **A.      Payroll, vacation, time off.**

13      Q.      But you had talked to your wife regarding

14   other issues of concern with the workers?

15      **A.      Most of that was her decision.**

16      Q.      And in terms of Lindsey Wilke, for a period

17   of time she was having attendance and tardiness issues?

18      **A.      To the best of my knowledge, yes.**

19      Q.      Do you know she received some warnings

20   regarding her attendance and tardiness problems?

21      **A.      Yes.**

22      Q.      And then she also received a warning

1    regarding her -- how she was -- could be rude to staff

2    members?

3        **A.    I don't recall that one.**

4        Q.    Were you aware that at one period of time

5    there was a concern regarding how Lindsey Wilke was not

6    taking direction from Joey Schmelzer?

7        **A.    Yes.**

8        Q.    And that Lynlee Wessels had to step in and to

9    direct Lindsey Wilke regarding her obligation to

10   cooperate and communicate professionally with Joey

11   Schmelzer?

12       **A.    Yes.**

13       Q.    And that Lynlee Wessels had to warn or

14   discipline Lindsey Wilke regarding conduct that was

15   uncooperative and unprofessional?

16       **A.    I don't recall any discipline.**

17       Q.    Just -- how would you describe it then when

18   she's communicating with Lindsey Wilke regarding those

19   concerns?  You wouldn't call it a warning?

20       MR. DARKE:  Objection as to speculation.

21       THE WITNESS:  It was my impression that in that

22   meeting, they were able to work out their differences.

1  BY MR. GAFFNEY:

2     Q.   To your knowledge, as a practice manager, did

3  Joey Schmelzer have any authority to warn or discipline

4  others?

5     **A.   She had the authority to file a complaint.**

6  **It depends on what the situation was.**

7     Q.   When you say "file a complaint," file a

8  complaint with who?

9     **A.   Lynlee.**

10    Q.   And then are you aware that Lynlee had

11  apprised Joey Schmelzer that, you know, before we would

12  ever fire -- before the clinic would ever fire an

13  employee, they would need to have two warnings for the

14  type of conduct that was at issue before you would fire

15  someone?

16    **A.   I guess that would be based on what the issue**

17  **was.**

18    Q.   Right.  So, obviously if it was a really

19  gross issue, gross misconduct, that you would fire

20  someone for just one incident.  Correct?

21    **A.   I guess, yeah.**

22    Q.   And but if it was not gross misconduct, that

1    you would provide warnings first, and then if it was

2    repeated, you would fire?

3        **A.    Correct.**

4        Q.    And that was the policy and practice at the

5    clinic?

6        **A.    Yes.**

7        MR. GAFFNEY:  All right.  I have no further

8    questions.

9        MR. DARKE:  I just have a few.

10                          EXAMINATION

11                       By:  Mr. Darke

12        Q.    Would you consider yelling at your boss gross

13    misconduct?

14        **A.    Yes.**

15        Q.    You also testified earlier that you received

16    a document from the Department of Labor on July 27,

17    2017.  Correct?

18        **A.    Yes.**

19        Q.    When you received that call or you talked to

20    the Department of Labor, at that time who did you

21    believe may have contacted the DOL?

22        **A.    We believed that it was Jessica.**

1      Q.   Why did you believe it was Jessica?

2      **A.   Because of what Mandy had told us.**

3      Q.   When was the first time you learn from the

4  Department of Labor or from anyone who actually made

5  the call or who didn't make the complaint?

6      **A.   The first time we found out who made the**

7  **complaint was July 31st, from a text from Joey.**

8      Q.   Do you remember what time that was on

9  July 31st?

10     **A.   It was around 11:30.**

11     Q.   Was it after Joey had already left the

12 building?

13     **A.   Yes.**

14     Q.   In May of 2017, you took over the books of

15 the company.  Correct?

16     **A.   Yes.**

17     Q.   How long did it take you to go through the

18 documents that you were provided by Ed Wessels to

19 realize that there was an issue with the IRA account?

20     **A.   It probably took us at least two weeks to get**

21 **a full grasp of what we were in for.**

22     Q.   And then after you looked through all the

1  documents for that two weeks, did you notice there was

2  anything else not being paid for or provided into any

3  of the accounts?

4      **A.    The property taxes were not being saved up**

5  **for.**

6      Q.    And would those have been put into checking

7  account number two that you were testifying to earlier?

8      **A.    Correct.**

9      Q.    Now, you also talked about that you use

10  company cards for gasoline or vehicle maintenance.

11          Was that for business-related issues?

12      **A.    We did use our cars for business errands and**

13  **business, yes.**

14      Q.    And what's your license plate on your car?

15  Do you have a specialized license plate?

16      **A.    On my car, or my wife's car?**

17      Q.    On either car.

18      **A.    My wife's car has a specialized plate.    It**

19  **says AWCM.**

20      Q.    And what does that stand for?

21      **A.    Animal Wellness Center of Monee.    My car, I**

22  **have a plate that says:  New day 1.**

238

1       Q.   When you received the letter -- strike that.

2            If you'd look at document -- I believe

3    it's 17(a).

4       **A.   We'll share.**

5       Q.   That's the document that -- or at least the

6    e-mail that the Department of Labor sent you that

7    letter on July 27.  Correct?

8       **A.   Yes.**

9       Q.   What time was that at?

10      **A.   4:12 p.m.**

11      Q.   Now, if you look at -- if you recall, you

12   testified earlier then on July 27, you also wrote

13   checks to Franklin Templeton for the IRA account.

14           Do you remember what time of day you

15   wrote that check out to -- that check out?

16      **A.   I don't remember.**

17      Q.   Do you recall if it was before or after you

18   received that e-mail?

19      **A.   I think was before, but I'm not positive.**

20      MR. DARKE:  I don't have any other questions.

21      MR. GAFFNEY:  Let me just follow up.

22

RE-EXAMINATION

By:  Mr. Gaffney

1

2

3    Q.   Obviously, you wrote the checks after you

4  received the phone call from the Department of Labor on

5  July 26.  Correct?

6    **A.   Not necessarily.**

7    Q.   Well, you said that you wrote the checks on

8  the 27th.  Right?

9    **A.   Yes.**

10   Q.   And the Department of Labor called on the

11  26th.  Correct?

12   **A.   Oh, yes.  Yes.**

13   Q.   In regards to money put into the -- called it

14  the Ed Wessels account, the second account.  Right?

15   **A.   Yes.**

16   Q.   Do you recall what the balance was as of May

17  -- mid-May 2017?

18   **A.   No, I do not.**

19   Q.   And whatever the balance was in there, that

20  was -- that occurred or accumulated in part because you

21  made deposits of cash from the clinic into that

22  account?

240

1    **A.    Yes.**

2    Q.    Because previously I thought I heard you say

3 that how you funded taxes was to put cash into the Ed

4 Wessels account.  Correct?

5    **A.    Cash and rebates, yes, went into that**

6 **account.**

7    Q.    And then July 31st, 2017, by mid-morning was

8 Joey Schmelzer's last day at work.  Correct?

9    **A.    Yes.**

10    Q.    And then the next day was a workday.

11 Correct?

12    **A.    Yes.**

13    Q.    And you didn't expect her back that day, did

14 you?

15    **A.    No.**

16    Q.    In fact, you already had her keys and other

17 items that belonged to clinic?

18    **A.    Correct.**

19    Q.    As of July -- as of July 31, 2017, Joey

20 Schmelzer's last day, in regards to Jessica McCaslin --

21 let me withdraw that.  Let me start over.

22              As of July 26, 2017, which was the date

1  that the Department of Labor called, as of that date,

2  Jessica McCaslin no longer worked at the clinic.

3  Correct?

4      **A.   Correct.**

5      Q.   In fact, she last worked at the clinic on or

6  about July 11, 2017.  Correct?

7      **A.   Yes.**

8      Q.   So, it had been over two weeks.  Right?

9      **A.   Yeah.  Yes.**

10     Q.   And on or about July 11, 2017, the clinic had

11 paid her money with the money that had been taken out

12 of her payroll account to Franklin Templeton.  Correct?

13     **A.   Yes.**

14     Q.   And the clinic also paid the matching

15 3 percent contribution into the Franklin Templeton

16 account.  Correct?

17     **A.   Yes.**

18     Q.   Which was a 3 percent match.  Well, actually,

19 in her case, I could be mistaken that -- yeah, you paid

20 the 3 percent match.  Correct?

21     **A.   Correct.**

22     Q.   And you also paid the additional 10 percent

242

1  for lost contributions -- lost contributions -- not

2  lost contributions -- lost investment return.  Right?

3      **A.   Correct.**

4      Q.   So, on or about July 12, 2017, all that money

5  was actually sent to Franklin Templeton.  Right?

6      **A.   Repeat the question.**

7      Q.   As of mid-July 2017, all of Jessica

8  McCaslin's money, plus the match, plus the investment

9  loss of 10 percent was already paid into Franklin

10  Templeton.  Correct?

11      **A.   Correct.**

12      Q.   And when you did that, you notified Jessica

13  McCaslin of that.  Correct?

14      **A.   I did.**

15      Q.   And so she was aware that a check had been

16  sent by mid-July into Franklin Templeton to pay her all

17  of her money plus a 10 percent investment loss amount.

18  Correct?

19      **A.   Correct.**

20      Q.   You also knew that when it came to Joey

21  Schmelzer, that nothing had yet been paid as of

22  July 26.  Correct?

243

1    **A.    Correct.**

2    Q.    And you were not aware what day anyone first

3  called the Department of Labor, were you?

4    **A.    No.**

5    Q.    All you knew is that the Department of Labor

6  called on July 26?

7    **A.    Correct.**

8    Q.    And within the next four business days, money

9  had been repaid to Joey Schmelzer's account, and she

10 had been terminated.  Correct?

11    MR. DARKE:  Objection to form of the question.

12    THE WITNESS:  That is correct.

13    MR. GAFFNEY:  No further questions.

14    MR. DARKE:  I don't have any questions.

15    MR. GAFFNEY:  Federal deposition, so signatures

16 are always reserved.  But that's your call actually,

17 not mine.

18    MR. DARKE:  Reserve.

19

20        (AND FURTHER THE DEPONENT SAITH NOT.)

21

22

244

1 STATE OF ILLINOIS  )

                    ) SS.

2 COUNTY OF DU PAGE  )

3      I, JANET L. HAYDEN, C.S.R., in and for the State

4 of Illinois do hereby certify that SCOTT MARHANKA was

5 first duly sworn by me to testify the truth; that the

6 above deposition was recorded stenographically and

7 reduced to typewriting by me; that the deposition is a

8 true, correct and complete transcript of the entire

9 testimony given by the said witness at the time and

10 place hereinabove set forth, and that signature is

11 hereby reserved by said witness.

12      I further certify that I am not counsel for nor

13 in any way related to any of the parties to this suit,

14 nor am I in any way interested in the outcome thereof.

15      In witness hereof, I have hereunto set my hand and

16 affixed my Notarial Seal this 13th day of February,

17 A.D., 2020.

18
                    _____

19                        JANET L. HAYDEN

                          Notary Public

20                   CSR License No. 084-004483

21

22

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

JOYCE E. SCHMELZER,                      )
                                         )
          Plaintiff,                     )
                                         )
          vs.                            ) 1:18 CV 01253
                                         )
ANIMAL WELLNESS CENTER OF MONEE, LLC,)
                                         )
          Defendant.                     )

DISCOVERY DEPOSITION OF

EDWARD WESSELS

November 20, 2018

9:00 a.m.

          Called as a witness by the Plaintiff herein, pursuant to the provisions of the Federal Rules of Civil Procedure pertaining to the taking of depositions for the purpose of discovery, before LINDA M. CIOSEK, C.S.R. No. 084-002892, a Notary Public qualified and commissioned for the State of Illinois, taken at 1771 Bloomingdale Road, Glendale Heights, Illinois.

2

1  PRESENT:

2          GAFFNEY & GAFFNEY, by

           MR. GLENN GAFFNEY

3          1771 Bloomingdale Road

           Glendale Heights, Illinois

4                  Appeared on behalf of the Plaintiff.

5          LITCHFIELD CAVO, LLP, by

           MR. SEAN F. DARKE

6          303 W. Madison Street

           Suite 300

7          Chicago, Illinois  60606

8                  Appeared on behalf of the Defendant.

9  ALSO PRESENT:

10         MR. SCOTT MARHANKA

11         MR. DON SCHMELZER

12         MS. JOYCE SCHMELZER

13

14

15

16

17
                   EXHIBIT D, CASE NO.: 18 CV 1253
18

19

20

21

22

1      **A.**      **May.**

2      Q.      And then so going back to 2016, did you

3  consult with Scott regarding finances during 2016?

4      **A.**      **No.**

5      Q.      Did you consult with Lynlee in 2016 regarding

6  the finances?

7      **A.**      **On a broad basis.**

8      Q.      So you were making -- in the first half of

9  2016 you were making regular contributions of payments into

10  the Franklin Templeton accounts for the employees into the

11  Simple IRA account; correct?

12      **A.**      **That's correct.**

13      Q.      And were you contributing then not only -- in

14  the first half of 2016, you were contributing not only what

15  was being deducted from the employees' payroll, but also the

16  company's 3 percent match?

17      **A.**      **Yes.  There was a transmission sheet created**

18  **by Aaron Sears that broke down the two or three payrolls in**

19  **each month by employee, their portion and company portion in**

20  **total.  And that was the amount that was transmitted, along**

21  **with the sheet, to Franklin Templeton so they could update**

22  **their accounts.**

1     Q.    Was it your understanding there was a deadline

2  or time frame within which to accomplish that?

3     **A.    No, I wasn't.**

4     Q.    What was your pattern and practice in 2015?

5     **A.    Pay it monthly.**

6     Q.    So you would send one check -- would you send

7  one check for all of the employees' contributions and the 3

8  percent match, along with the transmission sheets showing

9  the detail?

10     **A.    That's correct.**

11     Q.    And 2015, you did that monthly?

12     **A.    Yes.**

13     Q.    And then the first half of 2016, were you

14  doing that monthly?

15     **A.    Yes.**

16     Q.    And then do you recall when it was that you

17  made your last monthly contribution in the year 2016?

18     **A.    Probably in the summer.**

19     Q.    And so the last contribution was paid in July

20  for the calendar month of June, 2016?

21     **A.    If that's what it shows, yes.**

22     Q.    And then did you speak with Aaron Sears

EXHIBIT D, CASE NO.: 18 CV 1253

1    regarding stopping the payments to the Franklin Templeton

2    account?

3        **A.    Stopping is not the proper word, nor did I**

4    **talk to Aaron Sears.**

5        Q.    So you never spoke with Aaron Sears about not

6    making monthly contributions into the account in the second

7    half of 2016?

8        **A.    No, it was strictly a cash flow issue.**

9        Q.    Other than making the contributions into the

10   Simple IRA account, what other bills did you discontinue

11   paying in the second half of 2016?

12       **A.    It was virtually a balance left hand, right**

13   **hand-type thing.  The first part of '16 we were confronted**

14   **with issues on some of our major pharmaceutical companies.**

15   **Two, or maybe three, but our two largest ones were bought**

16   **out by other companies in '15 and changed their business**

17   **practices in '16.  As an example, Patterson Veterinarian had**

18   **us with a $50,000.00 credit line.  The new management and**

19   **the new practices were to eliminate the credit lines and**

20   **would only ship product with cash payment already being**

21   **made, so that's why we were strapped, but those two issues**

22   **especially.  And the second half of the calendar year is**

1    usually the slower income year where the revenues are down

2    sometimes maybe 20, 25 percent.  And I just didn't have the

3    money to pay them.

4                        Now, it's important to know that on the

5    balance sheet, the liability accounts for IRA stayed open.

6    They wouldn't erase.  They didn't go away.  We still had the

7    liability to pay them, I just didn't have the money to pay

8    them, and I kept thinking each month, well, I'll pay it next

9    month, and then I just lost it.  But there was several

10   vendors that I got behind on, all of which I had to deal

11   with a lot of phone conversations.  I scheduled payments as

12   tight as I could.  I actually paid bills on anticipated

13   receipts, and we also had an overdraft feature in our

14   checking account that allowed me to tap into that, seeing I

15   had the rent and payroll due at the same time and other

16   bills.

17        MR. GAFFNEY:  I'm going to move to strike as being

18   non-responsive.

19                        Don't worry about that, that's for the

20   judge.

21   BY MR. GAFFNEY:

22        Q.    So, here is my question, though.  Let me

1  restate my question.  So, we know that in the second half of

2  2016 you were not making the monthly contributions into the

3  Franklin Templeton accounts pursuant to the Simple IRA plan,

4  correct?

5       **A.     That's correct.  I was not making them, but I**

6  **wanted to.**

7       Q.     I understand.  I heard that.

8              In the second half of 2016 then you were

9  running late on vendor payments; correct?

10      **A.     Yes, plus we were obliged to pay back all of**

11  **the outstanding bills from unpaid bills from these**

12  **pharmaceutical companies.**

13      Q.     That's a vendor as well; correct?

14      **A.     Yes, that's correct.**

15      Q.     Let's put vendors aside for the moment.  Other

16  than vendors and the Simple IRA plan contributions, were any

17  other bills not being paid?

18      **A.     No.  I had priorities, obviously, with**

19  **payroll.  No payroll checks bounced.  I had legal**

20  **obligations for payroll taxes, both employee and employer.**

21  **I had obligations to contractual debt for working capital**

22  **loans, equipment leases, mortgage, and things like that.**

1     Q.     So all of those were paid timely in 2016?

2     **A.     Yes.  I had no choice on them.**

3     Q.     And then in 2017, up until the time that you

4 transitioned over to Scott, was the same true in 2017 as

5 well?

6     **A.     By early or mid -- spring of 2017, most of**

7 **those bills that we were making up for from the**

8 **pharmaceutical companies were caught up, and revenue with**

9 **our new doctor had increased substantially, so we worked**

10 **ourselves out of the problem in mid-2017.**

11     Q.     When you say mid, was it by May, by the time

12 you transitioned over to Scott?

13     **A.     Pretty much so.  There may have been a few**

14 **outstanding.  Some vendors were very tolerant, like TKR, the**

15 **cremation company, that we were as far behind as $7,000.00**

16 **we owed them at some points in time.**

17     Q.     So that's a vendor issue; right?

18     **A.     Uh-huh.**

19     Q.     You're indicating, though, in 2016, the second

20 half of 2016 and the first half of 2017, all the payroll was

21 paid timely; correct?

22     **A.     All contractual obligations were paid timely.**

EXHIBIT D, CASE NO.: 18 CV 1253

1    Q.    Now in 2016, did you receive any notifications

2   from anyone at Franklin Templeton or your insurance person

3   that set up the account regarding the contributions?

4    **A.    No.  He has long since not been our insurance**

5   **account by that time.  I saw no notices from Franklin**

6   **Templeton or the insurance page.**

7    Q.    In 2017, did you see any notices from Franklin

8   Templeton regarding the contributions or lack thereof?

9    **A.    No.**

10    Q.    Now, were you aware that Aaron Sears was

11   continuing to show the Simple IRA company withholdings

12   coming out of all the employee's payroll accounts; right?

13    MR. DARKE:  Objection to form of the question and

14   foundation.

15   BY MR. GAFFNEY:

16    Q.    Were you aware of that?

17    **A.    Yes.  All the accounts were intact.**

18    Q.    And you were aware that Aaron Sears was

19   showing that the company was continuing to match employee

20   contributions into the Simple IRA accounts?

21    **A.    From what he understood, yes.**

22    Q.    So, at the end of 2016, Aaron Sears -- after

1 2016, Aaron Sears needed to prepare the 2016 tax return for

2 Animal Wellness Center; right?

3     **A.**    **Yes.**

4     Q.    And did you consult with Aaron Sears regarding

5 that?

6     **A.**    **No.**

7     Q.    Did you apprise Aaron Sears that in the

8 calendar year 2016, that the company did not, in fact, make

9 all of the contributions into the Franklin Templeton account

10 so he could adjust for that in the 2016 tax return?

11     **A.**    **No, I did not.  It fell through as normal.**

12     Q.    I'm sorry?

13     **A.**    **It was processed as it was paid, I believe.**

14     Q.    Okay.  So your understanding was that Aaron

15 Sears prepared the 2016 Federal and State tax returns as if

16 all of the Simple IRA company matches were paid on a regular

17 basis?

18     **A.**    **Yes.  I didn't inform him that they were not.**

19     Q.    You didn't believe that was something that

20 Aaron needed to know?

21     **A.**    **I was always under the impression that we were**

22 **going to pay it absolutely as quickly as we could with**

EXHIBIT D, CASE NO.: 18 CV 1253

1 **interest, and that was my concern.**

2      Q.      But you did know, correct, that the 2016 tax

3 return was inaccurate, at least in part, as it relates to

4 the company's contributions to the Simple IRA plan?

5      **A.      Yes, I considered that --**

6      MR. DARKE:  Hold on, hold on.  Objection to

7 foundation of the question regarding taxes.  He's already

8 testified that Aaron Sears handled all the taxes.

9      MR. GAFFNEY:  I understand that, but you can answer.

10 Go ahead.

11      THE WITNESS:  Say the question again.

12 BY MR. GAFFNEY:

13      Q.      You were aware that the 2016 tax return for

14 AWC would have reported that all of the Simple IRA company

15 match payments had been made?

16      **A.      I should have been aware of that, but I don't**

17 **really know I remembered that.**

18      Q.      So then you would have been aware that the

19 2016 tax return prepared by Aaron Sears would have been

20 inaccurate in that regard?

21      **A.      Yes, but that's -- compared to the volume of**

22 **monies going through the organization, that was an**

1  **insignificant amount.**

2      Q.      Why did you choose to not pay the Simple IRA

3  accounts in the second half of 2016 and in the first half of

4  2017, other than not pay some other items?

5      **A.      Everything I paid had to be paid or face**

6  **penalties.   This was, I guess, the path of least resistance.**

7      Q.      Did you consider asking Scott Marhanka or

8  Lynlee to take less money in salary in order to make sure

9  that these Simple IRA plan contributions were made on a

10  timely basis?

11      **A.      No, I did not.**

12      Q.      Now, in 2016 did AWC hire someone to consult

13  regarding advertising or revenue?  Did you hire a

14  consultant?

15      **A.      Lynlee did.**

16      Q.      Did you discuss that with Lynlee, the hiring

17  of a consultant?

18      **A.      She only told me it was necessary in order to**

19  **maximize the revenue.**

20      Q.      And do you recall when the consultant was

21  hired?

22      **A.      No, I do not.  I wasn't involved with it.**

EXHIBIT D, CASE NO.: 18 CV 1253

1  opportunity to do that, but I don't know.  Like today, I

2  think she's seeing 15 or 18 patients and has a major surgery

3  scheduled.

4      Q.    Surgeries are once per week; right?

5      A.    Not like today.  There was a dog scheduled

6  yesterday that has an obstruction somewhere, and they're

7  doing -- what do they call that?  Help me, Joey.

8      MR. GAFFNEY:  I don't think it's necessary.  We won't

9  worry about that.

10     MR. DARKE:  We're going off the rail here.

11     MR. GAFFNEY:  I have no further questions.

12     MR. DARKE:  I don't have any questions.

13     MR. GAFFNEY:  Thank you, Mr. Wessels, very much.

14     MR. DARKE:  We'll reserve.

15

16

17          AND FURTHER DEPONENT SAITH NOT

18

19

20          EXHIBIT D, CASE NO.: 18 CV 1253

21

22

102

1  STATE OF ILLINOIS      )
                          )  SS.
2  COUNTY OF DU PAGE      )

3
              I, LINDA M. CIOSEK, C.S.R. No. 084-002892,
4  a Notary Public in and for the County of DuPage, State of
   Illinois, do hereby certify that at the request of MR. GLENN
5  GAFFNEY, subject to the usual terms and conditions of County
   Court Reporters, Inc, that EDWARD WESSELS was first duly
6  sworn by me to testify the truth; that the above deposition
   was recorded stenographically and reduced to typewriting by
7  me; that the deposition is a true, correct and complete
   transcript of the entire testimony given by the said witness
8  at the time and place hereinabove set forth, and that
   signature is hereby reserved by said witness.

9
              I further certify that I am not counsel for,
10 nor in any way related to any of the parties to this suit,
   nor am I in any way interested in the outcome thereof.

11
              In Witness Whereof:  I have hereunto set my
12 hand and affixed my Notarial seal this 23rd day of April,
   A.D. 2019.

13

14                     _Linda Ciosek_
                  -------------------------------
15                     LINDA CIOSEK, CSR

16

17

   My Commission expires:

18
   July 3, 2022.

19

20

21            EXHIBIT D, CASE NO.: 18 CV 1253

22